## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JEROME L. JOHNSON,** | * |
| 939 Zenith Drive, | |
| Freeland, MD 21053 | * |
| | |
| Plaintiff, | * |
| | |
| v. | *   Civil Action No. 1:19-cv.00698 |
| | |
| **BALTIMORE POLICE** | *   **JURY DEMAND** |
| **DEPARTMENT,** | |
| | * |
| **Serve on:** | |
| Acting Commissioner Michael Harrison | * |
| 601 E. Fayette Street | |
| Baltimore, MD 21201, | * |
| | |
| **KEVIN DAVIS** | * |
| 33226 Parker House Road | |
| Ocean View, DE 19970 | * |
| | |
| **FRANK BARLOW** | * |
| 9113 Bowline Road | |
| Nottingham, MD 21236 | * |
| | |
| **DANIEL BOONE** | * |
| 10 Bannock Court | |
| Randallstown, MD 21133, and | * |
| | |
| **GERALD GOLDSTEIN** | * |
| 115 Dolomite Drive | |
| York, PA 17408, | * |
| | |
| Defendants. | * |

\*      \*      \*      \*      \*      ooo0ooo      \*      \*      \*      \*      \*

## <u>COMPLAINT</u>

Plaintiff Jerome L. Johnson, by his undersigned attorneys, files this Complaint against the

Baltimore Police Department ("BPD"), and Kevin Davis, Frank Barlow, Daniel Boone, and

Gerald Goldstein ("Officer Defendants") for violating his rights and causing his wrongful incarceration.

## INTRODUCTION

1.      Plaintiff Jerome L. Johnson lost nearly 30 years of his life in prison for a murder he did not commit.

2.      In March 1989, Mr. Johnson received a life sentence plus 20 years after a jury wrongly convicted him.

3.      Until July 2018, when the Baltimore State's Attorney's Office exonerated him and asked for his release after its investigation, Mr. Johnson spent nearly three decades in prison because of the unconstitutional conduct of the Officer Defendants.  The BPD's customs, policies, and practices sanctioned the Officer Defendants' unconstitutional conduct.

4.      The Officer Defendants suppressed evidence favorable to Mr. Johnson, resulting in his wrongful arrest, prosecution, conviction, and incarceration.

5.      Most egregiously, the Officer Defendants concealed a police report containing a statement from the State's star witness—the only witness to implicate Mr. Johnson at trial—that contradicted her trial testimony.  This statement, taken minutes after the murder of Aaron Taylor, confirmed that Mr. Johnson did not commit the murder.  The star witness told BPD officers that she saw the shooter, a man named Alvin Hill, pull a gun out of his waistband.  That night, she never mentioned Mr. Johnson (whom she knew from the neighborhood), and her description of the shooting was inconsistent with Mr. Johnson being present or involved.  The Officer Defendants never disclosed this crucial statement.  Additionally, they failed to disclose the police report, which contained the statement, to the Assistant State's Attorney, Mr. Johnson, or his defense attorney.  Under constitutionally impermissible pressure from the BPD, the witness later

falsely testified that Mr. Johnson was both present at the crime scene and handed Mr. Hill the gun.

6.    Because of the Defendants' misconduct, Mr. Johnson's criminal defense attorney had no knowledge of that police report or the witness's original statement and could not use them at trial to help prove Mr. Johnson's innocence.  Nor could Mr. Johnson's attorney use the report to impeach the Officer Defendants—who suppressed the report—and more importantly, to impeach the 15-year-old star witness—who had told multiple inconsistent versions of her story.

7.    In fabricating a narrative that Mr. Johnson played a central role in the murder and concealing exculpatory and impeachment evidence, the Officer Defendants acted in accord with BPD customs, policies, and practices.  The Officer Defendants' misconduct in Mr. Johnson's case was part of a pattern of misconduct within the BPD in the years prior to Mr. Johnson's arrest and conviction.

8.    From the day the State wrongly accused him, Mr. Johnson never stopped trying to prove his innocence.  He repeatedly and exhaustively challenged his convictions in court (more than 15 times in total).  Twenty-two years after his conviction, in 2011, Mr. Johnson uncovered the exculpatory police report suppressed by the Officer Defendants.  It took another seven years for a court to grant him his freedom.

9.    On July 2, 2018, the Conviction Integrity Unit of the Baltimore City State's Attorney's Office—the same office that wrongfully prosecuted Mr. Johnson in 1989— recognized his innocence and joined him in filing a petition to vacate his convictions.  The State's Attorney's Office determined that the Officer Defendants' police report was kept "undisclosed" prior to Mr. Johnson's trial.

10.     That same day, the Circuit Court for Baltimore City granted the Joint Petition for Writ of Actual Innocence and ordered Mr. Johnson's immediate release from his nearly three decades-long wrongful incarceration.  That day, after having spent more than half of his life in prison, Mr. Johnson walked free.

11.     During his nearly 30 years in prison, Mr. Johnson suffered extensive physical and emotional pain.  Incarceration stole from him the prime of his life.  More than once, he sustained life-threatening injuries at the hands of other inmates.  Mr. Johnson lost the chance to raise his only child, a daughter born the day after he was arrested.  Correctional authorities would not allow him to attend his mother's funeral in 1995 or his father's in 2004.  He lost his family and friends because so many believed him to be a murderer.  The Department of Corrections transferred Mr. Johnson over a dozen times as standard operating procedure.  With each transfer, the innocent Mr. Johnson suffered threats to his safety and security and slights to his humanity and dignity.

12.     This lawsuit seeks redress for the injuries Mr. Johnson sustained as the result of Defendants' unconstitutional misconduct.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 to redress the deprivation under color of law of Mr. Johnson's rights as secured by the United States Constitution.

14.     This Court has both federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to this Complaint occurred in this judicial district.

- 4 -

16.     On September 21, 2018, counsel for Mr. Johnson sent the Baltimore City Solicitor notice of Mr. Johnson's claims.

17.     Other than an email exchange between the City Solicitor and Mr. Johnson's attorneys, the City of Baltimore never formally responded to the tort claims notice.

18.     On September 21, 2018, counsel for Mr. Johnson sent the Treasurer of the State of Maryland notice of his claims.

19.     The State denied Mr. Johnson's claims in a letter dated September 26, 2018.

## THE PARTIES

20.     Plaintiff Jerome L. Johnson is 51 years old.  He was born and raised in Baltimore, Maryland.

21.     At all times relevant to this Complaint, Defendants Kevin Davis, Frank Barlow, Daniel Boone, and Gerald Goldstein were employees of the Baltimore Police Department, acting under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and usage of the Baltimore Police Department.  Mr. Johnson sues Messrs. Davis, Barlow, Boone, and Goldstein in their individual capacities.

22.     Defendant Baltimore Police Department employs or has employed each of the foregoing individual defendants.  It is a "person" within the meaning of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

**A.     Mr. Johnson had no involvement in the murder of Aaron Taylor.**

23.     Just after 1:00 a.m. on July 14, 1988, four men approached Aaron Taylor on a basketball court in Northwest Baltimore.  The men argued, and Mr. Taylor fled into the nearby Nite Owl Tavern, at 3602 Woodland Avenue, followed by one of the four men, Alvin Hill.

24.     Mr. Hill pulled a gun from his waistband.  Mr. Taylor attempted to use a bar patron as a shield, but the patron broke free.  Mr. Hill then fired several shots at Mr. Taylor, killing him.

25.     Mr. Johnson was not part of the group that confronted Mr. Taylor.  Mr. Johnson had no involvement in his murder.

26.     At the time Mr. Hill shot Mr. Taylor, Mr. Johnson was at the corner of Reisterstown Road and Lucille Avenue, a few hundred feet from where he had lived since he was seven.

27.     Mr. Johnson was with his childhood friend, Alvin Morgan.

28.     Two plainclothes BPD Officers, including Officer Steve Owens, were nearby in an unmarked car when the shots rang out.  Officer Owens got out of the car and chased two of the men involved in the murder along an alley behind the houses on Lucille Avenue.

29.     Mr. Johnson and Officer Owens had gone to high school together, and when Officer Owens emerged from the alley, the two saw and spoke with one another.  Mr. Johnson told Officer Owens that he had heard multiple shots.

30.     At that point, Mr. Johnson, along with Mr. Morgan, went to Mr. Morgan's grandmother's house located at 3512 Lucille Avenue.

**B.      Minutes after the murder, Officer Kenneth Jones responded to the scene and took a statement from 15-year-old L.S. that exonerated Mr. Johnson.**

31.     After Mr. Hill shot Mr. Taylor, officers of the BPD responded to the crime scene at 3602 Woodland Avenue.

32.     Officer Kenneth Jones was one of the responding officers.

33.     The responding officers observed the body of Aaron Taylor and called over the police radio for BPD Homicide Detectives to come to the scene.

34.     Detective Kevin Davis arrived on scene approximately 15 minutes after the first responding officers.

35.     The responding officers and Detective Davis located individuals who had witnessed Mr. Hill shoot Mr. Taylor, including the owner of the Nite Owl Tavern and the bar patron who had been used as a human shield.

36.     They also located a 15-year-old girl, L.S.,[1] who was Mr. Taylor's cousin.  BPD Officer Jones and Detective Davis spoke with L.S. at or about 1:50 a.m., approximately 30 minutes after the murder.

37.     Shortly before the shooting, L.S. had been at her home with Mr. Taylor, her friend T.L.,[2] and a family friend known as Quinton.  At some point, Mr. Taylor left to ride his bike to the Nite Owl Tavern.  A few minutes later, L.S., T.L., and the family friend left to walk to the bar and were in the vicinity during the murder.

38.     Officer Jones authored a police report the same day, July 14, 1988, which documented the conversation he and Detective Davis had with L.S. shortly after the murder (the "July 14 Report").

39.     As detailed in the July 14 Report, L.S. told the police that the suspect "came into the bar, pulled a black + brown gun (unknown caliber) from his waist band, and held it down towards the floor."

40.     L.S. said that she then saw Mr. Taylor grab a bar patron and use him as a human shield.

---

[1] In compliance with the principle that a juvenile's actions should remain protected from the public, Plaintiff is not revealing the full name of L.S.; she was a juvenile when she provided her exonerating statement to the BPD and when she testified at trial.

[2] *See supra* note 1.

41.     L.S. explained that the bar patron broke free and fell to the ground, at which point Mr. Hill twice said that he was going to kill Mr. Taylor.

42.     L.S. stated that she ran from the bar at that point and, while running away, heard five shots.

43.     L.S. told Officer Jones that there were three men with the shooter when they were outside the Nite Owl Tavern, all of whom ran from the scene.

44.     L.S. provided a description of the shooter.

45.     Officer Jones wrote and signed his name on the bottom-left hand corner of the July 14 Report.

46.     On the bottom-right-hand corner of the July 14 Report, Detective Davis signed his name under the heading "Supervisor Approving."

47.     L.S. saw the shooter—Alvin Hill—on July 14, 1988.  She gave Officer Jones and Detective Davis a description of Mr. Hill that night.

48.     L.S.'s statement from the night of the murder, as detailed in the July 14 Report, reflects the true version of events.  The Defendants never turned that statement over to the State's Attorney's Office or to Mr. Johnson, thereby violating Mr. Johnson's due process rights.

49.     Notably, L.S.'s statement from the night of the murder (a) did not mention Mr. Johnson; (b) did not mention any handoff of a gun from Mr. Johnson to Mr. Hill; and (c) mentioned only four suspects (none of whom was Mr. Johnson, whom she knew previously from the neighborhood).

**C.     The Officer Defendants' misconduct.**

50.     Defendant Detective Kevin Davis was the lead investigator in the murder of Aaron Taylor.

51.     Defendant Detectives Frank Barlow, Daniel Boone, and Gerald Goldstein were members of BPD's Homicide Unit with Detective Davis.  Together, these Defendants investigated the Taylor murder, and they all knew of the undisclosed July 14 Report.

52.     From the outset of their investigation, the Officer Defendants, collectively and individually, conspired to suppress the July 14 Report and other exculpatory and impeachment evidence.  Instead of turning over all evidence to the State's Attorney's Office for an independent review by the prosecutor, the Officer Defendants selectively disclosed evidence that conformed to their narrative that Mr. Johnson was guilty and should be convicted of murder.

53.     Detectives Davis, Barlow, Boone, and Goldstein wrongly decided that Mr. Johnson was involved in the murder of Aaron Taylor.

54.     Despite Mr. Johnson's innocence, the Officer Defendants perpetuated a false narrative that added Mr. Johnson to the group that confronted Mr. Taylor outside of the bar and had Mr. Johnson handing Mr. Hill the gun used to murder Mr. Taylor.

55.     The Officer Defendants' conspiracy to suppress the July 14 Report is evident from their actions throughout the course of the investigation.

56.     On July 19, 1988, Detective Davis and Detective Barlow interviewed L.S. and her mother at the Violent Crimes Section of the State's Attorney's Office.

57.     Detective Davis prepared a formal report regarding this interview ("July 19 Report").

58.     The July 19 Report contains a statement from L.S. that is inconsistent with the statement she provided on the night of the murder (July 14) in several material respects, such as where she was standing during the murder, the people who were present, and the number of guns involved.

59.     In the July 19 Report, Detective Davis wrote that L.S. observed Mr. Johnson give the shooter a small handgun when they were standing outside the bar, that the shooter pointed the gun at the victim, and clicked it twice without the gun firing.  This contradicts L.S.'s statement on the night of the murder.

60.     Detective Davis also wrote in the July 19 report that L.S. ran into the store right behind the victim and then fled after the first shot—hearing three more as she ran away.  This, too, contradicts L.S.'s statement on the night of the murder.

61.     The July 19 Report was whited out in three places.

62.     The first two white-outs refer to the number of suspects involved in the murder. In place of whatever number was typed in the July 19 Report, the number "5" was inserted by hand.

63.     The third white-out refers to the number of suspects who accompanied the shooter.  In place of whatever number was typed in the July 19 Report, the number "4" was inserted by hand.

64.     Detective Davis took handwritten notes of the July 19, 1988, interview with L.S.

65.     There are material inconsistencies between Detective Davis's handwritten notes dated July 19, 1988, and the typewritten July 19 Report.

66.     According to his handwritten notes, L.S. was inside the bar when four shots were fired.  In the July 19 Report, Detective Davis wrote that L.S. was outside the bar when the gun misfired, ran into the bar right behind her cousin, and then fled after the first shot.

67.     Detective Davis's handwritten notes reflect that L.S. was accompanied by a friend and her mother's friend.

68.     Despite this knowledge, the Officer Defendants never interviewed T.L. or Quinton and did not disclose any efforts to interview those individuals to Mr. Johnson or his defense attorney.

69.     On information and belief, Detectives Davis and Barlow pressured L.S., a traumatized 15-year-old who had witnessed the murder of her cousin, into falsely adding Mr. Johnson to her account of who was involved in the murder of her cousin.

70.     On information and belief, the Officer Defendants purposefully altered the number of suspects in the July 19 Report to allow the addition of Mr. Johnson as one of the suspects.

71.     In both the typed July 19 Report and his handwritten July 19 notes, Detective Davis failed to mention that L.S.'s statement differed materially from her July 14 statement.

72.     Detectives Davis, Barlow, Boone, and Goldstein never disclosed the fact that they obtained L.S.'s new version of events by pressuring her.

73.     The Officer Defendants never disclosed the fact that the July 19 Report left out L.S.'s failure to implicate Mr. Johnson in her July 14 statement.

74.     The false statements provided by L.S were the lynchpin of the state's case against Mr. Johnson.

75.     Along with failing to turn over the July 14 Report, Detectives Davis, Barlow, Boone, and Goldstein never disclosed the July 19 Report or the July 19 handwritten notes to the prosecutor, Mr. Johnson, or Mr. Johnson's criminal defense attorney.

76.     At every step of the investigation following the July 19 interview of L.S., the Officer Defendants suppressed the July 14 Report and L.S.'s original statement.

77.     For instance, on July 28, 1988, the Officer Defendants submitted an Application for Statement of Charges/Statement of Probable Cause against Reginald Dorsey, one of the alleged co-defendants, on the same date that Detectives Davis and Boone met with Mr. Dorsey.

78.     The Application for Statement of Charges/Statement of Probable Cause against Mr. Dorsey referred only to L.S.'s second (July 19) statement—it did not include L.S.'s conflicting statement from the night of the murder.

79.     Beginning in July 1988, a grand jury convened to decide on charges.

80.     The Officer Defendants presented L.S. to the grand jury on July 28, 1988, and L.S. testified to the version of events that had been suggested to her by Detectives Davis and Barlow on July 19, 1988.

81.     Detectives Davis, Barlow, and Boone were listed as witnesses before the grand jury.

82.     The Officer Defendants completed an Application for Statement of Charges/Statement of Probable Cause against Mr. Johnson, which Detective Davis signed.

83.     In the Application for Statement of Charges/Statement of Probable Cause, the Officer Defendants omitted any reference to Officer Jones, the July 14 Report, or L.S.'s statement on July 14.

84.     Police officers have an obligation to disclose all material information, including information harmful to their cases, in an Application for Statement of Charges/Statement of Probable Cause and for an arrest warrant, so that a neutral judge can make a probable cause determination.

85.     The Officer Defendants prepared and obtained an arrest warrant for Mr. Johnson

on the basis of the statements that they had suggested to L.S. and without disclosing L.S.'s

statements on the night of the murder.

86.     On October 24, 1988, the Officer Defendants arrested Mr. Johnson.

87.     On that date, Mr. Johnson freely spoke with Detectives Davis and Goldstein about

the night of the murder.

88.     During this interview, Mr. Johnson denied being involved in the murder of Mr.

Taylor.  Mr. Johnson offered to take a polygraph test and truthfully stated that he was standing

on the corner of Reisterstown Road and Lucille Avenue with his friend Alvin Morgan at the

relevant times.

89.     Mr. Johnson further stated that he spoke with Officer Owens on the night of the

murder, and he described the clothes worn by Officer Owens that night.

90.     Despite knowledge of Mr. Johnson's conversation with Officer Owens, as well as

the fact that Officer Owens was present (in an undercover capacity) at 3610 Lucille Avenue, the

Officer Defendants never spoke with Officer Owens or investigated the truthfulness of Mr.

Johnson's statement that he saw and spoke with Officer Owens.

91.     On information and belief, the Officer Defendants never spoke with Alvin

Morgan or investigated the truthfulness of Mr. Johnson's statement that he was standing with

Mr. Morgan.

92.     On November 10, 1988, Detective Goldstein testified before the Grand Jury about

Mr. Johnson's alleged participation in the offense.  Despite knowledge of L.S.'s exculpatory

statement to Officer Jones on the night of the murder, Detective Goldstein deliberately concealed

information exonerating Mr. Johnson.

93.     Throughout the course of their investigation, Defendants Davis, Barlow, Boone, and Goldstein collectively prepared "Prosecution Reports" that conveyed the evidence they had collected, which they then shared with the prosecutor.

94.     The Officer Defendants continued to suppress the existence of the July 14 Report from the night of the murder in these Prosecution Reports.  For instance, the Prosecution Reports made no reference to Officer Jones.

95.     On information and belief, the Officer Defendants investigated the case for several weeks before the prosecutor, Albert Phillips, became involved in the case.  Detectives Davis, Barlow, Boone, and Goldstein suppressed and failed to reveal the July 14 Report both before and after Mr. Phillips became involved in the case.

96.     Closer to trial, the State submitted a list of witnesses that it anticipated calling at trial.  The list includes Detectives Davis, Barlow, and Boone, as well as Officer Mayes.  Because Defendants had failed to disclose all exculpatory evidence (*e.g.*, the July 14 Report) to the prosecutor, the State did not include Officer Jones on its witness list.

97.     In February 1989, the month before trial, Mr. Johnson's criminal defense attorney, Gordon Tayback, filed a discovery request, asking that he be provided copies of all police reports from the investigation pertaining to Mr. Johnson.

98.     Because the prosecutor did not have a copy of the July 14 Report and was not aware of its existence, no copy of that report was ever provided to Mr. Tayback for his use at trial.

99.     On information and belief, at no point before, during, or after trial did the Officer Defendants disclose the two witnesses who were present with L.S. on the night of the murder or any efforts to contact those individuals.

100.    On information and belief, the Officer Defendants met with L.S. multiple times in the lead-up to the trial, continuing to pressure her to incriminate Mr. Johnson.

101.    Detectives Davis, Barlow, Boone, and Goldstein further failed to conduct an adequate investigation into the murder of Mr. Taylor by, among other things, failing to speak with Officer Owens, T.L., or Quinton.

**D.    Mr. Johnson's trial and wrongful conviction.**

102.    Mr. Johnson's trial began on March 9, 1988, and lasted five days.

103.    The Officer Defendants' misconduct continued in court.  The Officer Defendants not only failed to disclose the existence of the July 14 Report and the July 19 Reports, but they affirmatively led the relevant parties to believe no such evidence existed.

104.    Detective Davis testified at a pre-trial hearing on March 9, 1988.

105.    During the hearing, Detective Davis concealed the fact that the BPD took a statement from L.S. at the scene shortly after the murder.

106.    Detective Davis testified that because L.S. was in such an emotional state on the night of the murder, he sent her home with her mother and did not take a statement from her until July 19, 1988, five days after the murder.

107.    Detective Davis knowingly misled the prosecutor, judge, jury, Mr. Johnson, and Mr. Johnson's defense attorney (as well as Mr. Johnson's co-defendants and their attorneys) into believing that L.S. first gave a statement to the police on July 19, 1988.

108.    Detective Davis testified during the trial on March 14, 1988.

109.    Detective Davis again misled all parties by testifying that the first time L.S. was interviewed was on July 19, 1988—not July 14, 1988.

110.    At trial, attorney Gordon Tayback continued to represent Mr. Johnson.

- 15 -

111.     When Mr. Tayback asked Detective Davis what information L.S. had provided concerning Mr. Johnson's actions, Detective Davis discussed the July 19, 1988, interview of L.S.

112.     Detective Davis never disclosed the July 14 Report, or even the fact that L.S. provided a statement on July 14, 1988.

113.     Officer Jones was never mentioned at Mr. Johnson's criminal trial.

114.     Without knowledge of the July 14 Report or the July 19 Report, Mr. Tayback could not use that information for cross-examination.

115.     When Mr. Tayback asked Detective Davis on cross-examination whether he prepared a formal report of the July 19, 1988, interview of L.S., Detective Davis knowingly misstated that he had not.

116.     Without the July 19 Report, Mr. Tayback could not impeach Detective Davis regarding the three redactions and hand-written changes to the July 19 Report.

117.     Without either the July 19 Report or Detective Davis's handwritten notes from the July 19, 1988, interview of L.S., Mr. Tayback could not question Detective Davis on the serious inconsistencies between that report and his notes.

118.     When 15-year old L.S. took the stand, she again changed her version of what happened on the night of the murder.

119.     At trial, L.S. testified that the shooter pulled a handgun from his waistband while the men were arguing outside the bar, but that the gun misfired.

120.     L.S. testified that Mr. Johnson handed a second gun to the shooter, who then chased the victim into the bar and used that gun to kill the victim.

121.     L.S. was the sole civilian witness who implicated Mr. Johnson as having any involvement in the crime.

122.    No physical evidence connected Mr. Johnson to the crime.

123.    Based on L.S.'s testimony, the jury convicted Mr. Johnson of first-degree murder and the use of a handgun in the commission of a felony.

124.    The prosecution, defense, judge, and jury never learned of the exculpatory evidence the Officer Defendants suppressed, including L.S.'s statement from the night of the murder; the July 14 Report; the existence of the formal July 19 Report; or that two other witnesses were present with L.S. at the time of the murder.

**E.    Mr. Johnson's nearly 30-year fight for freedom.**

125.    Mr. Johnson maintained his innocence following the verdict in 1988.

126.    Mr. Johnson filed a Motion for a New Trial, which outlined the truth: "[Mr. Johnson] was not at the scene of the crime, or involved directly therein."

127.    On June 2, 1989, the Court sentenced Mr. Johnson to life in prison plus 20 years to be served consecutively.

128.    Mr. Johnson's efforts to establish his innocence took nearly three decades.

129.    Mr. Johnson filed a direct appeal of his conviction, but the Court of Special Appeals affirmed the judgment.

130.    Mr. Johnson repeatedly and exhaustively challenged his convictions in post-conviction proceedings.  For decades, state and federal courts rejected his efforts.

131.    Mr. Johnson did not learn of the July 14 Report until 2011.

132.    Mr. Johnson ultimately obtained counsel who, on a pro bono basis, brought the evidence establishing Mr. Johnson's innocence to the attention of the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorney's Office.

133.    The CIU launched its own investigation and encouraged the Mid-Atlantic Innocence Project to join Mr. Johnson's post-conviction attorney in representing Mr. Johnson, which it agreed to do.

134.    Nearly 30 years after giving her statement as reflected in the July 14 Report, L.S. was interviewed by CIU prosecutors in May 2018.  At that time, L.S. gave the same statement to CIU prosecutors that she had given to Officer Jones on the night of the murder: that three men were with Alvin Hill when he confronted the victim outside of the bar, that Hill carried one gun, that Hill chased the victim inside the bar and shot him.  She made no mention of a second gun being handed to Mr. Hill (by Mr. Johnson or anyone else) after the first gun misfired.  As on the night of the murder, L.S. made no mention whatsoever of Mr. Johnson.

135.    The CIU's investigation also revealed "uncontroverted evidence that supports that [Thomas] Carroll and [Reginald] Dorsey were the ones that LS saw at the scene of the murder and not Johnson, most compelling is that Carroll and Dorsey themselves state that they were with the Shooter and were well known to the older siblings of LS."

136.    In light of the overwhelming evidence of Mr. Johnson's innocence, the State's CIU took the rare step of joining him in requesting that his convictions be vacated.

137.    The resulting Joint Petition for Writ of Actual Innocence acknowledged that neither the July 14 Report nor L.S.'s initial statement was disclosed and further recognized that the "differences between L.S.'s first statement" and her "subsequent statements were even more profound than the internal inconsistencies in her trial and grand jury testimonies."

138.    The Joint Petition concluded by stating, "The State and Petitioner assert that if the aforementioned evidence was presented alongside the evidence presented to the jury, it is probable that the outcome would have been different."

139.     On July 2, 2018, the Circuit Court for Baltimore City held a hearing, granted the Joint Petition for Writ of Actual Innocence, and vacated the convictions.

140.     The State then dismissed each of the counts against Mr. Johnson.

141.     That day, for the first time in nearly 30 years—more than half his life—Mr. Johnson walked free.

**F.     The Baltimore Police Department's policy and practice of suppressing exculpatory and impeachment evidence.**

142.     The unconstitutional conduct at issue in Mr. Johnson's case is part of a longstanding pattern and practice of suppressing exculpatory and impeachment evidence, sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which the BPD had actual or constructive knowledge.

143.     The BPD has systematically suppressed exculpatory and impeachment evidence over the course of decades.  BPD employees themselves have admitted or acknowledged that detectives within the Homicide Unit have failed to share evidence with state prosecutors, or to maintain case files and record information in a manner that would allow such disclosures.

144.     In 1988, the year before Mr. Johnson's trial, Anthony Coleman was tried and convicted of first-degree murder and conspiracy to commit murder.  In post-conviction proceedings, counsel for Mr. Coleman elicited testimony from the BPD detective investigating the homicide, Detective Sydnor, that BPD Homicide Detectives used their discretion to decide which documents to share with State prosecutors.  When asked whether he forwarded copies of everything in his file to the prosecutor, Detective Sydnor responded that "It depends on what it's about.  Yeah if it's pertinent to the investigation, yeah I would.  If it's something between me and another detective I may not."

145.     In a later exchange, Detective Sydnor answered affirmatively when asked, "isn't it fair to say that you do not always photocopy every information sheet and every set of notes that you take but, in fact, you usually concentrate on the ones that you believe are relevant to this offense?"  The detective further admitted that not everything contained in Anthony Coleman's case file was copied and given to the prosecutor.  Later, during direct examination, he explained that "sometimes" he would have witnesses review his notes of their conversation, sign the notes, and adopt them.  When witnesses gave "important" statements, he would write them down, but he did not document everything that a witness told him.

146.     The Court of Special Appeals later remanded Mr. Coleman's case after determining that evidence had been wrongfully withheld from Mr. Coleman's trial counsel.

147.     In January 2000, Lieutenant Stephen B. Tabeling completed a report regarding the BPD's Homicide Unit that had been requested by then-BPD Commissioner Ronald L. Daniel. Lieutenant Tabeling's report found, among other things, that there is "an apparent mutual lack of confidence and a serious divisive deficiency in teamwork" between the BPD and the Baltimore City's State's Attorney's office; that BPD Homicide Detectives kept case folders in "abysmal condition—that is, when they can be located," and that the homicide detectives lacked appropriate processes and protocols for recording information gathered in the course of their investigations.   On information and belief, these deficiencies dated to before and during the period when the Officer Detectives concealed the exculpatory evidence regarding Mr. Johnson.

148.     Several other cases, in addition to Mr. Johnson's, demonstrate that the BPD has condoned the suppression of exculpatory and impeachment evidence for far too long.

149.     In 1968, Walter Lomax was convicted of robbing a food market and fatally shooting the market's evening manager.  It was later discovered that several key pieces of

- 20 -

evidence were not disclosed to Mr. Lomax's trial attorney, including a BPD report that showed that an eyewitness identified someone else as the gunman.  A separate police report contained notes from a witness interview in which the witness's description of the gunman did not match Mr. Lomax.  Mr. Lomax was granted a new trial on the basis of these violations, and the State dismissed the charges.

150.    In 1974, Michael Austin was convicted of shooting and killing a private security guard.  BPD officers failed to turn over a non-identification of Mr. Austin by an eyewitness to the murder.  BPD officers also failed to investigate other potential suspects, including a man who admitted to participating in the shooting.

151.    Wendell Griffin, convicted in 1981 of murder, discovered that BPD officers never turned over key witness statements that excluded Mr. Griffin as the murderer, photo arrays in which a witness failed to identify Mr. Griffin as the murderer, and other evidence tending to show that someone else committed the crime.

152.    James Owens's February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives withheld evidence of several inconsistent statements by their star witness.  In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

153.    As noted above, also in 1988, the detectives involved in Anthony Coleman's murder case failed to disclose exculpatory evidence to Mr. Coleman's trial counsel.

154.    In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend. BPD officers failed to disclose notes and evidence regarding an alternate perpetrator and other evidence refuting gunshot residue results indicating that Mr. Burgess had recently fired a gun. As a result of these violations, Mr. Burgess's conviction was vacated and the charges against him

were dismissed.  Mr. Burgess brought suit against the BPD and several officers, including

Defendant Goldstein, and in 2017, a jury awarded him $15 million.  The evidence at trial

included testimony from BPD detectives that BPD policies and practices did not require the

proper documentation and recording of evidence or require officers to disclose evidence to State

prosecutors.

155.    Antoine Pettiford was convicted of murder in 1995.  Mr. Pettiford's post-

conviction counsel discovered that BPD officers failed to disclose eyewitness statements and

other exculpatory evidence.  An independent investigation by *The Baltimore Sun* uncovered

additional undisclosed evidence.  Not only was this information never disclosed to Mr.

Pettiford's trial counsel, it had never been disclosed to Mr. Pettiford's post-conviction counsel.

At a hearing on Mr. Pettiford's motion to re-open post-conviction, Judge Ellen M. Heller found

that a BPD Detective was aware that he had to disclose a witness statement and that his failure to

disclose the statement was "egregious."  Mr. Pettiford's plea was ultimately vacated and charges

against him were dismissed.

156.    In 1998, Rodney Addison was wrongfully convicted of a 1996 murder.  In

October 2005, after nine years in prison, Mr. Addison was released when it was revealed that the

State had withheld exculpatory witness statements, and its sole witness recanted her testimony at

a post-conviction proceeding.

157.    In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did

not commit.  Mr. Bryant was exonerated in 2016.  Mr. Bryant's post-conviction proceedings

uncovered BPD officers' failure to disclose several key pieces of evidence exculpating Mr.

Bryant and pointing to the true suspect, including undisclosed witnesses and witness statements.

158.     In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the shooting death of a 15-year-old boy.  At trial, the state presented evidence that a witness identified Jones in a photo array and that Jones had a particle of gunshot residue on his hand. During the post-conviction phase of Jones' case, his counsel discovered evidence in the BPD case file that the witness who identified Jones at trial had told a BPD officer that he had not seen the shooting or the shooter.  Further, internal BPD documents revealed that gunshot residue results were unreliable due to widespread contamination of police department facilities.  Despite requests by his counsel for exculpatory material, the documents were disclosed only after a court ordered their production.  Ultimately, Jones' conviction was vacated and the state nolle prossed the charges against him.

159.     In 1999, Garreth Parks was convicted of the murder of Charles Hill.  Mr. Parks was later exonerated after it came to light that BPD officers had suppressed a police report, written shortly after the murder, that documented the true shooter's confession.

160.     In 2002, Ezra Mable pled guilty to second-degree murder for an August 2000 homicide.  Mr. Mable was sentenced to 25 years in prison.  Mr. Mable's plea was motivated by the State's representation that two eyewitnesses had identified him as fleeing the crime scene. The BPD failed to test fingernail clippings from the victim for DNA.  The Baltimore City State's Attorney's Office joined Mr. Mable in moving for his release, which was granted in 2010.

161.     The BPD's policy, pattern, and practice of misconduct in murder investigations described above was caused by the BPD's failure to train, supervise, and discipline its police officers, which effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendants committed against Mr. Johnson in this case.  Constitutional violations such as

occurred in this case have been encouraged and facilitated as a result of the BPD's practices and *de facto* policies, as alleged above.

162.     For example, there was a failure during the relevant time period to train police officers on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), notwithstanding the obvious necessity of such training, as demonstrated by the public testimony and reports from BPD officers that, as a policy or practice, the BPD did not require officers to turn all *Brady* information over to prosecutors.

163.     In addition, the BPD failed to properly supervise and discipline its police officers. As a result, officers continue to violate suspects' rights with impunity in the manner described more fully above, as evidenced by the recent revelations of misconduct within the BPD's Gun Trace Task Force.

164.     For instance, the BPD did not take any actions to discipline the officers involved in the cases of Walter Lomax, Michael Austin, Wendell Griffin, James Owens, or the other cases listed above.

165.     The failure to train, supervise, and discipline BPD employees was approved and maintained at the highest policy-making level by policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

166.     Despite actual knowledge of the pattern of misconduct, including but not limited to the repeated failure to disclose exculpatory witness statements and other exculpatory evidence and the fabrication of evidence, the BPD did not act to remedy the abuses described in the preceding paragraphs.  It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to prevent or remedy Mr. Johnson's injuries.

167.    These failures were a cause of the injuries suffered by Mr. Johnson.

**G.    Mr. Johnson's damages.**

168.    Mr. Johnson spent more than 29 years in prison for crimes he did not commit.

169.    During and after his wrongful incarceration, he suffered immense physical and emotional pain.

170.    For significant periods of his wrongful incarceration, Mr. Johnson was confined to single-person cells for 23 or 24 hours a day without recreational or educational programming or even basic human interaction.  The profound and dehumanizing effects of solitary confinement on human beings are well-documented.

171.    On top of extreme psychological trauma, Mr. Johnson faced the constant threat of physical harm while in prison.

172.    Mr. Johnson was stabbed by other inmates in two separate incidents.  Both times, he nearly died as a result of his injuries.

173.    Mr. Johnson was assaulted by other inmates on multiple other occasions.  In one instance, even though Mr. Johnson was the victim of an assault and adjudicated "not guilty" by prison staff, the correctional officers sent him to solitary confinement.

174.    These violent attacks on Mr. Johnson not only caused physical pain, they compounded his psychological harm by shattering even the slightest sense of security.

175.    Beyond the lasting physical and psychological harms he suffered, Mr. Johnson's actual damages include the enjoyment of life he lost while trapped behind prison walls.

176.    Mr. Johnson was robbed of the best years of his life.  He entered prison at the age of 20 and walked out again a few months shy of his 51st birthday.  He spent 10,886 days behind bars.

177.    Each and every one of those days, he awoke in a prison cell with the knowledge of his own innocence and the injustice of his imprisonment.  Mr. Johnson lost some of the most basic human liberties: the ability to share holidays, birthdays, weddings, and funerals with those he cherishes; the opportunity to find meaningful work; the chance to care for and raise children; to be present with friends and family in moments both mundane and profound; to transform laughter and love into beloved memories; and the fundamental freedom to lead a life of his own choosing.

178.    Mr. Johnson's wrongful incarceration robbed him of the chance to show love and support to his family.  He could not care for his mother or say goodbye to her before she died in 1995.  He lost the chance to raise a family of his own.  Mr. Johnson was never able to develop a relationship with his daughter, who grew up believing her father was a murderer, and the damage to him from his forced absence from her entire life cannot be repaired.

179.    As a result of the foregoing, Mr. Johnson has suffered tremendous damage, including physical injuries and severe emotional trauma, all of which were proximately caused by Defendants' misconduct.

180.    Mr. Johnson's injuries and damages were foreseeable to Defendants at the time of their acts and omissions.

181.    All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## FEDERAL CLAIMS

### Count I – 42 U.S.C. § 1983
### Violation of Due Process (Fifth and Fourteenth Amendments)
### *Failure to Disclose Exculpatory and Impeachment Evidence*
### (Against Officer Defendants)

182.    Each foregoing paragraph is incorporated as if restated fully herein.

183.    As described more fully above, the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Johnson of his constitutional right to a fair trial.  In the manner described more fully above, the Officer Defendants, individually, jointly, and in conspiracy, deliberately withheld exculpatory and impeachment evidence.  In doing so, the Officer Defendants violated their clearly established duty to report all exculpatory and impeachment materials to prosecutors.  No reasonable officer in 1988 or 1989 would have believed this conduct was lawful.

184.    Absent the Officer Defendants' misconduct, the prosecution of Mr. Johnson could not and would not have been pursued, and Mr. Johnson would not have been convicted.

185.    The Officer Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Mr. Johnson and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

186.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Mr. Johnson suffered injuries, including but not limited to the loss of liberty, physical injury, and emotional distress.

187.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Johnson's clearly established constitutional rights.

### Count II – 42 U.S.C. § 1983
### Violation of Due Process (Fifth and Fourteenth Amendments)
### *Fabrication of Evidence*
### (Against Officer Defendants)

188.     Each foregoing paragraph is incorporated as if restated fully herein.

189.     In the manner described above, the Officer Defendants fabricated evidence against Mr. Johnson.

190.     The Officer Defendants performed the above-described acts under color of state law, deliberately, recklessly, and with deliberate indifference for Mr. Johnson's clearly established constitutional rights and innocence.  No reasonable officer in 1988 or 1989 would have believed this conduct was lawful.

191.     As a direct and proximate result of the Officers Defendants' fabrication of evidence, Mr. Johnson suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress.

192.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Johnson's clearly established constitutional rights.

### Count III – 42 U.S.C. § 1983
### Malicious Prosecution (Fourth and Fourteenth Amendments)
### (Against Officer Defendants)

193.     Each foregoing paragraph is incorporated as if restated fully herein.

194.     In the manner described above, the Officer Defendants caused Mr. Johnson to be arrested, charged, and prosecuted for the murder of Aaron Taylor pursuant to legal process that

was unsupported by probable cause, thereby violating Mr. Johnson's clearly established rights,
under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of
unreasonable searches and seizures.  No reasonable officer in 1988 or 1989 would have believed
this conduct was lawful.

195.    The misconduct described in this Count was objectively unreasonable, and the
Officer Defendants, with malice, acting individually and in concert, intentionally, knowingly,
and deliberately misrepresented the truth and withheld exculpatory facts from the prosecutor.

196.    The proceedings terminated in Mr. Johnson's favor.

197.    As a direct and proximate result of the Officer Defendants' malicious prosecution,
Mr. Johnson suffered injuries, including but not limited to loss of liberty, physical injury, and
emotional distress.  These Officer Defendants had a reasonable opportunity to prevent this harm,
but failed to do so.

## Count IV – 42 U.S.C. § 1983
## Failure to Intervene
## (Against Officer Defendants)

198.    Each foregoing paragraph is incorporated as if restated fully herein.

199.    In the manner described above, by their conduct and under color of law, during
the constitutional violations described herein, each of the Officer Defendants stood by without
intervening to prevent the violation of Mr. Johnson's constitutional rights, even though each of
the Officer Defendants had the opportunity to do so.

200.    As a direct and proximate result of the Officer Defendants' failure to intervene to
prevent the violation of Mr. Johnson's clearly established constitutional rights, Mr. Johnson
suffered injuries, including but not limited to loss of liberty, physical injury, and emotional

distress.  These Officer Defendants had a reasonable opportunity to prevent this harm, but failed

to do so.

201.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice and willful indifference to Mr. Johnson's clearly

established constitutional rights.

## Count V – 42 U.S.C. §§ 1983 and 1985
## Conspiracy to Deprive Constitutional Rights
## (Against Officer Defendants)

202.    Each foregoing paragraph is incorporated as if restated fully herein.

203.    After the murder of Aaron Taylor, the Officer Defendants, acting within the scope

of their employment and under color of law, agreed among themselves and with other members

of the Police Department to act in concert in order to deprive Mr. Johnson of his clearly

established constitutional rights under the Fourth, Fifth, and Fourteenth Amendments, including

his rights to be free from unreasonable searches and seizures, malicious prosecution, and

deprivation of liberty without due process of law, and his right to a fair trial, all as described in

the preceding paragraphs.

204.    Additionally, before and after Mr. Johnson's conviction, the Officer Defendants

further conspired to deprive Mr. Johnson of exculpatory information to which he was lawfully

entitled and to fabricate evidence against him, which would have led to his not being charged, his

acquittal, or an earlier exoneration.

205.    In this manner, the Officer Defendants, acting in concert with other unknown co-

conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful

means.

206.     In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above, such as fabricating evidence, withholding exculpatory evidence, and committing perjury during hearings and trials.  Each was an otherwise willful participant in joint activity.

207.     As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Mr. Johnson's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress.

208.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Johnson's rights.

### Count VI – 42 U.S.C. § 1983
### *Monell* Claim Under Fifth and Fourteenth Amendments
### (Against the Baltimore Police Department)

209.     Each foregoing paragraph is incorporated as if restated fully herein.

210.     This claim is brought against the Baltimore Police Department.

211.     The actions of all the Officer Defendants were undertaken pursuant to policies and practices of the BPD, described above, which were ratified by policymakers with final policymaking authority.  These policies and practices included the failure to adequately train or supervise police officers with regard to their constitutional obligations and failing to discipline police officers who engaged in constitutional violations.  The policies and practices also included regularly failing to turn over exculpatory evidence and regularly fabricating evidence.

212.     These policies and practices were so widespread with the BPD as to constitute a "custom or usage" of which BPD policymakers and supervisors had actual or constructive knowledge.

213.     The BPD's policy, custom, and/or pattern and practice of promoting, facilitating, and condoning improper, illegal, and unconstitutional investigative actions, and its policy, custom, and/or pattern and practice of failing to adequately supervise, discipline, and train BPD detectives and officers, is reflected by the multiple acts of misconduct and illegality committed by multiple BPD detectives and officers as described above, and the testimony and reporting of BPD detectives and officers that these practices constituted the official or unofficial policies of the BPD.

214.     The policies and practices described in this Count were maintained and implemented by the BPD with deliberate indifference to Mr. Johnson's constitutional rights.

215.     As a direct and proximate result of the BPD's actions, Mr. Johnson's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

216.     The BPD is therefore liable for the misconduct committed by the Officer Defendants.

## **STATE LAW CLAIMS**

### **Count VII – State Law Claim**
### **Malicious Prosecution**
### **(Against Officer Defendants)**

253.     Each foregoing paragraph is incorporated as if restated fully herein.

254.     The Officer Defendants accused Mr. Johnson of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to the prosecutor and other officials with the intent of exerting influence and to institute and continue the judicial proceedings.

255.     The Officer Defendants caused Mr. Johnson to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

256.     The Officer Defendants fabricated evidence and withheld exculpatory evidence that would have demonstrated Mr. Johnson's innocence.  The Officer Defendants were aware that, as described more fully above, no true or reliable evidence implicated Mr. Johnson in the murder of Aaron Taylor.

257.     The Officer Defendants intentionally failed to investigate evidence that would have confirmed Mr. Johnson's innocence.

258.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

259.     On July 2, 2018, the prosecution terminated in Mr. Johnson's favor when his conviction was vacated, the charges were dismissed, and the Baltimore City State's Attorney apologized to Mr. Johnson for his wrongful conviction.

260.     As a direct and proximate result of this misconduct, Mr. Johnson sustained, and continues to sustain, injuries as set forth above, including physical injury and emotional distress.

**Count VIII – State Law Claim**
**Abuse of Process**
**(Against Officer Defendants)**

261.     Each foregoing paragraph is incorporated as if restated fully herein.

262.     As explained more fully above, each of the Officer Defendants willfully misused the criminal process against Mr. Johnson for a purpose different than the proceeding's intended purpose.

263.     The Officer Defendants fabricated evidence and withheld exculpatory evidence to frame Mr. Johnson for a crime that he did not commit.

264.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

265.     As a direct and proximate result of this misconduct, Mr. Johnson sustained, and continues to sustain, injuries as set forth above, including physical injury and emotional distress.

### Count IX – State Law Claim
### Intentional Infliction of Emotional Distress
### (Against Officer Defendants)

266.     Each of the foregoing paragraph is incorporated as if restated fully herein.

267.     The acts and conduct of the Officer Defendants as set forth above were extreme and outrageous. The Officer Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Johnson, as is more fully alleged above.

268.     As a direct and proximate result of the Officer Defendants' actions, Mr. Johnson suffered and continues to suffer physical injury and severe emotional distress.

### Count X – State Law Claim
### Civil Conspiracy
### (Against Officer Defendants)

269.     Each of the foregoing paragraph is incorporated as if restated fully herein.

270.     As described more fully in the preceding paragraphs, the Officer Defendants, acting in concert with one another and with other co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

271.     In furtherance of the conspiracy, the Officer Defendants committed overt acts and were otherwise willful participants in joint activity, including but not limited to, the malicious prosecution of Mr. Johnson and the intentional infliction of emotional distress upon him.

272.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

273.     As a direct and proximate result of the Officer Defendants' conspiracy, Mr. Johnson suffered damages, including physical injury and severe emotional distress.

**Count XI – State Law Claim**
**Indemnification**
**(Against the Baltimore Police Department)**

274.     Each of the foregoing paragraph is incorporated as if restated fully herein.

275.     Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

276.     The Officer Defendants are or were employees of the Baltimore Police Department, who acted within the scope of their employment in committing the misconduct described herein.

**<u>Demand for Damages</u>**

WHEREFORE, Plaintiff Jerome L. Johnson requests that this Court enter judgment in his favor and against Defendants Baltimore Police Department, Kevin Davis, Frank Barlow, Daniel Boone, and Gerald Goldstein, and award him:

1.     Compensatory damages, attorneys' fees, and costs, jointly and severally against all Defendants;

2.     Punitive damages against each Defendant;

3.     Any and all other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff Jerome L. Johnson hereby demands a trial by jury pursuant to Fed. R. Civ. P.

38(b) on all triable issues of fact.

Dated: March 6, 2019                    Respectfully submitted,

                                                           /s/
                                         Kobie A. Flowers (Bar No. 16511)
kaf@browngold.com
Andrew D. Freeman (Bar No. 03867)
adf@browngold.com
Andrew D. Levy (Bar No. 00861)
adl@browngold.com
Joshua R. Treem (Bar No. 00037)
jtreem@browngold.com
Neel K. Lalchandani (Bar No. 20291)
nlalchandani@browngold.com
Abigail G. Graber (Bar No. 19727)
agraber@browngold.com
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21201
Tel: (410) 962-1030
Fax: (410) 385-0869

                                             /s/
                                         Nancy S. Forster (Bar No. 30194)
nforster@gmail.com
Forster & LeCompte
210 Allegheny Avenue, Suite 100
Towson, Maryland 21204
Tel: (410) 685-6000
Fax: 410-685-0298

*Attorneys for Plaintiff Jerome L. Johnson*