IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME L. JOHNSON,
    *Plaintiff*

    v.

BALTIMORE POLICE
DEPARTMENT, *et al.*
    *Defendants.*

Civil Action No. ELH-19-00698

## MEMORANDUM OPINION

This civil rights case is rooted in the 1989 conviction of Jerome Johnson for the murder of

Aaron Taylor in 1988. Mr. Johnson, who was convicted in the Circuit Court for Baltimore City,

was sentenced to life imprisonment, plus a consecutive term of 20 years for a related crime. The

Conviction Integrity Unit of the Baltimore City State's Attorney's Office eventually conducted an

investigation and concluded that Mr. Johnson was innocent. In 2018, after Mr. Johnson spent

nearly three decades in prison, his convictions were vacated. This suit followed.

Mr. Johnson has sued the Baltimore City Police Department ("BPD" or the "Department")

and four BPD detectives in their individual capacities: Frank Barlow, Daniel Boone, Kevin Davis,

and Gerald Goldstein (the "Officer Defendants"). ECF 1 (the "Complaint"). The Complaint

contains eleven counts. Counts I through VI are filed under 42 U.S.C. § 1983, while Counts VII

through XI assert claims under Maryland law. Count I, titled "Failure to Disclose Exculpatory and

Impeachment Evidence," is lodged against the Officer Defendants, and asserts a violation of due

process under the Fifth and Fourteenth Amendments to the Constitution. ECF 1, ¶¶ 182-87. Count

II asserts a claim of "Fabrication of Evidence" against the Officer Defendants, in violation of due

process. *Id.* ¶¶ 188-92. Count III alleges a claim of "Malicious Prosecution" against the Officer

Defendants under the Fourth and Fourteenth Amendments. *Id.* ¶¶ 193-97. Count IV asserts a

claim for "Failure to Intervene" against the Officer Defendants. *Id.* ¶¶ 198-201. Count V alleges that the Officer Defendants conspired to deprive Johnson of his constitutional rights. *Id.* ¶¶ 202-08. In Count VI, plaintiff lodges a "*Monell*" claim against the BPD, pursuant to the Fifth and Fourteenth Amendments. *Id.* ¶¶ 209-16; *see Monell v. City Dep't of Soc. Servs*., 436 U.S. 658 (1978).

Count VII asserts a claim against the Officer Defendants for "Malicious Prosecution." ECF 1, ¶¶ 253-60.[1] Count VIII, filed against the Officer Defendants, alleges "Abuse of Process." *Id.* ¶¶ 261-65. In Count IX, plaintiff asserts a claim against the Officer Defendants for "Intentional Infliction of Emotional Distress." *Id.* ¶¶ 266-68. In Count X, plaintiff asserts a claim against the Officer Defendants for "Civil Conspiracy." *Id.* ¶¶ 269-73. And, Count XI seeks "Indemnification" from the BPD. *Id.* ¶¶ 274-76.

Three motions to dismiss are pending. Detective Kevin Davis filed a motion to dismiss (ECF 22) under Fed. R. Civ. P. 12(b)(6), with respect to Counts I, II, III, V, VIII, IX, and X. The motion is supported by a memorandum. ECF 22-1 (collectively, the "Davis Motion"). The BPD has moved to dismiss, pursuant to Rule 12(b)(1) and Rule 12(b)(6) (ECF 24), supported by a memorandum. ECF 24-1 (collectively, the "BPD Motion"). And, Detectives Barlow, Boone, and Goldstein have moved to dismiss under Fed. R. Civ. P. 12(b)(6) (ECF 25), supported by a memorandum. ECF 25-1 (collectively, the "Officers Motion"). Plaintiff filed a consolidated opposition to the Davis Motion and the Officers Motion (ECF 28), and also opposes the BPD Motion. ECF 29. Defendants have replied. ECF 30 (BPD); ECF 32 (Officers); ECF 34 (Davis).

---

[1] The Complaint skips from paragraph number 216 to 253. *See* ECF 1 at 32.

The motions are fully briefed, and no hearing is necessary to resolve them. *See* Local Rule 105(6). For the reasons that follow, I shall deny the BPD Motion, and I shall grant in part and deny in part the Davis Motion and the Officers Motion.

## I.     Factual Background[2]

### A.  The Investigation Concerning Mr. Johnson

Just after 1:00 a.m. on July 14, 1988, four men approached Aaron Taylor on a basketball court in northwest Baltimore. ECF 1, ¶ 23. The men argued, and Mr. Taylor fled to the nearby Nite Owl Tavern. *Id.* One of the four men, Alvin Hill, pursued Mr. Taylor into the bar. *Id.* When Mr. Hill pulled a gun from his waistband, Mr. Taylor tried to use a bar patron as a shield, but the patron broke free. *Id.* ¶ 24. Mr. Hill shot Mr. Taylor, killing him. *Id.*

At the time of the shooting, Officer Steve Owens and another BPD officer were nearby, in an unmarked car. *Id.* ¶ 28. After the shots rang out, Officer Owens exited the car and chased two of the men involved in the shooting down an alley. *Id.* When Officer Owens emerged from the alley, he saw Mr. Johnson standing at the corner of Reisterstown Road and Lucille Avenue with his childhood friend, Alvin Morgan. *Id.* ¶ 26. Officer Owens knew Mr. Johnson; they had attended high school together. *Id.* ¶ 29. Officer Owens and Mr. Johnson talked, and Mr. Johnson told Office Owens that he had heard multiple gunshots. *Id.* Following the conversation, Mr. Johnson went to Mr. Morgan's grandmother's home on Lucille Avenue. *Id.* ¶ 30.

---

[2] Given the procedural posture of this case, I must "assume the truth of the plaintiff's well-pled facts" and "draw all reasonable inferences in favor of the plaintiff." *Bowling v. Dir., Va. Dep't of Corrs.*, 920 F.3d 192, 196 (4th Cir. 2019), *petition for cert. filed* No. 19-6710 (Nov. 21, 2019). I may also take judicial notice of matters of public record. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

The BPD responded to the Nite Owl Tavern shortly after the shooting. *Id.* ¶ 31. Officer Kenneth Jones was one of the first officers to arrive at the crime scene. *Id.* ¶ 32. Detective Davis, the lead investigator, arrived shortly thereafter. *Id.* ¶ 34; *see id.* ¶ 50. Officer Jones and Detective Davis located several witnesses, including the owner of the Nite Owl Tavern and the patron who had been used as a human shield. *Id.* ¶ 35. They also located a 15-year-old female, L.S., who was Mr. Taylor's cousin. *Id.* ¶ 36.[3] Shortly before the shooting, L.S. had been at her home with Mr. Taylor, her friend, T.L.; and a family friend, Quinton. At some point, Mr. Taylor left on his bicycle to go to the Nite Owl Tavern. *Id.* ¶ 37. A few minutes later, L.S., T.L., and Quinton walked to the bar and were in the vicinity at the time of the murder. *Id.*

Officer Jones and Detective Davis interviewed L.S. at approximately 1:50 a.m. on July 14, 1988, about thirty minutes after the murder. *Id.* ¶ 36. Officer Jones documented the interview in a report (the "July 14 Report"). *Id.* ¶ 38. According to the July 14 Report, L.S. stated that the suspect "'came into the bar, pulled a black + brown gun (unknown caliber) from his waist band, and held it down towards the floor.'" *Id.* ¶ 39. L.S. recounted that she saw Mr. Taylor try to hide behind a patron, but the patron escaped. *Id.* ¶¶ 40-41. At that point, the shooter said twice that he was going to kill Mr. Taylor. *Id.* ¶ 41. L.S. said that she then ran from the bar and heard five shots as she was running away. *Id.* ¶ 42. The July 14 Report stated that L.S. told Officer Jones that the shooter was accompanied by three men, all of whom fled after the shooting. *Id.* ¶ 43. During the interview, L.S. allegedly provided Officer Jones and Detective Davis with a description of the shooter that matched Mr. Hill. *Id.* ¶¶ 44, 47. Although L.S. knew Mr. Johnson from the

---

[3] Plaintiff refers to the fifteen-year-old eyewitness by her initials because she was a minor when she provided statements to the BPD and when she testified at Mr. Johnson's trial.

neighborhood, she did not mention him. *Id.* ¶ 49. Officer Jones and Detective Davis both signed the July 14 Report. *Id.* ¶¶ 45, 46.

According to plaintiff, the July 14 Report was known not only to Officer Jones and Detective Davis, but also to Detectives Barlow, Boone, and Goldstein, all of whom were members of BPD's Homicide Unit. *Id.* ¶ 51. However, the July 14 Report was allegedly never disclosed to the State's Attorney's Office or to Mr. Johnson. *Id.* ¶¶ 48, 52. Plaintiff claims that Detectives Davis, Barlow, Boone, and Goldstein decided that Mr. Johnson participated in Mr. Taylor's murder and concocted a story that Mr. Johnson was part of the group that confronted Mr. Taylor and handed Mr. Hill the gun used to murder Mr. Taylor. *Id.* ¶ 54.

On July 19, 1988, Detectives Davis and Barlow interviewed L.S. and her mother at the Violent Crime Section of the State's Attorney's Office. *Id.* ¶ 56. The interview was memorialized in a report prepared by Detective Davis (the "July 19 Report"). During the interview, L.S. made several statements that contradicted what she told the police the week prior. *Id.* ¶ 58. L.S. stated that she saw Mr. Johnson give the shooter a small handgun while they were standing outside the bar. *Id.* ¶ 59. L.S. also said that the shooter pointed the gun at the victim, but it twice misfired. *Id.* Further she told the detectives that she "ran into the store right behind the victim and then fled after the first shot—hearing three more [shots] as she ran away." *Id.* ¶ 60.

Three portions of the July 19 Report are covered over with white out. *Id.* ¶ 61. The first two white-outs concern the number of suspects involved in the murder. In place of whatever number was typed in the July 19 Report, the number "5" was inserted by hand. *Id.* ¶ 62. The third white-out refers to the number of suspects who accompanied the shooter; the number "4" was inserted by hand. *Id.* ¶ 63.

In addition to the July 19 Report, Detective Davis took handwritten notes of the interview with L.S. *Id.* ¶ 64. The notes allegedly reflect that L.S. was inside the bar when four shots were fired. *Id.* ¶ 66. But, the July 19 Report reflects that L.S. fled after the first shot. *Id.*

Plaintiff alleges that Detectives Davis and Barlow "pressured" L.S. to "falsely add[] Mr. Johnson to her account of who was involved in the murder of her cousin." *Id.* ¶ 69. And, plaintiff alleges that Detectives Davis and Barlow "purposefully altered the number of suspects in the July 19 Report to allow the addition of Mr. Johnson as one of the suspects." *Id.* ¶ 70. Further, plaintiff alleges that the Officer Defendants never provided the July 19 Report or Detective Davis's notes to the prosecutor or to Mr. Johnson. *Id.* ¶ 75.

A grand jury convened in July 1988 to decide charges in Mr. Taylor's murder. *Id.* ¶ 79. The Officer Defendants presented L.S. to the grand jury on July 28, 1988, where she testified to the version of events recounted in the July 19 Report. *Id.* ¶ 80. Detectives Davis, Barlow, and Boone also allegedly testified before the grand jury. *Id.* ¶ 81.

The Officer Defendants prepared "Prosecution Reports" to convey evidence to the prosecutor. *Id.* ¶ 93. They also completed an Application for Statement of Charges/Statement of Probable Cause ("Application") against Mr. Johnson, which Detective Davis signed. *Id.* ¶ 82. The Application made no mention of Officer Jones, the July 14 Report, or the interview of L.S. on July 14, 1988. *Id.* ¶ 83. Based on the Application, an arrest warrant was issued for Mr. Johnson, and he was arrested on October 24, 1988. *Id.* ¶ 86.

On that date, Mr. Johnson spoke with Detective Goldstein about Mr. Taylor's murder. *Id.* ¶ 87. Mr. Johnson denied having been involved in Mr. Taylor's death. *Id.* ¶ 88. He explained to Detective Goldstein that, at the time of the shooting he had been standing on the corner of Reisterstown Road and Lucille Avenue with Alvin Morgan. *Id.* ¶ 88. Mr. Johnson also told

Detective Goldstein that he spoke with Officer Owens that night, and he described the clothes that Officer Owens had been wearing. *Id.* ¶ 89.

Despite this conversation, the Officer Defendants never spoke with Officer Owens about his interaction with Mr. Johnson on July 14, 1988. *Id.* ¶¶ 91, 101. Moreover, the Officer Defendants allegedly failed to interview Alvin Morgan, and made no efforts to corroborate Mr. Johnson's alibi. *Id.* ¶ 91. Detective Goldstein "deliberately concealed" this exculpatory information when he testified before the grand jury on November 10, 1988. *Id.* ¶ 92.

At some point during the investigation, State's Attorney Albert Phillips became involved in the case. *Id.* ¶ 95. The Officer Defendants allegedly failed to disclose to Mr. Philips the July 14 Report. *Id.* As a result, when Mr. Johnson's attorney, Gordon Tayback, sought discovery in February 1989, the July 14 Report was not provided to him for inspection. *Id.* ¶¶ 97-98.

Further, plaintiff alleges that the Officer Defendants never disclosed the two friends who were with L.S. on the night of the murder. *Id.* ¶ 99. And, the Officer Defendants allegedly "met with L.S. multiple times in the lead-up to the trial" to "pressure her to incriminate Mr. Johnson." *Id.* ¶ 100.

## B. Mr. Johnson's Trial, Conviction, and Exoneration

Mr. Johnson's trial began on March 9, 1989, and lasted five days. *Id.* ¶ 102.[4] According to plaintiff, the Officer Defendants continued to suppress exculpatory evidence during the trial. Detective Davis testified at a pre-trial hearing on March 9, 1988, during which he concealed that the BPD took a statement from L.S. at the crime scene shortly after the murder. *Id.* ¶¶ 104-05. Instead, Detective Davis testified that he sent L.S. home with her mother the night of the murder

---

[4] The Complaint states that the trial began on March 9, 1988. ECF 1, ¶ 102. Given that Mr. Taylor's murder occurred on July 14, 1988, the trial must have occurred in March 1989.

because L.S. was too emotional, and he claimed that he did not take a statement from L.S. until July 19, 1988. *Id.* ¶ 106.

Detective Davis testified to the same effect during Mr. Johnson's trial. *Id.* ¶¶ 108-09. When Mr. Tayback asked Detective Davis what information L.S. had provided the police concerning Mr. Johnson, Detective Davis did not mention that he had interviewed L.S. on July 14, 1988, or the July 14 Report. *Id.* ¶¶ 111-12. When Mr. Tayback asked Detective Davis if he had prepared a formal report of the July 19, 1988 interview of L.S., Detective Davis falsely testified that no such report existed. *Id.* ¶ 115. Without the July 19 Report, Mr. Tayback could not press Detective Davis on the inconsistencies between the reports or the redactions contained in the July 19 Report. *Id.* ¶ 117.

L.S. also testified at Mr. Johnson's trial. *Id.* ¶ 118. Plaintiff contends that at the trial, L.S. changed her story of the events yet again. *Id.* On the stand, L.S. testified that the shooter pulled a gun from his waistband outside the bar, but that gun misfired. *Id.* ¶ 119. According to L.S., Mr. Johnson then handed the shooter a second gun, which was then used to kill the victim inside the bar. *Id.* ¶ 120. L.S. was the only civilian witness to implicate Mr. Johnson, and no physical evidence connected Mr. Johnson to the crime. *Id.* ¶¶ 121-22.

The jury convicted Mr. Johnson of first-degree murder and use of a handgun in the commission of a felony. *Id.* ¶ 123. Mr. Johnson was sentenced on June 2, 1989, to life imprisonment plus a consecutive term of 20 years. *Id.* ¶ 127. The Maryland Court of Special Appeals affirmed. *Id.* ¶ 128. For the next three decades, Mr. Johnson repeatedly challenged his conviction in both state and federal court. *Id.* ¶ 130. Mr. Johnson learned of the July 14 Report in 2011. *Id.* ¶ 131.

When Mr. Johnson's pro bono counsel presented evidence concerning Mr. Johnson's innocence to the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorney's Office, the CIU initiated its own investigation. *Id.* ¶¶ 132, 133. In May 2018, CIU prosecutors interviewed L.S. *Id.* ¶ 134. During the interview, L.S. gave the same statement that she had given to Officer Jones on the night of the murder: that three men were with Mr. Hill when he confronted Mr. Taylor outside the Nite Owl Tavern; that Mr. Hill carried one gun; and that Mr. Hill chased Mr. Taylor inside the bar and killed him. *Id.* ¶ 134. L.S. made no mention of Mr. Johnson. *Id.* The CIU's investigation also revealed "'uncontroverted evidence" that Thomas Carroll and Reginal Dorsey were the men who L.S. saw at the murder scene, not Mr. Johnson. *Id.* ¶ 135.

Given the evidence of Mr. Johnson's innocence, CIU joined Mr. Johnson in seeking vacatur of his conviction. *Id.* ¶ 136. The resulting "Joint Petition for Writ of Actual Innocence" (the "Petition") acknowledged that neither the July 14 Report nor L.S.'s initial statement was disclosed and further recognized that the "'differences between L.S.'s first statement' and her 'subsequent statements were even more profound than the internal inconsistencies in her trial and grand jury testimonies.'" *Id.* ¶ 137. The Petition concluded: "'The State and Petitioner assert that if the aforementioned evidence was presented alongside the evidence presented to the jury, it is probable that the outcome would have been different.'" *Id.* ¶ 138.

On July 2, 2018, the Circuit Court for Baltimore City granted the Petition and vacated Mr. Johnson's convictions. *Id.* ¶ 139. That day, for the first time in nearly 30 years—more than half of his life—Johnson walked free. *Id.* ¶ 141.

As a result of Mr. Johnson's wrongful incarceration, he suffered "immense physical and emotional pain." *Id.* ¶ 169. For significant periods of his wrongful incarceration, Mr. Johnson

was confined to single-person cells for 23 or 24 hours a day without recreational or educational programming or basic human interaction. *Id.* ¶ 170. Mr. Johnson also faced the constant threat of physical harm while in prison. *Id.* ¶ 171. He was stabbed by other inmates in two separate incidents, both of which resulted in life-threatening injuries. *Id.* ¶ 173. And, Mr. Johnson was assaulted by other inmates on multiple other occasions. *Id.* ¶ 174.

Mr. Johnson's wrongful incarceration also robbed him of the ability to enjoy and support his family. *Id.* ¶ 178. He missed major life events, such as holidays, birthdays, and weddings. *Id.* ¶ 177. Moreover, Mr. Johnson was unable to attend his mother's funeral in 1995, or his father's funeral in 2004. *Id.* ¶¶ 11, 178. And, Mr. Johnson was never able to develop a relationship with his daughter, who was born just one day after he was arrested. *Id.* ¶¶ 11, 178.

## C. Pattern and Practice Allegations

Plaintiff alleges that the unconstitutional conduct at issue in his case is part of a "longstanding pattern and practice of suppressing exculpatory and impeachment evidence, sufficiently widespread within the BPD to assume the quality of a 'custom or usage' of which the BPD had actual or constructive knowledge." *Id.* ¶ 142. To support this allegation, plaintiff points to several other cases that he alleges demonstrate that the BPD has a long history of condoning the suppression of exculpatory and impeachment evidence. *Id.* ¶ 148.

These are:

- In 1968, Walter Lomax was convicted of robbing a food market and fatally shooting the market's evening manager. However, it was later discovered that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney, including a BPD report that showed that an eyewitness identified someone else as the gunman. A separate police report contained notes from a witness interview in which the witness's description of the gunman did not match Mr. Lomax. After Mr. Lomax was granted a new trial, the State dismissed the charges. *Id.* ¶ 149.

- Michael Austin was convicted of shooting and killing a private security guard in 1974. BPD officers failed to turn over a non-identification of Mr. Austin by an

eyewitness to the murder. BPD officers also failed to investigate other potential suspects, including a man who admitted to participating in the shooting. *Id.* ¶ 150.

- Wendell Griffin, convicted in 1981 of murder, discovered that BPD officers never turned over key witness statements that excluded Mr. Griffin as the murderer, photo arrays in which a witness failed to identify Mr. Griffin as the murderer, and other evidence inculpating another individual. *Id.* ¶ 151.

- In 1988, Anthony Coleman was convicted of first-degree murder and conspiracy to commit murder. The Maryland Court of Special Appeals later remanded Mr. Coleman's case after determining that BPD homicide detectives wrongfully withheld evidence from Mr. Coleman's trial counsel. *Id.* ¶ 144.

- James Owens was also convicted in 1988 for burglary and felony murder. However, his convictions were later overturned after Mr. Owens discovered that BPD detectives withheld evidence of several inconsistent statements by their star witness. In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million. *Id.* ¶ 152.

- In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend. BPD officers failed to disclose notes and evidence regarding an alternate perpetrator and other evidence refuting gunshot residue results indicating that Mr. Burgess had recently fired a gun. As a result of these violations, Mr. Burgess's conviction was vacated and the charges against him were dismissed. Mr. Burgess brought suit against the BPD and several officers, including Detective Goldstein. In 2017, a jury awarded Mr. Burgess $15 million. The evidence at trial included testimony from BPD detectives that BPD policies and practices did not require the proper documentation and recording of evidence or require officers to disclose evidence to State prosecutors. *Id.* ¶ 154.

- Likewise, Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's postconviction counsel discovered that BPD officers failed to disclose eyewitness statements and other exculpatory evidence. An independent investigation by The Baltimore Sun uncovered additional undisclosed evidence. At a hearing on Mr. Pettiford's motion to re-open post-conviction, the Maryland circuit court found that a BPD Detective was aware that he had to disclose a witness statement and that his failure to disclose the statement was "egregious." Mr. Pettiford's plea was ultimately vacated and charges against him were dismissed. *Id.* ¶ 155

- In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that the State had withheld exculpatory witness statements, and its sole witness recanted her testimony at a post-conviction proceeding. *Id.* ¶ 156.

- In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did not commit. Mr. Bryant was exonerated in 2016. Mr. Bryant's post-conviction

proceedings uncovered BPD officers' failure to disclose several key pieces of evidence exculpating Mr. Bryant and pointing to the true suspect, including undisclosed witnesses and witness statements. *Id.* ¶ 157.[5]

- Tyrone Jones was convicted of conspiracy to commit murder in 1999. During the post-conviction phase of Jones' case, his counsel discovered evidence in the BPD case file that the witness who identified Mr. Jones at trial had told a BPD officer that he had not seen the shooting or the shooter. Further, internal BPD documents revealed that gunshot residue results were unreliable due to widespread contamination of police department facilities. Ultimately, Mr. Jones' conviction was vacated and the state nolle prossed the charges against him. *Id.* ¶ 158.

- Garreth Parks was convicted in 1999 for the murder of Charles Hill. Mr. Parks was later exonerated after it came to light that BPD officers had suppressed a police report, written shortly after the murder, that documented the true shooter's confession. *Id.* ¶ 159.

- In 2002, Ezra Mable pled guilty to second-degree murder for an August 2000 homicide. Mr. Mable was sentenced to 25 years in prison. Mr. Mable's plea was motivated by the State's representation that two eyewitnesses had identified him as fleeing the crime scene. The BPD failed to test fingernail clippings from the victim for DNA. The Baltimore City State's Attorney's Office joined Mr. Mable in moving for his release, which was granted in 2010. *Id.* ¶ 160.

According to plaintiff, the misconduct that plagued these murder investigations was the result of the Department's "failure to train, supervise, and discipline its police officers, which effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendants committed against Johnson in this case." *Id.* ¶ 161. In particular, plaintiff alleges that "during the relevant time period," the BPD failed to train police officers to comply with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). ECF 1, ¶ 162. And, plaintiff asserts that the BPD has "failed to properly supervise and discipline its police officers" for unconstitutional conduct. *Id.* ¶ 163. Thus, plaintiff alleges that the failure to train, supervise, and discipline BPD officers

---

[5] The Estate of Mr. Bryant has also filed a civil rights case that is assigned to me, arising from Mr. Bryant's wrongful conviction for murder. *See Estate of Malcolm J. Bryant v. Balt. Police Dep't,* ELH-19-384 (D. Md.). I note that many of the examples included in this case to illustrate pattern and practice are also included in the *Bryant* case. *See id.*, ECF 1, ¶¶ 95-102.

conducting homicide investigations "was approved and maintained at the highest policy-making level by policymakers who were deliberately indifferent" to the constitutional rights of homicide defendants. *Id.* ¶ 165.

## II.    Standards of Review

### A.  Rule 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192. Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270). In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

The Fourth Circuit recently reiterated that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018). But, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

The BPD challenges subject matter jurisdiction, asserting that the BPD is entitled to Eleventh Amendment sovereign immunity. ECF 24-1 at 5-13. The BPD appears to raise a factual challenge to the Court's jurisdiction. Therefore, I may consider evidence outside the pleadings to resolve the jurisdictional issue, without converting the BPD Motion to one for summary judgment.

### B. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see*

*Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*,

780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).

Ordinarily, the court "may not consider any documents that are outside of the complaint, or not

expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th

Cir. 2013); *see Bosiger*, 510 F.3d at 450.

      But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may

consider documents beyond the complaint without converting the motion to dismiss to one for

summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may properly consider documents that are "explicitly incorporated into the

complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166

(citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir.

2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg

v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n

v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004);

*Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

      However, "before treating the contents of an attached or incorporated document as true,

the district court should consider the nature of the document and why the plaintiff attached it."

*Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d

449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a

document upon which his claim is based, or when the complaint otherwise shows that the plaintiff

has adopted the contents of the document, crediting the document over conflicting allegations in

the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or

incorporates a document for purposes other than the truthfulness of the document, it is

inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

In support of plaintiff's opposition to the BPD Motion, plaintiff attached three exhibits. ECF 29-1, a letter dated July 30, 2018, is from Ray Garvey, a claims adjuster at the Maryland State Treasury, to Andrew Freeman, Esq., of the law firm Brown, Goldstein, Levy, P.A. In the letter,

Mr. Garvey explains that "for purposes of tort liability the Baltimore Police Department is a local government entity and its police officers are local government actors." *Id.* ECF 29-2 is a letter dated May 5, 2017, from Mr. Garvey to Joshua R. Treem, Esq., also of Brown, Goldstein, Levy P.A. That letter concerns the tort liability of the BPD. *Id.* These letters are not referenced in the Complaint, nor are they publicly available. Therefore, I shall limit my consideration of these letters to the issue of BPD's claim of sovereign immunity.

The exhibit at ECF 29-2 is the Consent Decree between the United States Department of Justice and the Baltimore Police Department. *See United States v. Balt. Police Dep't*, JKB-17-99, ECF 2 (D. Md.). Because this document is publicly available and defendants do not dispute its authenticity, I may consider it in resolving the BPD Motion. *See Philips*, 572 F.3d at 180.

In addition, Detective Davis attached two exhibits to his Reply. Each is a memorandum of law filed in another wrongful conviction case. ECF 34-1 and 34-2. As publicly-available filings whose authenticity is not disputed, I may examine these submissions in resolving the Davis Motion. But, I cannot necessarily accept the content as true.

### C. Section 1983 Generally

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*,

443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that

the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

## III.    The Officer Defendants

The Officer Defendants have moved to dismiss various counts in the Complaint. ECF 22-1.[6] All four Officer Defendants seek the dismissal of plaintiff's due process claims to the extent that they are predicated on the Fifth Amendment to the Constitution. *Id.* at 4-5. They also contend

---

[6] The Officers Motion incorporates by reference the arguments asserted in the Davis Motion. *See* ECF 25-1 at 14.

that plaintiff's claims for malicious prosecution (Count III), failure to intervene (Count IV), abuse of process (Count VIII), and intentional infliction of emotional distress (Count X) are barred by the statute of limitations. *Id.* at 5-7, 14-15. And, they argue that plaintiff's conspiracy claims, lodged under § 1983 in Count V and under State law in Count X, are foreclosed by the intracorporate conspiracy doctrine. *Id.* at 7-10.

In addition, Detectives Barlow, Boone, and Goldstein move to dismiss the Complaint on the ground that they are shielded by qualified immunity. *Id.* at 13. Further, they contend that plaintiff has failed to state plausible claims against them because the Complaint does not allege that they were personally involved in misconduct or had knowledge of exculpatory evidence. *Id.* at 9-13.

Plaintiff does not oppose the dismissal of his conspiracy claims or his claim for abuse of process. *See* ECF 28 at 14 n.3. Thus, I shall dismiss Counts V, VIII, and X. Plaintiff also agrees that Counts I and II should proceed solely under the Due Process Clause of the Fourteenth Amendment, which is coterminous with its Fifth Amendment counterpart. *Id.* at 15. Therefore, I shall dismiss Counts I and II to the extent that they are predicated on the Fifth Amendment.

However, plaintiff strenuously opposes dismissal of his claims for malicious prosecution, failure to intervene, and intentional infliction of emotional distress based on limitations. ECF 28 at 15-24. And, he insists that that Detectives Barlow, Boone, and Goldstein are not entitled to qualified immunity. *Id.* 31-35. Further, Mr. Johnson contends that he has adequately stated claims against Detectives Barlow, Boone, and Goldstein, asserting that the Complaint sufficiently alleges that they "knew and participated in the suppression of [L.S.'s] exculpatory statements and those that could have been used to impeach her testimony." *Id.* at 27.

## A.  Statute of Limitations

All four detectives move to dismiss as time-barred plaintiff's claims for malicous prosecution, failure to intervene, and intentional infliction of emotional distress ("IIED").  ECF 22-1 at 5-7, 14; ECF 25-1 at 14-15.  With respect to plaintiff's malicious prosecution claim, the Officer Defendants do not contest the timeliness of the claim to the extent that it relies on the Fourteenth Amendment. ECF 22-1 at 5.  But, they argue that the claim is barred to the extent it is rooted in the Fourth Amendment, because the limitations period on a Fourth Amendment false arrest or false imprisonment claim begins to run when the plaintiff is seized.  *Id.* at 6.  The Officer Defendants assert that plaintiff's failure-to-intervene claim expired in March 1992.  *Id.* at 7.  And, they maintain that plaintiff's IIED claim "necessarily expired decades ago," because plaintiff does not allege any misconduct following his conviction.  *Id.* at 15.

### 1.  Section 1983 Claim (Count II)

Section 1983 does not contain a statute of limitations.  Thus, to determine whether a § 1983 claim was timely filed, courts look to the statute of limitations from the most analogous state-law cause of action.  *Owens*, 767 F.3d at 388; *see also* 42 U.S.C. § 1988(a) ("[I]n all cases where [the laws of the United States] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies . . . the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause[.]").

A suit filed pursuant to 42 U.S.C. § 1983 constitutes a personal injury action. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989).  Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise.  Md.

Code (2013 Repl. Vol., 2018 Supp.), § 5–101 of the Courts and Judicial Proceedings Article ("C.J.").

"Limitations statutes . . . are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy." *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 85, 904 A.2d 511, 526 (2006); *see Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). In Maryland, "[a]s a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

Although the Maryland statute of limitations applies, the matter of when a cause of action has accrued under § 1983 is a federal question. *Nassim v. Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)); *see also McDonough v. Smith*, ___ U.S. ___, 139 S. Ct. 2149, 2155 (2019). "An accrual analysis begins with identifying 'the specific constitutional right' alleged to have been infringed." *McDonough*, 139 S. Ct. at 2155 (quoting *Manuel v. Joliet*, ___ U.S. ___, 137 S. Ct. 911, 920 (2017)).

The date of accrual occurs "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nassim*, 64 F.3d at 955 (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). However, "the answer is not always so simple." *McDonough*, 139 S. Ct. at 2155. "Where, for example, a particular claim may not realistically be brought while a violation is ongoing, such a claim may accrue at a later date." *Id*.

Maryland law is largely consistent with federal law. Therefore, I shall look to both federal and Maryland cases concerning accrual.

As noted, under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. C.J. § 5-101; *see Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011). Ordinarily, "'the question of accrual in § 5-101 is left to judicial determination,' unless the determination rests on the resolution of disputed facts regarding discovery of the wrong." *Poole*, 423 Md. at 131, 31 A.3d at 236 (citation omitted); *see Bank of N.Y. v. Sheff*, 382 Md. 235, 244, 854 A.2d 1269, 1275 (2004) (stating that summary judgment may be appropriate if there is no dispute of material fact as to whether plaintiff was on inquiry notice more than three years before suit was file); *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000) (explaining that the determination of accrual "may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied").

Nevertheless, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," the so-called discovery rule is sometimes used to determine the date of accrual. *See Sheff*, 382 Md. at 244, 854 A.2d at 1275; *Frederick Road Ltd. P'ship*, 360 Md. at 95, 756 A.2d at 973. "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167, 857 A.2d 1095, 1104 (2004).

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 444, 749 A.2d 796, 801 (2000)), *aff'd*, 495 F. App'x 350 (4th Cir. 2012).

Accrual cannot occur until the plaintiff has (or should have) "possession of the critical facts that he has been hurt and who has inflicted the injury." *Kubrick,* 444 U.S. at 122 (discussing discovery rule in the context of the Federal Tort Claims Act, which requires notice to the government "within two years after such claim accrues"); *see also Gould v. U.S. Dep't of Health & Human Servs*., 905 F.2d 738, 742 (4th Cir. 1990) (en banc) ("The clear import of *Kubrick* is that a claim accrues . . . when the plaintiff knows or, in the exercise of due diligence, should have known both the existence and the cause of his injury."); *Gilbert v. United States*, 720 F.2d 372, 374 (4th Cir. 1983). Notably, "[t]his standard . . . does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Dual Inc.*, 383 Md. at 167-68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano,* 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Wash.*, 114 Md. App. 169, 188-89, 689 A.2d 634, 644 (1997)).

A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and . . . a diligent investigation would have revealed that the plaintiffs were victims of . . . the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1104 (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448-49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Inquiry notice must be actual notice, either express or implied. *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981). But, "[c]onstructive notice or knowledge will not suffice for inquiry notice." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681.

As indicated, the Officer Defendants contend that plaintiff's § 1983 malicious prosecution claim accrued when he was arrested on October 24, 1988. ECF 25-1 at 6. And, they aver that plaintiff's § 1983 failure-to-intervene claim accrued when Mr. Johnson was sentenced in March 1989. *Id.* at 7. In contrast, plaintiff maintains that, as to his malicious prosecution claim, the three-

year limitations period did not begin to run until the criminal proceedings were resolved in Mr. Johnson's favor. ECF 28 at 17-18. And, plaintiff argues that because his failure-to-intervene claim is derivative of his due process claims, it accrued when his convictions were vacated. *Id.* at 18-22. Plaintiff is correct as to both counts.

The Officer Defendants' contention that limitations expired as to the malicious prosecution claim is squarely foreclosed by Supreme Court and Fourth Circuit precedent. The Fourth Circuit has recognized that "there is no such thing as a '§ 1983 malicious prosecution' claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000), *cert. denied*, 531 U.S. 1130 (2001). Rather, a claim framed in those terms "is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution[.]" *Id.* One such common law element that has been imported into the § 1983 context is "the requirement that the prior proceeding terminate favorably to the plaintiff." *Id.* (citing *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996)).

The favorable termination requirement is not just a prerequisite for recovery; "it establishes the time from which the claim accrues for purposes of determining whether the statute of limitations has run." *Lambert*, 223 F.3d at 257 n.3 (citing *Brooks*, 85 F.3d at 183). Thus, as the Supreme Court has explained, a § 1983 claim that is analogous to the common-law tort of malicious prosecution accrues when the underlying criminal proceedings have been resolved in the plaintiff's favor. *McDonough*, 139 S. Ct. at 2156-57 (holding that § 1983 fabrication claim was similar to malicious prosecution and therefore accrued when the plaintiff was acquitted at trial); *see also Owens*, 767 F.3d at 390; *Snider v. Seung Lee*, 584 F.3d 193, 199 (4th Cir. 2009),

*cert. denied*, 559 U.S. 1038 (2009); *Brooks*, 85 F.3d at 183; *Gray v. Maryland*, 228 F. Supp. 2d 628, 636 (D. Md. 2002). In short, plaintiff's § 1983 malicious prosecution claim is timely.[7]

So too is plaintiff's § 1983 failure-to-intervene claim. In the Fourth Circuit, a failure-to-intervene claim lies where there is "an omission to act . . . coupled with a duty to act." *Randall v. Prince George's Cty.*, 302 F.3d 188, 202 (4th Cir. 2002). To state a claim "on a theory of bystander liability," the plaintiff must plausibly allege that the officer "(1) kn[ew] that a fellow officer [was] violating an individual's constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act." *Id.* at 204 (internal footnote omitted); *see Burgess v. Balt. Police Dep't* ("*Burgess II*"), RBD-15-0834, 2017 WL 4947004, at *21-22 (D. Md. Oct. 31, 2017). Given the first element's requirement of an underlying constitutional violation, a § 1983 failure-to-intervene claim is, by nature, concomitant with a plaintiff's other § 1983 claims. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (observing that bystander liability claim was "derivative" of excessive force claim and holding that claim failed "[i]n the absence of any underlying use of excessive force"); *Dodson v. Prince George's Cty.*, JKS-13-2916, 2016 WL 67255, *3 (D. Md. Jan. 6, 2016) ("Because the excessive force claim fails, the failure to intervene claim also fails.").

Here, plaintiff's failure-to-intervene claim is derivative of his § 1983 claim for suppression of evidence, fabrication of evidence, and malicious prosecution. Each of those claims accrued upon the favorable termination of plaintiff's criminal proceedings. *See McDonough*, 139 S. Ct. at 2156-57 (fabrication claim); *Owens*, 767 F.3d at 390 (*Brady* claim); *Brooks*, 85 F.3d at 183 (§ 1983 malicious prosecution claim). Therefore, Mr. Johnson's failure-to-intervene claim ripened when

---

[7] In his reply, Detective Davis appears to concede the point. ECF 34 at 2 n.1.

his convictions were vacated, because that is the earliest that he could allege a predicate constitutional violation sufficient to support a bystander liability claim.

This conclusion is bolstered by the Supreme Court's recent decision in *McDonough*, 139 S. Ct. at 2155.[8] There, a grand jury indicted McDonough on numerous counts under New York law. *Id*. at 2154. The case against McDonough proceeded to trial but ended in a mistrial. *Id*. The state retried McDonough, and the second trial ended on December 21, 2012, with an acquittal on all charges. *Id*. Nearly three years later, McDonough filed suit under 42 U.S.C. § 1983, claiming that Smith, who was the prosecutor, and other defendants violated his due process rights by fabricating evidence and using it against him before the grand jury and at both trials. *Id*. Based on this timeline, "McDonough's claim was timely only if the limitations period began running at acquittal." *Id*.

The district court dismissed McDonough's fabricated evidence claim as untimely. *McDonough v. Smith*, 15-cv-01505-MAD-DJS, 2016 WL 5717263, at *12 (N.D.N.Y. Sept. 30, 2016). The Second Circuit affirmed, finding that the limitations period began to run "when (1) McDonough learned that the evidence was false and was used against him during the criminal proceedings; and (2) he suffered a loss of liberty as a result of that evidence." *McDonough v. Smith*, 898 F.3d 259, 265 (2d Cir. 2018). In accordance with this standard, the court reasoned that McDonough's fabricated evidence claim accrued when he "was arrested and stood trial." *McDonough*, 139 S. Ct. at 2154.

The Supreme Court reversed. It concluded that the statute of limitations for McDonough's fabricated evidence claim began to run once "the criminal proceedings against him terminated in

---

[8] *McDonough* was issued on June 20, 2019, after the Officer Defendants filed their motions to dismiss but before Mr. Johnson filed his oppositions.

his favor," *i.e.*, "when he was acquitted at the end of his second trial." *Id*. at 2161. The Court observed that starting the clock when the defendant became aware of the fabricated evidence was unworkable. Such a rule would force criminal defendants to make an "untenable choice between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." *Id.* at 2158. The former is "obviously undesirable," while the latter may prejudice the defendant's ability to mount an effective defense in his criminal case. Furthermore, the Court reasoned that requiring the defendant to bring suit as soon as he learned of the fabricated evidence "would also generate parallel civil litigation," which "run[s] counter to core principles of federalism, comity, consistency, and judicial economy." *Id.* at 2158.

Defendants' position that plaintiff's failure-to-intervene claim accrued when he first learned of the *Brady* violation of fabricated evidence produces these same problems. It makes little sense to apply separate accrual dates for a plaintiff's underlying § 1983 claims and his § 1983 failure-to-intervene claim.

Accordingly, I conclude that the limitations period as to the failure-to-intervene claim began to run when the criminal proceedings against Mr. Johnson terminated in his favor. Because that occurred in 2018, when Mr. Johnson's convictions were vacated, Count IV was timely filed.

### 2. State Law Claim (Count IX)

The Officer Defendants move to dismiss plaintiff's claim for intentional infliction of emotional distress on the ground that it is barred by Maryland's three-year statute of limitations for tort claims. ECF 22-1 at 14-15. In their view, plaintiff's IIED claim expired "decades ago" because plaintiff does not allege any recent allegations of misconduct. *Id.* at 15.

Defendants' argument is flatly contradicted by *Prince George's County v. Longtin*, 419 Md. 450, 19 A.3d 859 (2011). There, the Maryland Court of Appeals explained that "the accrual

date of an IIED claim can range, depending on the alleged actions." *Id.* at 481, 19 A.3d at 482.

The plaintiff's IIED claim in that case was rooted in "emotional distress [that] was the result of

continuing actions by [a] police department to keep him wrongfully imprisoned." *Id.* at 481, 19

A.3d at 878. Thus, because the plaintiff's "*continued wrongful imprisonment* [was] the 'crux of

his claim,'" the Maryland Court of Appeals reasoned that his IIED claim "did not accrue until his

release." *Id.* (emphasis in *Longtin*) (quoting *Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir.

2010)).

    *Longtin* applies on all fours here. Plaintiff alleges that he suffered extreme emotional

distress as a result of being wrongfully incarcerated for 20 years. ECF 1, ¶ 168-79. Thus, as in

*Longtin*, Mr. Johnson's imprisonment constitutes the "crux of his claim." Accordingly, the three-

year clock on plaintiff's IIED claim did not begin to run until July 2, 2018, when the circuit court

vacated his conviction and the State dismissed the case. *See id.*; *accord Burgess II*, 2017 WL

4947004, at \*9 (finding that the IIED claim accrued upon the plaintiff's release from prison).

Therefore, plaintiff's IIED claim is not time-barred.[9]

## B. Immunity

### 1. Qualified Immunity Generally

    As noted, Detectives Barlow, Boone, and Goldstein have moved to dismiss the suit,

claiming that they are protected by qualified immunity.

---

[9] As limitations was the only ground for dismissal asserted by defendants, the claim shall proceed. I note, however, that claims for IIED are generally disfavored, difficult to establish, and rarely viable. *See, e.g.*, *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 850 (D. Md. 2015); *Chin v. Wilhelm*, CCB-02-01551, 2006 WL 827343 (D. Md. Mar. 24, 2006); *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95, 113 (2000); *see also* David Crump, *Rethinking Intentional Infliction Of Emotional Distress*, 25 GEO. MASON L. REV. 287, 297 (2018) (noting that an IIED claim is "a kind of vituperative epithet" that "adds little that can be the subject of a separate or additional recovery" but "makes [the litigation] more expensive").

"Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Humbert v. Mayor & City of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Owens*, 767 F.3d at 395. Indeed, the Fourth Circuit recently reiterated: "'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Livingston v. Kehagias*, ___ F. App'x ___, 2020 WL 898092, at *3 (4th Cir. Feb. 25, 2020) (quoting *Pearson v. Callahan*, 552 U.S. 223, 23 (2009)) (internal quotation marks omitted)).

The doctrine of qualified immunity "'balances two important interests─the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018) (quoting *Pearson*, 555 U.S. at 231); *see also Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The cases are legion in support of these principles. *See, e.g.*, *District of Columbia v. Wesby*, 583 U.S. ___, 137 S. Ct. 577, 589 (2018); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*,

848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow*, 457 U.S. at 818. An officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability for "'bad guesses in gray areas'") (citation omitted). In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam).

Notably, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818. Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"

*Pearson*, 555 U.S. at 231.

Of relevance here, qualified immunity is an "'*immunity from suit* rather than a mere defense to liability[.]'" *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d, 374, 377 n.2 (4th Cir. 2007) (citation omitted).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Ray*, 948 F.3d at 226; *Owens,* 767 F.3d at 395-96. The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Ray*, 948 F.3d at 226; *Labowitz*, 885 F.3d

at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170). However, and of import here, a "question of material fact" as to whether "'the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (citation omitted).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law

was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto,* 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640). Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens,* 767 F.3d at 399; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017).

Generally, to "determine whether a right is clearly established", courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 574 U.S. at 16-17 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly,* ___ U.S. ___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1774 (2015); *Plumhoff v. Rickard*, 572 U.S. 765,778-79 (2014); *see also Reichle*, 132 S. Ct. at 2093 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017). Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 135 S. Ct. at 1775-76; *Plumhoff*, 572 U.S. at 779. Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (per curiam)).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

2. Analysis

As discussed, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 77 F.3d at 662 (citation omitted); *see Owens*, 767 F.3d at 395-96.

Detectives Barlow, Boone, and Goldstein assert that the "facts alleged [in the Complaint] do not amount to a constitutional violation." ECF 25-1 at 14. Regarding plaintiff's claim under *Brady v. Maryland*, 373 U.S. 83 (1963), they concede that Mr. Johnson had a clearly established right to the disclosure of potentially exculpatory evidence." *Id.* (citing *Owens*, 767 F.3d at 401). But, they argue that the Complaint is devoid of allegations that they acted in bad faith to suppress exculpatory material. *Id.* However, they fail to address with any specificity why they are immune from plaintiff's claims for fabrication of evidence, malicious prosecution, or failure to intervene.

At this juncture, Detectives Barlow, Boone, and Goldstein are not entitled to the benefit of qualified immunity. As discussed in greater detail, *infra*, plaintiff has pleaded facts which, together with reasonable inferences, state plausible violations of Mr. Johnson's due process rights to a fair trial. *See*, *e.g.*, *Ray*, 948 F.3d at 229. And, plaintiff is able to meet the second prong of the qualified immunity test. When Mr. Johnson was prosecuted in 1988, it was clearly established that an investigator who withheld exculpatory evidence or fabricated evidence violated the defendant's right to due process. *See Owens*, 767 F.3d at 401 ("[A] police officer's obligation to disclose material exculpatory evidence was clearly established by 1983[.]"); *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005) (observing that the "constitutional right not to be

deprived of liberty as a result of the fabrication of evidence by an investigating officer. . . . was clearly established in 1983"); *accord Burgess II*, 2017 WL 4947004, at *16 (rejecting BPD officers' qualified immunity defense against the plaintiff's *Brady* and fabrication-of-evidence claims).

### C. Failure to State a Claim

Detectives Barlow, Boone, and Goldstein contend that they should be dismissed from suit because the Complaint is devoid of allegations giving rise to liability. ECF 25-1 at 9-13. In their view, plaintiff has not plausibly alleged that Detective Barlow suppressed or fabricated evidence because the Complaint does not allege that Barlow knew of the July 14 interview and therefore he had no reason to know that the July 19 interview was exculpatory. *Id.* at 11. Further, they assert that plaintiff "has not plead any specific conduct of either Boone nor [sic] Goldstein in relation to the July 14 or 19 reports with L.S., but rather attempts to implicate them by improper group pleading." *Id.* at 12. Alternatively, the detectives posit that plaintiff has failed to allege plausible claims because "there is no basis from the allegations in the Complaint that disclosure of the July 14 statement would have changed the outcome of the trial." ECF 32 at 3.

The detectives ask the Court to ignore the Complaint's allegations. The Complaint is rife with allegations that the detectives collectively acted to violate Mr. Johnson's constitutional rights. Plaintiff alleges that Detectives Davis, Barlow, Boone, and Goldstein were members of BPD's Homicide Unit, were each intimately involved in the investigation concerning Mr. Taylor's death, and wrongly decided that Mr. Johnson was involved in the murder. ECF 1, ¶¶ 51, 53. All four detectives allegedly "knew of the undisclosed July 14 Report." *Id.* ¶ 51. Despite knowing its exculpatory nature, they "conspired to suppress the July 14 Report" as well as "other exculpatory and impeachment evidence," *id.* ¶ 52, such as the July 19 Report and Detective Davis's

handwritten notes from the interview. *Id.* ¶ 75. Plaintiff also alleges that the "Officer Defendants purposefully altered the number of suspects in the July 19 Report to allow the addition of Mr. Johnson as one of the suspects" *id.* ¶ 70, and "met with L.S. multiple times in the lead-up to the trial" during which they "pressure[d] her to incriminate Mr. Johnson." *Id.* ¶ 100.

Furthermore, the Complaint's allegations support the inference that Detectives Barlow, Boone, and Goldstein were well versed in the investigation of Mr. Johnson, such that they knew of L.S.'s conflicting statements. Detectives Davis, Barlow, and Boone were listed as witnesses before the grand jury. *Id.* ¶ 81. All four Officer Defendants allegedly drafted an "Application for Statement of Charges/Statement of Probable Cause," *id.* ¶ 82, as well as "Prosecution Reports" that conveyed relevant evidence to the prosecutor. *Id.* ¶ 94. In addition, Detective Barlow interviewed L.S. on July 19, 1988, *id.* ¶ 67, while Detective Goldstein interrogated Mr. Johnson after his arrest. *Id.* ¶ 87. In light of these allegations, it is reasonable to infer that the detectives knew of L.S.'s various statements and that those statements were inconsistent. Indeed, the contrary inference—that the detectives were unaware of L.S.'s interviews—is patently implausible.

These allegations are sufficient to support a § 1983 claim based on *Brady*. In *Brady*, 373 U.S. at 87, the Supreme Court expressly held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A *Brady* violation occurs when a defendant can show that the evidence at issue (1) was favorable to the defendant, (2) material to the defense, and (3) the prosecution had the evidence but failed to disclose it. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972); *United States v. Young*, 916 F.3d 368, 383 (4th Cir. 2019); *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998); *see also United States v. Agurs*, 427 U.S. 97, 106-07 (1976); *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019),

*pet. for cert. filed* No. 19-680 (Nov. 26, 2019); *Young*, 916 F.3d at 382 n.9; *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018), *cert. denied*, ___ U.S. ___, 139 S. Ct. 278 (2018); *United States v. Savage*, 885 F.3d 212, 220-22 (4th Cir. 2018), *cert. denied*, ___ U.S. ___, 139 S. Ct. 238 (2018); *United States v. Horton*, 693 F.3d 463, 470 (4th Cir. 2012).

Prosecutors are responsible for obtaining and disclosing evidence. Indeed, in some circumstances, "the knowledge of some who are part of the investigative team is imputed to prosecutors regardless of the prosecutors' actual awareness." *United States v. Robinson*, 62 F.3d 941, 951 (4th Cir. 2010); *accord Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Law enforcement officers also have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant. *See Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964); *see also Owens*, 767 F.3d at 396. However, police officers, unlike prosecutors, "commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Gilliam*, 932 F.3d at 238; *see Owens*, 767 F.3d at 396 & n.6. Notably, *Brady*'s obligations do not attach only to the officer who collected the evidence. Rather, *Brady* applies to any officer who has knowledge of the exculpatory or impeach evidence. *See Owens*, 767 F.3d at 397-98 (holding that police officers possessing the same exculpatory statements could be held liable for failing to disclose them to prosecutors); *Burgess II*, 2017 WL 4947004, at *10 ("Any police officer with knowledge of the exculpatory evidence has a duty to disclose that evidence.").

Evidence is "material" when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. *See Kyles*, 514 U.S. at 433-34; *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Chavez*, 894 F.3d at 600-01; *Savage*, 885 F.3d at 220-22; *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015); *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013); *United States v. Kelly*, 35 F.3d 929, 936 (4th Cir. 1994). However,

there is no *Brady* violation when the alleged exculpatory material is available to the accused from "a source where a reasonable defendant would have looked." *United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990). Moreover, mere speculation as to the materiality of the evidence is insufficient. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

Notably, the "'reasonable probability' standard does not require a showing that a jury more likely than not would have returned a different verdict. Rather, the 'reasonable probability' standard is satisfied if 'the likelihood of a different result is great enough to undermine confidence in the outcome of the trial, or the suppression 'cast[s] serious doubt on the proceedings' integrity.'" *Gilliam*, 932 F.3d at 238 (quoting *Owens*, *supra*, 67 F.3d at 398) (internal citation omitted; alteration in *Gilliam*).

Plaintiff has stated a plausible due process claim against Detectives Barlow, Boone, and Goldstein for withholding exculpatory evidence from the prosecution. As noted above, the Complaint alleges that the detectives failed to disclose the July 14 Report, the July 19 Report, and Detective Davis's handwritten notes. ECF 1, ¶ 75. These are, as alleged, material omissions. When L.S. was first interviewed on July 14, 1988, she allegedly told Detective Davis that she was inside the bar right up until Mr. Hill shot Mr. Taylor and that three men were with Mr. Hill. *Id.* ¶¶ 42-43. L.S. did not, however, mention Mr. Johnson, whom she knew from the neighborhood. *Id.* ¶ 49. In contrast, according to the July 19 Report, when L.S. spoke with Detectives Barlow and Davis on July 19, 1988, she told them that she observed Mr. Johnson hand Mr. Hill a handgun outside the bar. *Id.* ¶ 59. She also stated that the gun misfired twice and that she left the bar after the first shot. *Id.* ¶¶ 58-60. That story conflicts with L.S.'s prior statements. It is also inconsistent with Detective Davis's handwritten notes, which reflect that L.S. said that she was outside the bar

when the gun misfired and that she then ran into the bar, fleeing only after the first gunshot. *Id.* ¶ 67.

The failure to disclose these materials is "great enough to undermine confidence in the outcome of [Mr. Johnson's trial]." *Gilliam*, 932 F.3d at 238. The July 14 Report was material because L.S. knew Mr. Johnson and thus she certainly could have provided his name or a description if she had actually seen him. Yet, when she spoke to police just hours after the murder, she did not mention Mr. Johnson. Thus, the absence of any reference to Mr. Johnson in the July 14 Report tends to exculpate Mr. Johnson.

Moreover, these materials would have been valuable impeachment evidence. *See United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018) ("Evidence is favorable not only when it tends substantially to negate guilt but also when it tends to impeach the credibility of a key witness for the prosecution.") (internal quotations omitted); *Monroe v. Angelone*, 323 F.3d 286, 317 (4th Cir. 2003) (concluding that failure to disclose evidence that "would have significantly impaired the credibility of . . . a key prosecution witness" constitutes a *Brady* violation); *see also Giglio v. United States*, 405 U.S. 150 (1972) (requiring government disclosure of evidence tending to impeach its witnesses). Given that L.S. was the sole civilian witness to implicate Mr. Johnson in the crime and Detective Davis was the lead investigator, evidence tending to impeach her credibility was undoubtedly material.

In particular, at trial, L.S.'s testimony allegedly conflicted with the accounts recorded in the July 14 Report and the July 19 Report. On the stand, L.S. told the jury that the shooter pulled a gun from his waistband while the men were outside the bar, but that the gun misfired. ECF 1, ¶ 119. Mr. Johnson then handed a firearm to the shooter, who chased Mr. Taylor into the bar and killed him. *Id.* ¶ 120. Given the significant discrepancies between L.S.'s testimony and her prior

statements, Mr. Johnson's counsel could have used the reports to undermine L.S.'s credibility, causing the jury to discount her testimony. Likewise, the reports could have been used to impeach Detective Davis, who testified that he did not interview L.S. on July 14, 1988, and that no report of the July 19 interview existed. *Id.* ¶¶ 109, 115.

Plaintiff has also plausibly alleged that Detectives Barlow, Boone, and Goldstein acted with the requisite bad faith needed to state a *Brady* violation claim against law enforcement officers. A plaintiff need not demonstrate bad faith directly; it can be inferred through gross deviations from routine police conduct. *See Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) (finding that because the officer defendant "had participated in hundreds of homicide investigations," a reasonable jury "could conclude that [the officer] knowingly suppressed the statements to secure a conviction"); *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013) (noting that errors in investigation "were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights"). Moreover, bad faith can be inferred when police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence. *See Gilliam*, 932 F.3d at 239-40 (finding that plaintiff had adequately alleged bad faith in light of allegations that the defendants "intentionally fabricated, obscured, and failed to disclose the most relevant and exculpatory evidence in the case").

According to plaintiff, Detectives Barlow, Boone, and Goldstein suppressed the July 14 Report, the July 19 Report, and handwritten interview notes. ECF 1, ¶ 75. Further, plaintiff alleges that the detectives repeatedly pressured L.S. into identifying Mr. Johnson as a participant in the murder. *Id.* ¶100. The Complaint also alleges that the detectives intentionally failed to interview witnesses that would have exculpated Mr. Johnson, such as Officer Owens. *Id.* ¶ 90. These allegations suffice to support the inference that the detectives acted in bad faith. *See Gilliam*, 932

F.3d at 239-40 (defendant's alleged failure to disclose statement from an eye-witness was adequate to show bad faith); *Willis v. Blevins*, 966 F. Supp. 2d 646, 657 (E.D. Va. 2013) (concluding that "it can be reasonably inferred" from allegations that defendant fabricated crime scene photographs that defendant "intended to mislead the prosecution").

In sum, because plaintiff has stated a plausible *Brady* claim, I shall deny the Officer Motion to the extent that it seeks to dismiss Detectives Barlow, Boone, and Goldstein from suit.

## IV.    The BPD

The BPD seeks to dismiss the Complaint, asserting that it is immune from suit under the Eleventh Amendment. ECF 24-1 at 5-13. It also contends that plaintiff has failed to allege sufficient facts to support a *Monell* claim under § 1983. *Id.* at 13-21. Further, the BPD urges the Court to dismiss Count XI on the basis that, in the absence of a judgment against the Officer Defendants, plaintiff lacks standing to assert an indemnification claim. *Id.* at 21-23.

In response, plaintiff vigorously argues that the BPD is not entitled to Eleventh Amendment immunity. ECF 29 at 13-28. And, he posits that he has stated a plausible claim under *Monell* and that it is premature to dismiss his indemnification claim. *Id.* at 29-40.

### A.  Sovereign Immunity

#### 1.  Eleventh Amendment Immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."

Pursuant to the Eleventh Amendment, states generally enjoy immunity from suits brought in federal court by their own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal

court."). Therefore, absent consent or a valid congressional abrogation of sovereign immunity, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court to recover damages, unless there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).

However, the Eleventh Amendment did not create sovereign immunity. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

The Fourth Circuit has recognized that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). Moreover, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

Of pertinence here, state sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," including state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019); *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 618 (2002).

Notably, sovereign immunity has not been congressionally abrogated for claims under § 1983. In *Quern v. Jordan*, 440 U.S. 332, 345 (1979), the Supreme Court concluded that § 1983 suits by individuals against a state for money damages are barred by the Eleventh Amendment. It said, *id.*: "[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"

To be sure, a state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *see Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101. Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions." *Passaro v. Virgina*, 935 F.3d 243, 248 (4th Cir. 2019) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996)). And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law. *See Biggs v. N.C. Dep't of Pub. Safety*, ___ F.3d ___, 2020 WL 1140936, at *5 (4th Cir. Mar. 10, 2020). However, to avoid an Eleventh Amendment bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

### 2. Analysis

The Department argues that it is entitled to sovereign immunity because it is a State agency. ECF 24-1 at 11-13. Plaintiff counters that the BPD is a local government entity and therefore the BPD is not shielded from suit by the Eleventh Amendment. ECF 29 at 13-29.

As indicated, state agencies enjoy immunity from suit brought in federal court. *See Hans*, 134 U.S. at 3; *see also Garrett*, 531 U.S. at 363. On the other hand, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)). Thus, whether the Department is immune as to plaintiff's *Monell* claim depends on whether it is a Maryland State agency or a local one for purposes of the Eleventh Amendment.

In a related argument, the BPD also asserts that it is not amenable to suit under § 1983 because it is not a "person" within the meaning of 42 U.S.C. § 1983. ECF 24-1 at 5-8. Whether an entity is a "person" depends on whether it is a State agency or a municipality. *Compare Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that neither a State nor a State official are "persons" under § 1983), *with Monell*, 436 U.S. at 658 (holding that municipalities are subject to suit under § 1983).

The inquiry to determine whether the BPD is a "person" under § 1983 is coextensive with the Eleventh Amendment analysis. *See Harter v. Vernon*, 101 F.3d 334, 338 n.1 (4th Cir. 1996) ("Once the Eleventh Amendment inquiry is complete, there is no need to consider 'personhood.' If an official or entity is not immune from suit under the Eleventh Amendment that official or entity *is* a 'person' subject to suit under § 1983." (emphasis in original)). For that reason, the Fourth Circuit has instructed that "federal courts should approach these issues solely under the rubric of the Eleventh Amendment, and should not consider an argument of 'personhood' under § 1983." *Id.*

The first factor weighs decisively against finding that the BPD is an arm of the State. As the BPD concedes, it is the Mayor and City Council of Baltimore (the "City") that indemnifies the BPD, not the State. ECF 26-1 at 12. The Maryland Tort Claims Act does not waive the State's immunity to suits lodged against the BPD or its officers. *See* Md. Code (2013 Repl. Vol., 2018 Supp.), § 12-101 of the State Government Article. Therefore, the State has no obligation to pay for settlements or judgments obtained against BPD officers.

Conversely, the City and the BPD are expressly included in the list of local government entities covered by Maryland's Local Government Torts Claims Act ("LGTCA"). *See* C.J. § 301(d)(21). Moreover, the City has long paid judgments and settlements on behalf of PBD officers. *See Alderman v. Balt. City Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997) (noting that the City has indemnified BPD officers in "numerous cases"). Indeed, in 2018, the City budgeted over $22 million for "Police legal fees, judgments, and lawsuits." *See* Fiscal 2018 Summary of the Adopted Budget City of Baltimore 36 (2018), https://bbmr.baltimorecity.gov/sites/default/files/Fiscal%202018%20SOTA.pdf. Given that a judgment against the BPD will be paid by the City, not the State, the first factor counsels against holding that the BPD is an arm of the State. *See Oberg*, 745 F.3d at 139.

With respect to the second factor, the BPD maintains that it is "entirely autonomous from the City." ECF 24-1 at 12. As the BPD points out, the City exercises no managerial control over the BPD's day-to-day operations. Balt. City Charter, Art. II, § 27 ("[N]o ordinance of the City or act of any municipal officer . . . conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."); *see* ECF 24-1 at 12. And, the BPD cites to both State and federal decisions recognizing that the BPD is not a City agency. *See id.* at 12-13 (citing *Estate of Anderson*

*v. Strohman*, 6 F. Supp. 3d 639 (D. Md. 2014); *Chin v. City of Baltimore*, 241 F. Supp. 2d 546 (D. Md. 2003); *Upshur v. City of Baltimore*, 94 Md. 743, 51 A. 953 (1902)).

But, other indicia cut against the BPD's argument. The Mayor selects the BPD Commissioner, who "shall serve at the pleasure of the Mayor of Baltimore City[.]" Baltimore Public Local Law ("PLL"), Police Dep't § 16-5(a)(1). And, although the City does not train or supervise BPD officers, the City shares a close relationship with the BPD, including maintenance of the BPD's pension and retirement benefits system. Baltimore City Charter, Art. II, § 24(a); *see Alderman*, 952 F. Supp at 258.

Further, the City provides substantial funding to the BPD, including payment of the salaries of the BPD Commissioner and BPD officers. *Id.* §§ 16-5(b), 16-8(b); *see also* Baltimore City Charter, Art. II, § 24(a); Fiscal 2018 Summary, *supra*, at 127 (allocating nearly $500 million to the BPD). And, the City expressly permits the BPD Commissioner to use the funding that the BPD receives from the City to defend officers in lawsuits. *See* PLL § 16-13 (providing that the BPD Commissioner may use funds appropriated to the BPD in "any case, civil or criminal where a police officer of the Baltimore City Police Department is charged with the commission of any wrong, in consequence of an act done in the course of his official duty"). And, notably, the BPD is represented in this case by the City Solicitor's Office, not the Office of the Maryland Attorney General.

Although the facts point in both directions, at this stage in the litigation I must draw all reasonable inferences in favor of the plaintiffs. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440. Therefore, I find that the second factor counsels against finding that the BPD is entitled to sovereign immunity. *See Oberg*, 745 F.3d at 139 (concluding that second factor counseled against immunity despite conflicting facts).

The Department does not address the third factor, which assesses whether the BPD "is involved with statewide, as opposed to local or other non-state concerns." *Id.* (quoting *S.C. Dep't Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 307 (4th Cir. 2008)). The BPD's jurisdiction is "'unquestionably local.'" *Alderman*, 952 F. Supp at 258 (citation omitted). The BPD's authority is not state-wide but rather limited to the City limits. PLL, Police Dep't § 16-2(a) (delineating the BPD's duties "within the boundaries of [the City"). Indeed, to the extent that the BPD is authorized to act outside the City's corporate limits, it has authority only over properties that are "owned, controlled, operated or leased by the Mayor and City Council of Baltimore, or any [City] agency, commission, or department[.]" *Id.* § 16-2(b). Thus, because the BPD's jurisdiction is distinctly local, this factor weighs against Eleventh Amendment immunity. *See Harter*, 101 F.3d at 342 (third factor weighed against immunity because "the office of the sheriff has generally been involved with local rather than state concerns").

As to the last factor, "how [the entity] is treated under state law," *Oberg*, 745 F.3d at 140, heavily favors the BPD. To be sure, the Maryland Court of Appeals has acknowledged that, "with regard to federal law liability under 42 U.S.C. § 1983, the state law classification of the Baltimore City Police Department would not be decisive and the Baltimore City Police Department might well be regarded as a local government agency." *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 670 n.5, 541 A.2d 1303, 1306 n.5 (1988). However, Maryland law has long recognized the BPD as a State agency. *Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008) ("[T]he Baltimore Police Department is not an agency of the City of Baltimore and has not been for some time.") (citing Acts of 1860, ch. 7, § 14); *Clea*, 312 Md. at 669-70, 541 A.2d at 1306-07. Likewise, the City considers the BPD an arm of the State. *See* PLL, Police Dep't

§ 16-2(a) ("The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland.").

Notably, numerous decisions in this District have reached the conclusion that the BPD is not an arm of the State for purposes of Eleventh Amendment immunity. *See*, *e.g.*, *Hill v. CBAC Gaming LLC*, DKC-19-0695, 2019 WL 6729392, at *4-5 (D. Md. Dec. 11, 2019); *Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept. 25, 2019); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019); *Fish v. Mayor of Baltimore*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Humbert v. O'Malley*, WDQ-11-0440, 2011 WL 6019689, at *5 n.6 (D. Md. Nov. 29, 2011); *Munyiri v. Haduch*, 585 F. Supp. 2d 670, 676 (D. Md. 2008) (Davis, J.); *Hector v. Weglein*, 558 F. Supp. 194, 197-99 (D. Md. 1982) (Kaufman, J.).

I have also previously concluded that, in regard to a claim under § 1983, the BPD is not a State agency for the purpose of Eleventh Amendment immunity. *See Estate of Bryant v. Balt. Police Dep't*, ELH-19-384, 2020 WL 673571, at *29-33 (D. Md. Feb. 10, 2020); *Grim v. Balt. Police Dep't*, ELH-18-3864, 2019 WL 5865561, at *14-15 (D. Md. Nov. 8, 2019); *Burley v. Balt. Police Dep't*, ELH-18-1743, 2019 WL 6253251, at *28 (D. Md. Sept. 12, 2019);[10] *Jones v. Chapman*, ELH-14-2627, 2015 WL 4509871, at *10 (D. Md. July 24, 2015).[11]

---

[10] *Burley* has since been reassigned to Judge Stephanie Gallagher. And, on September 17, 2019, the BPD filed an interlocutory appeal to the Fourth Circuit concerning sovereign immunity. *See Burley v. Baltimore Police Department*, SAG-18-1743, 2019 WL 4325295 (D. Md. Sept. 12, 2019), *appeal filed*, No. 19-2029 (4th Cir.).

[11] On two occasions out of many, I suggested that the BPD is a State agency. *See Whetstone v. Mayor & City Council of Balt.*, ELH-18-738, 2019 WL 1200555, at *12 (D. Md. Mar. 13, 2019); *McDougald v. Spinnato*, ELH-17-2898, 2019 WL 1226344, at *11 (D. Md. Mar. 15, 2019). However, I have since recognized that my analysis regarding sovereign immunity in *Whetstone* and *Spinnato* was dicta and have declined to follow those decisions. *See, e.g.*, *Grim*, 2019 WL 5865561, at *14.

In its reply brief, the Department contends that two recent Fourth Circuit cases, *Allen v. Cooper*, 895 F.3d 337 (4th Cir. 2018), *cert. granted* No. 18-877 (June 3, 2019), and *Pense v. Maryland Department of Public Safety and Correction Services*, 926 F.3d 97 (4th Cir. 2019), foreclose plaintiff's argument. ECF 30 at 2. According to the BPD, these cases make clear that the BPD is immune from suit because the "State [has] not *specifically* and *expressly* waive[d] its immunity from suit in federal court." *Id.* (emphasis in original).

The Department's argument places the proverbial cart before the horse. In *Allen*, 895, F.3d 337, there was no question that the defendants were ordinarily entitled to Eleventh Amendment immunity: the plaintiff sued the Governor of North Carolina and officials with the North Carolina Department of Natural and Cultural Resources. Rather, the Fourth Circuit was asked to decide whether a settlement agreement between North Carolina and the plaintiffs constituted a waiver of its sovereign immunity. *Id.* at 346. Similarly, in *Pense*, 926 F.3d at 101-03, the Fourth Circuit found that Maryland had not waived its immunity as to the plaintiff's suit against the Maryland Department of Public Safety and Correctional Services, which is indisputably a State agency.

*Allen* and *Pense* address whether a state has *waived* its sovereign immunity. But, they provide no guidance on the antecedent question that is at issue here—whether the defendant is a State entity such that it is entitled to sovereign immunity absent waiver.

Ultimately, only one of the four factors points in the direction of recognizing the BPD as an arm of the State. And, State law has limited force, because the sovereign immunity analysis is a question of federal law. *Oberg*, 745 F.3d at 155; *Harter*, 101 F.3d at 342. On the record before me, plaintiff has plausibly alleged that the BPD is not an arm of the State. Therefore, BPD is not entitled to Eleventh Amendment immunity at this juncture.

Accordingly, the Eleventh Amendment does not compel the dismissal of plaintiff's *Monell* claims lodged against the BPD in Count I.

## B. *Monell* Claim (Count VI)

In Count VI, plaintiff brings a *Monell* claim against the BPD under two theories. ECF 1, ¶¶ 209-16; *see* ECF 29 at 29. First, plaintiff alleges that the BPD failed adequately to supervise, train, or discipline officers "with regard to their constitutional obligations," namely "failing to turn over exculpatory evidence and regularly fabricating evidence." ECF 1, ¶ 211. Second, plaintiff alleges that the BPD condoned a custom or policy of "improper, illegal, and unconstitutional investigative actions[.]" *Id.* ¶ 213. The BPD has moved to dismiss Count VI, asserting that the factual averments in the Complaint fail to state a plausible *Monell* claim under either theory. ECF 24-1 at 13-21.

### 1. *Monell* Generally

A municipality is subject to suit under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Supreme Court determined in *Monell* that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane*, 355 F.3d at 782. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord*

*Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id*., at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir.

1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04 (1997).

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Moreover, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 Fed. App'x at 799. In addition, "a policy or custom may possibly be inferred

from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).[12]

---

[12] I need not discuss the contours of official policy because plaintiff frames his *Monell* claims under failure to train and condonation. *See* ECF 29 at 29.

2.  Failure to Train

Plaintiff alleges that the BPD failed "to train or supervise police officers with regard to their constitutional obligations and . . . to discipline police officers who engaged in constitutional violations." ECF 1, ¶¶ 162-64, 211.  The BPD's inaction, plaintiff alleges, encouraged officers to "violate suspect's rights with impunity," *id.* ¶ 163, and "perpetuated" a culture of suppressing exculpatory evidence and fabricating inculpatory evidence.  *Id.* ¶ 164.  In *Canton v. Harris*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."

Indeed, the manner in which a police force chooses to train its officers is "necessarily a matter of 'policy[.]'" *Spell*, 824 F.2d at 1389.   Therefore, "the inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Canton*, 489 U.S. at 388.

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training."  *Lewis v. Simms*, AW-11-CV-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014).  The *Connick* Court observed, 563 U.S. at 61: "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into

contact." (Alteration in *Connick*); *see also Canton*, 489 U.S. at 388.  Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389.

Notably, even if "a particular officer may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *Canton*, 489 U.S. at 390-91.  The *Canton* Court reasoned, *id.* at 391:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Although the procedural posture of this case distinguishes it from *Connick*, 563 U.S. 51, that case is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim.  In *Connick*, the Court reiterated: "[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice."  *Id.* at 68 (alteration in *Connick*) (internal quotations omitted).

In *Connick*, respondent Thompson was prosecuted and convicted for attempted armed robbery and murder.  *Id.* at 54.  However, his convictions were overturned when it was discovered that the prosecution failed to disclose the existence of a certain crime lab report.  *Id.*  Based on the violation of *Brady*, 373 U.S. 83, Thompson filed a § 1983 suit against Harry Connick, in his official capacity as the Orleans Parish District Attorney.  563 U.S. 54.  He alleged, *inter alia*, a "deliberate indifference to an obvious need to train prosecutors in his office to avoid such constitutional

violations." *Id.* at 57. The district court ruled that, in order to establish deliberate indifference, Thompson was not required to show a pattern of similar *Brady* violations, when he could demonstrate that the need for training was "'so obvious.'" *Id.* at 58. The jury found for Thompson and awarded him damages. *Id.* A divided Fifth Circuit affirmed. *Id.* at 57.

The Supreme Court considered whether a "district attorney's office [could be] held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54. The Court noted that the *Canton* Court "sought not to foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Nevertheless, the Court said, *id.* at 61:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S. Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' "is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

The case of *Peters v. City of Mount Rainier*, GJH-14-00955, 2014 WL 4855032 (D. Md. Sept. 29, 2014), also provides guidance. In that case, the plaintiff lodged a § 1983 claim for failure to train the police force. *Id.* at *5. The complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of . . . "fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail[ing] to provide safeguards against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's conduct resulted from said training.'" *Id.* at *5 (quoting *Lewis*, 2012 WL 254024, at *1). He noted: "Peters has not even attempted to allege any such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers." *Id.* (citation to the record omitted). Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (i.e. the policy[-]or-custom element) is met. Without more, Peters has failed to adequately allege the existence of a policy or custom through the City's purported failure to train its officers." *Id.*

And, *Hall v. Fabrizio*, JKB-12-754, 2012 WL 2905293 (D. Md. July 13, 2012), is instructive. There, Judge Bredar dismissed a failure to train claim against the BPD because the complaint "d[id] not . . . allege a single instance of these alleged violations other than Plaintiff's own experience, and thus falls well short of showing the sort of 'widespread and permanent practice' that is required to show a municipal 'custom.'" *Id.* at *2. The plaintiff's claim also faltered, Judge Bredar noted, because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker." *Id.*

In contrast, in *Jones v. Jordan*, GLR-16-2662, 2017 WL 4122795 (D. Md. Sept. 18, 2017), Judge Russell found that the plaintiff had stated a plausible failure-to-train claim against the BPD. *Id.* at *9. Rejecting the BPD's contention that the plaintiff failed to identify specific training deficiencies, Judge Russell observed that the plaintiff "alleges that BPD 'relies on deficient training on a broad array of substantive policing functions' and 'numerous important topics,'

specifically pointing to lack of 'proper[] train[ing]' on 'use of force,' 'de-escalation,' 'stops, searches, and arrests,' and 'how to supervise and investigate misconduct.'" *Id.* at *6 (alterations in original) (quoting the complaint). Thus, Judge Russell found that, because the plaintiff had "identifi[ed] 'specific deficienc[ies]' with the training," the plaintiff had "stated the nature of the training for his failure to train claim." *Id.* at *7 (alterations in original) (citation omitted).

The Fourth Circuit has observed that "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Owens*, 767 F.3d at 403. Plaintiff's failure-to-train claim falls closer to *Jones* than to either *Connick*, *Peters*, or *Hall*. The Complaint contains far more than boilerplate allegations that the BPD failed to train and supervise its officers. Plaintiff identifies a specific deficiency with BPD's training: its failure to train officers on the obligation to disclose exculpatory information as required by Brady and failing to supervise and discipline officers for fabricating evidence. ECF 1, ¶¶ 162-64, 211. To illustrate this training defect, plaintiff highlights twelve instances where an individual was wrongfully convicted of murder after the BPD had suppressed exculpatory evidence. *Id.* ¶¶ 149-60. These factual allegations regarding the BPD's liability go well beyond a generic restatement of the elements of a *Monell* claim and are sufficient to provide the BPD with fair notice of the grounds for which has been sued.

Nonetheless, the Department argues that plaintiff has not alleged a plausible failure-to-train claim because he "does not allege any specific facts about the training the officers actually received, or point to any precise shortcoming." ECF 24-1 at 18. In essence, the BPD's argument seeks to foist an unreasonable pleading standard upon plaintiff's *Monell* claim. As noted, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 555). That standard applies to § 1983 claims. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (rejecting heightened pleading standards for § 1983 claims).

As the Supreme Court has explained, evaluating a complaint under Rule 12(b)(6) is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In the context of *Monell* liability, it will often be the case that a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery. Although boilerplate allegations will not suffice, at the motion to dismiss stage, courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers. *See Ulloa v. Prince George's Cty.*, DKC 15-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015) (requiring that the plaintiff "pair *general* averments of a policy or custom with particular examples" to state a *Monell* claim) (emphasis added); *see also Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019) ("[T]the details of the alleged policy or custom . . . is a topic properly left to development through discovery. It is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated guesswork."); *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 373 (E.D. La. 2016) (same); *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 841-45 (S.D. Tex. 2011) (same).

Thus, plaintiff has sufficiently alleged a *Monell* claim against the BPD for failure to train and supervise its officers with respect to their obligations under *Brady*.

### 3. Condonation

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). To assert a plausible claim, a plaintiff must allege "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-1391). Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391). However, only "'widespread or flagrant'" misconduct is sufficient. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). In contrast, "[s]poradic or isolated" misconduct is not. *Owens*, 767 F.3d at 403.

*Owens*, 767 F.3d 379, is illustrative. There, Owens brought a § 1983 claim against the BPD, several BPD officers, the Baltimore City State's Attorney's Office, and an assistant State's Attorney, alleging, *inter alia*, that the BPD "'maintained a custom, policy, and/or practice' of condoning its officers' conduct in 'knowingly, consciously, and repeatedly with[holding] and suppress[ing]' exculpatory evidence." *Id.* at 402 (quoting the complaint). The district court granted the defendants' motion to dismiss and Owens appealed. The Fourth Circuit reversed. *Id.* at 404.

As relevant here, the Fourth Circuit scrutinized Owens's complaint to determine whether it alleged a plausible condonation claim. The Court observed, *id.* at 403 (alterations in original):

> In support of his claim, Owens alleges that "[r]eported and unreported cases from the period of time before and during the events complained of" establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions. He further alleges that

"a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it."

According to the Court, "[t]he assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id.* Further, Owens's allegation that the BPD officers withheld exculpatory information "on multiple occasions could establish a 'persistent and widespread' pattern of practice, the hallmark of an impermissible custom." *Id.* (quoting *Spell*, 824 F.2d at 1386). Thus, the Court ruled that the complaint contained sufficient allegations to support a *Monell* claim premised on a condonation theory of liability. *Id.* at 404.

A similar result was reached in *Garcia v. Montgomery Cty.*, Md., JFM-12-3592, 2013 WL 4539394 (D. Md. Aug. 23, 2013). There, Garcia, his wife, and a family friend were leaving a restaurant when Garcia observed two young men being arrested by the Montgomery County Police ("MCP"). *Id.* at *1. Concerned that the arresting officers were using excessive force, Garcia, "an award-winning freelance photojournalist," began to photograph the incident from at least thirty feet away. *Id.* One of the officers flashed Garcia with a spotlight, and he moved across the street to continue photographing the incident from a distance of about one hundred feet. *Id.*

Garcia was then approached by an officer. Garcia identified himself as a member of the press, and opened his hands to show that he had nothing in his possession except his camera. *Id.* The officer "shouted that Mr. Garcia was under arrest, placed him in a chokehold, and forcibly dragged him along the ground to the police cruiser." *Id.* Subsequently, the officer "placed Mr. Garcia in handcuffs and confiscated his camera." *Id.* The officer then "kicked Mr. Garcia's right foot out from under him, causing Mr. Garcia to hit his head on the police cruiser as he fell to the

ground." *Id.* Garcia was subsequently taken into custody and charged with disorderly conduct. *Id.* At a trial in a Maryland court, Garcia was acquitted of disorderly conduct. *Id.*

Thereafter, Garcia filed suit against the County and, among other counts, he lodged a *Monell* claim. Garcia's complaint stated "that his injury resulted from 'Montgomery County's policy or custom of indifference to misconduct by [MCP] officers' and a 'lack of training and supervision requiring the police to follow the law and established departmental policies.'" *Id.* at *5 (quoting the complaint). Further, Garcia alleged that, despite a written media relations policy, which provides that police should maintain a cooperative working relationship with members of the media, there is a "'custom and practice among [MCP] officers of obstructing and/or preventing members of the media from filming police activity conducted in public.'" *Id.* (quoting the complaint). He also complained that Montgomery County has a policy, custom, or practice of "'failing to supervise and discipline officers who unlawfully obstruct and/or prevent members of the media and the public from recording police activity conducted in public view, despite its awareness that these violations happen.'" *Id.* (quoting the complaint). According to Garcia, Montgomery County effectively sanctioned and endorsed his treatment by the police because of its inadequate investigation of the incident. *Id.*

The defense moved to dismiss, asserting: "Mr. Garcia's complaint mentions only his incident and . . . he has pled nothing more than an isolated constitutional deprivation . . . ." *Id.* at *5. Judge Motz rejected that argument, reasoning, *id.*:

> Mr. Garcia has stated a valid *Monell* claim. Contrary to the defendants' assertion that Mr. Garcia's complaint mentions only his incident and that he has pled nothing more than an isolated constitutional deprivation, the complaint alleges that Montgomery County was aware of unconstitutional actions by MCPD officers directed towards members of the media but chose to ignore such behavior. The Fourth Circuit has made clear that a *Monell* plaintiff need not "plead the multiple incidents of constitutional violations that may be necessary at later stages to

establish the existence of an official policy or custom and causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339-40 (4th Cir. 1994) (citations omitted).

Judge Motz concluded: "At this stage, it is enough that Mr. Garcia has alleged that Montgomery County was aware of ongoing constitutional violations by [MCP] officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop." *Id.* Judge Motz added, *id.*:

> Under *Twombly* and *Iqbal*, the factual allegations in the complaint are sufficient to survive a motion to dismiss as they are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Jordan*, 15 F.3d at 338 (stating that "section 1983 claims are not subject to a 'heightened pleading standard' paralleling the rigors of proof demanded on the merits") (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).

Careful review of the Complaint here demonstrates that it adequately alleges that the BPD condoned a policy or pattern and practice of misconduct in murder investigations, including fabricating evidence or suppressing exculpatory and impeachment evidence. *See* ECF 1, ¶¶ 162-64, 211-15. In support of this averment, plaintiff points to particular examples of unconstitutional conduct, most of which preceded the events at issue. Specifically, as set forth earlier, the Complaint recounts twelve instances in which individuals were wrongfully convicted of murder, allegedly because the BPD suppressed exculpatory evidence. *See id.* ¶¶ 149-60.

The similarities are readily apparent. Here, the BPD allegedly withheld exculpatory evidence, such as a witness identification and impeachment evidence. *Id.* And, plaintiff alleges a conviction that was later vacated, involving Detective Goldstein. *Id.* ¶ 154.

The BPD insists that 12 cases spanning 35 years "does not provide facts to support the inference that . . . BPD [had] notice of the type of constitutional violations Johnson alleges in 1988." ECF 24-1 at 21. According to the Department, the alleged pattern-and-practice cases are insufficient to state a plausible claim because only two cases "have any temporal proximity to

Johnson's case" and "there are no allegations that anyone in BPD even knew about these alleged violations at the time" that they occurred. *Id.* at 21.

These arguments are not persuasive. Certainly, the "Law of Large Numbers" all but guarantees "the inevitability of mistakes over enough iterations of criminal trials." *Connick*, 563 U.S. at 73 (Scalia, J., concurring). But, plaintiff's allegations do not allege isolated mistakes. Rather, the Complaint paints a disturbing picture of a police department that turned a blind eye to the suppression of exculpatory evidence by its officers in murder investigations. *See Burgess I*, 2016 WL 795975, at *12. Likewise, that some of the cases occurred after Mr. Johnson's conviction is beside the point. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183, 210 (D.D.C. 2011) (same), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013).

Plaintiff alleges that, since at least 1974, there has been a widespread practice among BPD officers of conducting unconstitutional investigations such that the BPD had actual or constructive knowledge of this misconduct, not that the cases of Tyrone Jones or Ezra Mable put the BPD on notice of these practices. Accordingly, I will deny the BPD Motion as to the condonation claim lodged in Count VI.

## C. Indemnification Claim (Count XI)

In Count XI, plaintiff seeks "indemnification" against the BPD. ECF 1, ¶¶ 274-76. Plaintiff alleges that the "Officer Defendants are or were employees of the [BPD], who acted within the scope of their employment in committing the misconduct" set forth in the Complaint. *Id.* ¶ 276.

As discussed, *supra*, the LGTCA limits the civil liability of local governments and their employees. C.J. § 5-301 *et seq.* Under the LGTCA, "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." *Johnson v. Francis*, 239 Md. App. 530, 550, 197 A.3d 582, 594 (2018). Thus, the LGTCA "provide[s] 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'" *Rios v. Montgomery Cty.*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd*, 386 Md. 104, 872 A.2d 1 (2005).

The statute provides, in pertinent part, C.J. § 5-303(b):

(1) [A] local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

Thus, "an entity that is designated a local government under the LGTCA, and has available the common law defense of governmental or sovereign immunity, can no longer raise that defense to escape the statutorily imposed duties to defend and indemnify." *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434. However, the LGTCA does not create a direct cause of action to sue a local government entity. *Id.* at 319 (citing *Williams v. Prince George's Cty.*, 112 Md. App. 526, 552, 685 A.2d 884 (1996)).

Of import here, the BPD is included in the list of "local governments" covered by the LGTCA. C.J. § 301(d)(21). However, "by adding the [BPD] to the list of local governments in the [LGTCA] . . . the General Assembly waived [BPD's] common law State sovereign immunity

only to the extent of the statutory duties to defend and indemnify.  Otherwise, the [BPD's] State sovereign immunity remain[s] intact."  *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434.

The BPD avers that indemnification under the LGTCA "flows directly and solely from the employer-employee relationship, and is not a right held by anyone other than BPD employees." ECF 24-1 at 22.  Therefore, in the BPD's view, Count XI fails to state a claim for indemnification, because plaintiff has not obtained a judgment against any of the Officer Defendants nor established that they were acting within the scope of their employment.  *Id.* at 23.

The Department's arguments are without merit.  The Maryland Court of Special Appeals has squarely rejected BPD's contention that the LGTCA's obligations extend only to employees. *See Johnson v. Francis*, 239 Md. App. 530, 550-51, 197 A.3d 582, 594-95 (2018), *cert. denied*, 463 Md. 155 (2019).

In *Johnson*, 239 Md. 530, 197 A.3d 582, the BPD argued that the plaintiff could assert an indemnification claim only if the officers assigned their rights against the BPD to the plaintiff.  *Id.* at 549, 197 A.3d at 594.  To support the theory that an assignment is required for a plaintiff to pursue an indemnification claim, the BPD argued that C.J. § 5-303(b)(2) "establishes that the 'shall be liable' language in [§ 5-303(b)(1)] really just imposes on the local government an obligation of indemnification running to the employee, not liability running to the underlying plaintiff."  *Id.* at 551, 197 A.3d at 595.  The court acknowledged that § 5-303(b)(2) could "create an ambiguity in a vacuum as to the nature of the indemnification obligation[.]"  *Id.*  But, it explained that "[w]hen read in the context with the statute, the local government's obligation under § 5-303(b)(1) unambiguously runs directly to the underlying plaintiff."  *Id.*  Thus, the court found that a plaintiff can seek recovery directly against the local government.  *Id.* at 555, 197 A.3d at 597.

Moreover, the cases on which the BPD relies do not preclude a plaintiff from *pleading* an indemnification claim before final judgment. Instead, those decisions provide that the LGTCA's wavier of a local government's immunity extends only to indemnification claims. *See Cherkes*, 140 Md. App. 282, 303, 780 A.3d at 422 (dismissing BPD from suit because "none of the [plaintiff's] claims asserted against the [BPD] concern th[e] possible eventuality" that plaintiff would be entitled to indemnification); *Williams*, 112 Md. App. at 552-54, 685 A.2d at 897-98 (dismissing LGTCA claim where plaintiff had not also sued a local government employee); *Hansen v. City of Laurel*, 420 Md. 670, 678 n.5, 25 A.3d 122, 128 n.5 (2011) (noting that under the LGTCA, plaintiffs are "*unable* to sue directly (that is, name as the singular defendant) a local government for many tort violations" (emphasis in original)).

Certainly, a judgment against a local government employee is a precondition to recovering against a local government under the LGTCA. *See id.* at 555, 197 A.3d at 597. And, other courts have dismissed an indemnification claim brought against the BPD as premature. *See Burgess II*, 2016 WL 795975, at *11 n.13 (dismissing indemnification claim as premature); *Jones v. Ziegler*, 894 F. Supp. 880, 897 (D. Md. 1995) (same). But, permitting Mr. Johnson to plead an indemnification claim against the BPD at the outset avoids the possibility of redundant litigation, thereby facilitating the efficient resolution of this case. *See, e.g.*, Fed. R. Civ. P. 13(g) (allowing parties to file cross-claims for indemnification in pleadings). Indeed, for that reason, courts in this District have permitted the BPD to file a cross-claim for indemnification against an officer under Rule 13(g), seeking a declaration that it has no duty to indemnify despite the officer's liability not having been established. *See Bumgardner v. Taylor*, GLR-18-1438, 2019 WL 4115414, at *11 (D. Md. Aug. 29, 2019) (finding that "permitting BPD's Cross-Claim to proceed directly behind [the plaintiff's] claims serves the purposes of Rule 13(g)"); *Harrod v. Mayor & City Council of*

*Balt.*, GLR-18-2542, 2019 WL 5636392, at *4 (D. Md. July 24, 2019) (same). That approach makes good sense where, as here, "[d]etermining whether [the] Officer Defendants were acting within the scope of their employment will, in turn, determine whether BPD is liable for [the] Officer Defendants' actions." *Bumgardner*, 2019 WL 4115414, at *11.

Accordingly, I shall deny the BPD Motion as to Count XI.

## V.    Conclusion

For the foregoing reasons, I shall deny the BPD Motion (ECF 24). Further, I shall grant in part and deny in part the Davis Motion (ECF 22) and the Officers Motion (ECF 25). In particular, I shall dismiss Counts I and II to the extent that they are predicated on the Fifth Amendment, as well as Counts V, VIII, and IX in their entirety.

An Order follows, consistent with this Memorandum Opinion.


Date: March 10, 2020                              _____/s/_____
                                                                    Ellen L. Hollander
                                                                    United States District Judge