**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JEROME L. JOHNSON,

          Plaintiff,

     v.

BALTIMORE POLICE DEPARTMENT, *et al.*

          Defendants.

)
)
)
)
)
)
)
)
)
)

No. 1:19-cv-00698

Honorable Ellen L. Hollander

**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AS A LITIGATION
SANCTION BASED ON THE USE OF FALSE OR FABRICATED EVIDENCE**

Respectfully submitted,

        */s/*

Shneur Nathan, Bar No. 20707
Avi T. Kamionski, Bar No. 20703
Judson Arnold, Bar ID 21296
Nathan & Kamionski LLP
575 S. Charles St., Suite 402
Baltimore, MD 21201
Phone: (410) 885-4349
Fax: (952) 658-3011
snathan@nklawllp.com
akamionski@nklawllp.com
jarnold@nklawllp.com
*Counsel for Individual Defendants*

JAMES L. SHEA
Baltimore City Solicitor
       */s/*

Kara K. Lynch (Bar No. 29351)
Justin S. Conroy (Bar No. 28480)
Kyle A. Ashe (Bar No. 21551)
Natalie R. Amato (Bar No. 20749)
Baltimore City Law Department
Office of Legal Affairs
100 N. Holliday Street, Room 101
Baltimore, Maryland 21202

T: (410) 396-2495/F: (410) 396-2126
kara.lynch@baltimorepolice.org
justin.conroy@baltimorepolice.org
kyle.ashe@baltimorepolice.org
natalie.amato@baltimorecity.gov
*Attorneys for Baltimore Police Department*

Defendants, Kevin Davis, Frank Barlow, Daniel Boone, Gerald Goldstein, and the Baltimore Police Department ("Defendants"), through their undersigned attorneys, and under Fed. R. Civ. P. 41 and this Court's inherent authority, for their Motion to Dismiss Plaintiff's Amended Complaint as a Litigation Sanction Based on the Knowing Use of False or Fabricated Evidence, state as follows:

## INTRODUCTION

A Baltimore City jury convicted Jerome Johnson ("Plaintiff") for his role in the murder of Aaron Taylor that occurred at the Nite Owl Tavern on July 14, 1988. The conviction was largely based on eyewitness testimony from a woman named Lakesha Snead, who testified that Taylor was confronted by a group of men, including Plaintiff, near the Nite Owl Tavern. Snead testified that Plaintiff handed a gun to Alvin Hill before Hill shot Taylor. Plaintiff denied handing Hill the gun and asserted he was about one block away talking to a friend at the time of the murder. On March 15, 1989, the jury found Plaintiff guilty of first-degree murder and use of a handgun in a crime of violence. Plaintiff was later sentenced to a term of life imprisonment with twenty years consecutive for the handgun offense.

Over the next three decades, Plaintiff repeatedly defrauded the courts while trying to unlawfully obtain his release from prison. He knowingly obtained two irrefutably false affidavits: one from a man who claimed to have handed a gun to Hill ("Burton Affidavit"), and the other from Hill himself ("Hill Affidavit"). The Burton Affidavit is false. Paul Burton was not with Hill because Burton was in prison when Hill shot Taylor. The Hill Affidavit is also false because it asserted that Burton, not Plaintiff, handed Hill the murder weapon. Plaintiff attached these fraudulent affidavits to at least five court filings in which he represented that they were reliable and that Burton, not Plaintiff, handed a gun to Hill.

To avoid further judicial scrutiny of his false and fraudulent evidence at a post-conviction hearing, Plaintiff presented these same false affidavits to the State's Attorney's Office ("SAO") Conviction Integrity Unit ("CIU"). Using the false and fraudulent evidence, Plaintiff persuaded the SAO to join in his Petition for Writ of Actual Innocence ("Joint Petition") that led to his unjustified release from prison.

The evidence below unequivocally proves that Plaintiff was aware of the falsity of the Burton and Hill affidavits from the very moment that Plaintiff procured them. And, despite knowing that the affidavits were false, Plaintiff successfully obtained his release from prison by misleading the SAO and the Circuit Court for Baltimore City about the reliability of the supposedly exonerating Hill Affidavit. For the reasons discussed below, Plaintiff's knowing and deliberate submission of false evidence to the criminal courts and the SAO, along with the consequences of his witness tampering, infects this entire proceeding and undermines the public's confidence in the judicial system's ability to fairly adjudicate disputes on the basis of legitimate evidence. Accordingly, this lawsuit should be dismissed.

## FACTUAL BACKGROUND

Alvin Hill shot Aaron Taylor because of a dispute over drug money. Ex. 1 (Johnson Dep.) at 223:17-224:18; Ex. 2 (July 28, 1988 Statement of Reginald Dorsey to BPD) BPD Johnson 000110-113. Plaintiff and his co-defendants in the Taylor homicide – "Poopie" (Alvin Hill), "Butt" (Reginald Dorsey), and "Tommy" (Thomas Carroll) – sold drugs together in the area. Ex. 3 (Carroll Dep.) 17:13-18:22, 39:7-17. Reginald Dorsey admitted to police that he was at the crime scene and stated that Taylor was murdered after recently ripping off a drug purchaser who in turn

threatened retribution against Carroll and his family.[1] Ex. 2 at BPD Johnson 000110-111. Dorsey revealed that Hill, Carroll's cousin, had to cover the money that Taylor stole and that Hill had been looking for Taylor to recoup his loss. Ex. 2 at BPD Johnson 000110-111. The confrontation outside the Nite Owl on July 14 occurred after Hill and the others located Taylor and chased him to the bar. Ex. 2 at BPD Johnson 000111-113; Ex. 4 (October 24, 1988 Statement of Jerome Johnson to BPD) BPD Johnson 000150-152; Ex. 1 252:14-253:11 (stating that his statement to police was truthful).

Plaintiff knew about the facts surrounding Taylor's homicide. Ex. 4 at BPD Johnson 000150-152. Following his arrest, Plaintiff voluntarily gave a statement to police. Ex. 4 at BPD Johnson 000150. Plaintiff explained that on the night of the murder, he was walking towards the Nite Owl when he observed Alvin Hill, Reginald Dorsey, Thomas Carroll, Ornie Carroll, and Kenny Allen cross over Reisterstown Road to locate Taylor. Ex. 4 at BPD Johnson 000150. He knew something bad was about to happen because his friends were chasing Taylor and they were dressed in black. Ex. 4 at BPD Johnson 000150. Plaintiff claims, however, that he was not involved in the shooting; although he had been on his way to the Nite Owl, he had reversed course a few hundred feet from the bar, in the area of Reisterstown Road and Lucille. *See* Ex. 4 at BPD Johnson 000150; Ex. 1 at 231:6-232:20; 312:19-313:5.

According to Plaintiff, he met with Thomas Carroll shortly after the shooting and Carroll told him how the shooting happened. Ex. 1 at 241:17-253:11; Ex. 4 at BPD Johnson 000151. Plaintiff claimed to have learned from Thomas Carroll that Ornie Carroll, Thomas's brother, pointed a gun that did not fire at Taylor before Hill followed Taylor into the bar. Ex. 1 at 257:17-

---

[1] Reginald Dorsey is deceased and therefore did not provide deposition testimony. At the time of his death, he was still incarcerated for his role in the murder of Taylor.

20; Ex. 4 at BPD Johnson 000151. Plaintiff also stated that he sought out Hill shortly afterward and that Hill told him what happened during the shooting. Ex. 1 at 247:7-18; Ex. 4 at BPD Johnson 000151-152.

### The Burton Affidavit is Unarguably False

The Burton Affidavit asserts under the penalties of perjury that Burton happened upon the altercation with Taylor after "the automobile I was operating was involved in a minor traffic accident with another vehicle at the intersection of Reisterstown Road and Woodland Avenue." Ex. 5 (Paul Burton Affidavit) at ¶3. It continues by saying that a man called "Poopie" pulled out a handgun and that Aaron Taylor knocked the gun out of his hand. Ex. 5 at ¶5. It then claims that Burton picked up the gun and handed it back to "Poopie." Ex. 5 at ¶5. The Burton Affidavit claims Burton "felt bad" after learning Plaintiff had been convicted because it was in fact Burton who had handed the gun to "Poopie." Ex. 5 at ¶7.

Simply put, Paul Burton did not hand a gun to Hill before Hill shot Taylor. Burton's prison records show that he was incarcerated at Maryland Correctional Institute – Hagerstown between March 1987 and April 1989. Ex. 6 (Burton Prison Records 1987-1989) at NK DEF 012676-77. In fact, Burton testified during his deposition that he was in prison when Taylor was killed. Ex. 7 (Burton Dep.) at 202:18-203:18. Plaintiff also conceded this much during his deposition. Ex. 1 at 293:7-9. Moreover, Burton denies that he even signed the affidavit. Ex. 7 at 192:7-195:6.

### Plaintiff Manufactured the False Burton Affidavit

The Burton Affidavit materialized while Plaintiff and Burton were incarcerated at the same prison. By his own admission, Plaintiff worked as a "jailhouse attorney" and assisted Burton with his case. Ex. 1 at 276:15-21. In Plaintiff's words, "We was in one of these prisons together, and I actually was helping him with his case, because that's what I do, I help dudes with their cases. I

4

served as the jailhouse attorney, and, as we was talking -- and, you know that's where I met him." Ex. 1 at 276:15-21. Plaintiff claims Burton allegedly volunteered to Plaintiff that *he* was present at the crime scene, knew Aaron Taylor, handed a gun to the shooter, and would certify that Plaintiff was not present. Ex. 1 at 280:10-281:9.

But Burton denies ever signing the affidavit. Ex. 7 at 174:18-175:1. According to Burton, and confirmed by his prison records, Burton was in administrative segregation confinement on the day the Burton Affidavit was allegedly executed. Ex. 8 (Burton Inmate Institutional Progress Sheets 1994-2008) at NK DEF 009480-81; Ex. 7 at 199:20-202:1. Burton explained that while on administrative segregation, he could not have executed an affidavit for Plaintiff. Ex. 7 at 200:18-202:1. And according to Burton, in 2015 or 2016 he and Plaintiff had a falling out because Plaintiff had used Burton's name in court papers without his permission and because he had been incarcerated in 1988 the affidavit would not hold up. Ex. 7 at 202:3-204:5.

### Plaintiff Procured the False Hill Affidavit

Three years after Plaintiff obtained the Burton Affidavit, Plaintiff secured an affidavit from Alvin Hill that adopted the false version of events set forth in the Burton Affidavit. Ex. 9 (Hill Affidavit, attached as Exhibit A to Jerome Johnson's 2011 Pet. for Writ of Actual Innocence) at Johnson_001156.[2] The Hill Affidavit states that Hill recalled a man he did not know approaching the group that was confronting Taylor. Ex. 9 at Johnson _001156, ¶ 3. Hill then swore under the penalties of perjury that after Taylor knocked a gun out of his hand, "the guy who I have came to learn the name of was Paul Burton, pick up the gun. Then I told him to give me my f**** gun

---

[2] Alvin Hill is deceased and therefore did not provide deposition testimony. At the time of his death, he was still incarcerated for murdering Taylor.

back. Man I already told you one time that you don't have anything to do with this. Then Paul Burton, gave me the gun back." Ex. 9 at Johnson_001156, ¶ 3.

At Plaintiff's deposition, he admitted that he spoke with Hill about obtaining Hill's affidavit. Johnson Depo. Ex. 1 at 304:1-3. Plaintiff also admitted that Hill knowingly made a false statement in the affidavit when describing Paul Burton's supposed actions on the date of the murder:

> Q: Would you agree that the Paul Burton
> portion of this is false?
> A: Yes.
> Q: You would agree that Alvin Hill was
> present for the murder of Aaron Taylor?
> A: Yes.
> Q: You would agree that Alvin Hill knowingly
> made a false statement in this affidavit?
> A: Given what we know, yes.

Ex. 1 at 299:8-16. When asked if Plaintiff would feel comfortable attaching the Hill Affidavit to any future court filings, Plaintiff conceded that he would not. Ex. 1 at 310:8-10.

### Plaintiff Used the Perjured Affidavits in Court Filings

For about fourteen years, Plaintiff attached these fraudulent and perjured affidavits to multiple court filings, both *pro se* and while represented by counsel. Plaintiff began using the Burton Affidavit in filings only days after it was allegedly signed. *See* Ex. 10 (Jerome Johnson's Petition for Writ of Habeas Corpus filed April 24, 1997) at BPD Johnson 004371-72. Plaintiff's first known use of the Burton and Hill affidavits occurred in his *pro se* habeas petition to the U.S. Court of Appeals for the Fourth Circuit, which he filed just two days after the Hill Affidavit was executed. *See* Ex. 11 (Jerome Johnson's Petition for Writ of Habeas Corpus filed May 23, 2000) at NK DEF 001014-15.

Plaintiff also filed a Petition for Writ of Actual Innocence in April 2011 ("2011 Petition"), in which he again relied on the fraudulent and perjured affidavits. *See* Ex. 9. At first, Plaintiff's 2011 was denied without a hearing, but the Court of Special Appeals for Maryland later remanded Plaintiff's petition for an evidentiary hearing. Ex. 12 (Unreported Opinion of the Court of Special Appeals of Maryland Sept. Term, 2011 No. 1364, June 5, 2014) NK DEF 003193-205. Even so, as further described below, Plaintiff withdrew the 2011 Petition in favor of lobbying the SAO to dismiss the charges, a strategy that deprived the Circuit Court of the opportunity to scrutinize his affiants' credibility. *See* Ex. 13 (Motion to Withdraw Petition).

**Nancy Forster Becomes Involved as Counsel for Plaintiff and Paul Burton**

Nancy Forster was Plaintiff's post-conviction counsel from at least August 6, 2013 through the dismissal of his criminal charges in 2018. Ex. 14 (Entry of Appearance). Mr. Burton testified at his deposition that he met with Ms. Forster in December 2015 or 2016. Burton Depo. Ex. 7 at 332:10-16. Ms. Forster later entered her appearance as Paul Burton's post-conviction counsel, while she still represented Mr. Johnson. *See State of Maryland vs Paul Antonio Burton*, Baltimore County Circuit Court, Case No. 03-K-93-001699. When asked if he told Ms. Forster that the Burton Affidavit was false, Mr. Burton invoked his Fifth Amendment privilege. Ex. 7 at 332:17-333:6.[3]

**Plaintiff, via Ms. Forster, Withdraws his First Petition**

---

[3] Ms. Forster was listed as Plaintiff's counsel in the original Complaint. ECF 1. During Mr. Burton's deposition, the parties called the Court to address Mr. Burton's refusal to answer questions. Ms. Forster appeared before the district court via videoconference during this dispute. After defense counsel questioned Burton's affidavit, the Court directed a question to Ms. Forster, but she dropped off the videoconference without answering the Court's question. Ms. Forster later moved to withdraw her appearance. ECF No. 108. Plaintiff later objected to Defendants taking her deposition because she remained Plaintiff's attorney. ECF 120, p.1.

On June 5, 2014, the Court of Special Appeals vacated the denial of Plaintiff's 2011 Petition and remanded the matter for an evidentiary hearing. *See* Ex. 12 at NK DEF 003205.[4] Plaintiff, via Ms. Forster, requested a hearing on the remanded petition, which was reset several times for various reasons. *See* Ex. 17 (Request for Hearing). On June 30, 2016, Ms. Forster filed writs to secure the appearance of Hill and Burton at a July 26, 2016 hearing. Ex. 18 (Executed Writs for Burton & Hill). The hearing was continued multiple times until December 6, 2016, when Plaintiff withdrew the 2011 Petition. *See* Ex. 13.

Plaintiff knew he had an issue with Burton's cooperation before he withdrew the 2011 Petition and certainly before he filed the Joint Petition with the SAO in which he relied on Hill's affidavit again in 2018. During a prison call six months before Plaintiff withdrew the 2011 Petition, Plaintiff clandestinely discussed the likelihood that Burton would refuse to keep perjuring himself, stating:

> Matter of fact, remember on the remand there's three affidavits can you recall that? OK, I don't want to say the names cuz I don't want to give too much information over the phone but, one of the key people is supposed to be jumping ship. But we still gonna be able, she's [Nancy Forster] saying she's still gonna be able to use his affidavit, in other words the dude's not coming to testify. But she don't think it's real damaging, but it's a little bit. But we still may get it in cuz we still got Poopie [Hill].[5]

Johnson Depo. Ex. 1 at 395:19-397:13. This jail call, which Plaintiff confirmed was accurate, leaves no question that Plaintiff knew the Burton and Hill affidavits were unreliable when he agreed to use them in the Joint Petition.

---

[4] Plaintiff also filed a second petition on July 11, 2012, that was denied on January 17, 2013. *See* Ex. 15 (Denial of 2nd Petition for Writ of Actual Innocence). The denial was affirmed by the Court of Special Appeals on June 17, 2014. *See* Ex. 16 (Unreported Opinion of the Court of Special Appeals of Maryland, Sept. Term 2012 No. 2605). Notably, many of these claims are now repeated in this case.

[5] As stated previously, "Poopie" is the nickname for Alvin Hill. *See* Ex. 1 at 214:9-18.

**Ms. Forster's Presentation to the SAO**

Ms. Forster met with members of the Conviction Integrity Unit ("CIU"), in October 2017. Ex. 19 (Lipscomb Dep., June 28, 2021) at 78:14-79:4. Lauren Lipscomb, chief of the CIU at the time, testified that the CIU dispensed with the SAO's usual case screening process because Ms. Forster asked the CIU to investigate the case. Ex. 19 at 32:17-21. ("In the Jerome Johnson case, it was a case that was presented by Nancy Forster, and based on her presentation, it was a case that needed an investigation. So, the initial review process was almost none."). Discovery also revealed that Ms. Forster presented both the Burton and Hill affidavits on behalf of Plaintiff to the CIU to induce the State to vacate Plaintiff's conviction. *See* Ex. 20 (Plaintiff's Responses to Requests for Admission), Responses to Requests 3 & 6.

**SAO and Ms. Forster Join in The Petition Presenting the Hill Affidavit as Reliable Evidence**

Ultimately, Plaintiff filed the Joint Petition and presented the Hill Affidavit as a basis for the Court to set aside his conviction. *See* Ex. 21 (Joint Petition for Writ of Actual Innocence). Under a section titled "Newly Discovered Evidence Since the Time of Mr. Johnson's Trial Proves Innocence Under 8-301," the Hill Affidavit is the first piece of evidence listed. Ex. 21 at NK DEF 003029. The Joint Petition asserts based on the Hill Affidavit that: "On May 23, 2000, the Shooter [Hill] provided an affidavit that Johnson was not present at the time of the murder. He admitted to pulling the gun out on Victim and that Johnson was not there." Ex. 21 at NK DEF 003029. The Joint Petition again cited the Hill Affidavit under a list of the "most compelling" results of the CIU investigation. Ex. 21 at NK DEF 003032. The Joint Petition explained that its "Joint Conclusion," that the outcome of Mr. Johnson's trial would have been different, was based on the results of the CIU's investigation, the joint CIU and Mid-Atlantic Innocence Project investigation and the "totality of [the] prior investigation conducted by Ms. Forster." Ex. 21 at NK DEF 003033.

9

The SAO joined the Joint Petition and the Court granted it without a substantive hearing. Although this technically allowed the SAO to retry Plaintiff, the SAO immediately dismissed his charges. Ms. Lipscomb testified that she, as the representative of the SAO, would not have signed the Joint Petition if the defense had represented facts that she had known at the time were false. Ex. 19 at 257:6-13. Plaintiff was later awarded $2.3 million from the State of Maryland through the Board of Public Works and this lawsuit followed. Ex. 22 (Board of Public Works of Maryland Agreement).

## ARGUMENT

Federal courts have the inherent power to impose sanctions "for conduct which abuses the judicial process." *Chambers v. NASCO*, *Inc.*, 501 U.S. 32, 44–45 (1991). Such conduct includes situations in which the Court finds that "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id*. at 45–46 (internal quotations and citations omitted). Appropriate sanctions may include everything from outright dismissal of an action to the assessment of attorneys' fees. *Id*. at 45. The sanction of dismissal is appropriate "when a party deceives [the] court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 654 (4th Cir. 2006) (quoting *United States v. Shaffer Equip. Co*., 11 F.3d 450, 462–63 (4th Cir. 1993)).

Before imposing severe sanctions for litigation abuse, the Court should employ the heightened standard of clear and convincing evidence. *Dewitt v. Ritz*, DKC 18-3202, 2021 WL 915146, *4 (D. Md. Mar. 10, 2021). In evaluating whether dismissal is an appropriate sanction, the court considers: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by his attorney; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability

10

of other sanctions to fix the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest. *Shaffer Equip. Co.*, 11 F.3d at 462–63. These factors do not constitute a rigid test and so the lack of any one factor is not determinative. *See Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992) (there is no "magic formula whereby the decision to dismiss or not to dismiss a plaintiff's complaint becomes a mechanical calculation"); *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1325 (D. Utah 2016), *aff'd sub nom. Xyngular v. Schenkel*, 890 F.3d 868 (10th Cir. 2018).

Plaintiff's litigation misconduct set forth in the fact section above easily satisfies and exceeds the factors outlined in *Shaffer*. The only appropriate sanction is dismissal and an assessment of attorney's fees.

**(1) The Degree of the Wrongdoer's Culpability**

**<u>Plaintiff Procured Both False Affidavits</u>**

Plaintiff knew that the Burton and Hill Affidavits were false from the day he obtained each of these fraudulent documents. At the outset, Plaintiff was personally involved in procuring Burton's affidavit. Plaintiff testified that he was with Burton in prison when the two of them discussed that Burton would take responsibility for the crime for which Plaintiff was convicted. *See* Ex. 1 at 280:10-284:9.

There is simply no credible scenario where Plaintiff could feign ignorance about the falsity of Burton's affidavit. According to Lakeisha Snead's testimony, Plaintiff was the person who handed Hill the gun. Ex. 23 (Trial Tr. March 13, 1989) at SAO_PC_Johnson 002372, ln. 23-002376, ln. 4. Because Plaintiff was present, he knew that Burton was not present and that his assertions to the contrary were wrong. Even accepting Plaintiff's alleged version that he was talking to a friend in the area of Reisterstown Road and Lucille and was walking towards the Nite

Owl when the murder happened, he would have known the Burton Affidavit was false. *See* Ex. 1 at 228:7-229:7; 230:6-233:7; 312:19-313:5. According to the Burton Affidavit, Burton stumbled upon the Taylor homicide after a car crash "at the intersection of Reisterstown Road and Woodland Avenue." Ex. 5 at ¶¶3-5. Yet Plaintiff admits that he did not see a car accident on that date. Ex. 1 at 312:19-313:5. If Burton were in a car crash on Reisterstown Road and Woodland and Plaintiff had walked towards the Nite Owl but stopped short of crossing Reisterstown Road, Plaintiff would have seen the accident at an intersection approximately a hundred yards away. *See* Ex. 24 (Google Map of Area of Reisterstown Road and Woodland Avenue). Thus, Plaintiff knew Burton was not drawn to the scene of the murder after an accident because there was no car accident as asserted in the affidavit.

Additionally, during Plaintiff's statement to Detective Davis, which Plaintiff claims was the truth, Plaintiff named the five individuals he saw confronting Taylor and never mentioned that someone he did not know was there. Ex. 4 at NK DEF000150; Ex. 1 at 224:6-22. While implicating individuals with whom he had relationships, Plaintiff never mentioned that an unknown person was present. Ex. 4 at NK DEF000150. Plaintiff told Detective Davis that he had discussed the Taylor homicide with Hill and Carroll, and Plaintiff did not relay that either of their accounts discussed Burton or that someone they did not know picked up a gun that Hill had dropped. *See* Ex. 1 at 244:8-245:2, 246:11-251:3, 300:1-303:10; Ex. 4 at NK DEF000149-153.

As with the Burton Affidavit, Plaintiff admitted that he was personally involved in procuring Hill's false affidavit. Ex. 1 at 304:1-7 (Q: And, in your personal conversations with Mr. Hill, what was the discussion? A: I can't recall. Probably in reference to that affidavit. Him making an affidavit.) And because Plaintiff knew that Burton did not hand Hill a gun, Plaintiff knew that Hill's declaration that Burton handed him a gun was false.

Plaintiff's recorded phone call dated June 6, 2016, captured Plaintiff's candid admission that he believed Burton was "jumping ship… in other words the dude's not coming to testify." Ex. 1 at 395:19-397:13. Even so, Plaintiff expressed his hopes to backdoor the Burton Affidavit through Hill. Ex. 1 at 395:19-397:13. That the Joint Petition meticulously avoided express reference to the Burton Affidavit constitutes yet another fraud on the court because the Joint Petition still relied on the Hill affidavit, which falsely claims that Burton, not Plaintiff, handed Hill the gun.

Plaintiff's actions over the years and during this litigation leave no doubt that he actively participated in fraud on the court to overturn his conviction and open the door to this lawsuit. Although Plaintiff knew that the Burton Affidavit was false, he directly submitted it to courts in at least these pleadings:[6]

- 1997 Habeas Petition (*See* Ex. 10)

- 2000 Federal Habeas Petition (*pro se*) (*See* Ex. 11)

- 2001 Supplement Amendment to Reopen Post-Conviction (*pro se*) (*See* Ex. 27 at p.8)

- 2011 Petition for Writ of Actual Innocence (*See* Ex. 9)

Plaintiff's reliance on the false Burton and Hill affidavits in any one of the above pleadings would be enough to warrant dismissal of this lawsuit. Collectively, Plaintiff's repeated reliance on false evidence more than two decades proves his inexcusable culpability that must result in dismissal.

## <u>Plaintiff Tried to Influence His Other Co-Defendants' Testimony</u>

Several other circumstances unequivocally prove that Plaintiff was personally involved in building his case for release through blatant litigation misconduct. For example, on June 25, 2020,

---

[6] Not all of Plaintiff's post-conviction filings have been produced in discovery. Individual Defendants are aware of 15 post-conviction filings since the 1997 habeas petition.

Plaintiff offered to match whatever money his co-defendant, Thomas Carroll, raised so that Carroll could get an attorney. "Whatever you get, I'll match that. I mean, I'll probably do more than that, depending on the lawyer that I decide we can get to." Ex. 1 at 375:20-376:2. Plaintiff also mailed Thomas Carroll fifty dollars on March 23, 2000. *See* Ex. 25 (May 23, 2020 Letter from Jerome Johnson to Thomas Carroll).

On February 6, 2019, Plaintiff told Reginald Dorsey, a third co-defendant, that he and attorney Nancy Forster were working out how they could help him. "What I wanted to tell you, Man, is I'm talking Nancy [Forster] now to see if we can make something for you right. Yeah, so we trying to see what we can do." Ex. 1 at 391:11-22. Plaintiff told Dorsey during another recorded telephone call:

> But look, what I need you to do, I need you to do something different. Yo, I'm going to send you, when I send to you this money. Hey yo, this is what you got to do. Butt-Butt [Dorsey], I already know, yo, you been on my side since I've been here, right? I respect that. Butt this is what I need you to do. **I need you to start listening to me, Man, when it comes to this legal shit**.

Ex. 1 at 386:12-387:12 (emphasis added). This recording was authenticated by Plaintiff and establishes that he sought to influence Dorsey's anticipated deposition and trial testimony.

During the same call, Mr. Johnson also told Mr. Dorsey:

> What we got right now, Butt, is that what you told me about they told you about that statement. **Yo, you can't never say that**. I'm going to tell you why. Yo, listen to what I'm saying, because the way my case, the reason I'm out of prison, and the reason I got a 60 million lawsuit against the police, is because we saying they withheld that statement. Now, if you saying they said something to you about it when they got – when you got lock up, right, but **I'm telling you, don't say nothing about that, yo, in this case right now**.

Ex. 1 at 381:17-384:19 (emphasis added). Finally, Plaintiff acknowledged at his deposition that he tried to induce Dorsey to testify on his behalf at a post-conviction hearing by saying that he would return the favor for Dorsey at a future postconviction hearing. Ex. 1 at 363:4-22. The above

14

recordings and admission from Plaintiff establish conclusively that Plaintiff attempted to pay and otherwise influence the testimony of Mr. Dorsey in connection with this civil lawsuit. This independently constitutes litigation misconduct and warrants dismissal.

<u>**Plaintiff's Efforts to Influence Witness Tanya Lazenby**</u>

Plaintiff also tampered with Tanya Lazenby, a witness he seeks to place at the center of his civil suit. In his Amended Complaint, Plaintiff alleged the Officer Defendants sought to interview an eyewitness, T.L. [Tanya Lazenby], and never disclosed her identity to the SAO or counsel for Mr. Johnson. *See* ECF 116, ¶¶ 66-67. Plaintiff then disclosed Lazenby as a witness in the civil case and argued that Lazenby's testimony constitutes *Brady* evidence because it would have impeached certain details of Lakesha Snead's account of Taylor's murder. Ex. 26 (Pl.'s Second Supp. Answers to Interrogatories) at p. 10-11, 16, 20, 35. As described below, Plaintiff regularly communicates with Lazenby and directed his friend to "show her love" for "stepping up to the plate." Ex. 1 at 370:7-371:3.

Plaintiff admitted at his deposition that, although he did not know Lazenby before he went to prison, he has been in regular contact with her since his release. Plaintiff claims he now calls her "just to see how she's doing." Ex. 1 at 43:8-45:15; 46:14-49:17; 54:9-55:5. But during a January 22, 2017 jail call with Sean Morgan, the son of Plaintiff's alleged alibi witness, Alvin Morgan, Plaintiff discussed the need to "show her [Lazenby] love" for "her stepping up to the plate." Ex. 1 at 370:7-371:3. Plaintiff told Morgan, "Soon the girl, Tanya Lazenby, go do what she got to do. That's when I'm going to get in contact with her, right? Then I'm probably going to need you man. We've got to show her some love, man, for her stepping up to the plate." Ex. 1 at 370:7-371:3.

At his deposition, when Plaintiff faced the fact that he told his friend to show Lazenby "some love," he flippantly responded that he meant that Morgan should give her "a hug." Ex. 1 at 371:5-10. This blatantly false testimony alone constitutes litigation misconduct. It is even more egregious given the fact that Plaintiff makes Lazenby a centerpiece of his case. Collectively, the misconduct of procuring false affidavits from Burton and Hill combined with unduly influencing the testimony of Carroll, Dorsey, and Lazenby is overwhelming. Plaintiff's actions reveal the fundamental unfairness Defendants would face if they were forced to continue to litigate against an unscrupulous Plaintiff who is has been proved to fabricate testimony.

**(2) The Extent of the Client's Blameworthiness**

Plaintiff obtained and used the perjured affidavits years before Ms. Forster entered her appearance in his case. He repeatedly attached the documents to *pro se* and non-*pro se* court filings. He also knew on July 14, 1988 that Paul Burton was not involved in the Taylor homicide either because Plaintiff was the one involved or because, according to his own testimony, he was near the crime and saw and was told who had been involved. At any rate, Plaintiff knowingly relied on the perjured affidavits of Burton and Hill to have his conviction vacated. Thus, the creation and sustained use of the false affidavits are directly attributable to Plaintiff's own actions.

What is more, Plaintiff directly engaged in witness tampering to shape the testimony of his co-defendants and Lazenby. That Plaintiff is personally to blame for this litigation misconduct is beyond question: it was recorded by the prison phone system and Plaintiff authenticated the recordings at his deposition. As the bad actor who engaged in litigation misconduct, Plaintiff is individually culpable and cannot deflect his blameworthiness onto his current or former attorneys.

**(3 & 4) The Prejudice to the Judicial Process and to the Victim**

As for the third and fourth factors—prejudice to the judicial process and victim—Plaintiff challenges the Defendants' integrity with a claim that Defendants falsified and withheld documents, while using false evidence to secure his freedom and to gain a foothold to sustain litigation. Plaintiff's misconduct also prejudices the criminal justice system by presenting it with fraudulent evidence, monopolizing judicial resources better spent on Writs of Actual Innocence that do not rely on perjured evidence.

Plaintiff built a lawsuit based on false affidavits that were relied on to procure Plaintiff's release. In fraudulently gaining his release, Plaintiff re-victimized Aaron Taylor and his family when he sprung out of prison before serving his full sentence. Additionally, Plaintiff victimized the taxpayers of Maryland by taking an award of $2.3 million from the Board of Public Works from funds that are supposed to be reserved for individuals who were actually erroneously convicted.[7] In one swoop, Plaintiff victimized (a) the Defendants, now faced with defending themselves from Plaintiff's fabricated allegations; and (b) the public, who will suffer from the chilling effect engendered by permitting a plaintiff to build a lawsuit after utilizing fraudulent documents to obtain an unreliable exoneration.

**(5 & 6) The Availability of Other Sanctions**

Finally, the fifth and sixth factors identified in *Shaffer*—the availability of other sanctions and the public interest—suggest that this Court should dismiss this lawsuit and identify any additional sanctions against Plaintiff that might be appropriate. A felon serving a life sentence like the one Plaintiff faced has little incentive to play by the rules when attempting to craft post-conviction arguments. In contrast, the possibility of reward—regained liberty combined with the

---

[7] Press Release from Brown Goldstein & Levy, LLP Dated Nov. 1, 2019. https://browngold.com/news/bgl-secures-4-4-million-state-compensation-2-innocent-men/ (Last visited Dec. 21, 2021).

likelihood of significant financial compensation—is great. The strong public interest in a fair

criminal and civil justice system free of false evidence compels the need for the strongest possible

sanctions when Plaintiff fabricates evidence and tampers with witnesses he later relied on to his

benefit. At minimum, the Court should dismiss the Amended Complaint to punish Plaintiff, protect

the Defendants, and deter similar litigation misconduct in the future.

Even if Plaintiff suggests that he can simply avoid any reference to the perjured affidavits,

the damage has already been done. "A malefactor, caught red-handed, cannot simply walk away

from a case, pay a new docket fee, and begin afresh. History is not so glibly to be erased. Once a

litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guise it

may subsequently appear." *Tony DeWitt v. William Ritz, et al.*, No. CV DKC 18-3202, 2021

WL915146, at *5 (D. Md. Mar. 10, 2021) (citations omitted) (dismissing a 13-year reverse

conviction lawsuit after discovery of a fabricated police report and a payment to a witness). The

public interest will be served only by zero tolerance for actions that mock our laws and courts, and

the human life they protect. Where a plaintiff infects his own case with false evidence, dismissal

is appropriate. *Green v. Mayor and City Council of Baltimore*, 198 F.R.D. 645, 647 (D.Md. 2001)

(dismissing case based on submission of false documents).

*Dewitt v. Ritz*, *et al.*, showcases how an inmate who is incarcerated for life has every

incentive to falsify post-conviction evidence to break open the prison gates and why courts must

impose the most severe sanctions possible where a litigant is caught corrupting the judicial process

itself. In *Dewitt*, the Court stressed the importance of deterring others from creating and including

fraudulent evidence in post-conviction filings:

> There is a strong public interest in preserving the public confidence in the courts'
> ability to adjudicate disputes fairly on the basis of facts and legitimate evidence,
> not on perjured testimony and forged evidence. Our entire American judicial
> system is premised on such values. Dismissal is also in the public interest because

> it deters others from engaging in similar misconduct by sending the clear message
> to potential offenders that attempts to game the system will not be tolerated.

*Dewitt v. Ritz*, 2021 WL 915146, at *13. Plaintiff's fraud has allowed him to evaded punishment

for his involvement in the murder of Aaron Taylor and has already enriched him to the tune of

$2.3 million of taxpayer money from the State of Maryland. Only the most severe sanction could

begin to offer any sort of a deterrent to other prisoners aware of how much one can profit from

defrauding the criminal justice system.

As explained in *Vargas v. Peltz*, 901 F. Supp. 1572 (S.D.Fla. 1995), the sanction of

dismissal is especially appropriate where "the fabricated evidence undermines the theory in the

case." Courts across the country recognize that litigation misconduct of the variety established

above requires nothing short of dismissal. *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, (1st Cir. 1989)

(conduct of plaintiff in filing complaint based on bogus purchase agreement constituted fraud on

the court warranting dismissal of action); *Pope v. Federal Express Corp.*, 138 F.R.D. 675

(W.D.Mo. 1990), *aff'd in relevant part*, 974 F.2d 982 (8th Cir. 1992) (dismissal warranted where

plaintiff in sexual harassment lawsuit manufactured evidence by altering documents to create

a fraudulent document laden with sexual content); *Vargas*, 901 F. Supp. at 1572 (dismissing

sexual harassment suit under court's inherent authority where plaintiff relied, in part, on evidence

of panties allegedly gifted by harasser that had not been manufactured at time in question); *Rybner*

*v. Cannon Design, Inc.*, 1996 WL 470668 (S.D.N.Y. 1996) (dismissing case in which party relied

on fake resume and false testimony during deposition); *Eppes v. H.E. Snowden*, 656 F. Supp. 1267

(E.D.Ky. 1986) (awarding monetary sanctions on top of dismissal of counterclaim where

backdated letters were produced in support of counterclaim); *Access Innovators, LLC v. Usha*

*Martin Ltd.*, No. 09-2893, 2010 WL 11508119, at *3 (N.D. Ga. Apr. 28, 2010).

Plaintiff's litigation fraud significantly undermines the basic premise that he was ever wrongfully convicted for his role in the murder of Aaron Taylor. Despite eyewitness testimony that Plaintiff was the man who handed a gun to Hill before Hill shot Taylor, Plaintiff brazenly alleges that detectives fabricated this account. In fact, Lakesha Snead never recanted her testimony, and Plaintiff fabricated false affidavits from Burton and Hill. Knowing that this evidence was false, Plaintiff obtained false evidence and personally and through counsel relied on this false evidence to defraud the SAO and the courts, overturn his conviction, defraud the state Board of Public Works into awarding him $2.3 million dollars. His fraudulently overturned conviction also opened the door to this lawsuit, which is based, in part, on fabricated and false evidence and witness tampering. Along the way, Plaintiff offered to pay money to his co-defendants and to "show love" to another witness. Dismissal of the Amended Complaint is the only appropriate sanction under these circumstances.

## CONCLUSION

For the foregoing reasons, Defendants ask that this Court grant their Motion for Sanctions, dismiss Plaintiff's Amended Complaint with prejudice, grant Defendants their reasonable attorneys' fees pursuant to 42 U.S.C. §1988, and for any further relief deemed necessary.

DATED: December 24, 2021                          Respectfully submitted,

                                                  _____/s/_____
                                                  Shneur Nathan, Bar No. 20707
                                                  Avi T. Kamionski, Bar No. 20703
                                                  Judson Arnold, Bar ID 21296
                                                  Nathan & Kamionski LLP
                                                  575 S. Charles St., Suite 402
                                                  Baltimore, MD 21201
                                                  Phone: (410) 885-4349
                                                  Fax: (952) 658-3011
                                                  snathan@nklawllp.com

20

akamionski@nklawllp.com
jarnold@nklawllp.com

*Counsel for Individual Defendants*


JAMES L. SHEA
Baltimore City Solicitor
_____/s/_____
Kara K. Lynch (Bar No. 29351)
Justin S. Conroy (Bar No. 28480)
Kyle A. Ashe (Bar No. 21551)
Natalie R. Amato (Bar No. 20749)
Baltimore City Law Department
Office of Legal Affairs
100 N. Holliday Street, Room 101
Baltimore, Maryland 21202
T: (410) 396-2495/F: (410) 396-2126
kara.lynch@baltimorepolice.org
justin.conroy@baltimorepolice.org
kyle.ashe@baltimorepolice.org
natalie.amato@baltimorecity.gov
*Attorneys for Baltimore Police Department*

**EXHIBIT LIST**

1. Excerpts from Deposition of Jerome Johnson, July 22, 2021

2. Reginald Dorsey statement to Police, July 28, 1988

3. Excerpt from Deposition of Thomas Carroll, April 13, 2021

4. Johnson Statement to Police, October 24, 1988

5. Paul Burton Affidavit

6. Burton Prison Records 1987-1989

7. Excerpts from Deposition of Paul Burton

8. Burton Inmate Institutional Progress Sheets 1994-2008

9. Petition for Writ of Actual Innocence (2011)

10. Petition for Writ of Habeas Corpus (April 24, 1997)

11. Petition for Writ of Habeas Corpus (May 23, 2000)

12. Jerome L. Johnson v. State of Maryland, Court of Special Appeals of Maryland, No. 1364, 6-5-14 (unreported)

13. Motion to Withdraw Petition Without Prejudice (December 5, 2016)

14. Nancy Forster Entry of Appearance (August 8, 2013)

15. Denial of Petition for Writ of Actual Innocence (July 11, 2012)

16. Affirmance of Denial of Petition for Writ of Actual Innocence (June 17, 2014)

17. Forster Request for Hearing (May 18, 2015)

18. Executed Writs for Alvin Hill and Paul Burton

19. Excerpts from Deposition of Lauren Lipscomb, June 28, 2021

20. Plaintiff's Responses to Requests for Admission

21. Joint Petition for Writ of Actual Innocence

22. Board of Public Works of Maryland Agreement

23. Excerpt from Trial Transcript March 13, 1989

24. Map of Area of Reisterstown Road and Woodland Avenue

25. Letter from Jerome Johnson to Thomas Carroll (May 23, 2000)

26. Plaintiff's Second Amended Answers to Interrogatories

27. Supplemental Amendment to Reopen Post-Conviction (March 6, 2001)

**CERTIFICATE OF SERVICE**

I hereby certify that on December 24, 2021, I caused the foregoing document to be electronically filed with the Court's CM/ECF system, which will send an electronic copy of the same to all counsel of record.

*/s/ Shneur Nathan*