**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JEROME L. JOHNSON,

|  |  |  |
|---|---|---|
| | Plaintiff, | ) |
| | | ) |
| v. | | ) |
| | | ) |
| BALTIMORE POLICE DEPARTMENT, *et al.* | | ) |
| | | ) |
| | Defendants. | ) |

No. 1:19-cv-00698

Honorable Ellen L. Hollander

**INDIVIDUAL DEFENDANTS' MOTION FOR SANCTIONS EXHIBIT
LIST**

# EXHIBIT 21

*State*

IN THE CIRCUIT COURT FOR BALTIMORE CITY MARYLAND

JEROME L. JOHNSON,

RECEIVED

2018 JUL -2  AM 9: 28

    *Petitioner*

CIRCUIT COURT
BALTIMORE CITY
    v.          CRIMINAL DIVISION      CASE NO. 18831504

STATE OF MARYLAND,

    *Respondent*

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

### JOINT PETITION FOR WRIT OF ACTUAL INNOCENCE AND MEMORANDUM OF LAW IN SUPPORT OF JOINT PETITION FOR WRIT OF ACTUAL INNOCENCE

**NOW COMES,** Jerome L. Johnson, through undersigned counsel, and Marilyn J. Mosby, State's Attorney for Baltimore City and the State of Maryland by and through Lauren R. Lipscomb, Assistant State's Attorney for Baltimore City, and hereby petition this Court for a Writ of Actual Innocence, pursuant to Maryland Code of Criminal Procedure § 8-301, to set aside the verdict against Mr. Johnson, or in the alternative, to grant a new trial. Johnson respectfully requests a hearing on this Petition.

June _____ 2018

Respectfully Submitted,

Nancy Forster, Esquire
Nancy S. Forster, Attorney-at-Law, LLC
One South Street, Suite 2125
Baltimore, MD 21202
o (410) 685-6000
nsforster@gmail.com

*Counsel for Jerome Johnson*

Parisa Dehghani-Tafti*
Mid-Atlantic Innocence Project
George Washington University Law School
2000 H Street, NW
Washington, DC 20052
(o) 202-994-8676
ptafti@exonerate.org
*\*pro hac vice pending*
*Counsel for Jerome Johnson*

Marilyn J. Mosby
State's Attorney for Baltimore City

By: _____
Lauren R. Lipscomb
Chief, Conviction Integrity Unit
Office of the State's Attorney for Baltimore City
120 E. Baltimore Street
Baltimore, MD 21202

*State of Maryland*

IN THE CIRCUIT COURT FOR BALTIMORE CITY MARYLAND

JEROME JOHNSON,                                    *

      Petitioner,                              *

      v.                                       *          CRIM NO. 18831504

STATE OF MARYLAND,                              *

      Respondent.                            *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OF LAW IN SUPPORT OF JOINT PETITION FOR WRIT OF ACTUAL INNOCENCE

### I.   INTRODUCTION

On July 14, 1988, at approximately 1:15am, Victim Aaron Taylor (22 years old) was in the area of the 3600 block of Woodland Avenue when he was approached by several men.  An argument ensued between Victim and the men.  One of the men, not the ensuing shooter, pulled a handgun out and attempted to shoot the Victim, the gun misfired.  The Victim fled to the inside of the Night Owl Bar[1] located at 3602 Woodland Avenue. Another man from the group, Alvin Hill, (aka Poopie and hereinafter referred to as "Shooter"), chased the Victim to the inside of the bar.  The Victim grabbed a random patron and used the patron as a shield in an attempt to protect himself.  The Shooter yelled several times for that patron to duck.  At some point, the patron was able to break free from the Victim and the patron fell to the ground.  Shooter shot at Victim once, then shot at Victim several more times as the Victim tried to crawl toward the exit of the Night Owl Bar.  The Shooter and the men with the Shooter fled the scene.  The patron remained on scene until police arrived.

---

[1] The Night Owl Bar no longer exists.

1

Responding PO Mays was one of the first officers on the scene. He was present when CRT Britcher arrived and pronounced the Victim dead on scene at 1:22am. Victim's mother, along with other family members, arrived and identified the Victim as her son in the presence of PO Mays.

On scene, PO Mays spoke with witnesses.

Witness JM[2] advised that he was in the Night Owl Bar at the time and observed the Victim being assaulted by the Shooter with a handgun. He further advised that he saw the Shooter fire several shots at the Victim and he recognized the Shooter from the area.

Witness MR advised that he was purchasing a drink when the Victim rushed in, grabbed him from behind and used him as a shield. MR advised he saw the Shooter come in and he was able to break free at some point and fell to the ground. He saw the Shooter shoot Victim several times.

Witness JK was the owner of the Night Owl Bar and observed the shooting. She advised that she saw the Shooter and Victim fussing, then saw the Shooter's gun. She called 911. While she was calling 911, the Shooter shot at Victim once then shot Victim several more times.

Subsequently, these witnesses were interviewed by Homicide detectives. Witnesses MR and JK identified Alvin Hill as the Shooter in photo arrays. Months later, at trial, they identified Hill in Court as the Shooter.

On scene, at approximately 1:50am, PO Kenneth Jones spoke with a minor witness, LS. LS is a cousin of the Victim. LS advised that she was with her friend, TL, a family friend known as Quinton and the Victim at her home in the 3400 block of Virginia Ave[3]. At some point, the Victim left to ride his bike to the Night Owl Bar. LS, TL, and Quinton headed down to the Night Owl Bar as well to get some snacks. Once in the bar, LS saw the Victim. She then saw the Shooter come into the bar and pull a handgun from his waistband area. She saw the Victim grab a patron and hold the patron as a shield. She further advised the patron broke free from the Victim and fell to the ground. She heard the Shooter say he was going to kill the Victim twice. She then ran from the bar. She heard 5 shots. She advised there were

---

[2] The parties have agreed to refer to individuals generally and not by name for purposes of this joint pleading.
[3] This Virginia Avenue home has since been razed.

NK DEF 003019

3 men with the Shooter.  She said she knew the Shooter from the area but did not know his name.  She advised that she knew the names of 2 of the 3 men with the Shooter but she did not want to give their names.

Coincidently, PO A. Steve Owens and PO M McDonald were on scene, parked in the block along Woodland Avenue in an unmarked car.  When shots rang out, PO McDonald drove the patrol car toward everyone running up Lucille Avenue.  PO Owens got out of the car and chased 2 men along the alley and behind the houses on Lucille.  PO Owens observed the 2 men run into the rear of the house addressed at 3610 Lucille Avenue.  Owens rounded the block along the front part of the houses and called for backup.  Approximately 11 officers including a K9 unit conducted a search of 3610 with negative results.  Two witnesses[4] were brought to the house for a show up, negative results.

The day after the murder, on July 15, 1988, BPD Homicide responded to the Victim's home.  Once there, Detective Davis spoke with the Victim's mother and other family members.  The family advised that they had spoken to LS who told them the identity of the Shooter.  The family told detectives that a possible witness/suspect was a person named Lamont because they heard that Lamont was in the bar at the time of the murder.

On July 19, 1988, LS was interviewed at the State's Attorney's Office (hereinafter referred to as "SAO").  LS advised that she arrived outside the bar to see her cousin, the Victim, fussing with 5 males.  She said she saw Lamont hand the Shooter a gun.  The Shooter pointed the gun at Victim and it misfired.  She then saw the Victim run into the bar with the Shooter on his heels.  She further advised that she ran into the bar behind the Victim.  She said all 5 suspects were present in the entranceway to the bar.  She said the Victim grabbed the patron and held him as a shield.  She heard one of the men, Reginald Dorsey[5] (aka Buttons hereinafter referred to as "Dorsey") say "shoot him in the head".  She said that the 4 men had the following roles.  Alvin Hill was the Shooter.  Reginald Dorsey said "shoot him in the head".  Jerome Lamont Johnson gave Shooter the gun that misfired.  Thomas Carroll lived on the same street as

---

[4] These two witnesses' names are not identified in any documents.  The showup targets are also unknown.
[5] Reginald Dorsey is a co-defendant in this case.  The co-defendants are: Alvin Hill (Shooter), Jerome Lamont Johnson , Reginald Dorsey, Thomas Carroll.

3

NK DEF 003020

Johnson. LS was shown a picture of Thomas Carroll and identified him as being the person she knew as Thomas Carroll. At no point during this interview or thereafter was a pre-trial identification procedure conducted or confirmatory picture of Jerome Johnson shown to LS[6].

On July 28, 1988, LS testified before the grand jury and an indictment was issued for Jerome Johnson (aka Lamont hereinafter "Johnson").

## II. PROCEDURAL HISTORY

On October 24, 1988, Johnson was charged with first degree murder and use of a handgun in the commission of a felony.   Johnson pled not guilty. On March 8, 1989, trial began.  Johnson was tried alongside Hill/Shooter, Thomas Carroll (aka Tommy hereinafter "Carroll"), and Dorsey. On March 14, 1989, Hill, Dorsey and Johnson were convicted.  Carroll was acquitted.  On June 2, 1989, Johnson's attorney, Gordon Tayback, argued a motion for new trial, which was denied.  Johnson was sentenced to life plus 20 years consecutive.  Johnson appealed and the appeal was denied.  Johnson filed post-trial petitions as follows.

On September 23, 1992, through counsel, Johnson filed a post-conviction petition which was denied on July 14, 1993.  Johnson filed a second post-conviction petition which was dismissed, appeal denied.  On April 24, 1997, through counsel, Johnson filed a writ of habeas corpus which was dismissed for failure to comply with rules.  A revised writ of habeas corpus was filed by Johnson, it was denied in 1999. On January 25, 2001, Johnson filed a motion to re-open post-conviction which was dismissed.  On July 8, 2002, Johnson filed a motion to re-open post-conviction which was dismissed.  On June 25, 2007, Johnson filed a third motion to re-open post-conviction which was denied.  On February 17, 2010, through counsel, Johnson filed a motion to re-open post-conviction which was denied.  An appeal of that motion was denied.  On April 14, 2011, through counsel, Johnson filed a petition for writ of actual innocence which was denied.  On July 18, 2012, through counsel, Johnson filed a petition for writ of actual innocence.  Arguments were heard on January 23, 2013.  The writ was denied thereafter.  On

---

[6] There is a photo array that contains a picture of Jerome Johnson that was not submitted to ECU and there are no notes in either the BPD or SAO files that indicate the array was shown to anyone.  If it was shown, there is no indication that an ID of Johnson was made.

4

appeal, the denial was affirmed.  Through counsel, Nancy Forster, Johnson filed a writ of certiorari with the MD Court of Appeals which was denied.  Nancy Forster entered in the case and ultimately brought the case to the Conviction Integrity Program.

### III. STANDARD OF PROOF

The standard for granting a Petition for Writ of Actual Innocence is twofold. First, newly discovered evidence must "create a substantial or significant possibility that the result may have been different, as that standard has been judicially determined." Md. Code Crim. P. § 8-301(a)(1). The "substantial or significant possibility" standard has been judicially determined under Maryland Rule 4-331(c). *Huffington v. State*, No. 10-K-83-6373/4 at 9 (May 1, 2013) (mem. op.) (citing *Yorke v. State*, 315 Md. 578, 556 A.2d at 234-35. The standard is satisfied where "[t]he newly discovered evidence *may well have produced a different result*, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Id.* at 588, 556 A.2d at 235 (emphasis added). The Court of Appeals of Maryland articulated that the "significant possibility" standard does not require that the evidence "probably produce acquittal" or even rise to the level of probable cause, just that there be a "significant possibility that the verdict of the trier of fact would have been affected." *Love v. State*, 621 A.2d 910, 916 (1993) (quoting *Yorke v. State*, 315 Md. 578, 586-87 (1989)); *see also Yorke*, 315 Md. at 586-87 (explaining that the standard is one "that falls between 'probable,' which is less demanding than 'beyond a reasonable doubt,' and 'might' which is less stringent than probable."). The standard was described as a "judgmental one—weighing the effect of the evidence." *Jackson v. State*, 358 Md. 612, 626 (2000).

Second, the newly discovered evidence "could not have been discovered in time to move for a new trial under Maryland Rule 4-331." Md. Code Crim. P. § 8-301(a)(2). As a result, the newly discovered evidence must postdate the deadline set forth in Maryland Rule 4-331 of "one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post-conviction relief." Md. Rule 4-331(c)(1).

NK DEF 003022

## IV. QUESTION PRESENTED

Both the State and Petitioner agree that the conviction against Petitioner rested on the testimony of LS and same testimony was corroborated, in part, by witness KA.   LS testified that Johnson handed a gun to the Shooter and the Shooter tried to use the gun but it misfired.

Witness KA, early in the investigation, told police that Johnson was at the corner of Lucille and Reisterstown at the time of the murder.  However, he later testified that Johnson was standing with the other co-defendants at the scene of the murder though without participation in the murder.

There was no physical evidence of evidentiary value in this case.

## V.  PETITIONER'S INVESTIGATION AND ARGUMENT

*Investigation and Argument: Nancy Forster, Esquire and Mid-Atlantic Innocence Project on behalf of Johnson*

LS was indisputably the state's key witness.[7]  Her trial testimony was marked by profound internal inconsistencies, as well as inconsistencies with her prior statements. Although KA also testified for the state, his testimony, inconsistent with his prior statements, never implicated Mr. Johnson of any crime.

### A.  LS's Statements Were Inconsistent As To The Material Details of the Crime and Her Recollection

#### 1.  LS's Trial Testimony Was Internally Inconsistent Regarding Material Details of the Crime

LS, the 15-year-old cousin of the victim, first testified that on July 14th, 1988 around 1:00 a.m., she walked to the Nite Owl Tavern (a bar and liquor store) with her friend and her mother's boyfriend. Trial Tr. vol. 4, 9, Mar. 13, 1989. As she approached the Nite Owl, LS testified she saw the victim (her

---

[7] R.D.'s attorney remarked to the judge that the State's case "rested on the testimony of LS, and LS only." (Trial Tr. vol. 7, 11) and during the prosecution's closing, the evidence against Mr. Johnson was summarized as follows: "You have K.A.'s testimony that Jerome Lamont Johnson was there. You have then LS's testimony that Jerome Lamont Johnson was there . . . that Mr. Johnson pulled out a gun, the gun that misfired." Trial Tr. vol. 5, 43.

NK DEF 003023

cousin) talking with a group of men near the adjacent basketball court. Trial Tr. vol. 2, 35. LS testified that she was outside but that as she was walking in the bar, the victim ran into the store. Trial Tr. vol. 4, 12. LS testified that, while outside, she saw Alvin Hill pull a gun from behind his back and shoot twice at the ground, but the gun misfired.[8] *Id.* at 12-13, 17. LS testified was handed a second gun by Mr. Johnson, and then Hill ran in the store. *Id.* at 18-19. The victim tried to hide behind one of the store's patrons (MR), and unsuccessfully attempted to use him as a shield to save his life. *Id.* at 25. LS testified that at this point, she was in the store as well. *Id.* at 26. MR broke free of the victim and ran out of the store, and LS followed him out. *Id.* at 28. LS testified that when LS ran out of the bar, she heard RD say to Hill, "hit him with the gun" and "shoot him". *Id.* at 84. She testified that she heard four shots as she was crossing the street. *Id.* at 28.

Inconsistencies within her trial testimony are:

- Across two pages of trial testimony LS said first that she was inside the store when she saw Hill shoot his gun twice, misfiring, and then that she was outside the store when that occurred;[9] and
- Later during the same cross-examination, LS changed her location during the misfiring incident, belying the most charitable interpretation of her earlier inconsistencies, that she was at the doorway of the bar or just walking in.[10]

---

[8] While testifying before the Grand Jury, LS testified that A.H. was pointing the gun at the victim when it misfired. *See* Grand Jury Tr. 4 (Q: Where was he pointing it when he clicked it? A: At Aaron).

[9] Q: You told us that he shot this gun twice and nothing happened. That's inside the door, and A.H. is inside the store or right at the store, isn't that true?
A: Yes.
Q: Okay. And your cousin, A.T., has a man, a fellow by the name of M.R., as a shield?
A: Yes.
Q. And you are in there with Q. and T.L., is that also true?
A: Yes.
*Compare to,*
Q: So you, A.T., M.R., A.H., Q., and T.L. are all inside the store when A.H. pulled the gun from behind his back, shoots it twice at the ground, when you say it doesn't work, is that true?
A: Yes. But I wasn't in the store.
Q: Well now, as we was walking into the store, my cousin ran in and A.H. pulled a gun from behind his back. Are you saying you weren't in the store?
A: I wasn't in the store.
Q: Then where were you, if you weren't walking into the store; where were you?
A: I was outside.
Trial Tr. vol.4, 96-97.

7

LS herself was aware of and acknowledged the inconsistencies within her own testimony while on the stand, admitting, for example, that she testified both that she saw the gun as it was misfiring and that she did not see the gun misfiring because it was behind her.[11] As with her location during the misfiring incident, LS contradicted her own testimony about several key aspects of her role as a witness, including how she entered the store, what she heard and saw, and the locations of the other individuals she identified at the scene.

Not only did LS contradict herself multiple times during her testimony at trial, but her trial statements were inconsistent with her prior statements to the grand jury and to the police.

### 2. LS's Trial, Grand Jury, and Witness Statements Are Inconsistent Regarding Almost Every Material Detail of the Crime.

Across her statements to Officer Jones and Detective Davis, and to the court at the grand jury proceedings and at trial, LS inconsistently recounted material details regarding her location during the shooting, the number of people present at the scene and in the store at the time of the shooting, and the

---

[10] Q: When the gun was pulled on your cousin, A.T., by A.H., from behind his back and the gun is fired twice, haven't you indicated to us time and time again in my cross examination, haven't you said that at about the doorway area of the Nite Owl Bar, with A.T. inside, A.H. at the door, you at the door, Q. at the door, T.L. at the door?
A: No.
Q: Now, where was it?
*Compare to,*
Q: Where was the incident, was it at the door, was it at the Nite Owl, was it 15 or 20 feet away at the playground fence where the hole is in the fence?
A: Where the hole was in the fence.
Q: So it's completely outside the Nite Owl Bar, everybody is out of the Nite Owl Bar, nobody is in the Nite Owl Bar then, is that correct?
A: Yes.
Trial Tr. vol. 4, 118.
[11] Q: And you testified once today that you saw the gun as he was clicking it, and another time you testified that you couldn't have seen it because you don't have eyes in the back of your head, right?
A: Yes.
Q: So you testified both ways, didn't you?
A: What do you mean?
Q: You testified to both of those things I just stated, didn't you, LS?
A: Yes.
Trial Tr. vol. 4, 123.

NK DEF 003025

sequence of the alleged gun exchange between Hill and Mr. Johnson.   Most significantly, an undisclosed Police Report drafted by Officer Jones indicates that the differences between LS's first statement, taken by Officer Jones within 40 minutes of the shooting, and her subsequent statements, were even more profound than the internal inconsistences in her trial and grand jury testimonies. Officer Jones's report of interview with LS, July 14, 1988 ("Jones Report").

*Where She Was*

According to the Jones Report, LS stated that she was inside the store when Hill approached the victim and that she saw Hill pull a black and brown gun from his waistband. LS stated to Officer Jones that she ran out of the store before she heard five shots fired. Jones Report.

But, according to Detective Davis' handwritten notes of LS's July 19, 1988, interview, LS was inside the store when four shots were fired. Detective Davis Notes of Interview with LS, July 19th, 1988 ("Davis LS Notes").   However, in his formal report regarding that same interview, Detective Davis wrote that LS was outside of the store when the gun misfired, ran into the store right behind her cousin, and then fled after the first shot—hearing three more as she ran away.   Formal Report from Det. Davis to Capt. MacGillivary, July 19, 1988 ("Davis LS Report").   None of the pre-trial statements align with LS's trial or grand jury testimony, where she testified that she was *outside* the store when the first shots were fired, ran into the store only after the gun misfired, but fled before the four shots were fired that killed her cousin.  Grand Jury Tr. 4; Trial Tr. vol. 4, 120-121.

*Who Was Present*

On the night of the murder LS told Officer Jones that in addition to Hill, there were three—not four—other black men who confronted her cousin, two of whom she knew but was not willing to identify out of fear for her life.  Jones Report.  By July 19th, LS added one additional man to her statement. During her July 19, 1988 interview, [12]  in front of the grand jury, and at trial, LS testified that on the night

---

[12] Detective Davis denied at trial writing up a formal report of the July 19, 1988 interview with LS—but a formal report does exist and in it, the initial number of suspects recorded was whited out each time it appeared, and the number "5" was handwritten in. Det. Davis LS Report.

9

of the murder, she saw Mr. Johnson, Hill, RD, TC, and a fifth unidentified man talking with her cousin in the vicinity of the basketball court adjacent to the store.

LS was also inconsistent in detailing who was actually in the store at the time of the shooting. On the night of the murder, LS told Officer Jones that Hill was in the bar with her, the victim, and MR. Yet, on July 19, 1988, LS stated that in addition to herself and these three individuals, Q., LS's mother's boyfriend, was also in the store, and LS's friend TL was hiding outside.   At trial, however, LS testified that in addition to herself, the victim, MR, Hill, and Q., TL was also in the store. Trial Tr. vol. 4, 94.   At trial she also added that RD was standing in the doorway, and that she ran past him to escape the store. *Id.* at 101.

*How Many Guns and What Happened to Them*

The most crucial discrepancy between LS's statements is regarding the alleged exchange of weapons between Hill and Mr. Johnson. On the night of the murder, LS made no mention of a second gun or any gun exchange, only that when Hill entered the bar, he pulled the gun from his waistband and held it pointing towards the floor. Jones Report.   By July 19th, 1988 and before the grand jury, LS alleged that Mr. Johnson handed HILL the first gun that misfired, and that Hill produced the second gun.   Grand Jury Tr. 4-5; Trial Tr. vol. 4, 106.   By trial, she testified, Hill first unsuccessfully fired his own gun and then Mr. Johnson pulled the second gun from inside of his pants and handed it to Hill before he ran inside to kill A.T.   Trial Tr. vol. 4, 16-17. When asked to explain the discrepancies between the testimony she gave at trial and that which she gave to the grand jury, LS did not want to provide an answer, but when pressed she stated that it was because the transcript from the 1988 grand jury proceeding was wrong.[13]

> 3.  Neither JK and MR, Both Disinterested Eyewitnesses, Testified that LS Was Present During the Shooting.

---

[13] Q: Then I am asking you, since you are under oath, on July 28th, 1988, how come the story was completely different then?
A: Because they wrote it down wrong.
Trial Tr. vol. 4, 108

NK DEF 003027

Neither the Nite Owl store owner nor the customer who was used as a human shield recall LS being in the store when the shooting took place, and both of their accounts of the night differ dramatically from LS's various statements.   At trial, JK, the Nite Owl employee who was working behind the counter on the night of the murder, testified that she saw the victim enter the store and grab MR from behind when he was getting a drink from the soda machine Trial Tr. vol. 3, 6, Mar 10, 1989.   Then, JK testified that "some guys" entered the store, but did not indicate how many.   Trial Tr. vol. 3, 7.   She saw one of the men who entered take a gun out from his pocket, so she called the police immediately.   *Id.* The man who pulled out the gun was standing well inside the store, not in the doorway.   *Id.* at 18.   JK testified there was no one else in the bar when she called 911.   *Id.* at 20-21.   Earlier that night, there had been two girls in the store but they had left before she called the police.   *Id.* at 21.

MR testified that on the night of the murder he went to the store to get a drink, and when he was at the soda machine a man grabbed him from behind, yelling "don't do it" to an unidentified person.   *Id.* at 33.   He said that as he was dragged backwards, another man entered the store and shouted at him to "duck."   *Id.* at 34.   Upon breaking the grasp of the man holding him from behind, M.R fell to the ground, at which point he heard three or four shots.   *Id.*   MR also could not recall any other customers inside the bar at the time of the shooting.   *Id.* at 39.

## B. KA's Trial Testimony Was Inconsistent with His Statement to Police and Does Not Implicate Mr. Johnson of Any Crime.

In his statement given to Detective Davis on August 8[a], 1988, KA said that at the time of the shooting, Mr. Johnson was standing on the corner of Reisterstown and Lucille, a fair distance from the store.   KA Statement to Det. Davis, Aug. 8, 1988 ("KA Statement").   This statement is straightforwardly exculpatory for Mr. Johnson.   At trial, KA said that it was only during the brief altercation before the shooting that Mr. Johnson was standing on that corner, and that by the time the shots were fired, Mr. Johnson had crossed the four-lane street and was standing with the rest of the suspects outside of the Nite Owl Liquor Store.   Trial Tr. vol. 2, 85-87.   This revised testimony conflicts with KA's statements made in the direct aftermath of the shooting and with other eye-witness accounts discovered after the trial, but,

11

NK DEF 003028

significantly, it merely places him at the scene, and does not implicate Mr. Johnson of murder or any other crime.

> **C.** **Newly Discovered Evidence Since the Time of Mr. Johnson's Trial Proves Innocence under 8-301.**

In addition to the aforementioned statement and trial testimony inconsistencies, counsel provided as follows.

### Affidavit of Alvin Hill, Shooter

On May 23, 2000, Shooter provided an affidavit that Johnson was not present at the time of the murder. He admitted to pulling the gun out on Victim and that Johnson was not there.

### Affidavit of A. Morgan, Witness

On April 22, 1997, A. Morgan provided an affidavit that he was with Johnson at the corner of Lucille and Reisterstown Road at the time of the murder. He further stated that Johnson was with him when shots rang out and when PO Steve Owens came up and asked they had heard shots.

### Post-Conviction Testimony of D. McFadden

D. McFadden testified that she saw Johnson and A. Morgan the night of the murder on the corner of Lucille and Reisterstown Road.

### Statement of TL, Witness

TL was with LS the night of the murder. TL was not interviewed pretrial, during trial or post-trial. TL was located and interviewed in 2015. TL advised that she was with LS when the murder occurred. They both arrived at the Night Owl bar location and Victim was using MR as a human shield. The Shooter was yelling for the shield to move. TL said Shooter pulled gun, MR fell to floor on her foot and then the Shooter shot the Victim. TL and LS ran as more shots were fired. TL said they were only present for that. She did not observe a gun hand off, misfiring and no one yelled, "shoot him in the head". TL's statement mirrors LS's initial statement made to PO Jones following the murder.

NK DEF 003029

Based on all of the above information, Mr. Johnson's counsel, Nancy Forster, referred this case to the Conviction Integrity Program within the Conviction Integrity Unit of the Baltimore City State's Attorney's Office (hereinafter referred to as "CIP").

## VI. STATE INVESTIGATION BY THE CONVICTION INTEGRITY PROGRAM

In August of 2017, Nancy Forster (hereinafter referred to as "Forster"), counsel for Johnson, met with members of the CIP regarding the instant case and the aforementioned information. Forster presented both the overall sequence of newly discovered evidence over the years along with her own investigation which yielded the new addition of witness TL

Based on the strength of the totality of the information and new locating and interview of witness TL, CIP launched a re-investigation of this case. The CIP investigation included on and off site interviews of dozens of witnesses. Observing strong indicia of innocence, with the consent of Forster, the CIP contacted the Mid-Atlantic Innocence Project (hereinafter "MAIP"). Forster and MAIP joined together as co-counsel for Johnson.

The result of this re-investigation reveals that the weight of exculpating evidence, which was not presented and/or known at trial, strongly outweighs that which was presented at trial. The most compelling of, though not the totality of, the results of the CIP investigation are as follows.

### A. *Witness TL Interview (CIP and MAIP present)*

Witness TL advised that she was with State's witness LS the night of the murder. She advised that she and LS were in the Night Owl when the arguing occurred between the Shooter and Victim. She was also present when the Shooter began shooting Victim. She advised that Johnson was not present. Her statement is <u>consistent</u> with that of LS's from the night of the murder. She has had no contact with LS in over 20 years. This witness was not interviewed pre-trial or during trial.

### B. *Co-Defendant Dorsey – (CIP)*

Co-defendant Dorsey was interviewed at WCI. He is adamant and maintains that Johnson was not present during the murder. Dorsey states that he, Dorsey, was present during the murder and he is clear that Johnson was not there. He further advises that he knew Johnson from the neighborhood as they

13

had grown up together. He has not spoken with Johnson since the early 1990s. At no point after July 28, 1988, did Dorsey speak to BPD or the SAO until the interview on March 14, 2018. Co-Defendant told the PSI investigator that Johnson was not present. In spite of that information being presented in 1989 in open court at sentencing, there is no indication that this information was investigated.

C. *Initial Statement by LS vs. Statement on May 16, 2018 (CIP)*

On July 14, 1988, witness LS made a statement to PO Jones approximately 30 minutes after the murder. In her statement, she advised that she arrived at the Night Owl with her friend. She described the Shooter as being with 3 men – 2 of whom she knew by name but was too afraid to identify and 1 of whom she did not know. She further indicated that she knew the Shooter's face from around the neighborhood. She said the Shooter pulled a gun from his waistband and used it to kill Victim. She did not indicate that she saw a gun handoff.

On May 16, 2018, CIP interviewed LS  She indicated the same information as she did on July 14, 1988. She indicated that there was a Shooter with 3 men and the Shooter had 1 gun with no indication that Johnson handed a gun to the Shooter. LS said only the Shooter had a gun and there was only one gun that she saw. She has not been interviewed by anyone since the trial in 1989.

The State's investigation reveals that Johnson did not know LS before trial. Additionally, Carroll and Dorsey were well known to LS's family before trial. The State's investigation reveals uncontroverted evidence that supports that Carroll and Dorsey were the ones that LS saw at the scene of the murder and not Johnson, most compelling is that Carroll and Dorsey themselves state they were with the Shooter and were well known to the older siblings of LS. Further, the identity of the unknown 3rd man was and is known through other witnesses.

D. *Witness A. Morgan (CIP and MAIP present)*

Witness A. Morgan was interviewed. He advised that he was with Johnson at the time of the murder – they were standing on the corner of Lucille and Reisterstown Road. He further advised they were there when shots rang out. After the shots rang out, he and Johnson were approached by PO Steve Owens who spoke to Johnson. Witness Morgan's statement is consistent with the letter he

14

wrote in 1991, affidavit provided in 1997 and the statements of Johnson, Dorsey, McFadden, Carroll, and

TL  Witness Morgan was not interviewed pre-trial, during trial or post-trial by BPD or the SAO.  He has

not spoken with Johnson in decades and has not talked with Dorsey, McFadden, Carroll or TL at all.

### E.   *Co-Defendant Carroll (CIP and MAIP present)*

Carroll was interviewed at ECI (held on unrelated matters).  Carroll advised that he

was there during the murder and 'beat the murder' at trial.  Carroll knew Johnson well.  Carroll indicated

Johnson was not present at the murder and had nothing to do with it.  Carroll has not been interviewed by

BPD or SAO since the trial in 1989.  He has not seen or spoken with Johnson since the early 1990s.

### F.   *Co-Defendant Alvin Hill (Shooter) Affidavit*

In 2000, co-defendant Hill provided an affidavit indicating that he knew Johnson and

Johnson was not present at the time of the murder.  Hill died in 2016.

### G.   *Witness D. McFadden – Post-Conviction Testimony*

At a post-conviction hearing for Johnson, Witness McFadden testified that she was sitting

in front of her house at the time when shots rang out.  She observed Johnson and Witness A. Morgan

standing in front of the house across the street (corner of Lucille and Reisterstown Road) from where she

was located.

### H.   *Statement on Corroboration and Victim's Family*

The State asserts that it has interviewed numerous witnesses who corroborate each

other and the pieces of information obtained from the aforementioned witnesses.  CIP has met with the

Victim's mother and brother, next of kin, in person.  Both have been advised of the ongoing re-

investigation into this case and the potential outcome that Johnson may be released.  The Victim's mother

advised that she trusts in the process no matter the outcome.  The Victim's brother advised he did not

object to release of Mr. Johnson regardless of outcome.

## VII.   JOINT CONCLUSION

15

NK DEF 003032

It is the State's position that the results of the CIP investigation, joint CIP/MAIP investigation, and the totality of prior investigation conducted by Ms. Forster indicate that the requirements of § 8-301 have been met. The State and Petitioner assert that if the aforementioned evidence was presented alongside the evidence presented to the jury, it is probable that the outcome would have been different. Accordingly, the parties respectfully request this Court set aside the verdict against him and order a new trial.

June ____, 2018

Respectfully submitted,

Nancy Forster, Esquire
Nancy S. Forster, Attorney-at-Law, LLC
One South Street, Suite 2125
Baltimore, MD 21202
o (410) 685-6000
nsforster@gmail.com

*Counsel for Jerome Johnson*

Parisa Dehghani-Tafti*
Mid-Atlantic Innocence Project
George Washington University Law School
2000 H Street, NW
Washington, DC 20052
(o) 202-994-8676
ptafti@exonerate.org
*pro hac vice pending*
*Counsel for Jerome Johnson*

Marilyn J. Mosby
State's Attorney for Baltimore City

By:

Lauren R. Lipscomb
Chief, Conviction Integrity Unit
Office of the State's Attorney for Baltimore City
120 E. Baltimore Street
Baltimore, MD 21202
(443) 984-6223

*State of Maryland*

16

NK DEF 003033