IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| JEROME L. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. ELH-19-00698 |
| | ) | |
| BALTIMORE POLICE DEPARTMENT, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JEROME JOHNSON'S OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS AS A LITIGATION SANCTION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

LEGAL STANDARD ......................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.    There has been no fraud on the Court or abuse of process. ................................... 3

    A.    Mr. Johnson did not defraud the Maryland courts with his post-conviction filings. . 3

        1.    Mr. Johnson did not fabricate the Burton affidavit. ........................... 4

            a.    Mr. Johnson's attorney procured the Burton affidavit. ........................... 4

            b.    Paul Burton is as credible as a sundial on a cloudy day. ........................ 6

        2.    Mr. Johnson did not use either the Burton or the Hill affidavits knowing they were false. ............................................................................. 10

            a.    Defendants improperly ask the Court to assume Mr. Johnson is guilty of the crime for which he was exonerated. .................................. 10

            b.    The Burton and Hill affidavits are not inconsistent with Mr. Johnson's statement to police in 1988. .................................................. 12

            c.    Mr. Johnson's concern about Mr. Burton's refusal to testify and his eventual decision to withdraw his petition are not evidence of bad faith. ...................................................................................... 13

    B.    Mr. Johnson did not defraud the State's Attorney's Office or the circuit court in pursuing his successful Joint Petition for a Writ of Actual Innocence. ............... 16

        1.    Ms. Forster did not control the SAO investigation. ....................... 16

        2.    Mr. Johnson did not "induce" his exoneration through use of the Burton and Hill affidavits. ............................................................. 18

        3.    The Hill affidavit was not the primary piece of evidence that resulted in Mr. Johnson's exoneration. ............................................................. 20

        4.    The SAO testified that it knew the Burton affidavit was unreliable and did not rely on it. ......................................................................... 21

    C.    Mr. Johnson did not tamper with witnesses. .......................................... 22

II.    Dismissal is not an appropriate sanction for the alleged misconduct identified by Defendants. ....................................................................................................... 25

A.     Mr. Johnson's conduct is not of a nature that would warrant dismissal. ................. 26

B.     None of the alleged misconduct identified by Defendants has prejudiced the judicial process or the victim. ................................................................. 27

C.     The public interest favors allowing Mr. Johnson's claims to proceed. ................... 31

III.     The Court should not grant attorney fees or any other sanction ...................................... 31

CONCLUSION ............................................................................................................. 32

EXHIBIT LIST ............................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*Aoude v. Mobil Oil Corp.*,
  892 F.2d 1115 (1st Cir. 1989) ................................................................................. 29

*Atkins Nuclear Secured, LLC v. Aptim Fed. Servs., LLC*,
  No. 118CV1112AJTJFA, 2019 WL 1793137 (E.D. Va. Apr. 24, 2019) ........................ 3, 4, 26

*BSN Med., Inc. v. Parker Med. Assocs., LLC*,
  No. 3:09CV15, 2011 WL 1343188 (W.D.N.C. Apr. 8, 2011) .................................. 15

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ........................................................................................ 1, 2, 3, 4

*Dewitt v. Ritz*,
  No. CV DKC 18-3202, 2021 WL 915146 (D. Md. Mar. 10, 2021) ............................ 2, 27, 29

*Glynn v. EDO Corp.*,
  No. JFM-07-01660, 2010 WL 3294347 (D. Md. Aug. 20, 2010) .................................. *passim*

*Hanlin-Cooney v. Frederick Cnty.*,
  No. Civ. WDQ-13-1731, 2014 WL 34219213 (D. Md. July 9, 2014) ........................... 2

*Harris v. John Hiester Chevrolet of Lillington, LLC*,
  No. 5:16-CV-211-FL, 2018 WL 1021330 (E.D.N.C. Feb. 22, 2018) ............................ 10–11

*Holmes v. Wal-Mart Stores E., L.P.*,
  No. 1:10CV75, 2011 WL 1842868 (E.D. Va. Apr. 27, 2011) .................................. 28

*Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*,
  No. 1:02CV00146, 2006 WL 435726 (M.D.N.C. Feb. 22, 2006) ........................... 29

*PETA v. Tri-State Zoological Park of W. Md., Inc.*,
  No. 1:17-CV-02148-PX, 2018 WL 5761689 (D. Md. Nov. 1, 2018) ........................... 27

*Projects Mgmt Co. v. Dyncorp Int'l LLC*,
  734 F.3d 366 (4th Cir. 2013) ................................................................................. 26

*Rangarajan v. Johns Hopkins Univ.*,
  917 F.3d 218 (4th Cir. 2019) ................................................................................. 26

*Roadway Exp., Inc. v. Piper*,
  447 U.S. 752 (1980) ........................................................................................ 1

*Scibek v. Gilbert*,
  No. 2:20-CV-2638-DCN, 2021 WL 4502697 (D.S.C. Oct. 1, 2021) ........................... 9, 15

*Silvestri v. Gen. Motors Corp.*,
  271 F.3d 583 (4th Cir. 2001) ................................................................................. 3

*Suntrust Mortg., Inc. v. AIG United Guar. Corp.*,
  No. 3:09CV529, 2011 WL 1225989 (E.D. Va. Mar. 29, 2011) .................................. *passim*

*Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co.*,
   508 F. App'x 243 (4th Cir. 2013) .......................................................................... 2

*U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*,
   415 F. Supp. 2d 628 (E.D. Va. 2006) .................................................................. 14

*United States v. Shaffer Equip. Co.*,
   11 F.3d 450 (4th Cir. 1993) ......................................................................... *passim*

*Walden v. City of Chicago*,
   846 F. Supp. 2d 963 (N.D. Ill. 2012) .............................................................. 19, 20

**Rules**

Fed. R. Evid. 403 .............................................................................................................. 9

Fed. R. Evid. 804 ............................................................................................................ 18

**Other Authorities**

Obituaries, Balt. Sun (Jan. 11, 2002), https://www.baltimoresun.com/news/bs-xpm-2002-
   01-11-0201110403-story.html. .......................................................................... 5

Welcome to Maryland Board of Nursing License Verification, Maryland Board of Nursing,
   http://lookup.mbon.org/ verification/Search.aspx ........................................... 9

Defendants attempt to mislead the Court. There is no other way to describe the omissions from the record in their Motion to Dismiss. Focusing predominantly on an affidavit by Paul Burton and grounding their arguments in deposition statements by Mr. Burton, Defendants contend that Jerome Johnson fabricated the Burton affidavit from whole cloth and then duped the State's Attorney's Office ("SAO") with it to procure his release from incarceration. What Defendants omit from their story is that Mr. Burton's prison records show that Mr. Johnson's attorney, not Mr. Johnson, procured the affidavit from Mr. Burton; that the SAO gave sworn testimony that it did not think evidence regarding Mr. Burton was credible and did not rely on it when it petitioned for Mr. Johnson's release; and that Defendants themselves know that no attorney could put Paul Burton on the stand without consciously risking suborning perjury. This skims the surface of their misrepresentations. Defendants' conduct goes beyond painting the rosiest picture of their case. They have withheld from the Court the critical information needed to fairly evaluate their claims and wasted the Court's time with allegations they know, or with reasonable diligence should have known, to be unsupported. The Motion to Dismiss should be denied.

## LEGAL STANDARD

Defendants' Motion rests entirely upon the Court's inherent powers to sanction litigants for conduct not reached by any other rule of law. Mot. Dismiss 10, ECF No. 137 (hereinafter "MTD"); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). Because inherent powers derive from outside the democratic process, the Court exercises such power only "with the greatest restraint and caution, and then only to the extent necessary." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461 (4th Cir. 1993); *accord, e.g.*, *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). "Mindful of the strong policy that cases be decided on the merits," a court may dismiss a

case using its inherent powers only under narrow circumstances and only as a last resort. *Shaffer*, 11 F.3d at 462; *see Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 WL 3294347, at *8 (D. Md. Aug. 20, 2010). Dismissal may be appropriate "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Shaffer*, 11 F.3d at 462. While the Fourth Circuit has not spoken directly to the evidentiary standard, the parties here and most courts in this circuit agree that the moving party has the burden to show fraud on the court or abuse of process by clear and convincing evidence. MTD 10; *see, e.g.*, *Hanlin-Cooney v. Frederick Cnty.*, No. Civ. WDQ-13-1731, 2014 WL 3421921, at *3 (D. Md. July 9, 2014); *Suntrust Mortg., Inc. v. AIG United Guar. Corp.*, No. 3:09CV529, 2011 WL 1225989, at *2, *20 (E.D. Va. Mar. 29, 2011), *aff'd sub nom. Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co.*, 508 F. App'x 243 (4th Cir. 2013). That evidence should be in a form that would be admissible. *See Dewitt v. Ritz*, No. CV DKC 18-3202, 2021 WL 915146, at *6 (D. Md. Mar. 10, 2021); *see also Chambers*, 501 U.S. at 50 (instructing courts to "comply with the mandates of due process" when evaluating sanctions under inherent powers).[1]

Proof of fraud by clear and convincing evidence does not end the inquiry. Because "dismissal without deciding the merits is the most extreme sanction, a court must not only exercise its inherent power to dismiss with restraint, but it may do so only after considering several factors." *Shaffer*, 11 F.3d at 462. The Court considers:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable

---

[1] To the extent the Court is inclined to grant Defendants' Motion to Dismiss, a hearing is first required. *Chambers*, 501 U.S. at 32.

persons, compensating harmed persons, and deterring similar conduct in the
future; and (6) the public interest

*Id.* at 462–63. At bottom, the conduct must be "so extraordinarily egregious that dramatic

sanctions are necessary to deter future misconduct and preserve the integrity of the litigation

process," or the prejudice to the other party must be so great that it "cannot be cured through a

less dramatic sanction." *Glynn*, 2010 WL 3294347, at *8; *cf., e.g.*, *Silvestri v. Gen. Motors

Corp.*, 271 F.3d 583, 593 (4th Cir. 2001) (using this analysis in the closely related context of the

court's inherent power to dismiss for spoliation).[2]

But first, the moving party must prove the misconduct. Defendants cannot.

## ARGUMENT

### I.    There has been no fraud on the Court or abuse of process.

#### A.    Mr. Johnson did not defraud the Maryland courts with his post-conviction filings.

Defendants' Motion focuses primarily on an affidavit signed by Paul Burton that the

parties now agree is false. Mr. Johnson's unknowing use of a false affidavit in previous

proceedings does not give rise to sanctions in this one: "invocation of the inherent power would

require a finding of bad faith," *Chambers*, 501 U.S. at 49, in other words, conduct that rises to

the level of "willful or wanton behavior," *Atkins Nuclear Secured, LLC v. Aptim Fed. Servs.,

LLC*, No. 118CV1112AJTJFA, 2019 WL 1793137, at *5 (E.D. Va. Apr. 24, 2019). The bad-faith

standard "reflects at its core a focus on the actors' subjective intent (that is, something beyond

negligence or even recklessness) to disrupt the judicial process or manipulate it to harm a

---

[2] As with the present Motion, a motion to dismiss for spoliation "arises from a court's inherent
power to control the judicial process and litigation, but the power is limited to that necessary to
redress conduct 'which abuses the judicial process.'" *Silvestri*, 271 F.3d at 590 (quoting *Chambers*,
501 U.S. at 45–56, and citing *Shaffer*, 11 F.3d at 462). Cases addressing motions to dismiss for
spoliation are therefore relevant to the Motion before the Court.

litigation opponent, as opposed to simply whether the conduct had the effect of causing disruption." *Id.*[3] Defendants' evidence that Mr. Johnson acted in bad faith—i.e., that he used the affidavit knowing it was false—rests on a deeply selective reading of the record and a deeply selective credulity in statements by Mr. Burton. The totality of the evidence reduces Defendants' arguments to speculation and assumption—not the clear and convincing evidence they must develop.

### 1. Mr. Johnson did not fabricate the Burton affidavit.

The record evidence shows that Mr. Johnson's attorney, George Epstein, drafted Mr. Burton's affidavit, and Mr. Burton signed it. Defendants' claim that Mr. Johnson forged Mr. Burton's signature is spurious. MTD 5. That claim rests on Mr. Burton's testimony that he did not sign the affidavit and that he could not sign it because he was isolated from other inmates on the date it was signed.[4] There are two problems with this theory: first, the record shows that Mr. Burton met with Mr. Johnson's attorney in April 1997, when the affidavit was signed. Ex. 2, at NK DEF 9419–20; *see infra* Part I.A.1.a. Second, Defendants ask the Court to uncritically believe Mr. Burton.

### a. Mr. Johnson's attorney procured the Burton affidavit.

Defendants mislead the Court by representing that because Mr. Burton was in administrative segregation at the time the affidavit was signed, he could not have signed it. MTD 5. Mr. Burton testified that while in segregation, he was not allowed to keep paperwork other

---

[3] Although the Fourth Circuit has not ruled on whether the bad-faith standard for the exercise of a court's inherent sanctioning powers is objective or subjective, as *Atkins* reviews, a subjective standard is most consistent with *Chambers*, with the distinction between courts' inherent and statutory powers, and with precedent from other circuits. *Atkins*, 2019 WL 1793137, at *4–5.

[4] The date on the affidavit is difficult to read. It could be April 15, 1997, or April 18, 1997. Ex. 1, at NK DEF 768. The parties agree that the affidavit is dated sometime in April 1997, *see* MTD 6, which is all that matters for present purposes.

than legal mail and therefore could not have signed the affidavit. Ex. 3, Burton Dep. 201:1–22. Defendants never asked Mr. Burton whether he could receive legal visits while on administrative segregation. Mr. Johnson has never claimed that he obtained Mr. Burton's affidavit and signature personally. He has always maintained that his attorney at the time, George Epstein,[5] met with Mr. Burton, discussed the affidavit, and procured Mr. Burton's signature. Ex. 4, Johnson Dep. 280:10–282:15, 283:5–284:9. According to Mr. Burton's visitor logs, Mr. Burton received a visit from George Epstein in April 1997. Ex. 2, NK DEF 9419–20.[6] There is no evidence, much less clear and convincing evidence, that Mr. Burton could not have signed an affidavit during this visit. *See* Ex. 6, Johnson Decl. ¶ 3. That Mr. Epstein's office drafted Mr. Burton's affidavit is further supported by the fact that the affidavit appears written in the same typeface and printed on the same type of paper as the motion to which it was attached, which Mr. Epstein signed. Ex. 1, at NK DEF 762–70.

As Mr. Johnson explained in his deposition, while he now understands that Mr. Burton was incarcerated at the time Aaron Taylor was murdered and therefore could not have done what Mr. Burton claimed to do, Mr. Johnson verified Mr. Burton's information to the best of his abilities in 1997, including by having Mr. Burton talk to his attorney. Ex. 4, Johnson Dep. 281:6–282:15, 283:12–284:8, 287:1–13, 291:1–293:6. Mr. Johnson testified that he was satisfied with Mr. Burton's credibility because his lawyer was satisfied. *Id.* 285:2–6. That is not bad faith.[7]

---

[5] Unfortunately, Mr. Epstein died in 2002, according to the *Baltimore Sun*. Obituaries, Balt. Sun (Jan. 11, 2002), https://www.baltimoresun.com/news/bs-xpm-2002-01-11-0201110403-story.html.

[6] That George Epstein visited the prison where Mr. Burton and Mr. Johnson were incarcerated in April 1997 is also corroborated by Mr. Johnson's visitor log. Ex. 5.

[7] Three of Mr. Johnson's lawyers were apparently satisfied with the credibility of the Paul Burton affidavit—George Epstein, Gary Bair (a retired judge on the Montgomery County Circuit Court),

**b.      Paul Burton is as credible as a sundial on a cloudy day.**

Omitting the key fact that Mr. Johnson's attorney visited Mr. Burton in April 1997, just as Mr. Johnson testified, is bad. Asking this Court to trust Mr. Burton's word is worse. Mr. Burton was contumacious and mendacious throughout his deposition. The Court does not have to take Mr. Johnson's word for it: at Mr. Burton's deposition, arranged by counsel for the Officer Defendants, defense counsel described Mr. Burton on the record as "combative and noncooperative and . . . swearing at me repeatedly, not wanting to answer the questions." Ex. 3, Burton Dep. 72:18–20. At his first deposition, Mr. Burton dubiously claimed to need a sign language interpreter. According to the interpreter, "it was pretty clear that [Mr. Burton] was not using [the] sign language interpretation to understand questions being asked of him" because he would begin responding to questions before they were signed to him. Ex. 8, Martinez Decl. ¶ 7. After Mr. Burton requested and received a sign language interpreter, he invoked his right under the Fifth Amendment not to incriminate himself and refused to testify. Order Regarding Inadvertent Recording of Court Proceeding 1, ECF No. 73. At the rescheduled deposition, Mr. Burton obstructed the proceedings immediately and continuously. He took the Fifth in response to the fourth question posed, Ex. 3, Burton Dep. 7:10–11 ("At this time I'm swore in and I'm pleading the fifth from this point on."), stated his intent to "plead[] the fifth to every answer," *id.* 21:7–8, and initially refused to allow any line of questioning, *see, e.g.*, *id.* 7:8–10:21, 61:2–63:22. In between taking the Fifth in response to nearly every question during the first hour or so of the deposition, and intermittently thereafter, *e.g.*, *id.* 153:3–8, 184:1–8, 324:9–16, Mr. Burton repeatedly interjected, among other things, insults to counsel, *e.g.*, *id.* 36:12, 39:11–15, 45:4–

---

*see* ECF No. 137-9, at 16; and Rachel Kamins (currently with the Maryland Office of the Public Defender), *see* Ex. 7, at NK DEF 624–25.

46:17,[8] irrelevant protestations of his faith, *e.g.*, *id.* 23:21–22, 41:5–7,[9] 290:8–13, and threats to

sue counsel and the Court to "get some money," *id.* 20:13–16; *see, e.g.*, *id.* 21:22–22:11, 39:16–

21. Throughout the deposition, Mr. Burton monologued non-responsively, *e.g.*, *id.* 105:13–

107:13, 184:1–185:4, 334:4–336:19, made and took phone calls, *e.g.*, *id.* 129:14–130:21, 275:3–

276:15, and refused to answer questions when it did not suit him, *e.g.*, *id.* 306:12–14, 322:6–

16.[10] At times, he implied that his testimony could be bought. *See id.* 204:14–15 (refusing to

answer the question because "I ain't getting none of the money so I don't care"); *id.* 211:6–19

("If somebody would have helped me – I'm just saying if somebody would have helped me out

of a situation, I would have been pleased to help that person.").

This merely sets the stage for the stream of patent falsehoods Mr. Burton offered up

during the course of his deposition. Some of those claims relate to Mr. Johnson's efforts to

exonerate himself and, if true, would be cause for serious concern. But like Mr. Burton's claims

about the affidavit, they are not true. They include:

- The SAO took bribes to support Mr. Johnson's exoneration, and crooked judges on
  the Maryland bench are also taking bribes. *Id.* 239:16–240:8; *see id.* 322:6–16
  (refusing to answer questions about these allegations).

---

[8] For the Court to understand Mr. Burton's hostile and non-responsive approach to answering questions, and despite the vulgarity of the language, the following excerpt of his responses to defense counsel is provided:

> No disrespect to any of you women. Are you a cocksucker? That's the same as asking me if I'm a gang banger. You assaulted my character. Are you a cocksucker? Do you suck cock, because I know a lot of guys in prison would like to see you. Do you suck cock? You out of order asking me about some – I hate gangs. I'm against gangs.

Ex. 3, Burton Dep. 45:15–46:1.

[9] In professing his faith, Mr. Burton used offensive and homophobic language.

[10] Counsel occasionally accidentally called Mr. Burton by Mr. Johnson's name.

- Mr. Burton reported Mr. Johnson's use of his allegedly fabricated affidavit via a letter "to the appeals judge." *Id.* 267:15–20, 306:5–11. No such letter has been produced with Mr. Johnson's court records.

- Plaintiff's counsel was "trying to pay me off not to say anything today." *Id.* 286:5–7. Defendants do not claim this allegation is true (and it should go without saying, it is not).

- Jerome Johnson killed Alvin Hill "with fentanyl." *Id.* 166:11–20. Mr. Hill's autopsy report states that Mr. Hill died of heart disease. Ex. 9, at 4. His toxicology report did not show fentanyl use. *Id.* at 5.[11]

Mr. Burton did not limit his fantastical testimony to wild accusations relating to Mr. Johnson. Some of his other notable fabrications include:

- The Baltimore Police Department harassed and threatened him about testifying at the deposition. *E.g.*, Ex. 3, Burton Dep. 8:5–9, 13:2–16; *see id.* 148:22–150:9 (refusing to answer questions about the alleged harassment).

- He was in touch, during the deposition, with law firms asking to file a suit on his behalf against defense counsel. *Id.* 57:5–12, 62:18–63:22.

- Lakisha Snead had changed her name and was now a correctional officer. *Id.* 207:2–9, 223:3–12; *see* Ex 10, Lazenby Decl. ¶ 9.

- He was getting his nursing assistant and geriatric nursing assistant certification. Ex. 3, Burton Dep. 115:1–18. There is no person in Maryland with a nursing assistant certification under the name Paul Burton. *See* Welcome to Maryland Board of

---

[11] These accusations notwithstanding, Mr. Burton also claimed not to know "anything about [Jerome Johnson's] business." Ex. 3, Burton Dep. 32:9–10.

Nursing License Verification, Maryland Board of Nursing, http://lookup.mbon.org/
verification/Search.aspx (under "Profession" choose "Nursing Assistant," for License
Type, select "All," for Last Name, type "Burton," and hit Search).

- Despite picking up only "fractions, sometimes half of words" with his hearing, he
taught himself to speak "fluent Mandarin Chinese" (a tonal language) by lip reading.
Ex. 3, Burton Dep. 114:10–19, 188:19–21.

Defense counsel's skepticism of Mr. Burton is on the record from the deposition, if not
before the Court in their current Motion. *Id.* 16:5–15, 71:13–72:8 (disputing Mr. Burton's claim
that he was not properly subpoenaed and his account of being contacted by defense counsel's
office); *id.* 36:17–19 ("Isn't it true, sir, that you faked your own kidnapping in order to avoid
responsibility on a criminal kidnapping charge that was brought against you.").[12] Defendants
offer no explanation for selectively excerpting some of Mr. Burton's accusations as fact while
denying the Court the context of the bulk of his testimony. *See Scibek v. Gilbert*, No. 2:20-CV-
2638-DCN, 2021 WL 4502697, at *5 (D.S.C. Oct. 1, 2021) (rejecting attempt by party moving
for sanctions "to seize on testimony which benefits its theory of witness tampering and
intimidation while declaring conflicting testimony false").

Given Mr. Burton's performance at his depositions, it is difficult to imagine any lawyer
putting Mr. Burton on the stand without knowingly suborning perjury. At the very least, Mr.
Burton's combativeness, evasiveness, and struggle to tell truth from fiction would render any
testimony from him likely to confuse the issues, mislead the factfinder, and waste time, while
offering no probative value. *See* Fed. R. Evid. 403. The Court should therefore not consider it.

---

[12] More information about this incident appears in Mr. Burton's prison records. Ex. 2, at NK DEF
9263; *see also id.* at NK DEF 9267 (reporting that Mr. Burton attempted to use an imposter of the
victim in a criminal case against him to have the case dropped).

### 2.    Mr. Johnson did not use either the Burton or the Hill affidavits knowing they were false.

Mr. Johnson has established that he did not fabricate Mr. Burton's affidavit. He has also established that his lawyer obtained it in circumstances under which Mr. Johnson and the lawyer's use of it—alongside other evidence of his innocence—was reasonable. Defendants fare no better in their argument that Mr. Johnson (and his counsel) knew that the Burton affidavit, and Alvin Hill's statements about Mr. Burton in Mr. Hill's affidavit, were false at the time he and/or his counsel used the two affidavits in court.[13]

### a.    Defendants improperly ask the Court to assume Mr. Johnson is guilty of the crime for which he was exonerated.

Defendants first ask the Court to find that Mr. Johnson knew the affidavits were false because he was conscious of his own guilt—in other words, they ask the Court to simply assume that Lakisha Snead testified truthfully when she stated at trial that Mr. Johnson handed Mr. Hill a gun. MTD 11. That is not the way clear and convincing evidence works. Ms. Snead's credibility during the trial is close to the heart of the merits of this case, particularly Mr. Johnson's claim that police withheld a contradictory and exonerating statement from this witness. Opp. Individual Defs.' Mot. Summ. J. 36–37, ECF No. 151 (hereinafter "Opp. Officer Defs.' MSJ"). The credibility of her testimony at trial cannot be resolved in the posture of this Motion. *See Glynn*, 2010 WL 3294347, at *3 n.7 (court will not resolve issues "intertwined with the merits" on a motion for sanctions); *cf. Harris v. John Hiester Chevrolet of Lillington, LLC*, No. 5:16-CV-211-FL, 2018 WL 1021330, at *3 (E.D.N.C. Feb. 22, 2018) (declining to rule on Rule 11 sanctions

---

[13] Defendants do not claim that the Hill affidavit was fabricated (i.e., not signed by Mr. Hill). They present no argument that Mr. Johnson knew that Mr. Hill's statements about Mr. Burton were false separate from their argument that Mr. Johnson knew the Burton affidavit was false. MTD 6. Mr. Johnson therefore addresses the affidavits together in this section.

when the evidence was "inextricably linked to the credibility issues that make the denial of summary judgment necessary").

Nor is there clear and convincing evidence that Ms. Snead's testimony was credible and that Mr. Johnson is guilty; quite the opposite. As one judge noted during Mr. Johnson's appeals, "[t]he State's case against [him], by objective standards, was not particularly strong." Ex. 11, at JOHNSON_ 349. As described in Mr. Johnson's Opposition to the Individual Defendants' Motion for Summary Judgment, Ms. Snead herself gave an exonerating statement directly after the murder that omitted any mention of having witnessed a gun handoff and instead stated that Mr. Hill pulled the gun that shot Mr. Taylor from his waistband. Ex. 12, BPD Johnson 93; *see* Opp. Officer Defs.' MSJ 3–4. When contacted by the SAO's Conviction Integrity Unit ("CIU") in 2018, Ms. Snead affirmed that she only saw one gun during the murder and that Alvin Hill was holding it. ECF No. 138-20, at 13:45–14:10.[14]

There is significant other evidence of Mr. Johnson's innocence that Defendants neither claim is falsified nor bring to the Court's attention, instead disingenuously implying that the Burton and Hill affidavits are the sum total of Mr. Johnson's support. *See* MTD 2. The CIU found "overwhelming evidence" that Mr. Johnson was innocent. Ex. 13, at SAO_PC_Johnson 1321. The evidence of Mr. Johnson's innocence includes: two alibi witnesses, Alvin Morgan and Deborah McFadden, have given sworn statements that Mr. Johnson was not at the Nite Owl at the time of shooting. Ex. 1, at NK DEF 769–770; Ex. 14, Morgan Dep. 32:15–33:12, 44:8–

---

[14] Ms. Snead's interview alone—which Mr. Johnson's counsel did not attend—undercuts Defendants' assertion in their Motion for Summary Judgment that "[t]he SAO's 'reinvestigation' was heavily influenced by Mr. Johnson's post-conviction counsel and uncovered no consequential new evidence other than the fraudulent evidence Plaintiff concocted." Individual Defs.' MSJ 1, ECF No. 138-1.

46:19; Ex. 15, at NK DEF 959–60.[15] Another witness, Kenneth Allen, initially told police that

Mr. Johnson was on the corner of Reisterstown and Lucille, away from the scene of the crime,

when the shooter confronted Aaron Taylor on the basketball court. Ex. 12, at BPD Johnson

158.[16] The Officer Defendants also concealed an interview with Ms. Snead and a detective that

took place at the homicide unit after Officer Jones's interview on July 14, from which jurors can

infer that the interview included exculpatory information (or at least information that would have

impeached Ms. Snead's credibility). Opp. Officer Defs.' MSJ 24–26. As discussed in more detail

in Mr. Johnson's opposition to summary judgment, there is also evidence of confusion by Ms.

Snead and her family as to who was who among the defendants in the Taylor murder. Opp.

Officer Defs.' MSJ 6 n.2. While not the sum total of the support for Mr. Johnson's innocence,

this evidence, separately and together, defeats any claim of clear and convincing evidence of his

guilt and therefore his knowledge that the affidavits were false.

> **b.    The Burton and Hill affidavits are not inconsistent with Mr. Johnson's statement to police in 1988.**

Defendants next contend that Mr. Johnson must have known that the affidavits were false

because they conflict with what he knew about Aaron Taylor's murder in 1988. MTD 12.

Defendants ignore the fundamental fact that Mr. Johnson was not there—almost everything he

knew, or thought he knew, about the crime was from hearsay accounts. Ex. 12, at BPD Johnson

151 (stating that Thomas Carroll told Mr. Johnson about the crime). Defendants point to the fact

that Mr. Johnson never told police that he saw a car accident or Paul Burton on the basketball

---

[15] Mr. Morgan also wrote Mr. Johnson a letter in 1991 confirming Mr. Johnson's innocence. Ex. 16.

[16] Although Mr. Allen's testimony changed at trial to place Mr. Johnson at the scene of the confrontation, he never testified to seeing a second gun or a gun handoff, and he never testified that Mr. Johnson did anything criminal. Ex. 17.

court, MTD 12, but Mr. Johnson never claimed to see what happened once the group of men confronted Aaron Taylor. He told police that he "saw Poopie, Ornie, Tommy, Butt and Kenny cross over Reisterstown Rd and onto the basketball court." Ex. 12, at BPD Johnson 150. At that point, "Alvin Morgan . . . saw me on the corner and told me to go back up the street." *Id.* In response to, "What happened next," Mr. Johnson said, "I went back to Miss. Irene's porch with Alvin Morgan." *Id.* Mr. Morgan denied that they could see the confrontation from where he and Mr. Johnson were standing. Ex. 1, NK DEF 769, ¶ 3; *see* Ex. 14, Morgan Dep. 72:13–18, 75:18–22. Mr. Johnson would not have known whether Mr. Burton had a car accident or joined the confrontation after he lost sight of the men. *See* Ex. 4, Johnson Dep. 283:5–13 ("I'm not there. I wasn't there, so I can't say what happened over there because I wasn't over there, so I'm assuming what he's saying is true.").

Fundamentally, Defendants are arguing that Mr. Johnson should have believed what he initially heard from Thomas Carroll, who did not mention Mr. Burton being at the scene,[17] over what he heard from Mr. Burton, who said he was there. Defendants offer no support for their theory that a person uses a sworn affidavit in bad faith when he believes one person's account over another's regarding an event at which he was not present.

> ### c.   Mr. Johnson's concern about Mr. Burton's refusal to testify and his eventual decision to withdraw his petition are not evidence of bad faith.

Mr. Johnson's knowledge that Mr. Burton would refuse to testify in court is not the same as knowledge that Mr. Burton had perjured himself. Defendants rely on a phone call in which Mr. Johnson relayed his concern that Mr. Burton was "jumping ship . . . in other words, the

---

[17] Notably, Mr. Carroll did not mention Mr. Dorsey being at the scene, Ex. 12, BPD Johnson 151, even though Mr. Dorsey admitted to being there, *id.* at BPD Johnson 110–17. Defendants do not argue that Mr. Johnson could not believe Mr. Dorsey in good faith.

dude's not coming to testify." MTD 8, 13. Mr. Johnson did not express any opinion about why Mr. Burton refused to testify, and neither that refusal nor Mr. Johnson's reaction to it shows bad faith. As Mr. Johnson is intimately aware, witnesses do not testify for all kinds of reasons. Ex. 6, Johnson Decl. ¶ 6. One of his own alibi witnesses, his close friend Mr. Morgan, did not come to court on his behalf because he was worried about outstanding warrants. *Id.*; Ex. 1, NK DEF 770 ¶ 7; Ex. 16; Ex. 14, Morgan Dep. 32:21–33:5. It was reasonable to presume that Mr. Burton might have become concerned about implicating himself in the murder or refused to testify for any number of reasons not related to fear of perjury.

Nor can Defendants impute knowledge of Mr. Burton's perjury to Mr. Johnson because Mr. Burton pled the Fifth in response to a question about whether he told Mr. Johnson's attorney, Nancy Forster, that his affidavit was false. MTD 7. To draw adverse inferences from the assertion of the Fifth Amendment, the assertion must have a valid basis and the inference must be "relevant, reliable, and not unfairly prejudicial, confusing, or cumulative." *See U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 633–34 (E.D. Va. 2006). Mr. Burton invoked the Fifth in response to any question he did not feel like answering for any reason, including (but not limited to), who had allegedly harassed him, Ex. 3, Burton Dep. 61:18–21; the name of his parole officer and his conditions of parole, *id.* 248:11–19; and how many people he helped with their cases while incarcerated, *id.* 288:7–10. It is remarkable that Defendants think any reliable inference can be drawn from Mr. Burton's conduct when defense counsel commented at the deposition, "I think Mr. Burton is selectively choosing which questions to take the fifth to and not take the fifth to" and that he perceived Mr. Burton to be "mocking me and making jokes at me." *Id.* 50:6–11. Because Defendants cannot show that Mr. Burton had a valid basis for—or any rhyme or reason to—asserting his Fifth Amendment privilege, and because

attempting to divine anything reliable from any part of Mr. Burton's deposition is a fool's errand, no credible inference can be drawn from Mr. Burton's assertion of the Fifth Amendment.

If Defendants' assertion that Mr. Johnson and his attorneys' use of Mr. Burton's affidavit, which now (but not then) appears to be false, is sanctionable were true, then their offering Mr. Burton's clearly perjured deposition testimony is equally so. *Cf. Scibek*, 2021 WL 4502697, at *7 (rebuking party moving for discovery sanctions for trying to "have it both ways," having engaged in the conduct for which it requests sanctions). Mr. Johnson and his counsel do not, however, engage in such tit-for-tat and instead look forward to proving his case on the merits.

Finally, by Defendants' reckoning, Mr. Johnson somehow defrauded the Maryland courts by using the Burton and Hill affidavits and then by not using the affidavits. MTD 2, 7; *see also id.* at 13. Defendants have cited nothing in support of their argument that *not* using perjured testimony is fraud on the court. Their suggestion that Mr. Johnson, through Ms. Forster, withdrew the petition as "a strategy" to "deprive[] the Circuit Court of the opportunity to scrutinize his affiants' credibility," MTD 7, is unfounded speculation. The Court should ignore it. *See BSN Med., Inc. v. Parker Med. Assocs., LLC*, No. 3:09CV15, 2011 WL 1343188, at *5 (W.D.N.C. Apr. 8, 2011) (refusing to credit unsupported assertion that party "made 'calculated decisions'" and "'subverted' the judicial process").

By failing to present any, much less clear and convincing, evidence that Mr. Johnson knew Mr. Burton's affidavit or the portion of Mr. Hill's affidavit about Mr. Burton was false, Defendants have failed to carry their burden to show fraud on the court or abuse of process through the use of these documents.

**B.    Mr. Johnson did not defraud the State's Attorney's Office or the circuit court in pursuing his successful Joint Petition for a Writ of Actual Innocence.**

Defendants' claims regarding the process by which Mr. Johnson obtained the State's Attorney's cooperation in filing a Joint Petition for a Writ of Actual Innocence are equally steeped in misdirection from the record. Defendants paint a picture of a process entirely controlled and distorted by Mr. Johnson and his counsel, asserting that the SAO "dispensed with the SAO's usual case screening" on Ms. Forster's command, MTD 9; "Ms. Forster presented both the Burton and Hill affidavits on behalf of Plaintiff to the CIU to induce the State to vacate Plaintiff's conviction," MTD 9; the Hill affidavit is the foundational piece of evidence that procured Plaintiff's release, MTD 2, 9; *see* Individual Defs.' Mem. Supp. Mot. Summ. J. 1, ECF No. 138-1 (hereinafter "Officer Defs.' MSJ") (representing that the SAO "uncovered no consequential new evidence" other than the Hill and Burton affidavits); and Ms. Lipscomb never would have signed the Joint Petition if she had known part of the Hill affidavit was false, *see* MTD 10. These are brazen misrepresentations that border on knowing falsehoods.

**1.    Ms. Forster did not control the SAO investigation.**

Reading Defendants' Motion, one would think the CIU conducted no investigation at all and merely rubber-stamped what Mr. Johnson and his attorney presented. That is not the account told by the SAO 30(b)(6) deposition or the SAO's files. At the 30(b)(6) deposition, the chief of the CIU, Lauren Lipscomb, testified that a CIU re-investigation proceeds in several steps: First, the case is screened to make sure it fits the basic parameters that it is a Baltimore City case and "there's an allegation of factual innocence." Ex. 18, SAO Dep. 21:1–6. Second, the case is given an initial review by a law clerk, which involves "[d]ocument gathering, reviewing documents among other tasks." *Id.* 23:15–24:7, 25:12–26:19. If, after the initial review, the CIU determines there is "a strong indicia of factual innocence, the case may be elevated into a reinvestigation."

16

*Id.* 34:17–35:6. The reinvestigation is done by an Assistant State's Attorney ("ASA"), investigator, law clerk, and the chief of the CIU. *Id.* 54:17–55:3. If, after the reinvestigation, the CIU determines the person is factually innocent, the case goes to the "final review process," where it is reviewed by the deputy over the CIU, the chief deputy, and the State's Attorney. *Id.* 37:10–38:12, 39:18–40:10. If the SAO decides the person is factually innocent, it typically joins counsel for the petitioner in a joint petition for a writ of actual innocence. *Id.* 60:3–18.

Ms. Lipscomb testified that, in Mr. Johnson's case, the CIU largely skipped the *initial* review process—the law clerk's document review—because Ms. Forster's presentation demonstrated that "it was a case that needed an investigation." *Id.* 32:17–33:4. Defendants neglect to mention that reinvestigation follows initial review: they cut the SAO deposition excerpt halfway through Ms. Lipscomb's sentence—"So the initial review process was almost none," ECF No. 137-19, at 5—leaving out the conclusion—"because the case came in and was almost – almost immediately slated for a reinvestigation," Ex. 18, SAO Dep. 32:17–33:4.

The SAO conducted a thorough reinvestigation of Mr. Johnson's claim of innocence. It reviewed Mr. Johnson's file. Ex. 13, at SAO_PC_Johnson 1337–1340 (recounting "Preliminary Observations during Document Review"). It reviewed the trial transcripts. Ex. 18, SAO Dep. 78:11–13. It listened to jail calls. *Id.* 103:20–104:3, 359:8–10. It spoke to at least fourteen witnesses. *Id.* 99:3–103:19. The case was ultimately reviewed by the State's Attorney and at least two deputies. *Id.* 126:16–21. As indicated by Ms. Lipscomb, the SAO also worked with the lawyers of the Mid-Atlantic Innocence Project to re-investigate Mr. Johnson's innocence, and together they filed a Joint Petition for a Writ of Actual Innocence. *Id.* 60:3–18. The SAO did not simply adopt Ms. Forster's representations and parrot them back to the circuit court.

### 2.      Mr. Johnson did not "induce" his exoneration through use of the Burton and Hill affidavits.

As the SAO's documentation and testimony make clear, Mr. Johnson did not "induce" the SAO to do anything. MTD 9. Defendants' representation of how Ms. Forster used the Burton and Hill affidavits further lacks merit. Ms. Forster gave the SAO a binder of materials that summarized the procedural history of Mr. Johnson's case. The Burton affidavit was appropriately included therein as part of that procedural history.[18] The portion of the binder that contained Ms. Forster's own representations (separate from the fairly voluminous court documents Ms. Forster assembled) consists of a table of contents of the pleadings and the claims made therein, Ex. 19, at NK DEF 669–676; a "Case History," or timeline, *id.* at NK DEF 676–679; summaries of the trial testimony, *id.* at NK DEF 679–681; a timeline of post-trial proceedings, *id.* at NK DEF 681–689; and Ms. Forster's summary of the evidence of Mr. Johnson's innocence, *id.* at NK DEF 689–690. The Burton affidavit is listed only as part of the procedural history of the case. *Id.* at NK DEF 670, 672, 684. It was not listed in the table of contents for evidence of actual innocence, *id.* at NK DEF 673–676, and it was not described as evidence of actual innocence in Ms. Forster's summary, *id.* at NK DEF 689–690. Ms. Forster did present her opinion that the Hill affidavit was one—of many—pieces of evidence of innocence, but she cited it only for the proposition that Mr. Hill "admit[ed] to murdering Aaron Taylor and stat[ed] 'Mr. Johnson, was not present during the incident,'" and that he did not testify at trial on the advice of his attorney. *Id.* at NK DEF 673. Defendants do not claim this portion of the affidavit is false, and the fact that it implicates Mr. Hill gives it some indicia of reliability. *Cf.* Fed. R. Evid. 804(b)(3) (allowing for the admission of a statement against interest if the

---

[18] Ms. Lipscomb testified that the SAO would have reviewed all of Mr. Johnson's post-conviction filings in the normal course. Ex. 18, SAO Dep. 225:20–226:21.

declarant is unavailable). Defendants did not ask the SAO deponent about how Ms. Forster presented the Burton and Hill affidavits. Their assumption that Ms. Forster pushed these documents as the pillars of Mr. Johnson's claim finds no support in the record.[19]

A word on attorney Nancy Forster: Throughout this litigation, Defendants have attempted through innuendo and suggestion to lead the Court to the conclusion that Ms. Forster attempted to illegally secure Mr. Johnson's release through the use of Mr. Burton, whom she at one time represented in an unrelated matter. *E.g.*, ECF No. 121, at 2–3; MTD 7–9. Defendants have not a shred of evidence that Ms. Forster was aware of or participated in any fraud related to the securing or use of Mr. Burton's affidavit, that she ever misrepresented facts to the SAO, or that she advised Mr. Johnson to dismiss one of his appeals as part of a scheme to defraud the Court. Defendants have tiptoed up to the line of making such false accusations, without quite doing so, because they know that they are not true and cannot be supported. Defendants' Motion improperly attempts to sully the reputation of an esteemed lawyer.

It is Defendants—not Ms. Forster—who have played fast and loose with the way they have litigated this case. Plaintiff respectfully asks the Court to put an end to Defendants' false accusations and related misconduct. Plaintiff has real concerns that if this Court does not stop Defendants' win-at-all-cost approach, then a repeat of Defendants' outside counsel's unethical actions in Chicago could occur here in Maryland. *See Walden v. City of Chicago*, 846 F. Supp. 2d 963, 980 (N.D. Ill. 2012) ("There must be a bright line between aggressive advocacy and *'win-at-all costs' unethical conduct*. This bright line has been crossed by *defense counsel's*

---

[19] In response to Defendants' requests for admission, Mr. Johnson agreed that Ms. Forster gave the Burton and Hill affidavits to the CIU "in connection with her efforts to have the SAO reinvestigate Jerome Johnson's conviction." ECF No. 137-20, Resps. 3 & 6. That is a far cry from "present[ing]" the affidavits "to induce the State to vacate plaintiff's conviction." MTD 9.

repeated ill-advised actions in this case." (emphases added)). At least two of the lawyers

representing Individual Defendants (and retained by the City of Baltimore) in this case were

among the defense counsel in *Walden*, where they represented the City of Chicago. *See Walden*,

846 F. Supp. 2d at 967.

> ### 3.    The Hill affidavit was not the primary piece of evidence that resulted in Mr. Johnson's exoneration.

As recounted *supra* Part I.A.2.a, the record reflects substantial evidence of Mr. Johnson's

actual innocence. The evidence points clearly and convincingly against Defendants' implication

that the SAO, and therefore the circuit court, relied largely on the Hill affidavit. *See* MTD 2, 9;

Officer Defs.' MSJ 1. As Ms. Lipscomb explained, Section V of the Joint Petition reflects Mr.

Johnson's presentation to the Court, which the SAO did not necessarily join; Section VI is the

State's position. Ex. 18, SAO Dep. 214:15–215:6. Although both the SAO and Mr. Johnson cited

the Hill affidavit, neither cited it for any proposition involving Mr. Burton. Both confined their

reliance on the Hill affidavit to Mr. Hill's admission that he was the shooter and Mr. Johnson

was not at the scene of the crime. ECF No. 137-21, at NK DEF 3029, 3032. The State focused

on, in order: Tanya Lazenby's testimony; Mr. Dorsey's testimony; the new interview with

Lakisha Snead and her confirmation that only Alvin Hill had a gun; Mr. Morgan's evidence; Mr.

Carroll's testimony; *then* the Hill affidavit; and finally, Ms. McFadden's testimony. *Id.* at NK

DEF 3030–32. While Defendants point to Mr. Hill's affidavit as the first piece of evidence listed

under "Newly Discovered Evidence," MTD 9 (citing ECF No. 137-21, at NK DEF 3029), they

neglect to mention that this was Petitioner's recitation of his case, not the State's, and that

Petitioner began, not with the Hill affidavit, but by recounting substantial other evidence of his

innocence and included other newly discovered evidence alongside the Hill affidavit. ECF No.

137-21, at NK DEF 3023–29.[20]

Internal documents produced by the SAO demonstrate that the SAO was persuaded by, in

its own words, "overwhelming evidence" that Mr. Johnson was innocent. Ex. 13, at

SAO_PC_Johnson 1321. In a memo to the State's Attorney, the CIU explained: "We believe that

Snead told the truth during the initial interview and remembers the same facts now because they

are the truth. We believe that Snead was heavily influenced by the family's desire to locate

suspects in being helpful to police." *Id.* at 1323. The CIU emphasized, among other things, Ms.

Snead's shifting stories; her apparent confusion regarding the identities of young men in the

neighborhood; and the lack of a documented identification of Mr. Johnson. *Id.* at 1322, 1329,

1331, 1337–38. The CIU was concerned about the detectives' failure to investigate Mr.

Johnson's alibi witnesses and alternative suspects, and their poor documentation of photo arrays.

*Id.* at 1325, 1336, 1338–40. The CIU recounted the evidence from the witnesses listed above and

their interview with Mr. Johnson. *See generally id.* Once again, the CIU mentioned the Hill

affidavit as one piece of evidence among many, and once again only for the proposition that "he

killed Victim and Johnson was not there." *Id.* at 1323; *accord id.* at 1336, 1340.

### 4.   The SAO testified that it knew the Burton affidavit was unreliable and did not rely on it.

Defendants twist Ms. Lipscomb's words when they imply that she never would have

signed the petition if Mr. Johnson had been forthcoming about the Burton and Hill affidavits. *See*

MTD 10. Ms. Lipscomb said that she would not have signed the petition if "the defense

---

[20] Once again, Defendants attempt to attribute a nefarious motive to Mr. Johnson's decision *not* to rely on Mr. Hill's statement regarding Mr. Burton's presence. Defendants fail to explain how not surfacing all unreliable statements and other disputed evidence is fraud on the court. MTD 13. Certainly that is not the attitude Defendants took towards Mr. Burton.

represented [facts] that I knew were not true." Ex. 18, SAO Dep. 257:6–12. But the defense (i.e., Ms. Forster) did not represent facts that were not true. The defense and the State made identical use of the Hill affidavit, and neither made any representations that Mr. Burton's reported involvement mattered to Mr. Johnson's innocence.

What is more, the State already believed that Mr. Burton's affidavit and the portion of the Hill affidavit about Mr. Burton were not credible at the time it signed the joint petition. At her deposition, Ms. Lipscomb stated that she did not include the portion of the Hill affidavit relating to Mr. Burton in her memorandum "because I determined at some point that there was no credibility whatsoever to be assigned to it." *Id.* 252:8–253:16. Reading Defendants' Motion, the Court would never know that the SAO understood the problems with the Burton and Hill affidavits and determined, in spite of those issues, that Mr. Johnson was innocent. The SAO had all of the information it needed to make an informed decision. No one was defrauded.

C.      **Mr. Johnson did not tamper with witnesses.**

Defendants devote little attention to their argument that Mr. Johnson allegedly tampered with witnesses, because there is little evidence to support it. MTD 13–14. Defendants present no evidence that Mr. Johnson or anyone connected to him ever promised or provided anything to any witness in exchange for false testimony. Mr. Johnson has never attempted to induce any witness to lie on his behalf. Ex. 6, Johnson Decl. ¶ 8.

At his deposition, Mr. Johnson disclosed that he sent Mr. Thomas and Mr. Dorsey small amounts of money—$50—after his release from prison. Ex. 4, Johnson Dep. 376:10–378:9. Mr. Johnson explained that he sent $50 to dozens of prisoners:

> I did a letter campaign. A lot of the guys come home from prison and they don't do enough for the guys, do you know what I'm saying? I, fortunately, be in a situation where I can help guys out, because a lot of time guys be there for a long

period of time and the family is not really helping support them and stuff like that. So $50 go a long way.

*Id.* 378:10–380:9. Including Mr. Carroll and Mr. Dorsey in an act of general generosity is not clear and convincing evidence of an attempt to defraud the court.

Similarly, offers to assist Mr. Dorsey and Mr. Carroll with their cases, including offers to help them procure legal counseling, are not fraud. As Mr. Johnson explains, he understands the horror of remaining caged in prison for decades and sought to help. Ex. 6, Johnson Decl. ¶¶ 13–14. He specifically believes it was unjust that Mr. Dorsey remained incarcerated on the basis of testimony from a witness—Lakisha Snead—who had been found by the SAO to be unreliable.[21] Ex. 6, Johnson Decl. ¶ 15. At his deposition, Mr. Carroll reacted with disbelief to the suggestion that his testimony was procured in exchange for money for an attorney. Ex. 20, Carroll Dep. 112:22–113:14. He explained that he is trying to raise money for a lawyer from multiple sources and that there would be no need for him to try to raise the money himself if he thought he could exchange his testimony for the funds from Mr. Johnson. *Id.* 122:3–18, 123:5–124:8.[22] He denied that Mr. Johnson asked him to lie and stated that he had not spoken to Mr. Johnson "in years" before he was interviewed by the Innocence Project. *Id.* 128:20–129:15. CIU documents reflects that Mr. Carroll was interviewed by the Innocence Project and SAO on May 3, 2018, and professed Mr. Johnson's innocence years before Mr. Johnson's conversation with Mr. Carroll about helping to retain a lawyer. Ex. 13, at SAO_PC_Johnson 1344. There is simply no evidence

---

[21] Mr. Johnson and Mr. Dorsey had a conversation on this point in their phone call on January 18, 2020. Ex. 25, at 17:50–18:10.

[22] Listening to the full call makes clear that Mr. Johnson's offer to help Mr. Carroll was spontaneous and had no connection to Mr. Carroll's testimony. Mr. Carroll first raised the subject that he thought he would be able to get some money together for counsel. Mr. Johnson then offered to match what Mr. Carroll could raise. There is no discussion of Mr. Carroll's testimony or of him doing anything for Mr. Johnson in return. Ex. 24, at 9:16–10:10.

of a quid pro quo, and certainly no evidence that Mr. Johnson ever attempted to offer assistance to Mr. Dorsey and Mr. Carroll in exchange for false testimony.

Defendants similarly misconstrue Mr. Johnson's conversations with Sean Morgan about Tanya Lazenby. Defendants rely on nothing but their say-so—certainly no clear and convincing evidence—that Mr. Johnson offered or promised Ms. Lazenby anything in exchange for her testimony when he told Sean Morgan to "show her love" for "stepping up to the plate." MTD 15. Ms. Lazenby avers that she has never been offered anything in exchange for her testimony. Ex. 10, Lazenby Decl. ¶ 7. Ms. Lazenby explains that watching Mr. Taylor's murder was one of the most traumatizing moments of her life and that giving testimony in this case has been very difficult. *Id.* ¶ 6; *see also* Ex. 21, Lazenby Dep. 39:1–40:8 (Ms. Lazenby becoming emotional during her deposition). As Mr. Johnson explains, when he asked Mr. Morgan to "show her love" (or as he rephrased at his deposition, "give her a hug . . . or something like that"), he meant to thank her for coming forward and telling the truth. Ex. 6, Johnson Decl. ¶ 9; *see id.* ¶ 12; Ex. 4, Johnson Dep. 371:5–20. Defendants' subjective disbelief that this is what Mr. Johnson meant, MTD 16, is a credibility dispute, not clear and convincing evidence of fraud.

The only time Mr. Johnson ever offered any kind of assistance to a witness in exchange for their help with his case was in 1991. At that time, Mr. Johnson wrote a letter to Mr. Dorsey "try[ing] to get him to come back to court to say the right thing." Ex. 4, Johnson Dep. 363:8–11. Mr. Dorsey had previously testified at Mr. Johnson's sentencing that he was present when Aaron Taylor was murdered and that Mr. Johnson was not. Ex. 22, at NK DEF 2957–2959. Mr. Dorsey also provided a sworn statement to police two weeks after the murder in which he described the group of men who confronted Aaron Taylor on the basketball court and did not list Mr. Johnson

among them. Ex. 12, at BPD Johnson 112–13.[23] As Mr. Johnson explains, at that time he had already had the experience of his alibi witnesses failing to testify on his behalf for their own reasons. Ex. 6, Johnson Decl. ¶ 6. Long before this letter, Mr. Dorsey was on record professing Mr. Johnson's innocence. Mr. Johnson never attempted to persuade Mr. Dorsey to lie for him— he only wanted Mr. Dorsey to show up to tell the truth. Defendants have not cited any support for the proposition that this conduct from thirty years ago rises to the level of fraud on the Court.

***

Defendants have presented only a distortion of the record and their own unsupported assumptions in their attempt to prove that Mr. Johnson defrauded the Court and abused the judicial process. Because they have not proven Mr. Johnson's bad-faith fraud or abuse of process by clear and convincing evidence, their Motion to Dismiss should be denied.

## II.   Dismissal is not an appropriate sanction for the alleged misconduct identified by Defendants.

Even if the Court agrees that any of Mr. Johnson's conduct rises to the level of fraud on the court or abuse of process, which it does not, none of the alleged misconduct Defendants purport to identify is an appropriate basis for dismissal of Mr. Johnson's case. As noted above, the Court should consider the factors enumerated in *Shaffer*: the wrongdoers' culpability and blameworthiness; the resulting prejudice to the judicial process and to the victim; the availability of other sanctions to cure that prejudice; and the public interest. 11 F.3d at 462–63. Where dismissal is not necessary to either preserve the integrity of the litigation process or cure prejudice to a party, it should not be granted. *See Glynn*, 2010 WL 3294347, at *9.

---

[23] As explained in Mr. Johnson's Opposition to the Individual Defendants' Motion for Summary Judgment, Mr. Dorsey's statement is clear that the "Poopie's buddy" Mr. Dorsey claims participated in the murder is not Mr. Johnson. Opp. Officers' MSJ 8.

### A.       Mr. Johnson's conduct is not of a nature that would warrant dismissal.

Mr. Johnson has not engaged in the type of conduct characteristic of cases dismissed for fraud on the court and abuse of process. "[C]ourts should impose sanctions under their implied authority only to address conduct that is especially serious and knowing." *Suntrust Mortg.*, 2011 WL 1225989, at *19; *accord Atkins*, 2019 WL 1793137, at *5. Isolated occurrences of misconduct will not ordinarily suffice. *E.g.*, *Glynn*, 2010 WL 3294347, at *9 (finding conduct "not extraordinarily egregious" when litigant "inappropriately obtained only a handful of internal . . . documents" and asserted privilege in bad faith "over a few communications"). In *Projects Management Co. v. Dyncorp International LLC*, for example, the Fourth Circuit found that dismissal was appropriate when a litigant

> made a calculated effort to shield its damages claim from the crucible of discovery by providing false answers to interrogatories, providing false deposition testimony, withholding a large number of relevant documents during discovery, and making late disclosures of material significance that continued until the day before trial was to begin.

734 F.3d 366, 374 (4th Cir. 2013); *accord, e.g.*, *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 228–29 (4th Cir. 2019) (dismissing when plaintiff utterly failed to comply with discovery, "render[ing] much of the litigation activity essentially meaningless" (alteration omitted)). Defendants have identified no such comprehensive scheme perpetuated by Mr. Johnson.

With regard to the Burton and Hill affidavits, the evidence is clear that, contrary to Defendants' characterization of Mr. Johnson acting alone, MTD 16, Mr. Johnson relied on his lawyer's comfort with Mr. Burton's credibility at the time the lawyer obtained Mr. Burton's testimony. *See supra* Part I.A.1.a. Mr. Johnson has not attempted to hide his current understanding of the falsity of the affidavits from Defendants, candidly agreeing that they are not credible in light of the information he now knows. Ex. 4, Johnson Dep. 293:7–9, 299:8–22. Mr.

Johnson has not attempted to use either affidavit in the present litigation. *See* Ex. 23, Resp. 11 (not listing either the Burton or Hill affidavits as evidence of Mr. Johnson's innocence). The SAO understood the limitations of the affidavits, *see supra* Part I.B.4; there is no evidence that Mr. Johnson perpetuated a scheme to defraud that office. Mr. Johnson and his multiple attorneys' mistaken judgment is not the kind of outrageous conduct rising to the level of culpability and blameworthiness under *Shaffer* to merit dismissal.

Nor are Mr. Johnson's offers of assistance to his co-defendants. Defendants have not tied any conversation between Mr. Johnson and a witness about money or legal help to a request by Mr. Johnson related to their statements,[24] much less a request for an untruthful statement. In contrast, for example, the Court in *Dewitt* dismissed a case after finding that the plaintiff had agreed to pay witnesses large sums of money—$10,000—for their testimony, and that the testimony itself was false. 2021 WL 915146, at *10–11. That is a far cry from this case.

**B.      None of the alleged misconduct identified by Defendants has prejudiced the judicial process or the victim.**

In light of the guidance from the *Shaffer* court and the "strong policy that cases be decided on the merits," *Shaffer*, 11 F.3d at 462, courts in this circuit exhibit a deep reluctance to grant dismissal as a sanction when the alleged misconduct does not irretrievably pollute the merits of a party's case. *E.g.*, *PETA v. Tri-State Zoological Park of W. Maryland, Inc.*, No. 1:17-CV-02148-PX, 2018 WL 5761689, at *6 (D. Md. Nov. 1, 2018) ("A court must reserve the extraordinary sanction of dismissal for only those instances where the misconduct caused prejudice to the movant sufficiently severe to outweigh the public policy in favor of resolving claims on the merits." (citation omitted)); *Suntrust Mortg.*, 2011 WL 1225989, at *27 ("[I]t

---

[24] The one exception is a 30-year-old letter from Mr. Johnson to Mr. Dorsey begging him to give the same testimony Mr. Dorsey already provided at sentencing during a post-conviction hearing.

would be a fair reading of *Shaffer* to say that, generally speaking, fraud on the court or litigation abuse should be accompanied by something akin to severe prejudice to either the court or a party before the sanction of dismissal is appropriate."); *see also Holmes v. Wal-Mart Stores E., L.P.*, No. 1:10CV75, 2011 WL 1842868, at *6 & n.25 (E.D. Va. Apr. 27, 2011) (declining to dismiss on account of plaintiff's fraud when fraud affected an isolatable portion of the case). In *Shaffer*, for example, the district court found that the "government's attorneys deliberately and in bad faith breached their duty of candor owed to the court during the course of the proceedings." *Id.* at 452. The Fourth Circuit agreed that the breach had affected the reliability and the integrity of the administrative record on which the case was based. *Id.* at 460–61. The Court nevertheless held dismissal was inappropriate where lesser sanctions could cure the prejudice: "the district court did not adequately address the broad policies of deciding the case on the merits where the orderly administration of justice and the integrity of the process have not been permanently frustrated, and of exercising the necessary restraint when dismissal is based on the inherent power." *Id.* at 463.

Neither the use of the Burton or Hill affidavits, nor any of Mr. Johnson's communications with witnesses, have "permanently frustrated" the interests of justice or prevented Defendants from fairly defending the case against them. The Burton and Hill affidavits are entirely irrelevant to this case. They do not "significantly undermine[] the basic premise that [Mr. Johnson] was ever wrongfully convicted." MTD 20. As described *supra* Part I.B, neither Mr. Johnson nor the SAO relied on the Burton affidavit during the process that resulted in Mr. Johnson's exoneration. Nor did they rely on any portion of the Hill affidavit that represented facts about Mr. Burton, and the SAO understood that any such facts were unreliable. The affidavits also have nothing to do with whether the Officer Defendants violated Mr. Johnson's constitutional rights. Mr. Johnson

has not used either affidavit in the proceedings before this Court and has repeatedly communicated to Defendants that he does not intend to. *See* Ex. 4, Johnson Dep. 310:8–10; Ex. 23, Resp. 11.[25] Mr. Hill is deceased. Mr. Burton cannot be put on the stand. Because any alleged misconduct by Mr. Johnson with regard to these affidavits has no relationship to either Mr. Johnson's exoneration or the merits of the present action, dismissal is not appropriate. *See Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, No. 1:02CV00146, 2006 WL 435726, at *5 (M.D.N.C. Feb. 22, 2006) (distinguishing prejudice that harms the victim's "ability to prove its claims" from prejudice that does not).

Nor are Defendants prejudiced by Mr. Johnson's communications with potential witnesses in his case. Defendants do not allege that Mr. Johnson induced Mr. Carroll, Mr. Dorsey, or Ms. Lazenby to give false statements to the State's Attorney. With the exception of Mr. Johnson's 1991 letter to Mr. Dorsey, the communications between Mr. Johnson and witnesses that Defendants find objectionable occurred after Mr. Johnson was exonerated. MTD 14 (citing 2020 phone calls); *see* Ex. 10, Lazenby Decl. ¶ 2 (Ms. Lazenby had no contact with Mr. Johnson until the day he was exonerated). Mr. Carroll was recorded on a phone call with his mother professing Mr. Johnson's innocence before he met with the CIU. Ex. 26, at 25:39–27:17 (stating that Mr. Johnson "wasn't there"); *see* Ex. 20, Carroll Dep. 134:6–135:16. Mr. Dorsey

---

[25] In contrast, the plaintiff in *Dewitt*, who did not go through the CIU reinvestigation process, was exonerated entirely on the basis of fabricated and perjured evidence. 2021 WL 915146, at *1–2. The plaintiff's complaint in his civil suit continued to rely substantially on such evidence. *Id.* at *4–5, *12. Similarly, in the *Aoude* case cited by *Dewitt*, *id.* at *5; *see* MTD 18 (citing portion of *Dewitt* quoting *Aoude*), the plaintiff used a falsified document as the "centerpiece" of his complaint and, after the fabrication was discovered through substantial effort by the defendants, tried to make an end-run around his fraud by re-filing his suit. *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1117–18 (1st Cir. 1989). In contrast, here, Mr. Johnson has never relied on any document or testimony he knew to be false and has never represented to Defendants that Mr. Burton's affidavit was reliable and that he intended to use it.

was on the record supporting Mr. Johnson's innocence before Mr. Johnson, 30 years ago, attempted to persuade him to come back to court on his behalf. Ex. 22, at NK DEF 2959. There is no evidence that Mr. Johnson caused any of these witnesses to change their truthful statements.

The only allegation that Mr. Johnson attempted to change any witness's testimony relates to his phone call with Mr. Dorsey on January 18, 2020. This call does not undermine the fundamentals of Mr. Johnson's case. While this phone call is difficult to decipher and there is no certified transcript, Mr. Johnson and Mr. Dorsey might have been discussing a purported, undisclosed statement by Ms. Lazenby to the BPD during the call.[26] It is not clear whether Mr. Johnson was also referencing Lakisha Snead's undisclosed July 14, 1988, statement to the BPD. Even if, as Mr. Dorsey stated, BPD officers told him on the night of his arrest that Ms. Lazenby's testimony contradicted Ms. Snead's, there is no evidence that BPD disclosed Ms. Lazenby's statement to Mr. Johnson or his attorney. Mr. Johnson's uncounseled phone call to Mr. Dorsey was ill-considered at worse and confusing at best. Certainly, Mr. Johnson should have allowed his lawyers to investigate and prepare witnesses to provide truthful statements. He made a mistake. But a single, isolated moment of poor judgment in a conversation (that did not result in any change in Mr. Dorsey's testimony) is not the kind of egregious, planned scheme that justifies dismissal. *See Suntrust Mortg.*, 2011 WL 1225989, at *19. Mr. Dorsey is deceased. Mr. Johnson's actions have therefore not created any prejudice. Under these circumstances, it would

---

[26] Mr. Dorsey appears to be saying that police officers told him on the day of his arrest that they knew he was innocent because they had spoken to "the girl Tanya" who said "she didn't see nothing Lakisha supposedly seen." Ex. 25, at 11:54–12:36. Referring to what the police said to Mr. Dorsey "when you got locked up," Mr. Johnson says: "the first time we heard about her [was] from the state's attorney at trial," *id.* at 14:40–15:50, which can only be referring to Ms. Lazenby. Ms. Lazenby testified that she never talked to the BPD. Ex. 21, Lazenby Depo. 57:6–58:20.

be "unduly pernicious" to dismiss Mr. Johnson's case "when the record does not show [his claims] to be without merit." *Id.* at *29.

Mr. Johnson's actions have prejudiced neither Defendants' nor the Court's capacity to fairly adjudicate this case. There is no prejudice to Aaron Taylor's family from this case shining a light on how the Defendants' unconstitutional misconduct imprisoned a man for almost three decades. There is no prejudice to Maryland, which rightly compensated Mr. Johnson for his nearly 30 years of wrongful incarceration. Because Defendants have identified no tangible prejudice, no sanctions are appropriate under *Shaffer* and its progeny.

### C.    The public interest favors allowing Mr. Johnson's claims to proceed.

Mr. Johnson is not the only litigant here who stands accused of abusing the legal process. This case is fundamentally about whether officers of the Baltimore Police Department violated the Constitution by hiding evidence of a murder suspect's innocence. There is substantial public interest in the Court resolving claims that police officers violated the constitutional rights of the accused on the merits. Under *Shaffer* and its progeny, the public policy in favor of deciding cases on the merits—particularly ones with substantial implications for the public's interest in criminal justice in Baltimore—has not been overcome by Defendants' distorted presentation of the facts in this case.

### III.    The Court should not grant attorney fees or any other sanction

Defendants have played fast and loose with the record and should not reap any reward. The time and effort they have spent developing their case with regard to Paul Burton is no one's fault but their own. Mr. Johnson did not use Mr. Burton's testimony to obtain his freedom and has never suggested he would use it in this Court. Defendants have forced Mr. Johnson to litigate two depositions and repeatedly address Defendants' meritless attempts to probe further into this

entirely irrelevant matter. The least Defendants can do is bear their own costs for their forcing the parties and this Court into these diversions. No fees and no other sanctions are warranted on this record.

## CONCLUSION

For the forgoing reasons, the Motion to Dismiss should be denied.


Dated:  February 14, 2022                    Respectfully submitted,

                                             _____/s/_____
                                             Kobie A. Flowers (Bar No. 16511)
                                             Andrew D. Freeman (Bar No. 03867)
                                             Neel K. Lalchandani (Bar No. 20291)
                                             Brown, Goldstein & Levy, LLP
                                             120 E. Baltimore Street, Suite 2500
                                             Baltimore, Maryland 21201
                                             Tel: (410) 962-1030
                                             Fax: (410) 385-0869
                                             kflowers@browngold.com
                                             adf@browngold.com
                                             nlalchandani@browngold.com

                                             *Attorneys for Plaintiff Jerome L. Johnson*

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, hereby certify that I have caused true and correct copies of

the above and foregoing to be served on all counsel of record via the Court's CM/ECF system, in

accordance with the rules of electronic filing of documents, on February 14, 2022.


/s/
Kobie A. Flowers

**EXHIBIT LIST**

1. Application for Writ of Habeas Corpus & Exhibits (April 24, 1997)

2. Excerpts from Paul Burton's Prison Base File (Filed Under Seal)

3. Paul Burton Deposition Excerpts

4. Jerome Johnson Deposition Excerpts

5. Excerpts from Jerome Johnson's Prison Base File

6. Declaration of Jerome Johnson

7. Excerpts from Petition for Writ of Actual Innocence (July 11, 2012)

8. Declaration of Laurellie Jacobs Martinez

9. Alvin Hill Autopsy & Toxicology Report

10. Declaration of Tanya Lazenby

11. Memorandum Decision and Order (July 14, 1993)

12. Excerpts from Aaron Taylor Homicide File

13. Memorandum from Lauren Lipscomb to Marilyn Mosby (June 1, 2018)

14. Alvin Morgan Deposition Excerpts

15. Excerpts from Post-Conviction Hearing (May 4, 1993)

16. Letter from Alvin Morgan to Jerome Johnson (Feb. 6, 1991)

17. Trial Testimony of Kenneth Allen (Mar. 9, 1989)

18. Lauren Lipscomb (SAO 30(b)(6)) Deposition Excerpts

19. Front Matter of Binder Nancy Forster Presented to the SAO

20. Thomas Carroll Deposition Excerpts

21. Tanya Lazenby Deposition Excerpts

22. Excerpt of Transcript of Mr. Johnson's Sentencing (June 2, 1989)

23. Excerpt of Plaintiff's Second Supplemental Answers to Detective Davis's First Set of Interrogatories

24. Telephone Call Between Jerome Johnson and Thomas Carroll (June 25, 2020)

25. Telephone Call Between Jerome Johnson and Reginald Dorsey (Jan. 18, 2020)

26. Telephone Call between Thomas Carroll and Donzella Carroll (April 27, 2018)