# EXHIBIT 18

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3                (Northern Division)

4    JEROME L. JOHNSON        :

5       Plaintiff           : Civil Action No.:

6          Vs.             :  ECH-19-00698

7    BALTIMORE POLICE        :

8    DEPARTMENT, ET AL       :

9       Defendants          :

10                ---------------------

11

12          Deposition of LAUREN LIPSCOMB, was taken

13   on Monday, June 28, 2021, commencing at 9:07 a.m.,

14   at Owings Mills, Maryland, before MICHELE D.

15   LAMBIE, Notary Public.

16                ---------------------

17

18

19

20   Reported By:

21             Michele D. Lambie, CSR-RPR

1    the Conviction Integrity Unit?  What happens once

2    the person fills out the application?

3        A.   The case -- the case is reviewed and

4    screened.  Well, it's actually screened first to

5    make sure that it's a Baltimore City case and that

6    it's -- there's an allegation of factual innocence.

7        Q.   And who does the screening?

8        A.   The law clerk and an ASA.

9        Q.   How many people are now a part of the

10   Conviction Integrity Unit, Ms. Lipscomb?

11       A.   The unit has four ASAs, a law clerk, two

12   support staff and an investigator.

13       Q.   The unit as it is currently constructed,

14   does it take any and all applications that come in

15   or is there a -- aside from the screening, which

16   you explained as it being from Baltimore City and

17   there's a -- there must be an issue of factual

18   innocence, is there any other determining factor

19   that allows you or as far as your guidelines are

20   concerned that allows you to take the case?

21       A.   So, anyone can fill out the application.

1   and?

2        A.    Whatever -- it depends.

3        Q.    And what does it depend on?

4        A.    Hmm.  I think that would call for

5   speculation because I don't screen the cases.

6        Q.    Well, as the -- as the chief of the

7   Conviction Integrity Unit, do you -- do you give

8   some type of a parameter as to kind of listing once

9   it's screened, kind of what the next process should

10  be?

11       A.    So, that's a separate question.  If

12  you're asking specifically who specifically screens

13  the cases, that could be the law clerk and/or the

14  ASA.

15            Generally speaking, what is our process?

16  That's a separate question.  Generally speaking,

17  our process is once the cases are screened and it

18  is determined that they are Baltimore City cases

19  and that there is an allegation of factual

20  innocence, then depending on whether the cases meet

21  that -- those screening criterion, then they are

1    escalated into the initial review process.

2            The initial review process is one where

3    the cases are reviewed a little bit more in-depth.

4        Q.   And after that initial review process,

5    who does that review?

6        A.   The law clerk and -- well, the law clerk

7    overseen by the ASA.

8        Q.   And at that initial review process, what

9    exactly is the law clerk, who is overseen by the

10   AUSA, what are they reviewing for?

11       A.   We're not federal --

12           MS. SHIFF:  Wait a minute.  Wait a

13   minute.  Let me object because it's not an AUSA.

14   It's an ASA.  Just I want to -- I don't know if I'm

15   hearing you properly, and --

16           MR. FLOWERS:  No.  I --

17           MS. SHIFF:  -- but I want to make sure.

18   We're not federal.  This is a state, so it's an

19   Assistant State's Attorney as opposed to Assistant

20   U.S. Attorney.

21           MR. FLOWERS:  I think I did say ASA, but

1   if I didn't say ASA, that's what I meant.  I'm very

2   well aware of that.

3          MS. SHIFF:  Okay.  I just want to make

4   sure the record is clear.  Go on.

5          MR. FLOWERS:  No, no.  Good enough, and I

6   do appreciate the objection.

7          MS. SHIFF:  I'm sorry.

8          MR. FLOWERS:  I do want to make sure the

9   record is clear.  ASA, Assistant State's Attorney,

10  is what we're asking about.

11  BY MR. FLOWERS:

12     Q.   So, the question then, Ms. Lipscomb, is

13  at that initial review stage, what is the law clerk

14  looking for or doing as he or she is overseen by

15  ASA?

16     A.   The law clerk is performing whatever

17  tasks are -- are needed in order to accomplish the

18  initial review.

19     Q.   And what do those tasks consist of?

20     A.   Document gathering, reviewing documents

21  among other tasks.

1     Q.   Once that initial -- is that the only

2   thing that -- that is required at the initial

3   review, the document gathering, the reviewing of

4   documents among other tasks?  Is there -- is

5   there -- is there more that the law clerk would be

6   expected to do at that initial review stage?

7     A.   Not likely, but it's fluid.  You're not

8   going to get a definitive answer because it's

9   fluid, whatever the tasks are that need to be done.

10    Q.   And when does a definitive answer come

11   out of that initial review?  How long does it

12   typically take --

13    A.   Now we're --

14    Q.   -- for that initial review?

15    A.   I think you need to be more specific.

16   Are we now talking about the law clerk?  Are we

17   talking about the ASA?  Are we talking about the

18   process overall?  What's the specific question?

19    Q.   The specific question is, my

20   understanding from your testimony was that there's

21   a law clerk who conducts this initial review; is

1    duration for that initial review based off your

2    experience?

3         A.   It varies.

4              MS. SHIFF:  Objection.  Go ahead.

5              THE WITNESS:  It varies.  If you have a

6    question specific to this particular case, I might

7    be able to ballpark it a little bit better.

8    However, when you're speaking in generalities about

9    cases, like I've already explained here, I do

10   not -- we are not in the business of writing down

11   time as we review.  It is almost impossible to

12   quantify.  It really varies from case to case.

13   BY MR. FLOWERS:

14        Q.   Let me ask you specifically for the

15   Jerome Johnson case, how long did the initial

16   review take?

17        A.   In the Jerome Johnson case, it was a case

18   that was presented by Nancy Forster, and based on

19   her presentation, it was a case that needed an

20   investigation.  So, the initial review process was

21   almost none --

```
 1        Q.   What --
 2        A.   -- because the case came in and was
 3   almost -- almost immediately slated for a
 4   reinvestigation.
 5        Q.   And when you say almost immediately
 6   slated for reinvestigation, how long did that take?
 7        A.   What I'm trying not to do is to get into
 8   minutes, seconds, and hours.  So, when I say almost
 9   immediate, I mean almost immediately.
10             I don't want to say immediately because I
11   don't want the follow-up question to be, what does
12   that mean?
13             I'm saying it was presented by Nancy
14   Forster.  Based on the information that she gave
15   us, almost immediately it was slated for a
16   reinvestigation.  There was very little initial
17   review, very little.
18        Q.   And why are you not wanting to talk in
19   terms of minutes, seconds or hours about the
20   initial review process?  Why don't you --
21             MS. SHIFF:  Objection.
```

Lauren Lipscomb June 28, 2021

Page 34

1            THE WITNESS:  Because that's speculative.

2     BY MR. FLOWERS:

3        Q.   Okay.  And I'm just trying to ask you not

4     to speculate, but just based on your experience, to

5     the best of your memory of this case, you're unable

6     to say for this case, for which you're being

7     deposed, how long the initial review process was

8     aside from saying that it was pretty much

9     immediately taken to the reinvestigation stage; do

10    I understand your testimony?

11           MS. SHIFF:  Objection.

12           THE WITNESS:  The question has been

13    answered as almost no initial review.  That's not I

14    don't know.  That's not I'm not able.  The answer

15    is almost no.

16    BY MR. FLOWERS:

17       Q.   Okay.  All right.  After the initial

18    review process, what's the next step in the stage

19    of -- of a case that comes to you, Ms. Lipscomb?

20       A.   So, we're flipping back to general or are

21    we specific within Jerome Johnson?

1      Q.    We're going back to general.

2      A.    Okay.  So, after the initial review

3    process, depending on what has -- what's

4    been -- whether there's strong indicia of factual

5    innocence, the case may be elevated into a

6    reinvestigation.

7      Q.    And what do you look for to try to

8    determine that there is factual innocence enough to

9    elevate the case to reinvestigation?

10     A.    It depends on -- it depends on various

11   factors.  There is no specific formula as to what

12   would qualify a case to be escalated into a

13   reinvestigation.  There needs to be strong indicia

14   of factual innocence.

15     Q.    I understand that you said it depends on

16   various factors.  Can you share what those factors

17   are?

18     A.    It -- it varies from case to case.

19   It's -- it's not possible to -- you know, it

20   depends on what's being presented; witnesses,

21   statements, evidence.  It depends from case to case

Johnson case?

A.   I think that the documents you have would
be the best answer to that because I don't remember
off the top of my head.  It was four years ago.

Q.   No.  Fair enough.  Let me show
you -- I'll tell you what, we'll get to those
documents, but let's keep walking down this road of
kind of how a case gets kind of through the process
at the Conviction Integrity Unit.

Once it's at that reinvestigation stage,
what is the -- the next step, Ms. Lipscomb?

A.   Once a case has been investigated,
if -- if it is a case in which the person -- if the
case is such that the person was likely factually
innocent -- so, there are two ways out of an
investigation.  One is that we investigate the
case, and it does not appear that the person was
wrongfully convicted and that they -- there are too
many negatives in this.

It -- it does not appear that the person
was wrongfully convicted/it appears as though the

Laura Lipscomb
June 28, 2021

Page 38

1    person was not or is not factually innocent, so

2    that's the end of it.  That's the end of the case

3    in terms of our review, or it appears as though the

4    person was wrongfully convicted and is factually

5    innocent, and it gets escalated by me to the final

6    review process.

7         Q.   All right.  And that latter piece there

8    when it gets escalated by you to that final review

9    process, what does that final review process look

10   like?

11        A.   That's a review by the deputies and the

12   State's Attorney.

13        Q.   Okay.  And, I'm sorry, I should have

14   asked you at the very beginning of this deposition.

15   How would you like me to refer to you, ASA

16   Lipscomb, Ms. Lipscomb, something else?  What is

17   the -- what would you prefer?

18        A.   Ms. Lipscomb is fine.  It doesn't have to

19   be ASA Lipscomb, no.

20        Q.   Okay.  Ms. Lipscomb, when it gets

21   referred then to that -- that final review

1    and -- that final review process after the

2    investigation, who are the deputies that review

3    kind of -- I guess who steps in at that stage?

4            MS. SHIFF:  Are you asking currently or

5    in 2012 or when in the timeline?  Since she been

6    chief of the unit?  It may have changed.

7            MR. FLOWERS:  Okay.  Fair enough.

8    BY MR. FLOWERS:

9        Q.   Let's start with in 2018, during the

10   Jerome Johnson case, who would have been the

11   deputies that would have looked at the case after

12   it had been reinvestigated?

13       A.   The deputies at that time --

14   definitely -- Jim Bledsoe definitely was one of the

15   deputies as well as Patricia DeMaio.  What I'm not

16   certain about is whether Tony Gioia had moved on to

17   chief counsel or not at that point.

18       Q.   Fair enough.  And at that process or at

19   that stage, Ms. Lipscomb, you said there was a

20   review by deputies.  Is there a review by anyone

21   else?  I'm not sure I remember exactly if it was

1    just deputies or if there was somebody else who

2    also reviewed at that process -- at that stage

3    rather?

4         A.   Well, the protocols are that the deputy

5    over CIU and the chief deputy review as well as the

6    State's Attorney, and so I don't really know -- if

7    you're speaking generally, that's generally --

8    that's our process.  So, the deputy over CIU and

9    the chief deputy review the matter as well as the

10   State's Attorney.

11        Q.   Okay.  Very well.  And that review

12   is -- how does that -- how does that take place?

13   Is that a meeting?  Is that a series of meetings?

14   Are there memos written?  Can you just explain kind

15   of how that review takes place?

16        A.   Generally speaking, it's a series of

17   meetings, a review of the memo, phone calls.

18        Q.   And at that stage in the process, what

19   are the -- the deputy over CIU, the chief deputy

20   and the State's Attorney, what are they looking for

21   at that process?  What's the decision to be made at

Page 54

1        Q.   No, I understand.  I understand your

2    testimony is you don't know how many

3    non-exoneration cases you have had from 2015 to

4    2021; is that correct?

5            MS. SHIFF:  Objection.

6            THE WITNESS:  A specific number, no.

7    BY MR. FLOWERS:

8        Q.   In the reinvestigation stage,

9    Ms. Lipscomb, who takes part at that stage of -- of

10   the case?

11           MS. SHIFF:  And I just have to say I lost

12   the first part of that question because I think you

13   were speaking away from your microphone again.  So,

14   could you please restate the question?

15           MR. FLOWERS:  Yes.

16   BY MR. FLOWERS:

17       Q.   The question is, in the -- in the

18   reinvestigation stage -- in the protocol when we're

19   at the reinvestigation part, who are the personnel

20   that take part in that reinvestigation stage?

21       A.   Currently the reinvestigation -- the

1    reinvestigation is conducted by the full-time

2    investigator, ASA, law clerk, and me.  I oversee

3    the investigation.

4         Q.   Is it fair to say that you have

5    sufficient resources to conduct those

6    reinvestigations, Ms. Lipscomb?

7         A.   I don't think anyone in Baltimore City

8    working for the government would say that we have

9    sufficient resources for anything.

10        Q.   Fair enough.

11        A.   That's very generous.

12        Q.   Fair enough.  Fair enough.  Let me ask,

13   if you could have more resources, Ms. Lipscomb, if

14   you could be in charge of the money, what more

15   would you -- would you have?

16             MS. SHIFF:  Objection.  I think that's an

17   in- -- I think that's not a proper question.

18   BY MR. FLOWERS:

19        Q.   You may answer.

20        A.   We're able to get our work done.

21        Q.   Is it fair enough -- is it fair to say

Page 60

1    Office, what is the next step?

2         A.    Release.

3         Q.    And what does release entail?

4         A.    Thus far, it has been to file a Joint

5    Writ of Actual Innocence Petition with the Court.

6         Q.    And with that Joint Writ of Actual

7    Innocence Petition, you go before the Court and

8    explain why this person is factually innocent; is

9    that fair to say?

10        A.    Pretty much.

11        Q.    And you say that it's joint, because

12   typically you're joining with the person's

13   post-conviction counsel; is that how it typically

14   works?

15        A.    I -- well, defense counsel, period.  I

16   don't know whether they're post-conviction.  You

17   know, it depends, but defense counsel, period.

18   Yes.

19        Q.    And when you go before the Court, the

20   Court ultimately makes a determination; is that

21   correct, about whether the person is factually

1      Q.   Okay.  And under that subheading,

2  Ms. Lipscomb, do you see what looks like a

3  synopsis, a summary of each day in trial, kind of

4  who testified and basically what they said?  Do you

5  see that?

6      A.   Yes.

7      Q.   And in making your reinvestigation of

8  this case, it's fair to say you considered what

9  happened at trial?

10     A.   Yes.

11     Q.   It's fair to say you reviewed all of the

12  trial transcripts?

13     A.   Yes.

14     Q.   Then we get to page 15 of your memo here,

15  and that's the reinvestigation, and it says here On

16  October (sic) 29th, 2017, Nancy Forster met with

17  ASA Andrea Mason.  Do you see that language there,

18  Ms. Lipscomb?

19     A.   Yes.

20     Q.   And that's the system with which you

21  testified earlier, that Ms. Forster came to the

Page 99

```
 1    were not present at the murder?

 2         A.   Correct.

 3         Q.   Okay.  Moving further down the page, a

 4    little bit past halfway, you have a subheading for

 5    the Witness Interviews.

 6         A.   Oh, and I have to correct myself.  We did

 7    speak to Steve Owens.

 8         Q.   Well, that's fine.  This is not a test,

 9    and that's why --

10         A.   No.  I just am noticing it.  I'm noticing

11    that I did speak to him.

12         Q.   Yes.

13         A.   Yeah.

14         Q.   Okay.

15         A.   I didn't remember.  Okay.

16         Q.   That's exactly why we wanted to walk

17    through it because there's a lot here because of

18    how meticulous the investigation was.

19              All right.  So, for the witness

20    interviews, is it -- is it fair to say that you

21    spoke to PO Steve Owens?
```

1        A.    Yes.

2        Q.    Fair to say you spoke to Investigator

3    Tony Wilson, who was Nancy Forster's investigator?

4        A.    Yes.

5        Q.    You also spoke with Reggie or Reginald

6    Dorsey, I should say?

7        A.    Yes.

8        Q.    And then it says that you looped in the

9    Mid-Atlantic Innocence Project.  What do you mean

10   by that, Ms. Lipscomb?  I think I know what you

11   mean, but just for the record, what do you mean by

12   that?

13       A.    They are -- they are our grant partners.

14   At the time, they were our grant partners.

15            It's actually another grant that we're

16   grant partners with now, and so they were

17   co-counsel with Nancy Forster.

18       Q.    And then after the mention of the

19   Mid-Atlantic Innocence Project, you spoke with

20   Marvin Reid, who was the human shield; is that fair

21   to say?

Page 101

1      A.   Yes.

2      Q.   You then spoke with Tanya Lazenby.  Do

3   you see that indication there --

4      A.   Yes.

5      Q.   -- on page 21 of Plaintiff's Exhibit 7?

6   Okay.

7           You also spoke with Donald Parker, who

8   was the victim's brother, do you see that?

9      A.   Yep.  Yep.

10     Q.   You spoke with Gwendolyn Taylor

11  also --

12     A.   Yes.

13     Q.   -- who was the victim's next of kin, is

14  that fair to say?

15     A.   Yes.

16     Q.   You spoke to my client, Mr. Jerome

17  Johnson, do you see that there?

18     A.   Yes.

19     Q.   You also spoke with Tommy Carroll?

20     A.   Yes.

21     Q.   And you spoke with Alvin Morgan?

Page 102

```
 1         A.   Yes.

 2         Q.   And Allen Snead?

 3         A.   Yes.

 4         Q.   Did you speak with Allen Snead?  All

 5    right.  And you spoke with Deborah McFadden?

 6         A.   Yes.

 7         Q.   And you spoke to --

 8         A.   Well, I didn't.  No, I didn't.

 9         Q.   Fair enough.  For the reinvestigation, I

10    think you have already explained several times that

11    that reinvestigation includes people besides

12    yourself.  So, as part of that reinvestigation,

13    these are the people that were spoken to; is that

14    fair to say?

15         A.   Yes.

16         Q.   And then moving on to page 23.  You spoke

17    with Tommy Carroll, who was a codefendant in the

18    case --

19         A.   Yes.

20         Q.   -- in the murder case?

21         A.   Yes.
```

1      Q.   You also spoke with Alvin Morgan; is that

2   correct?  Or the Conviction Integrity Unit

3   personnel; spoke with Alvin Morgan?

4      A.   Yes.

5      Q.   You actually were part of that interview

6   if I read the first line correctly.

7           Then moving beyond Alvin Morgan, the

8   reinvestigation, spoke to Allen Snead; is that

9   correct?

10     A.   Yes.

11     Q.   I'm sorry, I should be moving this

12   through for you.

13          All right.  And then on page 24, it looks

14   like you spoke to five other people.  Does that

15   make sense?  Does that -- have I counted that

16   correctly?

17     A.   Yes.

18     Q.   Including Lekisha Snead; is that correct?

19     A.   Yes.

20     Q.   Okay.  And beyond speaking to people and

21   reviewing documents and doing a thorough

Page 104

1    investigation, you also listened to jail calls; is

2    that correct?

3        A.    Yes.

4        Q.    And then at the end of your -- of your

5    25-page memo, you also mention at least folks that

6    you were unable to contact, but at least you

7    thought of with respect to the reinvestigation.  Is

8    that a fair characterization of the names or, I

9    guess, five people that are mentioned --

10       A.    Yes.

11       Q.    -- at the end of page 25?

12       A.    Yes.

13            MR. ARNOLD:  Objection to form.

14    Mr. Flowers, if you're at the end of your analysis

15    of this exhibit, potentially could we take a

16    two-minute break?

17            MR. FLOWERS:  Certainly, yeah.  This is

18    probably a good time to take a quick two-minute

19    break because we do have a ways to go, but

20    certainly.

21            MR. ARNOLD:  Thank you, Mr. Flowers.

1    the law, and we can take it up with the Judge.

2            MS. SHIFF:  I think we're going to

3    disagree about a lot of things with regard to

4    Mr. Phillips, but given our time constraints today,

5    I think you should move on.

6            MR. FLOWERS:  I would like to move on,

7    and, again, it's my deposition, and I'm trying to

8    be very mindful of you trying to get out of here at

9    3:15.

10   BY MR. FLOWERS:

11       Q.   Ms. Lipscomb, the memorandum that we've

12   been discussing, Plaintiff's Exhibit 7, was that

13   memorandum reviewed by anyone in your State's

14   Attorney's Office?

15       A.   Yes.

16       Q.   Without telling me what was said, who

17   were the reviewers of the memorandum?

18       A.   Well, I know the State's Attorney, and at

19   a minimum, probably two of the deputies, at a

20   minimum, because that is required.  Most likely all

21   of the deputies.

1      A.    Yeah.

2      Q.    -- I was just going to say you know the

3   document way better than I, so can I scroll to the

4   section and then place it on the record and --

5      A.    Sure.

6      Q.    -- then we'll go from there?  Thank you.

7            So, when you reference Petitioner's

8   Investigation and Argument on subsection 5, I

9   believe that's on page 6, is that a fair statement?

10      A.    Yes.

11      Q.    Okay.  And I apologize for cutting you

12   off.  You were saying that this section is what?

13      A.    That is the petitioner's investigation

14   and argument.

15      Q.    So, anything that's within subsection 5

16   would not necessarily be facts that you are

17   adopting to reach your conclusion?

18      A.    Correct.

19      Q.    And then state -- subsection 6, State

20   Investigation by the Conviction Integrity Program,

21   that would be where you are adopting the state's

Page 215

1    position, is that a fair statement?

2         A.    That is -- well, not adopting.   That is

3    our state position.

4         Q.    That is your position?

5         A.    Yes.

6         Q.    Thank you.   So, on page 9, for instance,

7    which I believe we are still in subsection 5, the

8    top line that starts, Most significantly reads,

9    Most significantly an undisclosed police report

10   drafted by Officer Jones indicates -- actually,

11   strike that.   I want to go to a different part.

12             Okay.   We'll move on.

13             Ma'am, are you able to say whether any

14   documents definitively were not disclosed in this

15   case?

16        A.    No.

17        Q.    Are you able to say that there are any

18   Brady violations that were committed in this case?

19        A.    No.

20        Q.    Either by the State's Attorney's Office

21   or the Baltimore Police Department?

1        A.    Most likely, yes.

2        Q.    When you say most likely, is it possible

3   that you would have had a conversation that would

4   not have been memorialized?

5        A.    I highly doubt it.  I do not believe that

6   we spoke to him.  I highly doubt it, and -- no,

7   I -- I don't -- I don't believe we spoke to him at

8   all, no, and I also now am remembering that he was

9   already retired from the office.  I think he

10  retired in '14 I think.

11       Q.    So, then it's fair to say you haven't

12  received his position as to whether there was an

13  open-file discovery at the time of the --

14       A.    No.

15       Q.    -- Jerome Johnson case?

16       A.    No.  No.  I haven't spoken to him,

17  period.  Let me make that clear.

18       Q.    Okay.

19       A.    Okay.

20       Q.    And through you -- your and your office's

21  investigation, do you also review the

Page 226

1    post-conviction filings that are available to you?

2         A.    Yes.

3         Q.    And in a case like Jerome Johnson's,

4    there have been a lot of them.  Have you reviewed

5    all of them or what's available to you?  How does

6    it work?

7         A.    Whatever -- we pull back whatever

8    documents we have.  So, whatever -- whatever is in

9    the file is what we have.

10        Q.    And if I'm understanding you correctly,

11   whatever is in the file, you mean the SAO trial

12   file?

13        A.    Well, yes.  I mean, the SAO trial file;

14   however, when we are doing a review of -- when

15   we're doing an investigation, we pull back all of

16   the -- if there's a separate post-conviction file,

17   that is pulled back and consolidated.

18             So, when we scan in for -- when I say

19   2017/2018, we're looking at the file, we've got

20   everything that has been generated for Jerome

21   Johnson's file.

1      Q.   And the name Paul Burton, does that

2    register with you?

3      A.   Not at all.

4      Q.   I noticed that Mr. Burton's name didn't

5    appear anywhere in your memorandum, is that a fair

6    statement?

7      A.   Yes.  That's a fair statement; yes.

8      Q.   Is that normal to not talk with someone

9    who has alleged to have handed the murder weapon to

10   the shooter?

11     A.   It depends on whether there is some

12   indicia of credibility and --

13     Q.   What do you mean by that, if you don't

14   mind me asking?

15     A.   So, one of the things that is readily

16   apparent when reading that paragraph is that it

17   doesn't jive with what was presented at trial.

18          The circumstances of how the shooting

19   took place, the circumstances and the witnesses'

20   position of the individuals that participated in

21   this thing does not match what was said in that

1    Affidavit.

2          Moreover, the -- there were I

3    think -- there was a -- the actual -- the room in

4    the Night Owl where this thing took place and how

5    the circumstances and the positioning of the

6    individuals that were corroborated by everyone who

7    was in that room does not jive with that Affidavit.

8          And so, when I say if there's indicia of

9    credibility, I mean exactly that.  If there's

10   indicia of credibility, then we look into it.

11         The fact that there's no reference of

12   that Affidavit, no reference of -- of whoever that

13   was, Paul Burton, if it didn't make it into the

14   memo and it wasn't talked about at all, that's

15   because I determined at some point that there was

16   no credibility whatsoever to be assigned to it.

17       Q.   Very well.  So, you would agree then that

18   under the indicia of reliability that you just

19   referenced that the Alvin Hill Affidavit includes

20   material facts that are not true?

21       A.   I don't know that I would go as far to

```
 1   not --

 2        A.   I didn't mention it.

 3        Q.   Were not -- Ms. Lipscomb, I'm willing to

 4   represent that I don't believe there's a specific

 5   reference from you in the joint petition.

 6             If the defense represented facts in your

 7   joint petition that you knew were not true, would

 8   you have signed on to the joint petition?

 9        A.   If the defense represented that I knew

10   were not true?

11        Q.   Yes.

12        A.   Of course not, no.  I mean, I

13   don't --

14        Q.   I want to give you as much time to answer

15   that question, but out of respect for Ms. Shiff, I

16   do want to end there unless you're finished

17   answering your question.

18        A.   (No response.)

19             MR. ARNOLD:  Okay.  It is 2:58.  I think

20   we need to stay on the record briefly.

21   Mr. Flowers --
```

June 28, 2021

Page 266

1    State of Maryland

2    County of Baltimore, to wit:

3              I, Michele D. Lambie, a Notary Public of

4    the State of Maryland, County of Baltimore, do

5    hereby certify that the within-named witness

6    personally appeared before me at the time and place

7    herein set out, and after having been duly sworn by

8    me, according to law, was examined by counsel.

9              I further certify that the examination

10   was recorded stenographically by me and this

11   transcript is a true record of the proceedings.

12             I further certify that I am not of

13   counsel to any of the parties, nor related to any

14   of the parties, nor in any way interested in the

15   outcome of this action.

16             As witness my hand and notarial seal this

17   30th day of June 2021.

18            *Michele D Lambie*

19

20

21

Page 268

1                          VOLUME 2

2          IN THE UNITED STATES DISTRICT COURT FOR THE

3                     DISTRICT OF MARYLAND

4

5      JEROME JOHNSON                    No.  19-cv-698

6

7                 Plaintiff          Judge Ellen L. Hollander

8

9            v.                       JURY TRIAL DEMANDED

10

11     BALTIMORE POLICE DEPARTMENT,

12     et al.

13                 Defendants

14     _____/

15               The deposition via videoconference of

16     LAUREN LIPSCOMB was held on Thursday August 5, 2021,

17     commencing at 1:06 p.m., virtual location, before

18     Robert A. Shocket, a Notary Public.

19

20

21     REPORTED BY: Robert A. Shocket

1      with police would not help refresh your recollection as

2      to what Reginald Dorsey stated to police?

3              MR. FLOWERS:  Again objection, asked and

4      answered, calls for speculation.

5      A      Correct.  I was not present in 1988 so it

6      would not refresh my recollection as to what Reginald

7      Dorsey stated to police because I was not there.

8      Q.     Thank you.  In investigating this case did

9      you review jail calls?

10     A      Yes.

11     Q.     Is it fair to say that you would not have

12     reviewed jail calls after the date of the joint

13     petition?

14     A      That I would not have reviewed jail calls

15     after the date of the joint petition?  I have no idea

16     whether we did or not.  I have no clue.

17     Q.     So is it possible that your office

18     continued to investigate this case after the joint

19     petition was filed -- and forgive me, I'm loading the

20     actual date -- in June of 2018?

21             MR. FLOWERS:  Objection.  Calls for

August 5, 2021

Page 388

1    State of Maryland

2    Baltimore County, to wit:

3             I, ROBERT A. SHOCKET, a Notary Public of

4    the State of Maryland, County of Baltimore, do hereby

5    certify that the within-named witness remotely appeared

6    before me at the time and place herein set out, and

7    after having been remotely sworn by me, according to

8    law, was examined by counsel.

9             I further certify that the examination was

10   recorded stenographically by me and this transcript is

11   a true record of the proceedings.

12            I further certify that I am not of counsel

13   to any of the parties, nor in any way interested in the

14   outcome of this action.

15            As witness my hand this 19th day of

16   August, 2021.

17

18

19            Robert A. Shocket, Notary Public

20   My Commission Expires:

21   November 23, 2022