**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JEROME L. JOHNSON,

                 Plaintiff,

          v.

BALTIMORE POLICE DEPARTMENT, *et al.*

              Defendants.

)
)
)
)
)
)
)
)
)

No. 1:19-cv-00698

Honorable Ellen L. Hollander

**DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION TO DISMISS AS A LITIGATION SANCTION**

Defendants, Kevin Davis, Frank Barlow, Daniel Boone, Gerald Goldstein, and the

Baltimore Police Department ("Defendants"), by and through their attorneys, submit this Reply

Memorandum in support of their Motion to Dismiss Plaintiff's Amended Complaint as a Litigation

Sanction Based on the Use of False or Fabricated Evidence, and state as follows:

**<u>Introduction</u>**

Plaintiff Jerome Johnson ("Plaintiff") procured his release from a murder conviction using

at least two affidavits that are undisputedly false. These affidavits—perjured statements from Paul

Burton and Alvin Hill—falsely claimed that Burton, not Plaintiff, handed a gun to Hill that Hill

used to kill the victim. Plaintiff presented this powerful but false "real perpetrator" evidence to

several post-conviction courts as well as the Baltimore City State's Attorney's Office ("SAO").

Plaintiff knew the Burton and Hill affidavits were false from their inception. In this litigation,

Plaintiff was also caught instructing his co-defendant, Reginald Dorsey, to lie to manufacture a

false *Brady* claim. Having been caught in a decades-long scheme to commit fraud, Plaintiff now

argues that his use of false evidence should be excused because it was not that important. If this

Court permits Plaintiff's lawsuit to proceed after he knowingly manufactured and advanced false

evidence to help overturn his murder conviction and tampered with witnesses, it will amount to a public pronouncement that lying, cheating, and fabricating evidence is a golden key available for any prisoner to unlock the prison gates and sue for millions of dollars.

In the face of the undisputed evidence presented in Defendants' Motion to Dismiss ("Motion"), Plaintiff offers shifting explanations: 1) the Burton and Hill affidavits were unimportant; 2) Plaintiff did not know they were false; 3) Plaintiff's lawyers thought they were valid evidence; and 4) everyone should have known Burton is a liar. These are grossly inadequate explanations for Plaintiff's knowing presentation of false evidence and attempts to shape witness testimony. As demonstrated in Defendants' Motion, Plaintiff knew that the Burton and Hill affidavits were false because he admits he was close enough to the murder scene to know that Burton did not crash his car and incredibly land right in the middle of the action as asserted in Burton's affidavit. Plaintiff admits that *he* met with Burton in prison and discussed the content for Burton's affidavit; Plaintiff similarly admits that *he* met with Hill about the Hill affidavit. The notion that Plaintiff later duped one of his lawyers into formalizing the false affidavits of Burton and Hill provides him no cover. *See*, *e.g.*, *Staub v. Proctor Hospital*, 562 U.S. 411, 415 (2011) (A bad actor cannot escape liability by causing another to unknowingly commit the wrongful act because it is "axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action . . . from being the proximate cause of the harm.").

Plaintiff's assertion that the false Burton and Hill affidavits were not "pillars" of his case rings hollow given that on at least four occasions, Plaintiff falsely presented them to courts as a basis for his actual innocence claim. As noted in Defendants' Motion, the Hill affidavit was listed as the first piece of "newly discovered evidence" in the joint petition and identified in a list of "most compelling" results of the reinvestigation. Remarkably, Plaintiff continues to defend his use

of the false Hill affidavit in the joint petition, suggesting that he only relied on the parts he says were true. But there is no legal support for the selective use of perjured documents and this Court should not open the door to such a doctrine. After Plaintiff was caught on a recorded call telling Reginald Dorsey, a former co-defendant, not to say anything that could damage his "60 million lawsuit against the police" and instructing his friend, Sean Morgan, to "show [key witness Tanya Lazenby] love" for "stepping up to the plate," there is no question Plaintiff tampered with the witnesses in this case. It would be fundamentally unfair to force Defendants to continue to defend against this case where Plaintiff's actions leave the evidence itself unworthy of the Court's confidence.

Despite the bluster in Plaintiff's Response in Opposition to the Defendant's Motion to Dismiss ("Opposition"), Plaintiff cannot change the unassailable fact that he knowingly advanced false affidavits in court filings, including the Joint Petition for Writ of Innocence that secured his release from prison. He cannot escape the fact that he offered to pay witnesses. He cannot escape the fact that he told Reginald Dorsey to lie about a *Brady* claim—the cornerstone of Plaintiff's lawsuit. Notwithstanding Plaintiff's glib explanations, this case was infected by false evidence from its inception and the only appropriate remedy for such egregious litigation misconduct is dismissal.

## <u>Argument</u>

### I.   **Plaintiff Personally Participated in the Procurement of Burton's False Affidavit.**

It is now undisputed that the Burton affidavit is false. That was not always the case. Plaintiff presented the Burton affidavit as reliable in at least four different court filings, (ECF 137 at 8-9),

and, as discussed below, through the Hill affidavit that Plaintiff continues to defend.[1] Plaintiff was personally involved in procuring the Burton affidavit through direct discussions with Burton in prison and Plaintiff said in a recorded prison call dated June 26, 2016 that Burton was "jumping ship...In other words, the dude is not coming to testify." ECF 137-1 at 84-86 (395:19-397:13). Yet, Plaintiff did not disclose to the Circuit Court that he knew the Burton affidavit was false. Defendants issued a subpoena for Burton's prison records and Defendants proved that Burton was in prison on July 14, 1988, the date Plaintiff had been asserting that Burton handed the gun to Hill. ECF 137 at 6; *see also* ECF 137-20 at 7-8, ¶¶ 10-11. Plaintiff only acknowledged that the Burton affidavit was a lie after Defendants spent the time and resources to prove it beyond all doubt.

There is no way that Plaintiff ever reasonably believed that Burton's affidavit was truthful: it did not comport with common sense; it did not match the information Plaintiff personally knew about the crime; and it did not match the information Plaintiff says he learned from the perpetrators of the crime.

## A. The Burton Affidavit as Characterized by Plaintiff was Facially Unreliable.

Plaintiff's argument that he was completely unaware that the Burton affidavit was false is inconsistent with common sense and is inconsistent with the four pages of argument Plaintiff makes in his Opposition establishing that Burton is unreliable. ECF 152 at 9-14. Plaintiff asserts that he happened to discuss his case with Burton while the two of them were incarcerated together and that Burton just happened to confess to Plaintiff that Burton was actually the person who

---

[1] Plaintiff does not dispute that he relied on the Burton affidavit in multiple filings. ECF 137-1 at 69 (310:3-7). Plaintiff attached the Burton and Hill affidavits to his Petition for Writ of Innocence filed April 14, 2011. ECF 137-20, at 6, ¶17. ("17. Admit that You attached copies of Exhibits A and B to your Petition for Writ of Actual Innocence filed April 14, 2011. Response: [Objections omitted]. Plaintiff admits.").

should have been convicted for handing a gun to Alvin Hill, not Plaintiff. ECF 137-1 at 57-58 (280:12-281:4); ECF 137 at 6-7. Confoundingly, Plaintiff is asserting that he also reasonably believed Burton happened to get into a traffic accident right at the intersection where the altercation between the victim and Hill was happening in the very moments before it was happening. ECF 137-5. This was a lie when Plaintiff concocted the story in prison just as it is a lie now.[2] The only thing that changed is the fact that Defendants obtained Burton's prison records and proved beyond question that the Burton affidavit is false. ECF 137 at 6. Yet, Plaintiff concedes that he knew the Burton affidavit was false at the time he filed the Joint Petition for Writ of Innocence. *See* ECF 152 at 23. Since nothing changed between the time Plaintiff procured the false Burton affidavit and the time that he admits he knew it was false, this demonstrates that Plaintiff always knew the Burton affidavit was false.

It is also undisputed that Plaintiff was personally involved in procuring the Burton affidavit even though Plaintiff denies putting pen to paper. While it is possible that Plaintiff actually forged Burton's signature on the affidavit—Burton was in segregation at the time the affidavit was signed and Burton denies signing it—this is not a fact that Defendants must prove in order to show that Plaintiff is culpable for the false Burton affidavit. *Staub*, 562 U.S. at 415 (It is "axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action … from being the proximate cause of the harm."); *see Green v. Mayor & City Council of Baltimore*, 198 F.R.D. 645, 647 (D. Md. 2001) (providing for dismissal as the appropriate sanction when false documents are submitted to the court). Plaintiff attempts to distract from his admitted personal role in procuring the Burton affidavit by claiming that his now-deceased attorney actually

---

[2] Plaintiff spends four pages of his opposition brief arguing that no one should ever believe Burton because he is "as credible as a sundial on a cloudy day." ECF 152 at 11-14. This argument merely underscores the fact that Plaintiff could not have reasonably relied on Burton's affidavit.

obtained the signature from Burton and several other attorneys who represented him relied on Burton's affidavit. ECF 152 at 9-10. Even if there were evidence of this supposition, it is beside the point. Plaintiff knew the Burton affidavit was false and Plaintiff testified he was the person who first obtained the information from Burton.[3] Therefore, Plaintiff is personally culpable for the creation of the false Burton affidavit.

### B. Additionally, Plaintiff's Own Testimony and Statement to Police (Which He Says Was Truthful) Establish That he Knew the Burton Affidavit was False.

Plaintiff's intimate, personal knowledge of the facts of the Aaron Taylor murder makes it impossible that he ever could have reasonably believed the Burton affidavit was true. The Burton affidavit claims that Burton was in a car accident at Reisterstown Road and Woodlawn at the time of the incident, but Plaintiff was there and knew that no such thing occurred. *See* ECF 137-5; ECF 137-24. At his deposition, Plaintiff conceded that he never saw a car accident when he was walking to the Nite Owl on July 14, 1988. ECF 137 at 14; ECF 137-1, at 70-71 (312:19-313:1) (Q: "Mr. Johnson, when you were heading towards the Nite Owl down Lucille towards Reisterstown Road, did you ever see a car accident on July 14th, 1998? A: No."). Plaintiff also conceded that he never heard from anyone that there was a car accident in the area on that date. ECF 137-1 at 71 (313:2-5).

Alvin Morgan, Plaintiff's father figure and alleged alibi witness, confirmed at his deposition that it was impossible for Plaintiff to have ever believed there was a car accident as

---

[3] Contrary to Plaintiff's arguments, he is entitled to no credit for his alleged honesty about his role in procuring the Burton affidavit. The Burton affidavit itself implicates Plaintiff in its procurement because it says: "At the time of this incident, I did not know Jerome Johnson. I met him while we were both serving our sentences at the Annex…That is why I told him the truth about the incident. Prior to my meeting him at the Annex, we did not know each other or about each other…". ECF 137-5 at 3, ¶¶ 6-7.

described in the Burton affidavit. Alvin Morgan testified that he and Plaintiff heard gunfire "a matter of moments" after they observed a group of people run onto a basketball court and around a corner next to the Nite Owl. Ex. 1 (Morgan Dep.) at 76:9-77:12. After the gunshots, Morgan stated that he and Plaintiff saw a group of people run past them up Lucille Avenue. *Id.* at 80:4-12. An unmarked police car was *seconds* behind the fleeing group: "They (the police officers) was right behind -- they was right behind them. You could almost say they was with them." *Id.* at 83:1-6. If the Court were to accept Plaintiff at his word, that he was walking up Lucille after he saw the group of people on Reisterstown Road, he would have seen any car accident on Reisterstown and Woodlawn as described in the false Burton affidavit.[4] *See* ECF 137-5; ECF 137-24.

All other information available to Plaintiff would have also indicated that the Burton affidavit was false. Plaintiff's own words from his voluntary statement to police in 1989, a statement Plaintiff claims is true, (*see* ECF 116 at ¶¶ 89-93; ECF 151 at 50-51), make it impossible that he ever believed that Paul Burton picked up a gun and handed it to Alvin Hill. In his statement to investigators, Plaintiff demonstrated his knowledge of the Aaron Taylor murder via his proximity to the crime and close relationship with the perpetrators. *See* ECF 137-4 at 3-5. Plaintiff stated that on the evening of July 14, 1988, he was walking towards the Nite Owl when he encountered Alvin Hill, Thomas Carroll, Ornie Carroll, Reginald Dorsey, and Kenny Allen.[5] *Id.* at 3. He knew that the group was looking for Aaron Taylor to settle a drug debt. *Id.* Plaintiff also stated to police that on July 14, 1988, shortly after the murder, he spoke with Thomas Carroll who told him that Ornie Carroll pulled out a gun that did not work before Alvin Hill shot him. *Id.* at 4.

---

[4] Plaintiff claimed that he was walking up Lucille towards the house of "Ms. Irene" before he encountered Officer Steve Owens. ECF 137-4 at 3. Ms. Irene, Alvin Morgan's mother, resided at 3512 Lucille Avenue. Ex. 1 at 25:7-9. 3512 Lucille Avenue is .2 miles from the Nite Owl. *See* Ex. 2 (Google Map of Area of Lucille Avenue and Reisterstown Road).
[5] This was about 100 yards from the crime scene. ECF 137-24.

Plaintiff also admitted that he spoke to Alvin Hill on the same date about the murder. *Id.* In short, Plaintiff claims his 1989 statement to police was truthful, but it is wholly inconsistent with the false Burton affidavit.

Defendants proved by clear and convincing evidence that Plaintiff knew the Burton affidavit was false. The Burton affidavit is undisputedly false, and Plaintiff was personally involved in procuring it together with Burton while they were in prison. Since Plaintiff was with Burton, he likely knew that Burton was not a truth teller as set out in four pages of Plaintiff's Opposition. ECF 152 at 11-14. Plaintiff was present at the scene of the incident at issue, so he knew Burton did not arrive at the scene by way of a car crash. Additionally, the false affidavit was inconsistent with everything Plaintiff says that his co-defendant friends told him about the murder. Finally, Plaintiff admits he carefully avoided referencing the false Burton affidavit in his Joint Petition for Writ of Innocence because he knew it was false but provides no explanation about when he learned it was false. This mountain of evidence establishes beyond any question that Plaintiff knew the Burton affidavit was false when he personally participated in procuring it.

### C.  Plaintiff's Knowledge of the Burton Affidavit's Falsity is not a Matter of Credibility.

The notion that Plaintiff innocently relied on Burton's false affidavit because he had no way of testing its veracity against what he learned from Thomas Carroll and Alvin Hill on the night of the murder cannot be squared with the undisputed facts. Plaintiff's argument that he was entitled to rely on the Burton affidavit as a legitimate characterization of evidence myopically ignores the fact that Plaintiff personally developed the Burton affidavit and knew it was false based on his own knowledge of the scene. As such, Plaintiff's attempt to distance himself from the false Burton affidavit should be firmly rejected.

As demonstrated above, Plaintiff knew for a fact that Burton was not present for the Taylor homicide but nevertheless peddled this false evidence in court for decades. ECF 137 at 15. Plaintiff relied upon the false Burton affidavit in at least four instances set out in Defendants' motion. *Id.* The repeated use of this false evidence is inconsistent with Plaintiff's attempt to minimize it as an isolated lapse in judgment. *See Dewitt v. Ritz*, No. CV DKC 18-3202, 2021 WL 915146, at *12 (D. Md. Mar. 10, 2021); *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000) (finding that willfulness and bad faith can be part of reckless conduct). As a result, Plaintiff's use of the Burton affidavit constituted fraud on the court each time he advanced the false document in court filings. *See Green*, 198 F.R.D. at 647.

## II.   Plaintiff Defrauded the Circuit Court when he Presented the Fraudulent Alvin Hill Affidavit as a Key Component of the Joint Petition for Writ of Innocence.

Because Burton's affidavit is false, the Hill affidavit that claims that Burton and not Plaintiff handed Hill the gun is also false. Plaintiff admits that he discussed the affidavit with Hill and, thus, it constitutes additional evidence of Plaintiff's scheme to falsify evidence. *See* ECF 137-1 at 68 (304:1-3). The Hill affidavit was undisputedly presented to the Circuit Court in Plaintiff's successful Joint Petition for Writ of Innocence. ECF 512 at 25-26. Even after Plaintiff was caught in this shocking fraud, he stridently continues to rely on the Hill affidavit as if it is legitimate evidence of innocence. *See id.* This should shock the judicial conscience and is an independent reason this lawsuit should be dismissed.

### A.  The Alvin Hill Affidavit and its Perjured Statements make the Entire Document Unreliable.

Plaintiff acknowledged at his deposition that the Hill affidavit is false and that he would not feel comfortable attaching the Hill affidavit to future court filings. ECF 137-1 at 63; 69 (299:1-22; 310:8-10). Remarkably, Plaintiff continues to rely on the Hill affidavit as if it is legitimate

Case 1:19-cv-00698-ELH   Document 162   Filed 03/25/22   Page 10 of 22

evidence of his innocence because it says Plaintiff did not hand Hill the gun. ECF 152 at 25-26. This completely ignores what the Hill affidavit does say: that *Paul Burton* handed Hill the gun. Of course, this is demonstrably false as established above. The Hill affidavit's inclusion of the false statements involving Mr. Burton totally eviscerate its reliability.

Plaintiff's only justification for the partial citation of a fraudulent document is that it is a statement against interest under Fed. R. Evid. 804(b)(3). Setting aside the unreliability of the entire document, the Hill affidavit hardly constitutes a statement against interest. Despite Plaintiff's representation to the Circuit Court that Hill "admit[ed] to murdering Aaron Taylor" (*see* ECF 152 at 23), the Hill affidavit does not admit that Hill shot Taylor. ECF 137-9 at 19, ¶ 3. It only states that Paul Burton handed a gun to Hill and that "we" chased Taylor around a corner. *Id*.

### B. Plaintiff Improperly Cited the False Hill Affidavit in the Joint Petition for Writ of Innocence and the Circuit Court Relied on it to Vacate his Conviction.

Plaintiff succeeded in vacating his conviction by presenting a Joint Petition for Writ of Innocence to the Circuit Court, which was granted. *See* ECF 137-21. The Joint Petition for Writ of Innocence undisputedly relied on Hill's affidavit. Because it is undisputed that this document falsely claims that Paul Burton instead of Plaintiff handed Hill a gun, Plaintiff tries to spin this falsehood as immaterial and known to the SAO. ECF 152 at 20. But Plaintiff fails to address the fact that *he* presented the false Hill affidavit to the Circuit Court and did not disclose to the court that it was false. Plaintiff cannot escape culpability for his fraud on the court by throwing the SAO under the bus. *See Dewitt*, 2021 WL 915146, at *11-12 (dismissing lawsuit that relied on fraudulent evidence even though plaintiff was aided by multiple third parties). It was Plaintiff who knowingly advanced a fraudulent document to the Circuit Court to help secure his release. ECF 137-21 at 14; 17. The Circuit Court granted the joint motion after a brief recitation of the statements in the joint

10

petition, including that "Co-Defendant Hill, the shooter, in the year 2000 provided an affidavit indicating that he knew Mr. Johnson, and Mr. Johnson was not present with him at the time that he shot and killed Mr. Aaron Taylor." Ex. 3 (Joint Pet. Hr'g Tr. July 2, 2018) at NK Def 014410; 014412.

The argument that the Hill affidavit was a minor part of the Joint Petition for Writ of Innocence does not pass a straight face test. It purported to be "real perpetrator" evidence where Hill, the man convicted of shooting Taylor, stated that Burton and not Plaintiff handed Hill the gun. If true, this would constitute powerful evidence of innocence. It was demonstrably false, however. In his Joint Petition for Writ of Innocence, Plaintiff led the Circuit Court to believe under the subsection "Newly Discovered Evidence Since the Time of Mr. Johnson's Trial Proves Innocence Under 8-301" that "the Shooter [Hill] provided an affidavit that Johnson was not present at the time of the murder. He admitted to pulling the gun out on Victim and that Johnson was not there." ECF 137-21 at 14. The Hill affidavit was listed as one of the "most compelling" facts tending to establish Plaintiff's innocence. *Id.* As such, Plaintiff's intentional reliance on the false Hill affidavit cannot simply be ignored.

In truth, the Hill affidavit is only "compelling" because it demonstrates that Plaintiff's Joint Petition for Writ of Innocence contained a false affidavit and therefore merited a close examination by the Circuit Court. But Plaintiff never disclosed this material information to the Circuit Court that granted the Joint Petition for Writ of Innocence after a brief, uncontested hearing. *See* Ex. 3.[6]

---

[6] The oral recitation of the statements in the joint petition included that "Co-Defendant Hill, the shooter, in the year 2000 provided an affidavit indicating that he knew Mr. Johnson, and Mr. Johnson was not present with him at the time that he shot and killed Mr. Aaron Taylor." Ex. 3, at NK Def 014410, 014412.

Thus, Plaintiff procured his release through fraud on the Circuit Court which was deprived of its opportunity to legitimately evaluate whether Plaintiff deserved to have his convictions set aside.

### C. Plaintiff Cannot Hide Behind the SAO's Reinvestigation, Which was Itself Infected by False Evidence.

As demonstrated above, Plaintiff did not acknowledge the fact that the false Hill affidavit was relied upon by the Circuit Court when it granted the Joint Petition for Writ of Innocence. Therefore, Defendants need not prove that Plaintiff also duped the SAO. In fact, as discussed in Section IV (A), below, dismissal of this lawsuit as a sanction for Plaintiff's litigation misconduct is appropriate even if the Court finds that Plaintiff may otherwise have a meritorious claim.

In any event, there is ample reason to question the reliability of the SAO's reinvestigation. Robert Milan, a lifetime prosecutor and pioneer in the field of conviction integrity, issued a 95-page report explaining that the SAO's reinvestigation in this case was completely biased and unreliable. *See* Ex. 4 (Report of Robert Milan Dated Oct. 13, 2021). These deficiencies included extreme bias in the SAO's interview of Lakesha Snead, the main eyewitness who testified at Plaintiff's criminal trial; the failure to vet the Burton and Hill affidavits or even interview Burton, who was in prison and therefore readily available; and the failure to scrutinize the statements of Plaintiff's other co-defendants, Dorsey and Carroll. *Id.* at pp. 9, 23-24, 35, 40. Suffice to say that the SAO investigation did not address the fact that Plaintiff falsified evidence in the form of the Burton and Hill affidavits and shaped Mr. Dorsey's account with a *quid pro quo* offer. Regardless, the bottom line is that Plaintiff did not disclose his litigation misconduct to the Circuit Court even though he expressly relied on the false Hill affidavit in his Joint Petition for Writ of Innocence. In fact, the SAO affirmatively represented to the Court that witnesses such as Mr. Dorsey were "independent of each other and have not had contact with one another." Ex. 3, at NK Def 014410.

Plaintiff's Opposition utterly fails to address this litigation misconduct that was central to him procuring his release from prison without the Circuit Court's scrutiny.

### III.    Plaintiff's Fraud and Witness Tampering Prejudices Defendants and Prevents them from Litigating this Case with Evidence that was not Manipulated.

Without the fraud Plaintiff perpetrated on the Circuit Court, Plaintiff's conviction likely would have remained intact and he would be unable to bring a lawsuit. *See Heck v. Humphrey*, 512 U.S. 477 (1994) (a civil lawsuit may not be brought if it would necessarily imply the invalidity of a conviction). That Defendants are now forced to defend themselves when Plaintiff's convictions were overturned based on fraudulent evidence is inherently prejudicial. Emboldened by the success of his fraud before the Circuit Court, Plaintiff continued to engage in litigation misconduct by offering bribes to witnesses and influencing proposed witness testimony. Not having a legitimate explanation for the incriminating statements captured on recorded prison phone lines, Plaintiff lodges unsupported attacks on defense counsel and characterizes his own misconduct as an "isolated moment of poor judgment." ECF 152 at 35-36. These attempts to spin away decades of calculated litigation misconduct badly miss the mark.

Plaintiff has been tampering with the testimony of his former co-defendant, Reginald Dorsey over the course of thirty years. In a letter dated January 6, 1991, Plaintiff told Dorsey, "[I]f you help me, I can come back to court for you when you go to your postconviction." ECF 137 at 16; ECF 137-1 at 72 (363:4-22). At Plaintiff's deposition, he confirmed that this was in fact a *quid pro quo* offer that he made to Dorsey. ECF 137-1 at 72 (363:20-22) ("Q: Okay. So when you were offering to assist him, it was to induce him to help you? A: Right."). This flatly disproves Plaintiff's baseless assertion that "There is simply no evidence of quid pro quo[.]" ECF 152 at 28-29.

The Court need look no further than Plaintiff's continued interactions with Mr. Dorsey to reject Plaintiff's contention that his litigation misconduct should be excused because it occurred

years ago. *See* ECF 152 at 29. Plaintiff initially testified at this deposition that he never discussed his lawsuit with Mr. Dorsey. Ex. 5 (Johnson Dep.) at 72:17-19 ("Q: When you would talk with Mr. Dorsey post prison, did you ever discuss this lawsuit? A: No.").[7] However, when Plaintiff was confronted with a recorded prison phone call with Mr. Dorsey from January 18, 2020, Plaintiff admitted that he did in fact have the conversation with Mr. Dorsey about the lawsuit as reflected in the recording quoted below.

In the phone call dated January 18, 2020, Plaintiff plainly coaches Mr. Dorsey regarding his testimony and encourages Dorsey to lie in order to support Plaintiff's *Brady* claim. Plaintiff states:

> What we got right now, Butt, is that what you told me about they told you about that statement. **Yo, you can't never say that**. I'm going to tell you why. Yo, listen to what I'm saying, because the way my case, the reason I'm out of prison, and the reason I got a 60 million lawsuit against the police, is because we saying they withheld that statement. Now, if you saying they said something to you about it when they got – when you got lock up, right, but **I'm telling you, don't say nothing about that, yo, in this case right now**.

ECF 137-1 at 77-80 (381:17-384:19) (emphasis added). Plaintiff's best defense for this outrageous statement is that it is "difficult to decipher" because it is unclear whether it referenced the statement of witness Snead or Lazenby. ECF 152 at 35. Under either scenario, however, Plaintiff is clearly telling Mr. Dorsey to change his account about a witness statement because a truthful account would eviscerate Plaintiff's *Brady* claim in the present lawsuit. It is decidedly not "difficult to decipher" the above statement Plaintiff told Mr. Dorsey because Plaintiff personally authenticated it as his own statement at his deposition. ECF 137-1 at 79-80 (383:19-384:19). This attempt by

---

[7] Plaintiff additionally lied when he stated that he never discussed Thomas Carroll's legal situation with him. Ex. 5 at 66:10-21. Plaintiff also lied when he stated that he never discussed this lawsuit or his underlying conviction with Sean Morgan, his business partner. Ex. 5 at 75:18-20, 77:1-78:4.

Plaintiff to have Dorsey lie in support of Plaintiff's *Brady* claim is itself a basis to dismiss this lawsuit.

There are also large footprints in the record that strongly suggest that Plaintiff's fraud runs much deeper than Burton, Hill, and Dorsey. As set out in Defendants' Motion, Plaintiff told a friend to show Tanya Lazenby some "love" for "stepping up to the plate" and Plaintiff continues to contact her even though they were not acquainted prior to this lawsuit.[8] ECF 137-1 at 73-74 (370:7-371:3). When Plaintiff was asked at his deposition what this meant, he glibly responded that he wanted his friend to "give her a hug…or something like that." *Id.* at 74 (371:5-10). Plaintiff attempts to avoid this evidence of witness tampering by characterizing it as "defendants' subjective disbelief." ECF 152 at 29. This Court should draw on its own judicial experience and reject Plaintiff's childish explanation for this evidence. The most plausible explanation for Plaintiff's statement about Lazenby and his evasive explanation regarding his statement is that Plaintiff instructed his friend to pay Lazenby for her testimony. Indeed, Plaintiff admits he paid $50 to his co-defendants, Dorsey and Carroll, who are witnesses in this case.[9] Accordingly, it is highly likely that Plaintiff's litigation misconduct extended way beyond the fraud and witness tampering Defendants already proved by clear and convincing evidence.

The shifting explanations Plaintiff provides for his wide-ranging misconduct and his efforts to rely on tainted testimony demonstrates the need for this Court to address the pervasive litigation misconduct that occurred here. Plaintiff was already squarely caught procuring false statements

---

[8] As this Court is aware, Lazenby is important to Plaintiff's civil suit because Plaintiff is claiming that Defendants failed to disclose her as a potential witness. *See* ECF 138 at 31-32.

[9] Plaintiff's explanation for his payments to Thomas Carroll and Reginald Dorsey are severely lacking. In fact, Plaintiff acknowledges that "$50 go a long way" for individuals such as Carroll and Dorsey who have been incarcerated for a lengthy period of time and do not have family providing them with financial assistance. ECF 152 at 27-28.

from Burton, Hill, and Dorsey. There is strong evidence that the testimony of Lazenby and Carroll is also infected by payouts. While Plaintiff points out that he still does not concede that Lazenby and Carroll are tainted, Plaintiff should not enjoy any benefit of the doubt given his firmly established misconduct. At bottom, Defendants established through clear and convincing evidence that Plaintiff engaged in litigation misconduct with respect to Burton, Hill, and Dorsey.[10]

### IV.   Dismissal is the Only Appropriate Sanction for Plaintiff's Fraud and Other Litigation Misconduct.

This Court should not accept Plaintiff's dissonant explanations for the severe litigation misconduct he committed in this case. It prejudices the victim, the public, Defendants, and the judicial process itself. The procurement of the false Burton and Hill affidavits, their use in judicial proceedings, and the proved *quid pro quo* offer Plaintiff made to Dorsey each stand alone as clear and convincing evidence of fraud that warrant dismissal of this lawsuit. Taken together, this evidence of litigation misconduct by the Plaintiff is overwhelming and easily meets the factors outlined in *Shaffer*.

### A.   Plaintiff's Use of False Affidavits Warrants Dismissal as a Sanction.

Courts have an especially strong interest in punishing the use of false evidence. *Dewitt*, 2021 WL 915146, at *13 (citing *Green*, 198 F.R.D. at 647). The Court is especially sensitive to the use of false affidavits:

> The prejudice to the integrity both of the process of adjudication in general and of this Court in particular, which relies on the trustworthiness of those who submit— not to mention notarize—affidavits, is manifest. The public interest in preserving the trustworthiness of sworn documents as part of the process of orderly adjudication demands that the strongest means available be taken to redress the situation in this particular case and to deter similar misconduct by others.

---

[10] The only co-defendant who Plaintiff has not contacted on the phone since his release is Alvin Hill, who died before Plaintiff was released from prison. *See* ECF 152-9.

*Green*, 198 F.R.D. at 647. As the Court noted in *Dewitt*, courts have widely issued the sanction of dismissal for the use of false documents. *See Dewitt*, 2021 WL 915146, at *13 (citing *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, (1st Cir.1989) (dismissal is appropriate where the complaint relied on false purchase agreement); *Eppes v. H.E. Snowden*, 656 F.Supp. 1267 (E.D.Ky.1986) (dismissal of counterclaim where backdated letters were used)).

Plaintiff repeatedly attached the false Burton affidavit to court filings that sought the dismissal of his murder conviction. The false Hill affidavit was featured prominently in Plaintiff's Joint Petition for Writ of Innocence, which ultimately secured his release from prison. Since this was a prerequisite to the filing of the instant lawsuit, the false evidence Plaintiff presented to the Circuit Court is inextricably linked to this lawsuit. The false evidence discussed herein is now conclusively established and impacts the very claims that Plaintiff now asserts; it cannot just be wiped away. Courts have regularly dismissed lawsuits when fraud is uncovered in situations that are much less connected to the merits of the case than the fraud that Defendants uncovered here. *See Dotson v. Bravo et al.*, 321 F.3d 663, 667 (2003) (dismissal of case in which plaintiff misrepresented a name in criminal proceedings); *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 306, 308 (7th Cir. 2002) (dismissal when plaintiff knowingly filed false application to proceed *in forma pauperis*); *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) (also lying on in forma pauperis form); *Rodriguez v. M & M/Mars*, No. 96 C 1231, 1997 WL 349989, at *2 (N.D. Ill. June 23, 1997) (dismissal of case in which plaintiff lied about criminal record). Thus, the fraudulent evidence that Plaintiff procured here easily meets the severity threshold for dismissal.

This Court should not be swayed by Plaintiff's assertion that he is actually innocent of the crime for which he was convicted just because the SAO joined his Joint Petition for Writ of

Innocence. The Joint Petition for Writ of Innocence is not reliable given Plaintiff's litigation misconduct. In any event, Plaintiff's actual guilt or innocence is not the relevant inquiry for purposes of the Court's determination of the appropriate sanction for Plaintiff's misconduct that was proved here. Where fraud on the court is it issue, it is appropriate for the Court to dismiss a lawsuit even if it may have arguable merit. *See Dotson*, 321 F.3d at 669; *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 782 ("The court considered the possibility – indeed, it expressly assumed – that Ramirez may have had a meritorious case of employment discrimination, and that dismissal would foreclose Ramirez from pursuing relief for that injury."). Plaintiff advanced a fraudulent affidavit as a basis for his innocence and withheld from the Circuit Court both that the Hill affidavit was false and that it relied on the fraudulent Burton affidavit which had been repeatedly presented to other courts. Such misconduct alone warrants dismissal of this case.

## B. Plaintiff's Witness Tampering Warrants Dismissal as a Sanction.

Dismissal is also appropriate when a litigant engages in witness tampering. *See Dewitt*, 2021 WL 915146, at *12; *Ramirez*, 845 F.3d at 782 ("[W]itness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction."). Plaintiff is wrong in suggesting that he should be let off the hook because Mr. Dorsey, a witness he tried to induce to lie for his benefit in this lawsuit, is now deceased. ECF 152 at 35. For starters, dismissal has been found to be an appropriate sanction when a plaintiff unsuccessfully tries to tamper with witnesses. *See Ramsey*, 2010 WL 1251199, 3, 6 (S.D. Ill. 2010). Applying Plaintiff's prejudice standard that an offender's misconduct must succeed would also undermine the strong public interest factors noted in *Dewitt*, including preserving the public's confidence in the court's ability to evaluate legitimate evidence and "sending the clear message to potential offenders that attempts to game the system will not be tolerated." *Dewitt*, 2021 WL 915146, at *13. The record irrefutably

supports that Plaintiff's attempts to influence the testimony of witnesses such as Mr. Dorsey were not a "single, isolated moment of poor judgment in a conversation." ECF 152 at 35. It took place over thirty years. Defendants established beyond question that Plaintiff made an unambiguous *quid pro quo* offer to Mr. Dorsey in 1991 and that in 2020 Plaintiff asked Mr. Dorsey to lie about a key element of Plaintiff's civil case. Therefore, dismissal would be warranted even if Plaintiff's only misconduct related to Mr. Dorsey.

### C. Plaintiff's Wrongful Actions Prejudiced Defendants, the Public, and the Judicial Process.

As stated in Defendants' Motion, Plaintiff's misconduct infects the legitimacy of the process by which his conviction was vacated as well as this judicial process. Shooting victim Aaron Taylor and his family are re-victimized by the very fact that the integrity of his murder investigation has been questioned by a litigant who has utilized fraudulent evidence. Defendants are prejudiced by having to defend their integrity against a Plaintiff who used false evidence to secure his freedom and to gain a foothold to sustain this litigation.

Plaintiff was unquestionably caught fabricating the statements contained in the affidavits of Burton and Hill. His efforts to manipulate Mr. Dorsey's testimony through a promise to return the favor in 1991 and through an unambiguous request in 2020 for Dorsey to lie in support of Plaintiff's civil case are also beyond legitimate dispute. Plaintiff paid money to his co-defendants, who are witnesses in this case and instructed his friend to show "love" to Tanya Lazenby, another important witness in the lawsuit. Like most instances of fraud, only the perpetrator knows the full extent of the scheme and this case is no different. After Defendants proved Plaintiff's fraudulent scheme, they should not be forced to stand trial against claims when the propriety of the evidence itself cannot be trusted. That would be the very definition of prejudice.

19

Finally, Plaintiff's misconduct also prejudices the criminal justice system by corrupting it with false evidence and encouraging other inmates to rely on false evidence to improperly overturn their convictions. The incentives for inmates convicted of serious felonies to falsify evidence is great—their freedom may be procured, and fortunes can be made. This Court should take a strong stand where, as here, Plaintiff was caught falsifying evidence and tampering with witnesses. Dismissal of this lawsuit is necessary in order to preserve the integrity of the judicial process itself.

For these reasons, dismissal of the Amended Complaint is the only appropriate sanction.


DATED: March 25, 2022

                                  */s/*

Shneur Nathan, Bar No. 20707
Avi T. Kamionski, Bar No. 20703
Judson Arnold, Bar ID 21296
Nathan & Kamionski LLP
575 S. Charles St., Suite 402
Baltimore, MD 21201
Phone: (410) 885-4349
Fax: (952) 658-3011
snathan@nklawllp.com
akamionski@nklawllp.com
jarnold@nklawllp.com

*Counsel for Individual Defendants*


JAMES L. SHEA
Baltimore City Solicitor

                      */s/*

Kara K. Lynch (Bar No. 29351)
Justin S. Conroy (Bar No. 28480)
Kyle A. Ashe (Bar No. 21551)
Natalie R. Amato (Bar No. 20749)
Baltimore City Law Department
Office of Legal Affairs
100 N. Holliday Street, Room 101
Baltimore, Maryland 21202
T: (410) 396-2495/F: (410) 396-2126
kara.lynch@baltimorepolice.org

justin.conroy@baltimorepolice.org
kyle.ashe@baltimorepolice.org
natalie.amato@baltimorecity.gov
*Attorneys for Baltimore Police Department*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2021, I caused the foregoing document to be electronically filed with the Court's CM/ECF system, which will send an electronic copy of the same to all counsel of record.

*/s/ Shneur Nathan*