IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME JOHNSON,

    *Plaintiff*,

    v.

BALTIMORE POLICE DEP'T, *et al.*,

    *Defendants*.

Civil No. ELH-19-0698

## MEMORANDUM OPINION

This wrongful conviction action is rooted in events that occurred in Baltimore City in 1988 and 1989.  Aaron Taylor was murdered in 1988, at the age of twenty-two. In 1989, a jury in the Circuit Court for Baltimore City convicted plaintiff Jerome Lamont Johnson and two others of the murder. Johnson, who was 20 years old at the time of the murder (ECF 151-2 at 4), was sentenced to life imprisonment, with a consecutive term of twenty years' incarceration for a related gun offense.

In July 2018, the Baltimore City State's Attorney's Office (the "SAO") and plaintiff filed a Joint Petition for Writ of Actual Innocence, pursuant to § 8-301 of the Criminal Procedure Article ("C.P.") of the Maryland Code.  ECF 151-30. It was supported by a memorandum of law.  *Id.* at 3-18 ("SAO Memorandum") (collectively, the "Joint Petition").  The Joint Petition followed an investigation conducted by the SAO's Conviction Integrity Unit ("CIU").  *See* ECF 151-1 ("CIU Memorandum").[1]  The Circuit Court for Baltimore City (Peters, J.) granted the Joint Petition and vacated plaintiff's convictions.

---

[1] The Joint Petition was signed by Lauren Lipscomb, Chief of the CIU, and two lawyers for Johnson.

After the SAO dismissed the charges against Johnson, he filed suit against the Baltimore City Police Department ("BPD"), as well as four former BPD officers in their individual capacities: Frank Barlow, Daniel Boone, Kevin Davis, and Gerald Goldstein (the "Officer Defendants"). *See* ECF 1. In sum, Johnson contends that, as a result of the Officer Defendants' failure to disclose exculpatory evidence, the BPD's failure to establish a policy requiring disclosure of exculpatory evidence, as well as its failure to train BPD officers in regard to their constitutional obligations, he served approximately three decades in prison for a murder that he did not commit.[2]

At the outset of the case, various defendants moved to dismiss the suit. *See* ECF 22; ECF 24; ECF 25. By Memorandum Opinion and Order of March 10, 2020 (ECF 45, ECF 46), I granted the motion in part and denied it in part.

Johnson then filed an Amended Complaint (ECF 116), seeking compensatory and punitive damages. The Amended Complaint contains eight counts. Counts I through V are founded on 42 U.S.C. § 1983 and Counts VI through VIII assert claims arising under Maryland law. Count I is titled "Failure to Disclose Exculpatory and Impeachment Evidence." In Count I, plaintiff asserts a claim against the Officer Defendants for a violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution. *Id.* In Count II, Johnson brings a claim for "Fabrication of Evidence," in violation of his due process rights under the Fifth and Fourteenth Amendments. Count III asserts a claim for "malicious prosecution" against the Officer Defendants, in violation of the Fourth and Fourteenth Amendments. Count IV lodges a claim against the Officer Defendants for "Failure to Intervene." Count V asserts "a *Monell* Claim"

---

[2] As discussed, *infra*, defendants contend that Johnson procured his release through fraud on the court, including the submission of false affidavits. ECF 137 at 3. Defendants also question the reliability and impartiality of the SAO's reinvestigation. *See* ECF 162 at 12; ECF 162-4 (Expert Report of Robert Milan, dated 10/13/21).

against the BPD under the Fifth and Fourteenth Amendments, and pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  Count VI, lodged against the Officer Defendants, asserts malicious prosecution under Maryland law.  Count VII, also filed under Maryland law, alleges a claim for intentional infliction of emotional distress.  And, in Count VIII, Johnson asserts a claim against the BPD for indemnification.

Several motions are pending.  Along with the motions, the parties have submitted approximately 6,000 pages of exhibits.

Defendants have filed a "Motion to Dismiss Plaintiff's Amended Complaint as a Litigation Sanction Based On The Use Of False Or Fabricated Evidence" (ECF 137) (the "Sanction Motion"). They urge the Court to dismiss the suit, claiming that plaintiff secured his exoneration through the use of false and fabricated evidence: the affidavit of Alvin Hill, one of Johnson's codefendants, and the affidavit of Paul Burton, with whom Johnson had been incarcerated.  Additionally, defendants contend that Johnson intentionally attempted to influence the testimony of at least three potential witnesses in connection with his effort to vacate his convictions.

Plaintiff opposes the Sanction Motion.  ECF 152.  Notably, Johnson concedes that the affidavits contain false information.  However, he maintains that he was not aware of the false information when he submitted the affidavits.  *Id.* at 15.  And, in any event, Johnson argues that his exoneration did not depend on the assertions set forth in these affidavits.  *Id.* at 23.  Moreover, with respect to Johnson's communications with potential witnesses, he contends that his communications were not improper and did not prejudice the case.   ECF 152 at 8.  Defendants have replied. ECF 162.

The Officer Defendants have moved for summary judgment (ECF 138), supported by a memorandum of law (ECF 138-1) (collectively, the "Officer Motion").  In general, plaintiff

opposes the Officer Motion.  ECF 151.  The Officer Defendants have replied.  ECF 163.  However,

plaintiff "requests to dismiss Frank Barlow and Count II (Fabrication) against all Defendants."

ECF 151 at 11 n.1.  I shall grant those requests.

The BPD has also moved for summary judgment.  ECF 136.  The BPD motion is supported

by a memorandum of law (ECF 136-1) (collectively, the "BPD Motion").

In the alternative, all defendants jointly moved to bifurcate the *Monell* claim against the

BPD, and to stay discovery as to the *Monell* claim, pending resolution of plaintiff's claims against

the Officer Defendants.  ECF 140.  The motion is supported by a memorandum of law.  ECF 140-

1 (collectively, the "Bifurcation Motion").

Johnson has filed a consolidated opposition to both the BPD Motion and the Bifurcation

Motion.  ECF 156.   Both the BPD (ECF 164) and the Officer Defendants (ECF 167) have jointly

replied as to bifurcation.

The Court held a hearing on the motions on September 23, 2022, at which argument was

presented.  ECF 174.  The defense also used a powerpoint presentation.  ECF 175.  For the reasons

that follow, I shall dismiss all claims against Frank Barlow; dismiss Count II; grant the Sanction

Motion; alternatively, grant the Officer Motion and the BPD Motion; and deny the Bifurcation

Motion, as moot.

## I.      Factual Background[3]

Aaron Taylor was shot to death in Baltimore on July 14, 1988.  Johnson was one of four

people charged with Taylor's murder, and one of three who were convicted.  Two of Johnson's

---

[3] To the extent relevant, I incorporate here the factual background set forth in my Memorandum Opinion of March 10, 2020.  *See* ECF 45 at 3-13.  I also draw on the parties' submissions and the numerous exhibits, including the summaries provided by the SAO's CIU (ECF 151-1; ECF 152-13 (same)) and the Joint Petition.  ECF 151-30.

codefendants, Alvin Hill, who was the shooter, and Reginald Dorsey, have since died.  *See* ECF 138-1 at 11 n.3 (noting Dorsey's death); ECF 152 at 35 (same); ECF 151-1 at 4; ECF 152-9 (Hill's Autopsy Report, dated April 23, 2017).  At the time of their deaths, Hill and Dorsey remained incarcerated for their roles in Taylor's murder.  ECF 138-1 at 11 n.3; ECF 151-1 at 4.  Johnson's defense attorney, M. Gordon Tayback, and the presiding judge, Joseph Pines, have also died.  And, the establishment where the murder occurred has been razed.

Some of the individuals pertinent to this case were known by more than one name or by a nickname.  For instance, plaintiff used his middle name, "Lamont"; Hill used the nickname of "Poopie"; Dorsey used the nickname of "Buttons" or "Butt"; and Taylor, the victim, used the name "Hooper."  ECF 151-2 at 45, 46; ECF 138-3 at 8.

Notably, the Homicide File for the case is not available in its original condition, at least partly because the litigation has continued for decades, which has affected the content.  Plaintiff also notes that "no fewer than four versions of the SAO file have been produced . . . ."  ECF 151 at 25. Thus, plaintiff contends that "there is no definitive record of what documents were contained in the SAO file at the relevant time."  *Id.* at 29.  In any event, the parties did not submit with the motions any version of the SAO file or the defense attorney's file.

### A.  The BPD Investigation

On July 14, 1988, shortly after 1:00 a.m., Aaron Taylor "left the area of Virginia Avenue and traveled to the Night Owl Bar located at 3602 Woodland Avenue" in Baltimore.  ECF 151-1

---

Throughout the Memorandum Opinion, I cite to the electronic pagination.  But, the electronic pagination does not always correspond to the page number that appears on a particular submission.  And, some exhibits have been submitted more than once.  *See*, *e.g.*, ECF 151-1; ECF 152-13 (same).  On occasion, I cite to the duplicate versions of the same exhibit.

(SAO Memorandum) at 5.[4]   The front door of the Night Owl opened to a small area with a soda machine and a protected, glass-enclosed counter, where customers could buy snacks and beverages.  ECF 138-2 (Trial Transcript) at 109-10.

Lauren Lipscomb, who served as the Division Chief of the CIU, set forth the following account in the CIU Memorandum, ECF 151-1 at 5:

> Once in front of the location, Victim[5] was approached by several men and the shooter (later identified as Alvin Hill, aka Poopie, and hereinafter referred to as "Shooter").  An argument ensued.  Victim fled from the group to the inside of the Night Owl Bar.  Victim grabbed a patron (later identified as Marvin Reid and hereinafter referred to as "Shield") and used this patron as a human shield, hiding behind same from the Shooter.  The Shooter yelled multiple times for the Shield to "duck".  Victim screamed "don't shoot".  During this, store owner Jung Kim (hereinafter referred to as "Owner") called 911.  After moments went by with the Shield struggling to break free and Victim clutching on to him, the Shield and Victim fell to the ground.  Shooter approached and fired multiple shots down into Victim.  Victim tried crawling toward the doorway and collapsed.  The Shield's foot was struck by a bullet.  The Shooter and the guys from outside all fled.  The Shield remained until police arrived.  EMTs arrived and Victim was pronounced dead at the scene.  Victim's family responded.  Victim's mother identified Victim.

The Night Owl was adjacent to a basketball court and a playground on the corner of Woodland Avenue and Reisterstown Road.  ECF 138-2 at 112.[6]  A fence ran along the sidewalk of Woodland Avenue by the basketball court and playground.  *Id.*  There was a hole in the fence in the vicinity of the Night Owl.  *Id.*

---

[4] The establishment is referred to variously as the "Night Owl Bar" (ECF 151-at 5); "Night Owl Liquors" (ECF 138-3 at 10);  "Night Owl Bar & Lounge" (ECF 138-3 at 15); "Night Owl" (ECF 151-2 at 46); "Nite Owl Tavern" (ECF 151-8, ¶ 3); and "Nite Owl" (ECF 151-6 at 6).  It is also described as a "store" (*e.g.*, ECF 151-14 at 6) and as a "bar."  *See*, *e.g.*, ECF 151-8, ¶ 3.

[5] Taylor is identified in the SAO Memorandum as "Victim."  ECF 151-1 at 5.

[6] The Night Owl, the playground, and the basketball court "have been razed since the events at issue," and "[a] small parking lot now occupies the plot at the corner of Woodland Ave."  ECF 138-1 at 7 n.1.

The parties do no dispute that the key intersections of Reisterstown Road/Woodland Avenue and Reisterstown Road/Lucille Avenue are unchanged and are approximately 300 feet apart. Defendants submitted a map of the area that includes the relevant intersections mentioned in the factual summary. *See* ECF 137-24 (the "Map").[7]



---

[7] The Map indicates that it was generated using "Map data © 2021 Google." Although the Map post-dates the relevant events at issue, it is useful to locate key streets.

According to the Joint Petition, responding police officers "PO Mays"[8] and "PO Kenneth Jones" spoke with several witnesses at the scene.  ECF 151-30 at 4; *see also* ECF 151-8 (Jones Declaration), ¶ 3; ECF 151-1 at 5 (stating "PO Mays and Jones were first responding").  Robert Mays, Sr. is now known as Robert Muhammad.  *See* ECF 156-21 (Muhammad Decl.), ¶ 2 (specifying name change).

Officer Mays arrived at the Night Owl at 1:17 a.m. on July 14, 1988, in response to a reported "assault + robbery."  ECF 138-3 at 15-18 (Mays Incident Report) (emphasis omitted); *see also* ECF 138-2 at 104-118 (Mays Trial testimony).  Upon his arrival at the Night Owl, Mays "observed [the victim] slumped down on his knees' [sic] with his head lying in his chest, and bleeding heavily."  ECF 138-3 at 15-16.   The Mays Incident Report reflects that the incident occurred at "0116 Hrs."  *Id.* at 15.  Mays also wrote that the victim "had been shot several times." *Id.* at 16.

Officer Mays "[s]ummoned more officers" and "[s]ecured the bar area from anyone entering the bar[.]" *Id.* At trial, Officer Mays explained that he "secured the crime scene" in order to "protect the evidence around it."  ECF 138-2 at 113.  He also "called for an ambo and then advised that the incident on Woodland Ave. 3602 was an assault by shooting."  ECF 138-3 at 16. And, he "notified Homicide" and "notified Det. Davis[.]"  *Id.*

According to Mays, he "located" several witnesses at the scene.  They included Jung Kim, the owner of the Night Owl; Marvin Lewis Reid, who was the so called "Shield," *id.* at 17; and JuAndre Mims, who was in the Night Owl at the time.  ECF 138-2 at 117; ECF 151-1 at 6.[9]

---

[8] The Trial Transcript uses the spelling of "Mayes."  *See* ECF 138-2 at 103.

[9] The CIU Memorandum uses the spelling of "Juandre" Mims.  ECF 151-1 at 6.

At "0128 hrs.", a dispatcher notified the Homicide Unit that Homicide was requested to respond "to a serious shooting . . . ."  ECF 138-3 at 10.  Homicide Detective ("Det.") Kevin Davis responded to the scene at "0145 hrs."  *Id.; see also* ECF 151-1 at 5.  This was about thirty minutes after Taylor was killed.  *See* ECF 138-2 (Davis trial testimony) at 113-14; ECF 138-3 at 10 (Davis Report, 7/14/88).  Det. Davis remained at the scene until "the investigative work was completed," at which point he "returned to the homicide unit . . . ."  ECF 151-10 (Davis response to request for admissions), ⏍ 12.

Under BPD policy that was in effect at the time, and as discussed *infra*, the BPD Homicide Unit is granted "[t]he authority and responsibility to coordinate the entire investigation and handling [of] the technical phases of the investigation . . . ."  ECF 151-9 (General Order 14-83) at 6.  To that end, "detective(s) in charge of the investigation" are empowered to "[t]ake complete charge of the crime scene" and "no person may enter the restricted area without permission of the detective in charge of the investigation[.]"  *Id.*

Detective Davis assumed the role of the lead investigator in regard to the Taylor murder.  ECF 151-11 at 15 (Davis Dep.).  By 1989, he had conducted over 100 homicide investigations.  *Id.* at 13.  As the lead detective, Det. Davis was in charge of witness interviews.  *Id.* at 6.  He was aided by Det. Daniel Boone, who "assisted in all aspects of this investigation."  ECF 151-2 at 9.[10]

The Joint Petition states, ECF 151-30 at 4 (emphasis added):  "*On [the] scene*, at approximately 1:50 am, PO Kenneth Jones spoke with a minor witness, L.S.  L.S. is a "cousin of the Victim."  She was fifteen years old at the time.  *See* 151-1 at 6.

---

[10] Det. Davis and Det. Boone also had primary responsibility for investigating the murder of David Hightower, which occurred two days prior to Taylor's murder and a few blocks away.  *See* ECF 156-12 (report of plaintiff's expert witness, Robert Stewart, discussing Hightower murder), at 35.

Jones was then a "rookie BPD patrol officer and . . . had been working in that capacity for approximately three weeks."  ECF 151-8 (Jones Decl., 6/25/21), ⁋ 2.  And, on July 14, 1988, he personally recorded the time of 1:50 a.m. for his interview of L.S..  *See* ECF 138-5.  That is about five minutes after Davis arrived at the scene.  *See* ECF 151-1 at 5.

In a Declaration dated June 25, 2021 (ECF 151-8), Jones recalls that L.S., the victim's cousin, was "identified as having witnessed the murder."  *Id.* ¶ 5; *see* ECF 138-3 at 11.  The Declaration also states that a homicide detective "directed" Jones to take L.S. to the "Homicide Unit at Police Headquarters in downtown Baltimore."   ECF 151-8, ¶ 5.  Jones claims that he "transported" Ms. L.S. to the Homicide Unit in the back of his police vehicle.  *Id.* ⁋ 6.  Once there, Jones "took a witness statement from [L.S.] . . . for approximately thirty minutes." *Id.* ⁋ 7.

Jones does not identify who instructed him to transport L.S. to the homicide unit, nor does he explain how he could have gotten to Police Headquarters by 1:50 a.m.  Moreover, he does not address the assertion in the Joint Petition that Jones spoke with L.S. at the scene.  *See* ECF 151-30 at 4.

Officer Jones also states in his Declaration that he did not "recall writing down notes in a note pad."  *Id.*   Nevertheless, he memorialized L.S.'s account in a "Supplement Report (Form 87/7)" dated "14 Jul 88."   *Id.* ⁋ 8; ECF 138-5 (the "Jones Report"); ECF 151-2 at 23 (same).  Although the Jones Report reflects the time of the interview, it does not specify the location of the interview.

In his Declaration, Jones also avers, ECF 151-8, ⁋ 12: "After completing the Report, I left a copy of it with a detective in the Homicide Unit."  And, Officer Jones states that he "recall[ed] leaving [L.S.] in the interview room at the Homicide Unit," because he "expected a homicide detective to interview [L.S.], as was the procedure at the time, and because [he] was only a rookie

patrol officer." *Id.* ⁋ 13.  Moreover, Jones recounts that he "did not transport [L.S.] home." *Id.* Jones also states that he "was never contacted by any of the homicide detectives assigned to the investigation of the murder at the Nite Owl, nor did [he] speak to them or anyone else within the BPD about the witness statement that [he] took from [L.S.]." *Id.* ⁋ 14.

Officer Jones provided a second Declaration on August 20, 2021.  ECF 138-7.  He states, *id.* ⁋ 4: "At the scene, I was directed by a member of the BPD who I cannot identify but believed was a detective to transport a witness named . . . L.S. to the Homicide Unit at Police Headquarters in downtown Baltimore."  According to Jones, the officer "who directed [him] to transport the witness was not Kevin Davis or Daniel Boone . . . ."  *Id.*  Further, Officer Jones reiterates that he interviewed L.S. at Headquarters and memorialized the contents in the Jones Report.  *Id.* ⁋ 5.  And, Officer Jones avers, *id.* ⁋ 6: "After I concluded my interview with [L.S.] and my supplemental report, I left my report with a member of the BPD who I thought was a detective and I told a member of the BPD who I believed was a detective that [L.S.] was present at the Homicide Unit." *Id.*  However, Officer Jones could not remember "who [he] spoke with at the time," other than it "was not Detective Kevin Davis or Detective Daniel Boone."  *Id.*

The "Narrative" portion of the Jones Report contains a summary of L.S.'s interview, according to Jones.  He wrote, ECF 138-5 at 2:

> Spoke with [L.S.] . . . who states on 14 July 88 at 0130 hrs she was present in the bar at 3602 Woodland Ave with the victim (her cousin).
>
> [L.S.] states the suspect (30-1) came into the bar pulled a black + brown gun (unk caliber) from his waist band and held it down towards the floor.  She states the victim then grabbed Marvin Reid . . . using him [as] a shield in front of his body stating "Don't go nowhere he's going to shoot me;" referring to suspect (30-1).  She states Mr. Reid (the shield) somehow got away and hit the ground.  She states suspect (30-1) said "I'm going to kill you," twice.  She states she then ran out and heard 5 shots.  She states there were 3 other Blk [sic] males with suspect but they fled also.  She states that she know [sic] the names of two of the black males with suspect (30-1) who also ran but she did not want to give the names because she's

in fear of her life.  She states she does not know the suspects [sic] name but she seen [sic] him in the area.

> [L.S.] described the suspect (30-1) as a light skin black male, thick eye brows [sic], cat eyes, light brown eyes, skinny nose, slim build, black sweatshirt, red shorts, white tennis [shoes], and a fade haircut.

On July 14, 1988, Det. Davis submitted a report of the incident to his Commanding Officer, Captain John J. MacGillivary.  ECF 138-3 at 10-13 ("July 14 Report").  The July 14 Report is co-signed by Davis's supervisor.  *Id.* at 13.  Among other things, the July 14 Report expressly stated: "Officer Kenneth Jones, NWD interviewed [L.S.]."  *Id.* at 11.  The July 14 Report also stated, *id.* at 12: "This witness who was in a [sic] extremely excited condition stated she was in the store when her cousin . . . was shot."  And, Det. Davis specifically informed MacGillivary that L.S. "*will be interviewed* by Homicide Investigators as soon as possible."  *Id.* (emphasis added).

Moreover, Detective Davis testified at trial that he "talked" with L.S. "on the night of the incident at the Nite Owl," but "[s]he was in a very emotional condition . . . ."  ECF 138-2 at 25.  Therefore, he decided "to let her go home with her mother."  *Id.*  At his deposition (ECF 138-6, Davis confirmed that he did not "interview [L.S.] back at the homicide unit" on July 14, 1988, because "she was extremely upset, 15 years old," and it was the "middle of the night."  *Id.* at 13.  Davis claimed that he "spoke to [L.S.] in depth on the 19th of July . . . ."  ECF 138-2 at 25.

The Homicide File contains a handwritten note, docketed at ECF 151-12 at 2.  Although the author is not specified, the parties acknowledged at the motions hearing that Davis is the author of the note.[11]  The note appears to be a recap of events concerning the investigation.  As to "7/14/88," it states: "[L.S.] – upset briefly interviewed *at scene*, released."  *Id.* (emphasis added).  There is also an entry for "7/19/88—SAO [L.S.]."  It states:  "After getting descriptions addresses

---

[11] The Court does not have a transcript of the hearing.  Therefore, I have relied on my notes and my recollection.

or nicknames of S's [*i.e.,* suspects] showed her a pix of Tommy Carroll ID'd as Tommy — showed

her 2 spreads of 'Poopies' — Neg." Further, the note states, *id.*: "7/29 – Interviewed McFadden

she gave us names of Lamont & Poopie – 3622 Lucille."

An image of the handwritten note follows, *id.*:



Detective Davis spoke with JuAndre Mims on July 14, 1988, at 3:20 a.m., "via telephone."

*See* ECF 151-2 at 16-17 (typed report); *see also* ECF 138-3 at 2 (Davis's handwritten notes); ECF

138-6 (Davis Dep.) at 7. According to handwritten notes, Mims stated that he "saw some people

on [the] basketball court"; "Heard shot thru car"; "crowd ran into bar"; "saw B/M run in bar";

heard "6-8 shots"; described the clothing of an individual he "knows from area"; and described

the weapon as ".38 long blue steel." ECF 138-3 at 2.  The handwritten note also says:  "asked for a ride – W said no."  *Id.*

Davis memorialized the content of his notes in a typed memorandum to Captain MacGillivary, dated July 14, 1988.  ECF 151-2 at 16-17.  He wrote that Mims "stated that he drove up to the bar and observed some people on the basketball court next to the bar."  *Id.* at 16.  Mims reported hearing "a shot coming from the area of the basketball court and saw a group run into the bar," followed by "a b/m armed with a .38 blue stell [sic] revolver . . . ."  *Id.*  Mims then "heard 6-8 shots," at which point "the armed suspect ran past" and asked Mims "to drive him out of the area."  *Id.*  However, "Mims refused and the suspect fled."  *Id.*

Of relevance, a section of the report is titled "Follow Up."  *Id.* at 17.  There, Davis stated: "Interviews of JuAndre Mims and [L.S.] will be conducted as soon as possible." (Emphasis added). The report was also signed by Davis's supervisor.  *Id.*

Other witnesses also provided statements to BPD officers on July 14, 1988.  They included Kim, the owner of the Night Owl, and Marvin Reid, the man Taylor used as a human shield.  *See* ECF 138-3 at 21-23 (Kim Statement); *id.* at 24-30 (Reid Statement).

Reid, who was 29 years old at the time (ECF 138-3 at 24), gave a signed statement to Det. Charles Gilbert at 3:28 a.m. on July 14, 1988, in the "Homicide Unit Office."  *Id.* at 26-29.  Reid said, in part, *id.* at 26-27:

> I rode my bike down Reisterstown Rd. and turned on Woodland to go to that bar. As I got to the bar, I noticed two guys arguing on the basketball court next to the bar.  The one guy had a gun in his left hand and was pushing the guy that died around.  I really didn't pay it much mind.  I proceeded into the bar—the front carry out section . . . .  I was grabbed from behind by the guy who eventually got shot. He had his arm around my neck.  He had run in with the guy with the gun behind him.  He was using me as a shield and saying "No man, no man.  Don't," to the guy with the gun.  The guy with the gun was telling me to duck.  The one who had me around the neck was dragging me around trying to get away from the guy with the gun, but there wasn't really any place to go. . . .  The guy told me to duck again and

I ducked, putting my hands over my head.  He shot three to five times.  I dropped
to the floor and the guy who got shot dropped on me.

Kim provided a "verbal statement" to Det. Boone at 3:35 a.m. on July 14, 1988.  ECF 138-
3 at 22.  According to Boone's handwritten notes, Kim recounted that she "was inside her liquor
store when she heard a noise outside. When she looked up she saw the [victim] and the shielded
subject in front of the soda machine." *Id.* at 22.  Boone wrote that, according to Kim, "the suspect
was standing inside the door and he had a long barrel 4" black handgun."  When Kim saw the gun,
she called 911. *Id.*  "When she finished the call the 3 were further inside the store in front of the
center glass partition." *Id.*  According to Boone, Kim said that she "heard one shot then saw the
[suspect] shoot down several more times at the victim who was out of her sight below the glass
partition." *Id.*  Then, the "suspect ran out the door in [an] unknown direction." *Id.*  According to
Boone, Kim described the suspect as a black male in his "early 20's," "very thin," and "dark skin,"
about "5'7 – 5'8" in height, wearing a black hooded sweatshirt. *Id.*

Det. Davis wrote a memorandum to Captain MacGillivary on July 15, 1988 (ECF 151-2 at
15) indicating that on that date he spoke with Gwendolyn Taylor, the victim's mother, as well as
"several other family members." *Id.*; *see also id.* at 6 (identifying Gwendolyn Taylor as "the
victims [sic] mother," and noting that she "assisted police in identifying the suspects involved in
the murder").  Det. Davis said: "The family had been in contact with [L.S.] who told the family
that 'Poopie' did the shooting." *Id.* at 15.  And, Davis wrote, *id.*:  "A possible witness/suspect was
also identified by the family as Lamont . . . who lives somewhere on Lucille Avenue." *Id.*  Det.
Davis continued, *id.*: "According to the information the family has received, Lamont was in the
bar and told 'Poopie' to shoot the victim in the haed [sic]."   In Dorsey's signed statement to Det.
Davis and Det. Boone, he claimed "Poopies [sic] buddy . . . ran in the bar." ECF 137-2 at 5.

-15-

The BPD Homicide File includes handwritten notes on paper that resembles a memo pad, with dates, words, phrases, and names, again without the identity of an author, but clearly consistent with the gathering of information during an investigation.  *See* ECF 151-12 at 5-7.  For example, one entry reflects that on 7/15 "at 7:30 pm" someone "spoke to Shanay."  *Id.* at 7.  She is the sister of L.S. and a cousin of the victim.  Another entry mentioned names and some addresses. *Id.* at 6.  The names include "Buttons," with an address; "Tommy"; D.S. (L.S.'s sister), "has info"; "Desiree," with an address; "Poppie [sic] shooter don't live in area"; and "Lamont."  *Id.*  The note indicates "info" was obtained from "Phyliss Smith," the "V's aunt."  *Id.*  As to "Lamont," the note states that he "lives on Lucille" and was "with shooter told to shoot."  *Id.*  It also provides information as to a vehicle with "Va tags."  *Id.*

On July 19, 1988, Det. Davis conducted an interview of L.S.  He took handwritten notes of his interview, which contain the words "Notes of Interview."  ECF 151-13 at 1-4 ("July 19 Notes").  The notes reflect a time of 10:20 a.m.  *Id.* at 2.  L.S. is referenced as "W," for witness.[12]

In the July 19 Notes, Det. Davis assigned a number to the five suspects who are referenced, four by name.  Poopie is referenced as number 1, and the notes include a description and that he "hangs on Lucille at Reisterstown."  *Id.* at 2.  "Lamont" is number 2.  *Id.*  Next to his name, the Notes reflect that he "lives on Lucille" and "drives a rental car."  Under his name, it says "had a little gun, gave it to Poopie."  *Id.*  Tommy is listed as number 3; Buttons is listed as number 4; and "B/M NFD" is listed as number 5.  *Id.*

Davis wrote that L.S. said she told Dezzerie, *i.e.*, her mother, that she was "going to the store to get some chips & pretzels."  *Id.* at 3.  L.S. "then left about a minute later with [her] mothers

---

[12] ECF 151-12 at 4 is a duplicate of ECF 151-13 at 3.

[sic] man friend and [her] girlfriend." *Id.*; *see* ECF 151-2 at 76 (same).  Of significance, the names of the friend of L.S.'s mother and L.S.'s girlfriend are not mentioned.  ECF 151-13.

Further, the July 19 Notes state, *id.* at 2:  "Lamont gave Poopie a small gun at the crack in fence.  Poopie shot at V gun clicked 2 times, V ran into store, W ran in w/her mothers [sic] friend." *Id.* at 2-3.  The victim then "grabbed a man" and person number 3, who is specified as "Tommy," *id.* at 2, 3, "ran in w/a bigger gun."  *Id.* at 3.  The July 19 Notes indicate:  "Poopie told the man to move or get shot.  Unk B/M 'hit [victim] w/gun.'"  *Id.* at 2.  In addition, the July 19 Notes state, *id.*:  "Buttons said shoot him, he can ID us."  The notes again indicate that Poopie told "the other man to move or he would shoot them both."  *Id.* at 3.  The "man broke away . . . ."  *Id.*

Davis wrote that L.S. indicated that both she and "her mothers [sic] friend" were "in [the] store at [the] time of [the] shooting," along with Poopie, the victim, and the man the victim had "grabbed."  ECF 151-13 at 3.  And, Davis wrote that L.S. said "[h]er girlfriend was hiding outside." *Id.*  L.S. "heard 4 shots."  *Id.* at 2.[13]

The July 19 Notes are memorialized in a typed report of the same date, addressed to Captain MacGillivary (the "July 19 Report").  ECF 151-2 at 13-14.  The July 19 Report reflects that L.S. was interviewed in the presence of her mother, Dezzerie, "at the States [sic] Attorneys [sic] Office, Violent Crimes Section."  *Id.* at 13.  According to Davis, L.S. "stated that she witnessed the shooting of her cousin . . . inside the Night Owl Liquor Store."  *Id.* at 13.

According to the July 19 Report, L.S. recalled that Taylor left her house "to get some chips at the bar."  *Id.*  L.S. left a few minutes later and "also headed toward the Night Owl."  *Id.*  She stated that "[a]s she entered the 3600 Blk. Woodland Avenue she observed her cousin at the

---

[13] As discussed, *infra*, at L.S.'s 2018 interview with the CIU, she claimed that Lazenby was hiding under a trash can at the relevant time.  *See* ECF 138-20.

entrance (hole in fence) to the playground/basketball court which is just east of the Night Owl."

*Id.*

> Further, Davis wrote, in part, *id.*:

> [L.S.] stated that her cousin was having some difficulty with approx. 5 black males all of whom she knew with the exception of one. She stated she observed a black male named Lamont give Poopie and [sic] small handgun. Poopie pointed the gun at the victim and it clicked twice, but didn't fire. She stated she then ran into the Night Owl right behind the victim who grabbed a patron in the store. She stated that all 5 suspects then ran to the front of the store. She heard one of the suspects tell Poopie, who entered the store to hit the victim in the head with the gun. She then saw Poopie holding a large black handgun. She heard the suspect known to her as Buttons tell Poopie to "Shoot him in the head, he can identify us." She stated that Poopie then ordered the patron being held by the victim to move or he (Poopie) would shot [sic] both of them. The patron then broke away and Poopie fired once then three more times at the victim. The witness ran out after the first shot and Poopie followed her across Reisterstown Rd. She doesn't know where the other 4 suspects fled but according to her mother she saw two of them earlier this date looking to see her son Troy.[14]

L.S. also provided the names of four of the five suspects, as follows: Poopie, Lamont, Tommy, and Buttons. *Id.* at 14. And, she provided Det. Davis with physical descriptions of them. A fifth suspect was described by [L.S.] only as "B/M nfd." *Id.* She also provided the street on which each of the four men lived. *Id.* According to the July 19 Report, L.S. indicated that "Lamont . . . lives in the 3600 Blk. Lucille Ave. [and] drives rental cars." *Id.* And, the July 19 Report states, *id.*: "[L.S.] also provided information regarding the murder of David Hightower which will be followed up by Det. Boone and Det. Davis."

Moreover, the July 19 Report indicates that L.S. was shown a photo "taken at the Homicide Unit on July 12, 1988 of Thomas Carroll . . . at which time [she] Identified the photo as the suspect she knows as Tommy." *Id.*[15] The "identification was made in the presence of Det. Daniel Boone

---

[14] The numbers four and five appear to have been handwritten.

[15] The CIU Memorandum indicates that L.S. did not select Tommy from a photo array. ECF 151-1 at 10. Rather, she was shown "a single, confirmatory photo" on July 19, 1988. *Id.*

. . . ." *Id.*  It appears that the photo of Carroll was taken in connection with the investigation of the murder of David Hightower.  *Id.* at 14.  Carroll resided on Lucille Avenue.  *Id.*  And, L.S. provided information about that murder.  *Id.*

The July 19 Report (ECF 151-2 at 13-14) does not indicate that anyone went with L.S. to the Night Owl.

L.S. testified before a Grand Jury on July 28, 1988.  *See* ECF 143.  In pertinent part, L.S. testified that at about 1:00 a.m. on July 14, 1988, she was at her home with her mother, her "mother [sic] friend and [her] girlfriend," as well as Taylor.  *Id.* at 2-3.  At an unspecified time, Taylor "left to go to . . . Night Owl." *Id.* at 4.  L.S. followed Taylor about five minutes later.  *Id.*  Notably, L.S. was not asked whether the two individuals accompanied her to the Night Owl, nor was she asked their names.

L.S. recounted that she saw the victim standing with five black males.  *Id.* at 3, 4.  As she was entering the store, "Lamont, he gave Poop a gun and [the victim] ran in the store and then that's when Poop came in and that's when he was firing at [the victim] . . . ." *Id.* at 3.  She confirmed that Johnson "hand[ed] Poop the gun[.]" *Id.* at 4.

In addition, L.S. recalled, *id.*:  "Poop clicked it [*i.e.*, the gun] twice and it wouldn't shoot." *Id.*  At the time, "Poop" was "pointing" the gun at the victim.  *Id.*  The victim then ran into the store, as did L.S.  *Id.*  The victim grabbed a patron and used him as a shield.  *Id.* at 5.  Poop "told the guy, 'If you don't move, I'm gonna kill both of you all.'" *Id.* at 6.  At that time, Poop had a

---

Moreover, the CIU Memorandum states that "the only array apparently shown to L.S. contained the Shooter." *Id.*

The Joint Petition is consistent.  It states that L.S. was never shown a confirmatory photograph of Johnson or an array with his photograph.  ECF 151-30 at 6.

"different" gun, which was "bigger" than the first, with a brown handle.  *Id.*  She described it as "like the police gun."  *Id.* at 7.

L.S. claimed that someone she did not know said to hit the victim with the gun, and Poopie hit him.  *Id.*  Then, Buttons "ran to the store" and he said, "'Shoot him in the head.'"  *Id.* at 7. Buttons added:  "He gonna identify us."  *Id.* at 8.  And, "that's when [she] ran out of the store and they shot [the victim] . . . ."  *Id.* at 7.  She heard four gun shots.  *Id.*

Initially, L.S. said she last saw Johnson on July 12.  *Id.* at 8.  But, she corrected her response to say:  "No.  It was the last time I was here."  The prosecutor asked L.S. if she selected a photograph when she was in the courthouse on July 12.  *Id.* at 10.[16]  L.S. responded "Yes" and indicated that she selected "Tommy".  *Id.* at 11.  She agreed that he "was present at the time . . . ." *Id.*

In addition, L.S. described "Lamont."  *Id.* at 9.  And, she confirmed that he gave a "small gun" to Poopie "outside the bar," which "didn't fire . . . ."  *Id.*

On July 28, 1988, Det. Davis arrested Dorsey for the "Homicide/Shooting" of Aaron Taylor.  *See* ECF 138-3 at 8.  Dorsey died approximately two weeks before he was scheduled to provide deposition testimony in this case.  At the time, he was still incarcerated for his involvement in Taylor's murder.  ECF 138-1 at 11 n.3; ECF 152 at 35.

Det. Davis interviewed Dorsey on the date of his arrest, July 28, 1988, "in the presence of Det. Daniel Boone."   *See* ECF 137-2 at 2-9 ("Dorsey Statement").  The interview took place at the Homicide Unit and was recorded on paper.  Dorsey signed the statement, attesting that it is "true and accurate[.]"  *Id.* at 9.

---

[16] The date of July 12 may derive from the July 19 Report, in connection with the Hightower murder.  *See* ECF 151-2 at 14.

Dorsey, who was then seventeen years of age, stated that his nickname is "Buttons." ECF 137-2 at 2. He explained that Taylor was murdered because Taylor had angered a drug purchaser (the "Buyer") who, in turn, threatened Tommy. *Id.* at 2-3. Specifically, Dorsey stated that on an unspecified date "about a week or two" before Taylor's death, a "Jamaican man came to Reisterstown + Lucille to buy some coke" from Dorsey, Tommy, and Taylor. *Id.* at 2; *see id.* at 3 (specifying who was present at the time). The Buyer gave $300 to Taylor, who then promptly rode away on his bicycle with the money. *Id.* at 2-3. At that time, the Buyer "started running after Hooper," *i.e.*, the Victim, evidently to no avail. *Id.* at 3. The Buyer "told [Dorsey] that he wanted his money or he was going to kill all [their] families." *Id.*

Dorsey recounted that later that day, the Buyer went to Tommy's home and threatened Tommy's family. ECF 137-2 at 3. Then, Tommy came to Dorsey's home and indicated that they "need[ed] a hundred dollars to pay the Jamaican man." *Id.* But, Dorsey claimed that he did not have sufficient funds to repay the Buyer. *Id.* Tommy "went to Poopie's house" to obtain the necessary funds. *Id.* Poopie is Tommy's cousin. *Id.* at 3. A few days later, Dorsey saw the Buyer, who told him that Hill had repaid the $300. *Id.*

In addition, Dorsey described the circumstances leading to Taylor's murder on July 14, 1988. *Id.* at 3-4. He stated, *id.* at 3: "I was on my porch, [when] a boy named Kenny came around and said he saw Hooper . . . ." *Id.* at 3. He and Kenny went to Poopie and "Kenny told Poopie that Hooper was around the corner." *Id.* at 3-4. He and Kenny walked to Lucille and Reisterstown. *Id.* at 4. Dorsey continued, *id.*: "Poopie, Tommy and a guy I don't know who I've seen with Poopie, were walking around Beehler & Reisterstown." *Id.*

At that time, Taylor "was on Reisterstown Rd. near the basketball court." *Id.* According to Dorsey, "Poopie, the guy and Tommy ran to the basketball court," and Dorsey was with them.

*Id.* Taylor "walked to Reisterstown and Woodland and was talking to a guy about buying some cocaine." *Id.* Kenny and Dorsey then "went up to Hooper and told him [that] Poopie and Tommy wanted their money." *Id.* In response, Taylor said "'fuck them' and then "walked towards the bar." *Id.*

Dorsey recounted that at this time, Hill and Tommy were on the playground. *Id.* But, when "Hooper got to the hole in the fence," which abutted the Night Owl, Tommy, Hill, K.A., Dorsey, and the unnamed individual "went up and talked to Hooper." *Id.* at 4.  Hill told Taylor that he wanted his money. *Id.* Hooper "said he gave the money to Tommy." *Id.* But, Tommy denied that Taylor had given him the money. *Id.*

According to Dorsey, Hooper "had some money in his hand from the guy he was talking to at the corner about some coke." *Id.* Hill then said, *id.*: "'I want my mother fucking money and I want it know [sic].'" *Id.* Dorsey continued:  "Thats [sic] when the boy I dont [sic] know pulled out" a gun, which Dorsey described as "an automatic" that was "blue steel," and "pointed it at Hooper and shot twice," *id.* at 4, but "the gun did not fire." *Id.* at 5.

Dorsey claimed that Taylor then "ran inside the bar" and was followed quickly by Hill. *Id.* at 5.  According to Dorsey, "Poopies [sic] buddy, the one with the automatic that didnt [sic] work, ran in the bar." *Id.* Elsewhere in the Dorsey Statement, Dorsey states that Johnson was "Poopies [sic] buddy." ECF 137-2 at 6.  Dorsey stated that he "went to the front door of the bar," at which point he saw Hill "smack Hooper upside the head with [his] gun." *Id.* at 5. Dorsey noted that Taylor was "hollering for Poopie to stop hitting him" and "holding onto some old man on the floor." *Id.*

Dorsey asserted that he "walked away from the door and went toward the phone booth," and then he "heard two shots from the bar . . . ." *Id.* He claimed that Poopie had a "Long barrel

blue steel .38 revolver" inside the bar.  *Id.* at 6.  After Dorsey heard the shots, he "ran across Lucille + Reisterstown and Tommy and Poopies [sic] buddy were behind [him]."  *Id.* at 5.  Further, Dorsey stated that "Tommy and Poopies [sic] buddy ran up the alley behind Tommy's house" and came out through the front door of the house.  *Id.*   An officer named Steve ran up the alley behind Tommy and Poopie's buddy.  *Id.* at 6.

According to Dorsey, Poopie was "staying at 3605 Lucille with a girl named Deborah." *Id.*  And, he was asked:  "Who is Lamont?"  *Id.*  He answered:  "Poopies [sic] buddy."  *Id.*  Further, he stated that Lamont was "staying at 3605 Lucille Ave."  *Id.*  And, he identified Kenny as Kenny K.A.  *Id.*

Dorsey indicated that he had last seen Lamont about a week prior.  *Id.* at 7.  He stated, *id.*: "He told me watch my back because Hoopers [sic] brother Donald was looking for me."

Detective Davis prepared a report for Captain MacGillivary on July 29, 1988, concerning the arrest of Reginald Lewis Dorsey, "aka 'Buttons,'" as a "participant" in the murder of Taylor. ECF 138-3 at 8.  Det. Davis wrote that based on the information provided by Dorsey, the BPD had "learned that suspects 'Poopie' and 'Lamont' had recently been staying at 3622 Lucille Avenue." *Id.*[17]

Det. Davis went to 3622 Lucille Avenue on July 29, 1988.  There, he met Deborah McFadden.  *Id.*  She provided "Lamont's" last name as Johnson, and stated that he "did rent a room in her house but has since moved out to Randallstown."  *Id.*  And, she stated that "'Poopie's' real name is ALVIN HILL, M/B/23."  *Id.*  Further, McFadden stated that Johnson "often used rental cars, had a contact beeper and sold drugs."  *Id.*  Moreover, McFadden "stated that a person

---

[17] Dorsey had provided the address of 3605 Lucille Avenue.  *See* ECF 137-2 at 6.

named 'Poopie' did stay with Lamont for a time but also left several months ago." *Id.* According to McFadden, Poopie and Lamont "would leave their 'guns' laying around her house." *Id.*

On August 8, 1988,[18] Det. Davis took the statement of twenty-year old witness K.A. ECF 138-13 ("K.A. Statement"). The statement is typed and it was signed by K.A., who verified the statement as "true and accurate." *Id.* at 4.

K.A. indicated that on July 14, 1988, he "was walking down Lucille Ave, past Tommy's house and Poopie came out." *Id.* at 2. Poopie said that "he was going to put something in Hooper." *Id.* K.A. indicated that Poopie "thought [K.A.] was Hooper." *Id.* He noted that on other occasions Poopie and Butt (*i.e.*, Dorsey) "mistook" K.A. for Hooper. *Id.* K.A. explained that Poopie was looking for Hooper because Hooper and Butt "burned Lamont for his drug money." *Id.*

According to K.A., when he "passed Butt's house, he was out on his steps, and Tommy, Poopie ("*i.e.*, Hill), Ornie and another guy were at Tommy's house." *Id.* Thereafter, K.A. "walked down to Reisterstoen [sic] and Lucille and went across to the bar" and "Hooper was in the bar." *Id.* But, upon K.A.'s entrance into the bar, Hooper left. *Id.* When K.A. left the bar, he "saw Hooper and Butt standing outside on the side of the bar by the basketball court fussing with Butt." *Id.* Tommy and Ornie walked toward Butt. *Id.* Butt "grabbed onto Hooper and was holding him and telling him not to go anywhere." *Id.* At that time, K.A. saw Poopie "coming from around the back of the bar and he walked to Butt and Hooper." *Id.* Further, K.A. claimed that Poopie "had a long barrel black handgun . . . ." *Id.* K.A. stated that he then told "Poopie that [the gun] was not necessary and they should talk it out." *Id.* K.A. added: "I heard Hooper say he already talked to Lamont." *Id.* And, K.A. added: "Hooper said there go Lamont up there (Lamont was standing

---

[18] The Officer Defendants erroneously indicate that the statement was obtained on August 8, 1989. ECF 138-1 at 11.

on the corner of Reisterstown & Lucille.)"  K.A. was asked "Did anyone else have a gun?"  *Id.* at 3.  K.A. answered "No."  *Id.*

K.A. claimed that Poopie and Butt tried to get Hooper onto the basketball court.  *Id.* at 2. K.A. continued, *id.*: "Hooper broke away from Butt and ran into the bar.  Poopie ran to the front of the bar with Butt.  I saw Poopie fire into the bar twice, then I ran.  I heard a total of five shots."

In addition, K.A. stated that before the shooting, Butt told Poopie to shoot Hooper.  *Id.* K.A. stated that, at the time of the shooting, Tommy and Ornie "were by the hole in the fence on the basketball court."  *Id.* at 3.  K.A. then saw "Tommy and Ornie [run] up the alley behind Lucille."  *Id.*  And, he noted, *id.*: "I saw Off. Steve driving down Reisterstown Rd. him [sic] and another police, Off. Steve wasn't driving.  They made a U turn and Off. Steve got out and ran up the alley behind Lucille Ave." At the same time, "[t]he Officer in the car drove up Lucille to the second alley, where Butt lives."  *Id.*  K.A. "walked up Lucille Ave. and Off. Steve stopped [him]" and told K.A. "to get off the street."  *Id.*

Lazenby was deposed in May 2021.  ECF 138-15.  She claimed that she was with L.S. on the morning of July 14, 1988, and that the two of them "walked through an alley [towards] Reisterstown Road," heading to the Night Owl to buy snacks.  ECF 138-15 (Lazenby Dep.) at 6, 7.  She did not see anyone before she entered the Night Owl.  *Id.* at 6-7.  Moreover, she claimed that a man named Quinton was not with them.  *Id.* at 6.  Lazenby recalled that three people were arguing in the store, and "one guy pulled a gun out."  *Id.* at 9.

Of import, she recalled that three police officers came to her house on July 14, 1988, *i.e.*, the date of Taylor's murder.  *Id.* at 14-15.  The officers wanted to speak to Lazenby "about a homicide that happened" at the "Nite Owl bar."  *Id.* at 17.   However, Lazenby's mother refused to allow them to do so, stating "Hell no" and "Fuck no."  The officers left, without speaking to

Lazenby. *Id.* Lazenby indicated that she never spoke with any police officers about the crime. *Id.* at 13, 18.

In or about August 1988, after Det. Davis obtained the K.A. Statement, he completed an Application For Statement Of Charges/Statement Of Probable Cause" with respect to Johnson, for the murder of Aaron Taylor. *See* ECF 151-17 (the "Warrant Application").[19]  Det. Davis wrote, *id.*:

> Several witnesses were located and stated that the victim was accused on the street outside the Night Owl Bar.  One witness stated the above Defendant, Jerome Lamont Johnson, produced a handgun and gave it to another suspect, Alvin Hill, who pointed it and shot twice at the victim.  The handgun however did not discharge.  The victim then ran into the Night Owl Bar followed by Jerome Johnson and Alvin Hill.  Hill produced a second handgun and shot the victim.  Both Johnson and Hill then fled the scene.
>
> All witnesses will be available for future court proceedings.

An arrest warrant was issued for Johnson on August 11, 1988.  *See* ECF 151-2 at 19. However, Johnson was not arrested until several months later.  An arrest warrant was issued for Hill on September 4, 1988, and he was arrested on the same date.  *Id.* at 18.

### 2. Photo Arrays

During the investigation, BPD officers showed individual photos and photo arrays to various individuals.  ECF 151-12 at 2. Colonel ("Col.") Richard Worley, one of BPD's Rule 30(b)(6) designees, confirmed that, as a general matter, a photo array is prepared "to show to a witness."  ECF 151-19 (Worley Dep.) at 4.  Plaintiff asserts that "photos were shown to witnesses without documentation per BPD policy." ECF 151 at 21.  Further, plaintiff posits that BPD officers "did not formally document identification[s] or document the photos shown."  *Id.*

---

[19] The Warrant Application is dated July 10, 1988.  ECF 151-17 at 2.  But, Taylor was not murdered until July 14, 1988.

According to plaintiff, the Homicide File contains two arrays containing Johnson's photograph. *See* ECF 151-2 at 80-82 (photo arrays). The Homicide File contains signed photo spreads (ECF 151-2 at 67-70), on forms that contain the statement: "A supplementary report must be prepared for each photographic line-up." The Homicide File also contains references to instances when witnesses were presented either with a single photograph of a particular person or a photo array. *See*, *e.g.* ECF 151-1 at 10; ECF 151-2 at 12, 14, 24, 25, 30.

The Homicide File contains what appears to be an index card that identifies three witnesses: Jung Kim, Marvin Reid, and Ju Andre Mims. ECF 151-2 at 75. The card does not reflect who made the entries, but there is a check mark next to each name. *Id.* The card also indicates that these witnesses may be able to identify suspects. *Id.* The card has a handwritten date of "9/6/88" and is shown below, *id.*:



In undated, handwritten notes in the Homicide File, docketed at ECF 138-3 at 30, "KD," *i.e.*, Det. Kevin Davis, wrote that on September 16, 1988, he and Det. Barlow showed Marvin Reid an array of photos, which included the photo of Hill. ECF 138-3 at 30. Reid "identified the photo

of Alvin Hill as looking like the suspect he saw shoot the victim." *Id.*  But, Det. Davis also noted that Reid "could not be positive in his identification." *Id.*

Davis's notes also indicate that Kim was shown a "Spread" on September 20, 1988.  ECF 151-12 at 2.  She made a "positive ID of Hill as shooter." *Id.*

Additionally, according to Davis's handwritten notes, on July 19, 1988, L.S. identified a photograph of Tommy Carroll as "Tommy."  ECF 151-12.  Similarly, Davis's July 19 Report reflects that L.S. identified a photo of the suspect she knows as Tommy.  ECF 151-2 at 14.  And, when L.S. testified before the Grand Jury on July 28, 1988, she stated that she was "shown a group of photographs" by "Detective Boone and Detective Davis[.]" ECF 151-14 at 18.  From that group, she identified Tommy.  *Id.* at 20.

Also on July 19, 1988, "[L.S]/Dezzerie" identified a photo of "Thomas Carter."  ECF 151-13 at 4.

ECF 151-2 at 12 is a typed report prepared by Davis, documenting that on August 1, 1988, Donzella Carroll identified a photo of Hill as the person she knows as "Poopie."  The same report reflects that L.S. was shown a photo spread on August 2, 1988, and she "positively identified" the photo of Hill as the person she knows as Poopie and the individual who shot Taylor.  *Id.*

A report of Det. Davis dated July 28, 1988 (ECF 151-2 at 24) reflects that two photo spreads, each with six photos, were shown to two unidentified witnesses with "negative results." Each photograph is referenced by a "BPI" number.

ECF 151-2 at 25 indicates that a photo array was shown to an unidentified witness on August 2, 1988, "at 1215 hours."  It contained six photographs, again referenced by an assigned BPI number.  The unnamed witness "positively identified photo #1 as the subject that shot and killed the victim." *Id.*  And, photo #1 is identified as that of Hill. *Id.*  On September 20, 1988, an

-28-

unidentified witness "positively identified photo #289658 as the shooter in this incident." *Id.* at 68. And, at ECF 151-12 at 3, it states: "930 AM Neg on both spreads."

Plaintiff contends that Donzella Carroll identified Hill based on a photograph that was not included in the Homicide File. ECF 151 at 21; *see also* 151-2 at 12. And, ECF 151-2 at 57 specifies that K.A. "ID's pix of Poopie," without any further information. Another document referenced "Pix," and suggests they were shown to L.S. and "Kim." *Id.* at 71. But, according to plaintiff, there is no formal documentation pertaining to an identification made by Mims. ECF 151 at 14.

As discussed earlier, when L.S. appeared before the Grand Jury on July 28, 1988, the prosecutor asked, ECF 151-14 at 18: "[O]n July 12th when you were here in this courthouse, you were shown a group of photographs . . . by the detectives, Detective Boone and Detective Davis, is that correct?" L.S. responded "Yes," and indicated that she picked out a photograph of "Tommy." *Id.* However, Johnson believes that L.S. "mixed up Mr. Johnson and Mr. Carroll." ECF 151 at 49 n.22.[20] Nevertheless, the Joint Petition states, ECF 151-30 at 6: "At no point . . . was a pre-trial identification procedure conducted or confirmatory picture of Jerome Johnson shown to [L.S.]."

### 3. Prosecution Reports, Indictments, and Johnson's Statement

On September 8, 1988, Hill, Dorsey, and Tommy were indicted on charges of murder with malice aforethought (First Count); unlawful use of a handgun in the commission of a felony or a crime of violence (Second Count); and unlawful carrying of a handgun (Third Count). *See* ECF

---

[20] The reference to July 12, 1988, may derive from the statement in Davis's July 19 Report that a photo of Tommy Carroll was taken at the Homicide Unit on July 12, 1988. *See* ECF 151-2 at 14.

151-18 at 2 (Hill Indictment), 6 (Tommy and Dorsey Indictment); *see id.* at 5, 8 (specifying date on which each indictment was filed).

During the pendency of the investigation, Det. Davis prepared "prosecution reports" for Dorsey and Tommy.  According to the deposition testimony of Col. Worley, a Rule 30(b)(6) designee for the BPD, a prosecution report is a document put together by "the lead detective" for the purpose of summarizing "the case to hand over to the prosecutor."  ECF 151-19 at 6.  The lead detective aims "to put in all the witnesses" and to "list[ ] the people," including "the BPD personnel who have taken statements."  *Id.*

With respect to Dorsey and Tommy, Det. Davis listed twelve witnesses, including L.S., Kim, Reid, Ofc. Owens, Ofc. McDonald, Mims, Det. Boone, and Det. Davis.  ECF 151-2 (Homicide File) at 9-10 ("Dorsey Prosecution Report," listing witnesses pertaining to Dorsey); *id.* at 11 ("Tommy Prosecution Report," incorporating the substance of the Dorsey Prosecution Report).  The Hill Prosecution Report (*id.* at 5-6) listed L.S., Kim, Reid, Ofc. Mays, Mims, McFadden, K.A., Gwendolyn Taylor, Det. Barlow, Det. Boone, and Det. Davis as potential witnesses.[21]

Plaintiff was arrested on October 24, 1988.  *See id.* at 20.[22]  Following his arrest, Johnson provided a statement to Det. Davis.  *Id.* at 42-49; *see* ECF 151-2 ("BPD Homicide File") at 42-49 ("Johnson Statement"); ECF 137-4 (same).  Det. Gerald Goldstein was present at the time.  *Id.* at 42.

---

[21] The Court was not provided with the first page of the Hill Prosecution Report.

[22] At the time of plaintiff's arrest, he was "incarcerated at BCJ under the name TROY SMITH for unrelated CDS/Handgun violations."  ECF 151-2 at 4; *id.* at 20 (specifying that "[o]n 10/24/88 [Johnson], was taken from Balto. City Jail and charged" with the instant offense).

In his Statement, Johnson disclaimed any involvement in Taylor's murder.  He stated that he was with his friend, Alvin Morgan, at the time.  *Id.*

In Johnson's telling, on the night of July 14, 1988, he "was sitting on Miss Irenes [sic] porch 3512 Lucille Ave."  *Id.* at 46.  "Miss Irene" refers to Irene Morgan, the mother of Alvin Morgan.  *See* ECF 151-2 at 46; ECF 151-6 (Alvin Morgan Dep.) at 3.  At an unspecified time, Johnson "wanted a soda and started walking toward the Night Owl."  ECF 151-2 at 46.  However, according to Johnson, he "never crossed over Reisterstown Rd."  *Id.*

On the way, Johnson "saw Poopie" (*i.e.*, Alvin Hill); "Ornie" (*i.e.*, Ornie Carroll); "Tommy" (*i.e.*, Thomas Carroll); "Butt" (*i.e.*, Reginald Dorsey); and K.A., who were "cross[ing] over Reisterstown Rd. and onto the basketball court."  *Id.*[23]   Johnson continued, *id.*: "Alvin Morgan . . . saw me on the corner and told me to go back up the street.  He told me he didn't want me to get involved in that[.]"  Johnson explained that Tommy and Ornie intended to "beat up" Taylor because Taylor "burned some Jamaicans and the Jamaicans went to Tommys [sic] house and threatened to shoot up Tommy's house."  And, both Poopie and Ornie were dressed "in all black which meant they were going to fight."  *Id.*

Johnson claimed that he and Morgan "went back to Miss Irenes [sic] porch[.]"  *Id.*  But, "just before [Johnson] got to Miss Irenes [sic] porch," he "heard about 3 or 4 shots . . . ."  ECF 151-2 at 46.  Then, Johnson saw "Officer Steve" (*i.e.*, Aaron Steve Owens) "chase 2 guys," identified by Johnson as Tommy and Ornie, "up the alley behind Tommys [sic] house."  *Id.*[24]; *see also* ECF 151-20 (Owens Declaration), ¶ 5 (affirming that "after a shooting at the Nite Owl Tavern

---

[23] I generally refer to individuals by their last name.  To avoid confusion, however, I shall refer to Thomas Carroll as "Tommy" and Ornie Carroll as "Ornie."

[24] Johnson referred to Owens by his middle name, Steve.  *See* ECF 151-2 at 47; ECF 151-7 (Johnson Dep.) at 4.

. . . [Owens] saw to [sic] black men running away from the scene of the shooting" and he "chased them to the house at 3610 Lucille Avenue and saw them run inside the back door.").  At the same time, a police car "drove . . . straight down Lucille."  ECF 151-2 at 47.  Johnson saw Tommy and Ornie "run out of the front of their house across Lucille to another house across the street from Tommy's house."  *Id.*

Officer Owens then "came out the alley next to Butts [sic] house" and spoke with Johnson. *Id.*  Johnson, who knew Officer Owens from school, told Officer Owens that he had "heard some shots."  *Id.*; *see* ECF 151-7 (Johnson Dep.) at 4.  According to Johnson, he "then went up to Miss Irenes [sic] porch with Alvin and his brother Maurice."  ECF 151-2 at 47.

"Later that night, [Johnson] saw Tommy and Ornie at the house they ran into."  *Id.* According to Johnson, "Tommy asked him to drive him to his girlfriend Debbie's house near Pimlico Rd."  *Id.*  While "[o]n the way, Tommy told [Johnson] that they had Hooper on the side of the bar. Ornie pulled out a gun pointed it at Hooper but it didn't shoot."  *Id.*  Taylor then "ran into the bar" and Hill "chase[d] him in the bar," armed with a ".38 revolver."  *Id.*  According to Johnson, Tommy also "said Hooper grabbed a [sic] old man around the neck and Poopie hit Hooper in the head with the gun and Hooper let the hostage go and Poopie shot him in the chest."  *Id.*  He added, *id.*:  "Hooper fell down and Poopie stood over him and shot Hooper several times to the head."  Johnson added that after he "dropped Tommy off" he saw Poopie, and "Poopie told [Johnson] he shot Hooper because Hooper was reaching for the gun in the bar."  *Id.* at 47.

Johnson was asked what led to the shooting.  *Id.* at 8.  He said, *id.*:  "Hooper supposed to have taken some money from some Jamaicans for drugs.  Hooper . . . took the Jamaicans' money . . . .  The Jamaicans got made and threatened to shoot Tommys [sic] house

up . . . . Tommy's mother went and gave the Jamaicans their money.  That's why Tommy and Ornie were after Hooper."

Johnson concluded his statement, attesting, ECF 151-2 at 48: "Everything I said is true, I will take a lie detector test, I wasn't there when Hooper was killed."

Plaintiff claims that although the Johnson Statement implicated Ornie Carroll in Taylor's murder, Det. Davis did not investigate Ornie as a potential suspect.  ECF 151 at 18-19; *see* ECF 151-11 (Davis Dep.) at 22 (stating that Davis did not investigate Ornie for Taylor's murder). Further, he asserts that Det. Davis did not investigate whether Alvin Morgan could provide an alibi for Johnson.  *See* ECF 151-11 at 20 (stating that he could not recall "writ[ing] any reports investigating the credibility of Alvin Morgan as an alibi witness" or "doing any investigation about Alvin Morgan").  And, former BPD Officer Owens averred, ECF 151-20 (Owens Decl.), ¶ 10: "I was never contacted by any of the homicide detectives assigned to the investigation of the murder at the Nite Owl."

Johnson was indicted on November 10, 1988.  ECF 152-13 at 12.[25]  On November 23, 1988, Det. Davis drafted a prosecution report pertaining to Johnson.  ECF 151-2 at 4 ("Johnson Prosecution Report").   It indicated that plaintiff was charged with "1st Degree Murder/Felony Handgun."  The Johnson Prosecution Report also listed Hill, Dorsey, and Tommy as codefendants and incorporated the details of their prosecution reports.  *Id.*

Hill's case was subsequently consolidated for trial with the cases of Johnson, Dorsey, and Tommy.  *See* ECF 151-1; ECF 138-14 at 6; *see also* ECF 152-13 at 12.

_____

[25] Despite the volume of evidence submitted to the Court, neither side has provided the Court with a copy of the indictment.

### B.  Pretrial Discovery

On December 29, 1988, attorney M. Gordon Tayback, a private practioner, was appointed to represent Johnson.  ECF 151-25 at 2-3 (Tayback Appointment Letter).[26]  The SAO received a "Demand for Discovery" from Tayback on February 15, 1989.  ECF 151-26 (the "Demand Letter").  Specifically, Tayback sought "information and exhibits [that] may be material to the preparation of [Johnson's] defense . . . ."  *Id.* at 2.  He asked the SAO to produce, *inter alia*, "any material or information which tends to negate the guilt of the Defendant as to the offense charged or would tend to reduce the punishment therefor, or would be of assistance in impeaching the credibility of a State witness," including copies of all statements made by Johnson, codefendants, or any witnesses whom the State intended to call at trial.  *Id.* at 2-3.

Det. Davis claimed that as a matter of practice, he made "all the information that's in [each homicide file]" available to the prosecutor.  ECF 138-5 at 6.  But, plaintiff asserts, and defendant does not dispute, that there is no evidence reflecting a pretrial conference between Det. Davis and the prosecutor in Johnson's case.  ECF 151 at 21-22.  In particular, plaintiff observes that the "Case Preparation Review List, on which detectives were supposed to document the conference with the Assistant State's Attorney is blank."  ECF 151 at 21-22; *see* ECF 151-2 at 79 (blank Case Preparation Review List).[27]

Albert Phillips, a prosecutor in the State's Attorney's Office for Baltimore City at the time, handled the prosecutions of Johnson, Hill, Dorsey, and Tommy.  *See* ECF 138-14 (Phillips Dep.) at 6.  At his deposition, Phillips testified that he had "[v]ery little" recollection of the trial.  *Id.* at

---

[26] Tayback was appointed pursuant to "Article 27A, Section 6 of the [Maryland] Code, and the rules adopted by the Public Defender . . . ."  ECF 151-25 at 2.  As noted, Tayback has since passed away.  ECF 138-1 at 25; ECF 151 at 27 n.8.

[27] It seems unlikely that the prosecutor would have proceeded to trial in a murder case without conferring with the lead detective.

8.  But, he claimed that it was his general practice to "review[ ] the homicide detective's book and [make] sure [he] had everything that was in their book."  *Id.*  Further, Phillips asserted, *id.*: "It was also my practice to order the full Baltimore City complaint file, complaint—the CC, the criminal complaint number, that was assigned to the case and I would order all the documents that were filed under that complaint number in Central Records."  And, it was Phillips's custom to copy "[t]he vast majority . . . of documents in the BPD Homicide Unit's file[.]"  *Id.* at 9-10.

Moreover, Phillips stated that he maintained an "open file policy."  This meant, said Phillips, that "members of the Office of the Public Defender or private defense bar were permitted to inspect, review, and/or copy any document in [his] SAO file, including but not limited to all police reports and witness statements."  ECF 151-27 (Phillips Dep.) at 3, 4.

### C. Trial & Sentencing

Trial began on March 8, 1989, before a jury, and concluded on March 15, 1989.  ECF 152-13 at 12; ECF 151-29 at 2 (identifying the proceeding as a jury trial).[28] Judge Joseph Pines presided at trial.  *See* ECF 138-2 at 2.  The parties have only provided the Court with excerpts of the trial transcript.  The excerpts include the testimony of K.A., L.S., Jung Kim, Marvin Reid, Officer Mays, and Detective Davis.[29]

At trial, Tommy Carroll moved to suppress L.S.'s photo identification of him, on the ground that Det. Davis used only a single photograph, rather than an array, to secure the identification.  ECF 138-2 at 28-29.  The court held an evidentiary hearing, at which Det. Davis

---

[28] The CIU Memorandum includes a summary of the witnesses called on each day of trial, as well as an overview of the testimony of each witness.  ECF 152-13 at 13-16.  Neither side has challenged the accuracy of this portion of the CIU Memorandum.

[29] According to the CIU Memorandum, the medical examiner, Dr. Charles Paul Kokes, also testified.  ECF 152-13 at 13-14.

testified that he showed L.S. the photograph "after getting complete descriptions, addresses, anything that she had on the subjects that [the officers] were looking for." *Id.* at 26. Judge Pines subsequently denied the motion. *See* ECF 138-2 at 30 (orally denying the suppression motion on the ground that "the photograph was shown by the police was merely to ascertain whether the person who was generally described and having been known by the witness over a period of time").

K.A. testified on March 9, 1989. ECF 138-2 at 33-87. He stated that he saw Dorsey, Hill, Johnson, and Taylor at the basketball court near the Night Owl on July 14, 1988, and they "were just discussing something . . . ." *Id.* at 44; *see also id.* at 45. At the time, he had just "come out of the bar," *i.e.*, the Night Owl. *Id.* at 45. K.A. also testified that he had seen a person "coming out of the hole of the basketball court." *Id.* at 50. When asked who the person was, he answered: "I believe it was Jerome Johnson." *Id.*; *see also id*. at 69.

K.A. explained that he went to the Night Owl to get food, and when he came out, he saw the individuals identified above, and he also saw that Hill had a gun behind his back. *Id.* at 46-47. ASA Phillips asked: "How far away was [Johnson] when you observed Mr. Hill with the gun?" *Id.* K.A. answered: "Next to Mr. Hill." *Id.* at 50.

According to K.A., Butt (*i.e.*, Dorsey) grabbed Taylor by the shirt. *Id.* at 50-52. Taylor tried to run, and fled to the bar. *Id.* at 52. K.A. claimed that Hill subsequently shot Taylor. *Id.* at 52-53.

As mentioned, K.A. had said in his pretrial statement to the BPD on August 8, 1988, that Johnson was "on the corner of Reisterstown & Lucille" when Taylor was confronted on the basketball court. ECF 138-13 at 2.[30] On cross-examination, Tayback vigorously pressed K.A. on

---

[30] As noted earlier, in his pretrial statement, K.A. also provided information about a drug debt that Taylor owed to Johnson. At trial, however, the State did not elicit testimony about the alleged debt.

the discrepancy. ECF 138-2 at 55-87. K.A. responded, in essence, by indicating that his prior statement meant only to suggest that he had previously noticed Johnson standing at the intersection but Johnson could have walked down to the basketball court when K.A. was inside the Night Owl. *Id.* at 63.

In particular, Tayback asked K.A.: "Now, today in court, you have told the ladies and gentlemen of the jury that you saw my client, Jerome Lamont Johnson, with Alvin Hill and Reginald Dorsey at the basketball court near the Nite Owl Bar?" *Id.* K.A. responded: "Now, if you remember, when I got down there, when I walked past the corner, Lamont was standing on the corner. Who is to say he didn't walk behind me? He is on the corner, when I got back up there, he wasn't there, and there was another person out at this shooting." *Id.*

K.A. then used a diagram to indicate the location of Johnson, Hill, Thomas Carroll, and Taylor at the time of the shooting. Tayback said: "You have indicated to the ladies and gentlemen of the jury that the place you saw Jerome Lamont Johnson was on one corner of Lucille Avenue, which is Reisterstown Road." K.A. answered: "That's right." *Id.* ECF 138-2 at 63.

Nevertheless, K.A. was steadfast in his claim that, when he came out of the Night Owl, he saw Taylor, Hill, Johnson, and Dorsey. *Id.* at 65. Tayback asked, *id.*: "So [Johnson] is no longer on the corner of Lucille and Reisterstown?" K.A. answered, *id.*: "No, he is not." He also recalled that there was "fussing" outside the bar. *Id.* at 66. And, he heard Hooper state, "I already talked that out. I already talked to Lamont." *Id.* The court sustained an objection on hearsay grounds. But, K.A. then said, without objection or a motion to strike: "That is what I heard." *Id.*

Tayback continued, *id.* at 67: "You say some people there, Hooper, Butt and Alvin Hill, is that what you are saying?" K.A. responded, *id.*: "And Jerome Johnson." Tayback then asked, *id.*: "Now, you are telling us that you also saw Jerome Johnson there?" K.A. answered, *id.*: "Yes."

-37-

K.A. explained that when Det. Davis questioned him on August 8, 1988, he said that when he was coming from the Night Owl, he saw "Lamont on the corner." *Id.* at 73.  The following exchange ensued, *id.* at 73-74,:

> Q:      Now, which is true? You said on August 8th, 1988, what you were saying is true and accurate.  You are now stating under oath something entirely different, which is under oath.  You have told a lie one place.
>
> PHILLIPS:      Objection.
>
> COURT:      Objection sustained.  Sustained.
>
> Q:      You have told two different things.
>
> PHILLIPS:      Objection.
>
> COURT:      Counsel, ask him questions.
>
> Q:      Do you agree, [K.A.], when you say Lamont was standing on the corner of Reisterstown and Lucille at the time you are talking about, not before, but right at this time when the other people were there and the handgun is produced, that is different than what you have said in court today?
>
> A:      When Lamont was standing on the corner and when Alvin Hill and Reginald Dorsey was discussing, Lamont walked over to them.  The time I said that, ain't necessary I'm standing there, I am looking there at them and I do see Jerome Johnson right there.
>
> Q:      Let's go back then. [reading K.A.'s prior Statement] I told Poopie that that was not necessary, and they should talk it out.
>
> A:      Right.
>
> Q:      So, you like that part, that part is accurate?
>
> A:      That part is what I said.
>
> Q:      Okay.  Right after that, in the very next sentence is when you said that at that time, at that point, Lamont was standing on the corner of Reisterstown and Lucille.
>
> A:      I don't recall that.

K.A. also confirmed that Hooper broke away from Butt, ran into the bar, Poopie and Butt ran to the bar, and Poopie fired the gun.  *Id.*  at 74-75.  K.A. said, "Yes, gunshots were going off. You hear gunshots, you don't stand around to find out where the bullets are going.  One gunshot is enough for me, so I got out."  *Id.* at 75.

In subsequent questioning by "Ms. Phillips," K.A. was asked if he saw Hill holding a gun that misfired.  *Id.* at 99.  K.A. responded, *id.*: "I don't remember."  K.A. heard "a girl screaming." *Id.* at 94. [31]

Notably, K.A. testified that he did not recall Tommy or Orni being at the scene.  *Id.* at 76, 77, 79.  But, he did recall the others he had named. *Id.* at 76.  Tayback asked: "Who had the gun?" *Id.*  K.A. answered: "Alvin Hill."  *Id.*  Tayback then asked: "Did you see anybody else have any other guns?" *Id.* K.A. answered: "Not that I know of." *Id.*

Again, Tayback reviewed K.A.'s claim as to who he saw at the time.  *Id.* at 76.  K.A. reiterated that when he came out of the Night Owl, he saw Hill with a gun behind his back, as well as Johnson, Dorsey, and Taylor.  *Id.*

L.S. testified at trial on March 13, 1989. ECF 137-23 at 2.  She stated that she went to the Night Owl on July 14, 1988, along with her friend, "Tanya Lasenben [sic]", and her "mother's friend," a man named "Quinton" whose last name she did not know.  *Id.* at 29-30; *see id.* at 3; ECF 152-10 at 2 (indicating the correct spelling of Tanya's surname as "Lazenby").  L.S. indicated that both Lazenby and Quinton "would have seen what [L.S.] saw."  ECF 137-23 at 30.  Further, L.S. testified that while on her way to the Night Owl she saw Hill talking to her cousin.  *Id.* at 3-4.  She made in-court identifications of Hill, Dorsey, Tommy, and Johnson, along with "another boy," and

---

[31] Presumably, L.S. was the girl who was screaming.

said that each was standing in front of the Night Owl at the time Taylor was confronted. *Id.* at 4-7.

According to L.S., Hill pulled out a gun from behind his back. ECF 151-31 at 3-4; *see also* 137-23 at 7. L.S. recalled that Hill "shot it twice," as it was pointed "toward the ground," and "nothing happen[ed]." ECF 151-31 at 4-5. She claimed that when the gun misfired Johnson "handed [Hill] another gun." *Id.* at 5. Specifically, L.S. claimed that Johnson "reach[ed] down into his pants" and pulled out a gun, which he handed to Hill. *Id.* at 6. Hill "grabbed" the gun and then Hill chased Taylor into the Night Owl. *Id.* at 7-9. In other words, Johnson handed Hill a gun only after the first gun misfired.

However, according to the July 19 Report, L.S. had said that Johnson handed Hill a gun that misfired. *See* ECF 152-2 at 13. After that gun misfired, L.S. and Taylor ran into the Night Owl Bar, and all five suspects followed. *Id.* The July 19 Report also stated that L.S. "then saw Poopie holding a large black handgun." *Id.* In other words, the gun provided by Johnson was the first gun, and it misfired.

Moreover, as noted, in L.S.'s Grand Jury testimony on July 28, 1988 (ECF 143), L.S. said that Johnson handed a gun to Hill and the victim ran into the store. *Id.* at 3, 4. Hill clicked the gun twice but "it wouldn't shoot." *Id.* at 4. Then, Hill used a "bigger" gun to shoot the victim. *Id.* at 5. Thus, the Grand Jury account was consistent with the July 19 Report in this respect: L.S. said Johnson provided the first gun, and it misfired.

Tayback cross-examined L.S. at length about the alleged discrepancies between her Grand Jury testimony and her trial testimony. ECF 151-31 at 9-59; *see also* ECF 137-23 at 27-77. Tayback did not pose questions in connection with Officer Jones's report. Nor did he question L.S. about the content of the July 19 Report. Johnson asserts that because Tayback did not use

these items to cross-examine L.S. at trial, it indicates that Tayback was unaware of the Jones

Report and the July 19 Report.  ECF 151 at 36.

At the close of cross-examination, Tayback indicated that he would ask for a "missing

witness instruction," because he had not previously heard of a witness named Lazenby.  *Id.* at 79.

Although it is not made clear by the parties' exhibits, it appears that Judge Pines did not provide a

jury instruction to this effect.  *See* ECF 152-19 at 14 (noting that, on appeal, Johnson claimed the

trial court erred by failing to give a missing witness instruction).[32]

Plaintiff notes (ECF 151 at 24) that, until trial, Phillips was also unaware that L.S. went to

the Night Owl with Lazenby and Quinton.  *See* 151-29 at 3 (Phillips confirming on March 15,

1989, that "Tanya and Quentin [sic] were first made known to [him] during the course of the day

before trial ended, [*i.e.*] the day before yesterday.").[33]

 Det. Davis testified on March 14, 1989.  *See* ECF 151-33 at 2-8.  He did not reference

L.S.'s statement to Jones on July 14, 1988.  But, he indicated that he interviewed L.S. on July 19,

1988.  ECF 151 at 23; ECF 151-33 at 3.  Det. Davis recalled, erroneously, that L.S. appeared before

the Grand Jury on that date.  ECF 151-33 at 3.  He also indicated that, to his knowledge, L.S. did

not mention any "other individuals who had gone with her to the Nite Owl Tavern[.]"  ECF 151-

33 at 7.  Further, Det. Davis testified that he met with L.S. "[n]umerous times" in the weeks leading

---

[32] ECF 152-19 contains what plaintiff describes as "Front Matter of Binder Nancy Forster Presented to the SAO."  It pertains to the material that Ms. Forster provided to the SAO in an effort to prompt a reinvestigation of plaintiff's convictions.  *See* ECF 151-1 at 16 (describing Forster's meeting with CIU).

[33] As noted earlier, at L.S.'s Grand Jury appearance, she testified that her friend and her mother's friend were at her home.  ECF 151-14 at 6.  She was never asked if anyone went with her to the Night Owl.  The police attempted to interview L.S.'s friend, Tanya Lazenby, but Lazenby's mother would not permit the police to do so.  ECF 138-15 at 17.  It is not apparent as to how the police obtained Lazenby's name.

up to trial, to make arrangements for court but not about her testimony.  *Id.* at 5.  On cross-examination, Tayback elicited from Davis that he could not "reconcile the information [he] received" from L.S. and K.A. as to whether Johnson was present at the Night Owl.  *Id.* at 6, 7.  He also said that he was never able to locate Orni Carroll.  *Id.* at 7.

No defense was presented.  ECF 152-11 at 3; ECF 151 at 16.  On March 14, 1989, the jury found Johnson, Hill, and Dorsey guilty of murder in the first degree and use of a handgun in the commission of a crime of violence.   ECF 152-13 at 12; *see also* ECF 151-29 at 5-6 (excerpt of trial testimony of foreman reading verdicts).  Tommy was acquitted of all charges.  ECF 152-13 at 12; *see* ECF 151-29 at 6.

On June 2, 1989, Tayback moved for a new trial.  ECF 152-13 at 12.  Judge Pines denied the motion on the same date.  *Id.* at 13.

Sentencing was held on June 2, 1989.  ECF 151-15 at 2 (specifying date).  At sentencing, Johnson asserted his innocence, stating, *id.* at 5: "I would like to tell everything that happened that night.  I'm an innocent man.  And I was standing on the corner of Lucille and Reisterstown Road with Alvin Morgan. . . . . ."

As mentioned, Judge Pines sentenced Johnson to life in prison with respect to the offense of murder in the first degree, and to a consecutive term of twenty years' imprisonment for the handgun offense.  *Id.* at 6; *see* ECF 152-13 at 13 (specifying sentence).  Through counsel, Johnson noted an appeal.  ECF 152-11.  He argued, *inter alia*, that he was denied a fair trial because Phillips told the jury in his opening argument that the shooting was drug-related, and also because the trial court erred by refusing to instruct the jury on a missing witness.  ECF 152-19 at 14.

On March 5, 1990, the Maryland Court of Special Appeals affirmed the convictions in an unpublished opinion.  ECF 152-19 at 14; *see* ECF 152-11.  Johnson's petition for a writ of

-42-

certiorari to the Maryland Court of Appeals was denied on June 29, 1990.  ECF 152-19 at 14; *see* ECF 152-11.

### D.  Post-Conviction Proceedings

During his incarceration, Johnson lodged several collateral challenges to his convictions and sentences.  *See* ECF 152-19 at 14-23 (summarizing the array of post-conviction filings advanced by Johnson); ECF 137-9 at 3-9 (same).

On September 23, 1992, in the Circuit Court for Baltimore City, Johnson, through counsel, Alan L. Cohen, filed a petition for writ of habeas corpus (the "1992 Petition").  Johnson asserted twenty grounds for relief.  ECF 152-19 at 14; *see* ECF 152-11 at 2.

Judge Hilary Caplan held a hearing on May 4, 1993.  ECF 152-15 at 2.  McFadden testified at the hearing.  *Id.* at 3-13.  She stated that she was with Johnson and Morgan during the early morning hours of July 14, 1988.  *See id.* at 5-7.  According to McFadden, she "was sitting on the steps" while Johnson "was standing across the street talking to someone," and she "found out later" that the person "was [Morgan]."  *Id.* at 6.   McFadden clarified that "when [she] heard the shots, [she] saw Mr. Johnson and Mr. Morgan across the street from [her.]"  ECF 152-15 at 6.[34]

Judge Caplan issued a "Memorandum Decision and Order" on July 14, 1993, denying the 1992 Petition.  ECF 152-11 at 1 (underlining in original).  Judge Caplan observed, *id.* at 8: "The State's case against Petitioner, by objective standards, was not particularly strong."  Nonetheless, Judge Caplan rejected Johnson's various challenges.  *Id.* at 11.

---

[34]  McFadden initially testified that Johnson had been talking to Hill, but later corrected herself. *See* ECF 152-15 at 6.

On April 24, 1997, Johnson, through new counsel, George Epstein, filed a post-conviction petition in the Circuit Court for Baltimore City.  ECF 152-1 (the "1997 Petition").[35]  Of import here, the 1997 Petition advised that plaintiff had obtained newly discovered evidence that showed his innocence.  *Id.* at 3, ₱ 7.  In particular, plaintiff directed the circuit court's attention to sworn affidavits from Alvin Morgan (*id.* at 9-10) and an individual named Paul Burton.  *Id.* at 7-8. According to the 1997 Petition, these affidavits established Johnson's innocence and warranted his release from prison.  *Id.* at 4-6, ₱₱ 8-10.

In the Morgan Affidavit, dated April 22, 1997 (ECF 152-1 at 9-10), Morgan asserted, *id.* at 9, ₱ 3: "During the early morning hours of July 14, 1988, I encountered Jerome Johnson at the corner of Lucille Avenue and Reisterstown Road."  Morgan averred that he and Johnson spoke "for approximately 15 or 20 minutes."  *Id.*  Morgan continued, *id.*:

> Suddenly, a young man whom I did not know ran across Reisterstown Road, running slowly as if he were tired.  He was followed by two or more young men I did not know, who appeared to be chasing him.  Shortly afterward, four or five more young people I did not know trotted across Reisterstown Road.  Mr. Johnson greeted them.  These people all ran in the direction of a bar at the corner of Woodland Avenue and Reisterstown Road.  They turned the corner onto Woodland Avenue and disappeared from sight.

Morgan maintained: "Moments later, I heard four or five popping sounds."  ECF 152-1 at 9, ₱ 4.  Johnson "wanted to go see what was going on," but Morgan "advised against it, and [they] remained where [they] were."  *Id.*  Thereafter, a "small crowd of people . . . came from Woodland Avenue toward us."  *Id.*

Additionally, Morgan said, *id.*: "An unmarked police car pulled up and stopped and a plainclothes police officer jumped out. The crowd dispersed and several of its members ran down

---

[35]  Epstein passed away in 2002.  *See* Obituaries, Balt. Sun (Jan. 11, 2002), https://www.baltimoresun.com/news/bs-xpm-2002-01-11-0201110403- story.html

an alley, with the police officer chasing them." *Id.*  Morgan added: "[T]he plainclothes police officer who had run down the alley emerged . . . He came over to speak to us." *Id.* at 10, ¶ 5. Johnson addressed the officer as Steve, *id.*, and the officer "asked if [they] had heard the shots just now." *Id.*  Morgan stated that "[a] girl nearby said they were firecrackers." *Id.*

After talking with the officer, Morgan and Johnson "left and went to [Morgan's] mother's house at 3512 Lucille Avenue." *Id.* ¶ 6.  Morgan said that "an ambulance went by, and shortly afterward someone walking by told [them] that somebody had been killed." *Id.*

Morgan averred, *id.* ¶ 7: "I did not testify at Mr. Johnson's trial because I had outstanding arrest warrants at the time and did not want to be arrested."

In an Affidavit dated April 15, 1997, Burton averred, in part, ECF 152-1 at 7-8, ¶¶ 2-7:

> 2.    I am presently serving a sentence of 40 years in the Maryland Division of Corrections, dating from June 16, 1994.  At the present time, I am incarcerated in the Maryland House of Corrections Annex (hereinafter "Annex") in Jessup, Maryland.

> 3.    Sometime after midnight on July 14, 1988, the automobile I was operating was involved in a minor traffic accident with another vehicle at the intersection of Reisterstown Road and Woodland Avenue.[36]

> 4.    While I was standing outside of my automobile at that location, I observed a friend of mine named "Aaron", whose last name I did not know but who I also knew as "Hooper", involved in an argument on the nearby basketball court with four or five men and a female I did not know.  I heard him say something to the effect of, "It doesn't have to be like that."

> 5.    I walked over to Aaron and asked what was going on.  One of the men he was arguing with, a light-skinned man I heard Aaron call "Poopie", said "This motherfucker wants some trouble."  That man then pulled out a handgun and pointed it at Aaron.  Aaron hit the gun out of his hand, and I picked it up.  "Poopie" said "Give me my shit."  Because I did not know if the gun was loaded or operable or if any of the other people in the group was armed, I handed the gun back to him. Aaron then started running and went through a hole in the fence, with the men chasing him.  I did not see what happened after that, but I heard the following day that Aaron had been shot.

---

[36] Woodland Avenue is approximately one block away from the Night Owl.

      6.     At the time of this incident, I did not know Jerome Johnson.  I met him while we were both serving our sentences at the Annex.  Mr. Johnson was not present during this incident described above.

      7.     When I learned that Mr. Johnson had been convicted in connection with the incident described above, I felt bad, because I knew that he was not involved, and that in fact I was the person who had handed "Poopie" a gun (which he had dropped) during the incident.  That is why I told him the truth about the incident.  Prior to my meeting him at the Annex, we did not know each other or about each other, and there was no way he could have learned about my role in the incident or produced me as a witness at his trial.

Critically, both sides agree that the information contained within the Burton Affidavit is false because Burton was incarcerated at the time of Taylor's murder and thus was not at the scene.  ECF 137 at 6; ECF 152 at 9-15.  Indeed, prison records reflect that Burton was incarcerated at the Maryland Correctional Institute—Hagerstown between March 1987 and April 1989.  *See* ECF 137-6 (Burton's MCI records); *see also* ECF 137-1 (Johnson Dep.) at 62 (stating that he now understood that Burton was incarcerated in 1988).  ECF 137-7 (Burton Dep.) at 16 (confirming that he was in prison on the night of Taylor's murder).  The parties dispute, however, the means by which Johnson obtained the Burton Affidavit and whether and when he knew of the falsity of the content.  This matter is discussed, *infra*.

On October 8, 1997, Judge David Mitchell denied the 1997 Petition, without a hearing.  *See* ECF 137-11 at 20-23.  He found that Johnson had failed to "state the grounds he requested relief on for both of his post-conviction hearings, which is required under [Maryland] Rule 15-302(b)(2)."  *Id.* at 22.

Thereafter, Johnson obtained a sworn affidavit from Alvin Hill, ECF 137-9 at 19-20 ("Hill Affidavit"), which was signed on May 23, 2000.  *Id.* at 20.  In relevant part, Hill stated, *id.* at 19, ⁋ 3:

Some time after midnight around 12:30 a.m. Me and a couple of guys was talking to the victim in this case on the basket ball [sic] Court. I then observed a guy who I did not know walk over towards us and he said, something to Aaron, like what's happening. I told the guy to mind his business because he does not have any thing to do with this. Then I pulled the gun out and pointed it at Aaron, and then Aaron knock [sic] the gun out of my hand. Then the guy who I have came [sic] to learn the name of was Paul Burton, pick up the gun. Then I told him to give me my fucking gun back . . . . Then Paul Burton gave me the gun back. Then Aaron, ran around the corner. Then we chased him. Mr. Johnson, was not present during the incident described above. I wanted to testify at trial and Mr. Johnson's Post Conviction hearing but I was advised by my Counselor not to testify at no! [sic] time in this case. This is why I am coming forth now with this statement because I know Mr. Johnson's innocence and that he had nothing to do with this crime. As much as I may want to help him at trial. I had to listen to the advice of my Counselor because at that time. The Counselor is the one who is controlling the situation . . . .

The parties agree that the Hill Affidavit contains statements that are untrue. ECF 137 at 7-8; ECF 152 at 15. In particular, the Hill Affidavit falsely states that Burton was present at the crime scene and handed a gun to Hill. ECF 137-9 at 19.

In December 1993, Johnson filed a Writ of Habeas Corpus in federal court, MJG-93-4098, pursuant to 28 U.S.C. § 2244. It is case MJG-93-4098. ECF 137-11 at 41. Judge Marvin J. Garbis denied the petition on April 5, 1995. *Id.*[37]

Thereafter, on May 23, 2000, Johnson, then self-represented, sought leave from the Fourth Circuit to file a successive habeas petition. ECF 137-11 at 3-7. Johnson included a proposed petition for habeas corpus. *Id.* at 40-46 (the "2000 Petition"). He appended to his submission a copy of the Burton Affidavit, the Morgan Affidavit, and the Hill Affidavit. *Id.* at 10, 14. His submission was filed under penalty of perjury. *Id.* at 46. The Fourth Circuit denied the request by Order of June 26, 2000. *Id.* at 47.

---

[37] The case was initially assigned to Judge Herbert Murray. It was reassigned to Judge Marvin Garbis on October 28, 1994. *See* Docket.

On April 14, 2011, plaintiff, through a new lawyer, Gary Bair, filed a Petition for Writ of Actual Innocence in the Circuit Court for Baltimore City.  ECF 137-9 (the "2011 Petition").[38]  The Hill Affidavit, the Burton Affidavit, and the Morgan Affidavit were appended to the 2011 Petition.  *See* ECF 151-9 at 21-26.   The 2011 Petition was grounded on the claim that the Hill Affidavit corroborated the Burton Affidavit and showed that Johnson was not at the scene of the crime at the time of Taylor's murder.  *See* ECF 137-9 at 12-15.

Initially, the circuit court denied the 2011 Petition without a hearing.  *Id.* at 8.[39]  But, on June 5, 2014, the Maryland Court of Special Appeals vacated the order of the circuit court and remanded the 2011 Petition to the circuit court for an evidentiary hearing.  *See* ECF 137-12 (unreported opinion of the Maryland Court of Special Appeals) at 2.  The mandate issued on July 7, 2014.  *Id.*

On May 18, 2015, Johnson, through new counsel, Nancy Forster, requested a hearing before the Circuit Court for Baltimore City with respect to the 2011 Petition.  ECF 137-15.  It was rescheduled several times in the following months for unspecified reasons.  ECF 137 at 10.  Then, on June 30, 2016, Forster filed writs to secure the appearance of Hill and Burton, who were both incarcerated, for a hearing scheduled on July 26, 2016.  *See* ECF 137-18.

The hearing was subsequently continued through December 6, 2016.  On that date, plaintiff withdrew the 2011 Petition.  *See* ECF 137-13 ("Motion To Withdraw Petition Without Prejudice").  Forster indicated that she sought to withdraw the 2011 Petition in light of the fact that she had been

---

[38] Bair later became a judge of the Circuit Court for Montgomery County.  He served in that capacity from January 2012 until his retirement in November 2020.  See *Former Judges*, MONTGOMERY                  CTY.                  CIRCUIT                  COURT, https://msa.maryland.gov/msa/mdmanual/31cc/former/html/msa11501.html (last accessed Aug. 15, 2022).

[39] To my knowledge, the record does not contain the name of the circuit court judge.

"made aware of more information that requires further investigation." *Id.* ⁋ 4. Thus, "out of fairness to all parties," Forster asked the court to permit Johnson to "withdraw the pending Petition for Writ of Actual Innocence without prejudice so that undersigned's investigation into all matters pertinent to the petition may be completed before refiling the petition and asking for a hearing date." *Id.* ⁋ 5.

In the interim, on an unspecified date prior to July 2012, while Johnson was reviewing his parole file, Johnson claims to have discovered the Jones Report. ECF 151-7 at 6-7. Based on the information contained within the Jones Report, Johnson, then represented by Rachel Kamins, filed another Petition for Writ of Actual Innocence in the Circuit Court for Baltimore City ("2012 Petition"). He argued that the failure to disclose the Jones Report amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See* ECF 152-19 at 18; *see also* ECF 152-7 (excerpts of the 2012 Petition).

On December 4, 2012, Baltimore City Circuit Court Judge M. Brooke Murdock held a hearing regarding the 2012 Petition. At the hearing, Tayback, Johnson's trial attorney, "testified that he did not remember seeing or receiving the [Jones Report] before Johnson's trial." ECF 137-16 (Maryland Court of Special Appeals Opinion) at 8; *see also* ECF 151-36 (Tayback testimony, Dec. 4, 2012) at 4-6. Tayback said, ECF 151-36 at 6: "I think it's clear that had the document been produced, I would have used it because I think that document is contrary to the State's theory of the case." He explained, *id.*: "I think the State's theory of the case was that Mr. Johnson was one of the others, rather than the actual perpetrator." As the Maryland Court of Special Appeals put it, Tayback stated that he would have used the Jones Report "'for impeachment purposes," as

that was "exactly what its value would have been to [him] as the Defense Attorney."  ECF 137-16 at 8.[40]

Notably, Tayback acknowledged that the Jones Report was "not necessarily a document that will be produced to the Defense Attorney.  That is the work product" of the police officer. ECF 151-36 at 5.  However, he claimed that if it is potentially exculpatory, then "the State could produce it . . . ." Id.[41]

Phillips, the prosecutor, also testified at the hearing.  He said that he "can't recall" whether the Jones Report was in the Homicide File, but "if it was in the homicide file, [he] knew about it, [he] had copies of it."  ECF 151-36 at 8.  However, he added that handwritten notes of a detective are "not in the file."  Id. at 9.

Judge Murdock denied the 2012 Petition on January 17, 2013.  See ECF 137-15 (Memorandum Opinion and Order).  She explained, id. at 7: "Petitioner's proffered newly discovered evidence is not exculpatory . . . as it does not tend to prove or disprove Petitioner's guilt or innocence."  Referring to L.S.'s statement as set forth in the Jones Report, Judge Murdock

---

[40] One of plaintiff's experts, Brian J. Murphy, Esquire, described Mr. Tayback as an experienced and "talented trial lawyer" who was "thorough in his pretrial preparation."  ECF 151-32 (Murphy Report) at 4.  He opined that Tayback "would have used the July 14, 1988 report and the July 19, 1988 [Report] at trial, if he had the reports."  Id. at 7.  The defense has not challenged the admissibility of such opinion testimony.

REDACTED

[41] This Court was provided only with an excerpt of Tayback's testimony at the hearing. See ECF 151-36.  The excerpt does not include any discussion of the July 19 Report, or a claim that it was not produced.

reasoned that it was "materially consistent with the witness' trial testimony." *Id.*  She reasoned that L.S.'s statement did not "state that Petitioner was not present at the scene," and L.S. did not "provide the name of any suspect. . . ." *Id.*  In other words, she did not identify some assailants while omitting Johnson; no one was named.  Thus, Judge Murdock found, *id.*: "[T]he statement could be used to point out [L.S.'s] lack of detail, but not any inconsistency on the actual merits."

Further, Judge Murdock observed that L.S.'s trial testimony was inconsistent with her Grand Jury testimony.  ECF 137-15 at 8.  And, Judge Murdock noted that "Petitioner's counsel rigorously exposed the inconsistencies . . . ." *Id.*  Given that L.S.'s "brief statement on the night of the incident would only further add possible impeachment of the eyewitness," Judge Murdock stated that the court could not "conclude that the addition of the witness' oral statement on the night of the incident creates a substantial or significant possibility that Petitioner's trial would not have resulted in a conviction." *Id.*  at 8-9.

Johnson noted an appeal.  *See* ECF 152-19; ECF 137-14 (Forster's "Entry of Appearance on Appeal," dated August 6, 2013).  On June 17, 2014, the Maryland Court of Special Appeals affirmed Judge Murdock's decision.  ECF 137-16 (unreported decision of the Maryland Court of Special Appeals).

Of relevance, the State's intermediate appellate court determined that "there is nothing in the [Jones Report] that shows that L.S. 'testified falsely on the core merits of the case under review.'" *Id.* at 12 (quoting *Jackson v. State*, 164 Md. App. 697, 698, 884 A.2d 694, 704 (2014)).  The court reasoned, ECF 137-16 at 11: "Although there were minor inconsistencies between the [Jones Report] and [L.S.]'s trial testimony, the circuit court was correct that the [Jones Report] was not material."  Further, the appellate court said, *id.* at 13: "Even if the statements in the report were 'material,' the report's possible impact on the outcome of the trial would have been minimal."

The court explained: "There is nothing in the [Jones Report] that suggests it would have been more persuasive than defense counsel's cross-examination of L.S.." *Id.*

Johnson sought certiorari to the Maryland Court of Appeals on July 30, 2014.  ECF 152-19 at 19.  The petition was denied on September 22, 2014.  *Id.*

### E.  Investigation & Release

Ms. Forster met with Assistant State's Attorney Andrea Mason on August 29, 2017, as well as Lauren Lipscomb, who served as the Division Chief of the Conviction Integrity Unit. ECF 151-1 at 16. [42]

At the meeting, Forster provided "a binder of information" that she believed established Johnson's innocence.  *Id.*; *see* ECF 152-19.  She provided the CIU with information pertaining to McFadden's testimony at a post-conviction hearing, stating that "she saw Johnson across Lucille when shots rang out"; the Morgan Affidavit, stating that Morgan "was with Johnson on the corner of Lucille at the time of the murder"; Lazenby's testimony that she "was with L.S. on the night of the murder and her version of the events match[ing] L.S.'s initial statement made to PO Jones the night of the murder." ECF 151-1 at 16-17.  Notably, Forster presented the CIU with a copy of the Burton Affidavit.  ECF 137-20 at 5-6.

Thereafter, the SAO began gathering and reviewing evidence, as well as the SAO file, the BPD file, and the transcripts.  ECF 151-1 at 17.  Between March 2018 and May 2018, the CIU conducted interviews with several witnesses including Officer Owens, Morgan, L.S., Lazenby,

---

[42] At Lipscomb's deposition (ECF 137-19), defense counsel reviewed the contents of the SAO Memorandum.  *Id.* at 7.  Defense counsel erroneously stated that Forster met with the CIU on October 29, 2017.  *Id.*

Tommy Carroll, and Dorsey. *Id.* at 21-26.[43]   K.A. could not be located, and several others had

since died. *Id.* at 26. The man known as Quinton could not be identified. *Id.*

After the CIU's reinvestigation, the CIU submitted a memorandum to Baltimore City

State's Attorney Marilyn Mosby. ECF 151-1 (the "CIU Memorandum"). The CIU Memorandum

concluded that Johnson did not participate in Taylor's murder. *Id.* at 2.

The CIU Memorandum is lengthy, and I need not review it here in detail. Dorsey insisted

Johnson was not present for the murder. *Id.* at 22. And, as part of the CIU's reinvestigation,

Lipscomb and Detective Al Marcus conducted a recorded interview of L.S. on May 16, 2018, from

3:25 p.m. to 3:41 p.m. The audio recording of the interview is docketed at ECF 138-20.[44]

The CIU Memorandum described L.S. as a "current drug user" who was difficult to find.

ECF 151-1 at 25. However, the audio recording reflects that she was quite coherent. *See* ECF 138-

20. She also recalled that after the murder, she was in "shock." Notably, L.S. was unequivocal in

her assertion that Johnson was involved in the murder of her cousin.

In the interview, L.S. claimed the shooting happened "late" at around 11 or 12 at night.

ECF 138-20. Taylor had been at L.S.'s house on Virginia Avenue, and left to go to the Night Owl,

stating that he was going to "see these guys to give them they [sic] money." *Id.* According to

L.S., Johnson, Hill, and Dorsey sold cocaine on Lucille and Reisterstown, and Taylor worked for

them. *Id.* Notably, she said that she knew Johnson, Hill, and Dorsey, claiming that all of them

frequently came to her mother's house. *Id.*

---

[43] On March 19, 2018, the CIU "[l]ooped in Mid Atlantic Innocence Project[.]" ECF 151-1 at 22.

[44] The Court was not provided with a transcript of the interview. Therefore, the quotes from the interview that appear in this Memorandum Opinion derive from my attempts to capture the content. They may not be completely accurate.

L.S. recalled that she also went to the Night Owl that night, along with Tanya Lazenby and another man, whose name she could not recall.  She saw "Buttons, Lamont, and Poopie" and said: "They was surrounding my cousin."  *Id.*  She heard Taylor "fussing" with them, and Taylor said: "I got y'all money. I got y'all money. I got y'all fifty dollars."  *Id.*  According to L.S., at that point Lazenby went to hid under a trash can.

In the store, Taylor grabbed a customer to use as a shield.  *Id.*  She recalled Taylor grabbing the customer and saying, "they gonna kill me. They gonna kill me."  *Id.*  L.S. stated she did not know the name of the customer, but he never came forward in the investigation.  *Id.*

Further, L.S. stated: "That's when Poopie came in."  *Id.*  The customer broke away from Taylor, and Taylor tried to run.  But, Hill hit him with the gun, causing Taylor to collapse on the floor.  *Id.*  Taylor began "crawling to get out" of the store.  *Id.*  At that time, L.S. ran out of the store.  *Id.*  She said: "By the time I made it out the store, that's when I heard the first shot."  *Id.*  She turned around and "saw Poopie standing overtop" of Taylor in the doorway, "getting ready to shoot him again."  *Id.*  She then started running and calling for her mother, and that is when she heard the second and third shot.  *Id.*

L.S. claimed that she talked to a plainclothes detective on the scene.  *Id.*  When asked how many times she spoke to the police in total, L.S. states that: (1) the police came to her house so that she could pick out pictures, (2) she went "downtown" to pick out pictures; and then (3) she went to trial.  *Id.*  When she went downtown to pick out pictures, she said she "picked all three out," indicating that she identified Hill, Johnson, and Dorsey. *Id.*

Marcus asked L.S. whether Lamont or Buttons ever had a weapon that she saw.  L.S. stated that, as far as she knew, no one other than Hill had a gun.  *Id.*  L.S. also confirmed that Hill was the one who shot Taylor, but maintained that Johnson and Dorsey were also involved in the murder.

*Id.* She stated: "Poopie was the one that did the killing, but no matter what all three of them had something to do with it."  *Id.*

The CIU Memorandum asserts that "[L.S.]'s version [of events] changed multiple times" in 1988.  ECF 151-1 at 3.  And, it then concludes that L.S.'s account in 2018 was consistent with her statement to Officer Jones in 1988, *i.e.*, the Jones Report, and thus is accurate.[45]  In reaching that conclusion, the CIU posits that in 2018 L.S. "[did] not talk about a gun hand-off or misfiring."  ECF 151-1 at 26.  But, she was not asked whether a gun had misfired.

Further, the CIU Memorandum also discusses K.A.'s trial testimony.  It claims that he testified that "Johnson was present though he did not say he participated" in the murder.  *Id.* at 3.

The CIU Memorandum determined that Johnson "was not present and did not participate in [Taylor's] murder."  ECF 151-1 at 2.  It stated that "there is overwhelming evidence that the Johnson [sic] was not present during the murder and was not involved in it.  Therefore, the Johnson [sic] did not hand a gun to the Shooter."  *Id.*  Thus, the CIU Memorandum recommended that the SAO file a "joint petition for writ of actual innocence and not seek to re-try the case."  *Id.*

The conclusion directly contradicts what L.S. said in the 2018 interview, however.  As noted, when L.S. was asked who confronted Taylor about the drug debt, L.S. said: "It was Buttons, Lamont, and Poopie.  They was surrounding my cousin."  ECF 138-20.  L.S. also inculpated

---

[45] L.S.'s 2018 account, some 30 years after the event, contains a handful of minor inaccuracies.  Taylor was murdered at approximately 1:15 a.m., not 11 or 12 at night.  She spoke to Jones, a patrol officer, who would have been wearing a uniform.  ECF 151-8, ¶ 13.  L.S. also claims that the customer Taylor used as a shield, Marvin Reid, never came forward in the investigation.  *Id.*  But, Reid gave a signed statement to Det. Charles Gilbert at 3:28 a.m. on July 14, 1988 in the "Homicide Unit Office."  ECF 138-3 at 26-29.  In the months following the murder, L.S. claimed that she went to the courthouse only once for trial.  ECF 138-20.  However, it is undisputed that L.S. appeared at the Grand Jury prior to trial.  And, L.S. did not remember Quinton's name or Thomas Carroll, even though she had identified his photo in 1988.  *Id.*

Johnson when she said: "Poopie was the one that did the killing, but no matter what all three of them had something to do with it." *Id.*

The CIU Memorandum also claimed, ECF 151-1 at 18: "There is no evidence in the SAO or BPD file nor have we located any evidence that suggests [L.S.] knew the [sic] Johnson before this incident or the trial." However, L.S. stated in the 2018 interview that Johnson, Dorsey, and Hill regularly came to her mother's house. ECF 138-20.

The CIU Memorandum claimed that L.S.'s statement in the Jones Report "*appears to have not been disclosed.*" *Id.* at 17 (italics in original). It did not reference that Davis disclosed the existence of the interview in his July 14 Report. But, of particular relevance to the issues here, the CIU Memorandum never asserts that the BPD officers acted in bad faith.

The CIU Memorandum also mentions several perceived errors with the investigation, such as the failure to contact potential witnesses. For example, the CIU Memorandum states: "There is no indication that the ASA attempted to contact Alvin Morgan, Deborah McFadden, any of the 11 search officers, PO Owens, nor are there notes that the ASA directed BPD to do any follow up in any of these areas." ECF 151-1 at 21. The CIU Memorandum also states that Thomas Carroll was not interviewed. ECF 151-1 at 8. But, it is clear that the police did contact McFadden as discussed earlier. And, Carroll was a defendant. In any event, the police did attempt to interview him but, on advice of counsel, he did not submit to an interview. *Id.* Morgan was Johnson's friend. He chose not to appear at trial for fear of being arrested. ECF 152-1, ⁋ 7. And, the defense summoned Officer Owens for trial, and he did not appear.

Thereafter, on July 2, 2018, Forster, Lipscomb, and Parisa Dehghani-Tafti, an attorney from the Mid-Atlantic Innocence Project, and Johnson filed a "Joint Petition For Writ Of Actual Innocence" in the Circuit Court for Baltimore City. ECF 151-30 (the "Joint Petition"); ECF 137-

21 (same).[46]  The Joint Petition asked the circuit court to "set aside the verdict against [Johnson] and order a new trial."  ECF 137-21 at 18.  The Joint Petition did not contain exhibits.

The Joint Petition provided an overview of the factual and procedural background regarding Johnson's case, which has been recounted above.  *Id.* at 3-8.[47]  It is largely consistent with the CIU Memorandum.  It stated that on multiple occasions L.S. had "contradicted her own testimony about several key aspects of her role as a witness . . . ."  *Id.* at 10.  According to the Joint Petition, L.S.'s witness statements, Grand Jury testimony, and trial testimony were "inconsistent regarding almost every material detail of the crime."  *Id.*  And, the Joint Petition stated that the Jones Report was "undisclosed," without reference to Det. Davis's disclosure of the interview in his July 14 Report.  *Id.*  The Joint Petition also claims that the discrepancies between the Jones Statement and L.S.'s other statements "were even more profound" than other inconsistencies.  *Id.* at 11.  According to the Joint Petition, the "most crucial discrepancy" in L.S.'s statements concerned "the alleged exchange of weapons between" Johnson and Hill.  *Id.* at 12.

As noted, K.A., could not be located for the CIU Memorandum.  ECF 151-1 at 26.  The Joint Petition characterized his Statement to the BPD on August 8, 1988, as "straightforwardly exculpatory" for Johnson.  ECF 137-21 at 13.  And, as to K.A.'s "revised testimony" at trial (*id.* at 13), the Joint Petition stated that K.A. "merely places [Johnson] at the scene" but did not implicate him in a crime.  *Id.* at 14.

---

[46] The Joint Petition is undated, but a date-stamp reflects that it was received by the circuit court on July 2, 2018.  ECF 137-21 at 2.

[47] The Joint Petition refers to the relevant witnesses by their initials.  *See, e.g.*, *id.* at 4.

Notably, the Joint Petition also pointed to "newly Discovered Evidence Since the Time of Mr. Johnson's Trial," which "Proves Innocence . . . ." *Id.* at 14. The Hill Affidavit is the first item that is mentioned. *Id.* There, Hill asserted that Johnson was not present at the murder. *Id.*[48]

In sum, the Joint Petition maintained that Johnson's convictions should be vacated in light of L.S.'s inconsistent testimony, coupled with other evidence that showed that Johnson was not present at the scene of Taylor's murder, including statements from Tommy Carroll; Dorsey; Morgan; Lazenby; McFadden's testimony at a post-conviction hearing; and the Hill Affidavit. *Id.* at 15-17.

On July 2, 2018, Judge Charles Peters held a hearing on the Joint Petition. *See* ECF 151-5 (excerpt of hearing transcript) at 2. Lipscomb provided an overview of the Joint Petition, before concluding, *id.* at 9: "We submit that Jerome Johnson was not present during the commission of this homicide. As such, the State is asking the Court to grant our Joint Petition for Writ of Actual Innocence that was filed in this case."

Judge Peters granted the Joint Petition and awarded Johnson a new trial. *Id.* But, Lipscomb indicated that "the State [was] entering nolle pros as to each count of the indictment." *Id.* This suit followed on March 6, 2019.

Additional facts are included, *infra*, pertinent to the Sanction Motion and the *Monell* claim.

---

[48] The Joint Petition did not mention the Burton Affidavit. However, the Hill Affidavit references the Burton Affidavit. Moreover, neither the CIU Memorandum nor the Joint Petition mentions Dorsey's pretrial statement, in which he claimed the gun misfired twice. ECF 137-2 at 4. That assertion corroborated L.S.'s account.

## II.  Sanction Motion

### A.  Factual Allegations

Defendants have moved to dismiss the suit as a sanction, claiming that plaintiff repeatedly "defrauded" the courts by procuring "irrefutably false affidavits" from Burton and Hill, and also because he attempted to influence the testimony of Carroll, Dorsey, and Lazenby.  ECF 137 at 4, 15-18.  They contend that "for approximately fourteen years, plaintiff attached these fraudulent and perjured affidavits to multiple court filings, both *pro se* and while represented by counsel." *Id.* at 8.  Thus, they maintain that Johnson obtained his release by misleading the SAO and the Circuit for Baltimore City about his role in the case.  *Id.*  Defendants also seek attorneys' fees, pursuant to 42 U.S.C. § 1988.  ECF 137 at 22.

Johnson concedes that the relevant affidavits contain false information.  ECF 152 at 9-15. However, he maintains that he was not aware at the time that they contained false information, and he denies that he participated in procuring false information.  *Id.*  He also denies that he attempted to influence any witnesses.

It is undisputed that the Burton and Hill affidavits falsely state that Burton was present at the crime scene and that he is the one who handed a gun to Hill.  ECF 137-5, ¶ 5; ECF 137-9 at 19.  As noted, the Burton Affidavit claims that Burton happened upon the scene of the altercation because, in the early morning of July 14, 1988, he was involved in a car accident at the intersection of Reisterstown Road and Woodland Avenue.  ECF 137-5, ¶ 3.  That is also the general location of the Night Owl.  *See* 138-13 at 2; 138-2 at 72.  However, prison records irrefutably establish that Burton was incarcerated at the time of Taylor's death.  *See* ECF 137-6.  Moreover, Burton denies signing the Burton Affidavit and claims that his signature is a forgery.  ECF 137-7 at 10-11.

According to defendants, plaintiff's first known use of the Burton and Hill affidavits occurred on May 23, 2000, in his *pro se* submission to the Court of Appeals for the Fourth Circuit. ECF 137-11.  Plaintiff also relied on the affidavits when he filed a Petition for Writ of Actual Innocence on April 14, 2011.  ECF 137-9.  Although plaintiff later withdrew that petition in favor of lobbying the SAO to dismiss the charges (ECF 137-13), defendants maintain that this strategy deprived the circuit court of the opportunity to scrutinize his affiants' credibility.  ECF 137 at 7.

The BPD also points to Johnson's deposition testimony, in which he said that he played the role of a "jailhouse attorney" when he was incarcerated and, in that capacity, he worked with Burton on Burton's case.  ECF 137-1 (Johnson Dep.) at 56.  Johnson testified, *id.*: "We was in one of these prisons together, and I actually was helping him with his case because that's what I do, I help dudes with their cases.  I served as the jailhouse attorney, and, as we was talking—and, you know that's where I met him."

At Johnson's deposition on July 22, 2021, Johnson testified that, while he and Burton were working on Burton's case, Burton told Johnson that "he was actually from [Johnson's] neighborhood."  ECF 137-1 at 57.  And, when Johnson told Burton "about the events that happened surrounded [sic] [him], he said that, you know, he was out there that night."  *Id.*  Specifically, Johnson claims that Burton advised that "he knew the victim or something that he seen them" on the night of Taylor's murder.  *Id.*  Further, Burton claimed that "he was trying to . . . stop the altercation that was going on, and, you know, something about the gun fell out the guy's hands. Some stuff like he was saying he was supposed to pick the gun up and gave the gun back to the guy."  *Id.* at 57-58.

According to Johnson, he asked Burton for proof to establish that he was "on the street" on the night of Taylor's murder, at which point Burton "showed [him] a document from the Court

showing that [Burton] was on the street." *Id.* at 58.  Johnson then arranged for Burton to speak

with his attorney, George Epstein, who worked with Burton to obtain the Burton Affidavit.  *Id.*

An "Inmate Visitor Record" from the State Division of Correction indicates that Epstein visited

Burton in April 1997, the month in which the Burton Affidavit was executed.  *See* ECF 153 at 5.

But, Burton denies that he signed the Burton Affidavit and claims that it is a forgery.  ECF

137-7 (Burton Dep.) at 10-11.  Further, defendants point out that prison records reflect that Burton

was in administrative segregation on April 15, 1997, the day on which the Burton Affidavit was

supposedly executed.  *See* ECF 137-8 at 2 (Burton Inmate Institutional Progress Sheet, indicating

that Burton was "continue[d] ad seg" on April 3, 1997, and "remove[d] from A/S" on September

25, 1997).  According to Burton, he could not have executed an affidavit for Johnson when placed

in restrictive confinement.  *See* ECF 137-7 at 14 (confirming that while he was in segregation, he

could not have "sign[ed] for no [sic] affidavit unless it's a legal mail coming in through . . . the

police bringing it certified mail").

The defense identifies several other facts that they claim establish that plaintiff knew the

affidavits were false when he submitted his 2011 Petition.  As mentioned, the Burton Affidavit

includes details regarding a car crash that occurred "at the intersection of Reisterstown Road and

Woodland Avenue," in close proximity to the Night Owl.  ECF 137-5 at ⁋ 3.  Given plaintiff's

statement to the BPD, showing his proximity to the scene at the time, as well as plaintiff's

deposition testimony, plaintiff would have known that no such accident occurred.  ECF 137 at 14.

Additionally, in his statement to the BPD on October 24, 1988 (ECF 137-4 at 3), and in his

deposition in July 2021, plaintiff stated that several individuals confronted Taylor.  ECF 137-1 at

27.  Yet, he did not mention the presence of Burton, or an individual who fit his description, when

he gave his statement to the BPD on Oct. 24, 1988.

At plaintiff's deposition, he acknowledged that Hill "knowingly" made a false statement in his Affidavit.  ECF 137-1 at 63.  Moreover, over the objection of his lawyer, he conceded that Hill "had to have known" of the falsity, because he was, after all, there at the time.  *Id.*  Further, when Johnson was asked if he "would feel comfortable attaching the Alvin Hill affidavit to any future court filings," Johnson noted that he would not.  *Id.* at 69.  Johnson also confirmed that he and his lawyer spoke with Hill about an affidavit.  *Id.* at 68.

Defendants also highlight a telephone call between Johnson and Morgan that occurred on June 26, 2016, which, according to defendants, "leaves no question that plaintiff knew the Burton and Hill affidavits were unreliable when he agreed to use them in the Joint Petition."  ECF 137 at 10.  In relevant part, Johnson stated, ECF 137-1 at 84-86:

> Matter of fact, remember on the remand there's three affidavits can you recall that? OK, I don't want to say the names cuz I don't want to give too much information over the phone but, one of the key people is supposed to be jumping ship. But we still gonna be able, she's [*i.e.*, Nancy Forster] saying she's still gonna be able to use his affidavit, in other words the dude's not coming to testify. But she don't think it's real damaging, but it's a little bit. But we still may get it in cuz we still got Poopie [*i.e.*, Hill].

According to defendants, plaintiff's counsel used the Burton and Hill affidavits to induce the State to agree to vacate plaintiff's conviction.  *See* ECF 137-20 at 5-6.  Ultimately, however, the Joint Petition only referenced the Hill Affidavit as a basis for the court to set aside Johnson's conviction.  *See* ECF 137-21.  Although it does not appear that exhibits were submitted with the Joint Petition, the submission contains a section titled "Newly Discovered Evidence Since the Time of Mr. Johnson's Trial Proves Innocence Under 8-301."  ECF 137-21 at 14.  As mentioned, the Hill Affidavit is listed as the first item of evidence in that category.  *Id.*  It is cited for the proposition that it was Hill who shot the victim and that Hill claimed that Johnson was not present. *Id.*

In regard to the claim of witness tampering, defendants point to a phone conversation that Johnson had with Sean Morgan, the son of Alvin Morgan, on January 22, 2017.  The contents of the call were read during Johnson's deposition testimony.  *See* ECF 137-1 at 73.[49]  In particular, Johnson stated, *id.*: "'Soon the girl, Tanya Lazenby, go do what she got to do.  That's when I'm probably going to need you man.  We've got to show her some love, man, for her stepping up to the plate.'"  When asked at his deposition what Johnson meant by "'show her some love,'" Johnson said he meant for Morgan to "give her a hug, or you know what I'm saying, or something like that."  *Id.* at 74.

Defendants also presented evidence pertaining to communications between Johnson and Lazenby.  Notably, Johnson indicated at his deposition that he did not know Lazenby prior to his trial.  ECF 137-1 at 6.  But, since his release, he "has spoken to Tanya Lazenby by phone intermittently since 2018."  ECF 169-1 (Response to Interrogatories) at 4.  At Johnson's deposition, he claimed that the purpose of these calls was to "just see how she is doing."  ECF 137-1 at 8.

Defendants also cite a letter Johnson sent to Tommy Carroll on March 23, 2020, after Johnson's release.  ECF 137-25 (the "March 2020 Letter").  In the letter, Johnson wrote, *id.* at 3:

What's up! Tommy

How are you doing? I sincerely hope that this brief notation finds you well.
As for me I am blessed just trying to deal with life.  Here is a few dollars for you.

Take care!

Talk to you soon

Jerome ,
A.K.A

---

[49] At this time, Johnson was still incarcerated.  The parties have not presented the Court with an audio recording of this conversation.

Himalaya

The parties presented the content of various telephone conversations that Johnson had with Dorsey and Carroll.[50]  During a recorded phone call between plaintiff and Carroll on June 25, 2020, Johnson offered to help pay for a lawyer for Carroll.  ECF 137-1 at 75.  Johnson stated, *id.*: "'Whatever you get, I'll match that.  I mean, I'll probably do more than that, depending on the lawyer that I decide we can get to.'"  ECF 152-24 at (00:09:16-00:10:10) (audio recording of phone call between Johnson and Carroll).

In a phone call between plaintiff and Dorsey on February 6, 2019, Johnson stated, ECF 137-1 at 83: "'What I wanted to tell you, Man, is I'm talking [to] Nancy [Forster] now to see if we can make something for you right.  Yeah, so we trying to see what we can do.'"  And, in a subsequent phone call on January 18, 2020, Johnson stated, *id.* at 79-80:

> What we got right now, Butt, is that what you told me about they told you about that statement.  Yo, you can't never say that.  I'm going to tell you why.  Yo, listen to what I'm saying, because the way my case, the reason I'm out of prison, and the reason I got a 60 million lawsuit against the police, is because we saying they withheld that statement.  Now, if you saying they said something to you about it when they got – when you got lock up, right, but I'm telling you, don't say nothing about that, yo, in this case right now.

Johnson continued, *id.* at 81:

> But look, what I need you to do, I need you to do something different.  Yo, I'm going to send you, when I send to you this money.  Hey yo, this is what you got to do. Butt-Butt, I already know, yo, you been on my side since I've been here, right? I respect that.  Butt this is what I need you to do.  I need you to start listening to me, Man, when it comes to this legal shit.

---

[50] Plaintiff provided audio recordings of the phone calls, with the exception of plaintiff's phone conversation with Dorsey on February 6, 2019. Defense counsel read transcripts of the phone recordings into the record at Johnson's deposition.  *See* ECF 137 at 16-17.  The content is not disputed; the significance of the content is disputed.

With respect to Burton, plaintiff claims that he relied on his former lawyer, George Epstein, who is now deceased.  Epstein met with Burton, allegedly discussed the Affidavit, and procured Burton's signature.  ECF 152-4, Johnson Dep., at 3-5, 6, 8.  The prison visitor log indicates that Epstein visited the prison where plaintiff and Burton were incarcerated in April 1997.  ECF 152-5.  But, there is no information as to what was discussed.  And, as stated, Burton has denied that he signed the Affidavit.  ECF 152-3 at 41.  As to the Hill Affidavit, plaintiff claims he had no reason to suspect its inaccuracy.  ECF 152 at 17.

At his deposition, Johnson confirmed that he included $50 with the March 2020 Letter to Carroll.  ECF 152-4 at 17.  Johnson explained, *id.* at 20: "I did a letter campaign.  A lot of the guys come home from prison and they don't do enough for the guys . . . I, fortunately, be in a situation where I can help guys out, because a lot of time guys be there for a long period of time and the family is not really helping support them and stuff like that.  So $50 goes a long way."  Johnson estimated that he had given the same kind of support to somewhere between thirty and forty people, including Dorsey.  *Id.* at 21.

In a sworn Declaration dated February 11, 2021 (ECF 152-6), Johnson explained: "I gave people with whom I was incarcerated small amounts of money because I know how they are struggling like I was struggling when I was incarcerated."  *Id.* ⁋ 13.  Plaintiff also averred that he "did in the past offer to help Mr. Dorsey and Mr. Carroll find and pay for lawyers."  *Id.* ⁋ 14.  But, he maintained, *id.*: "I did not offer this assistance in exchange for false evidence.  I offered it because I had known them for a long time; we grew up together in the same neighborhood."  And, Johnson said: "I communicated with Mr. Dorsey about him testifying on my behalf.  My motivation was to secure Mr. Dorsey's truthful statement that I was not there when Aaron Taylor was killed."  *Id.* ⁋ 16.

Further, Johnson points out that when he provided a statement to the police in 1988, he did not claim he saw what happened after the group of men confronted Taylor on the basketball court. *Id.* at 18.  Moreover, plaintiff asserts that his attempts to procure testimony were not attempts to influence the substance of the testimony.  *Id.* at 27.

Plaintiff has submitted the Declaration of Tanya Lazenby, dated February 7, 2022.  ECF 152-10 (Lazenby Decl.).  She asserted, *id.* ¶ 2: "I spoke to Jerome Johnson for the first time on the day of his release from prison in 2018.  I had no prior relationship or communication with Jerome Johnson."  And, Lazenby averred: "I have spoken to Jerome Johnson very occasionally—once when he was released from prison and I believe once more time [sic] at some point later."  *Id.* ¶ 3.

In the first conversation, Lazenby "spoke to [Johnson] on the phone while he was in his lawyer's office," at which time Johnson "thanked [her] for doing the right thing and coming forward with [her] statement."  *Id.* ¶ 4.  During the second conversation, Johnson asked Lazenby how she was doing, but they did not discuss Johnson's lawsuit or her statement.  *Id.* ¶ 5.  Lazenby also stated: "No one, including Jerome Johnson, has offered me anything in exchange for any statement as to what I saw at the Nite Owl on July 14, 1988."  *Id.* ¶ 7.  She also said that she does not know "Shaun Morgan."  *Id.* ¶ 8.  She also said, *id.* ¶ 6: "Witnessing the murder on July 14, 1988, was one of the most traumatic moments of my life . . . .  [I]t is very hard to be dragged back into these memories."

**B.  Standard of Review**

The Sanction Motion is filed pursuant to Fed. R. Civ. P. 41(b).  It states, in part: "If the plaintiff fails to prosecute or comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it.  Unless the dismissal order states otherwise, a dismissal under this subdivision (b)  . . . operates as an adjudication on the merits."   Thus, a dismissal

pursuant to Rule 41 ordinarily amounts to a judgment on the merits and is given preclusive effect. *See Black Water Marine Explorer LLC v. Unidentified Shipwrecked Vessel or Vessels*, 714 F. App'x 296, 297 (4th Cir. 2018) (per curiam) (citing Fed. R. Civ. P. 41(b)).

"Rule 41(b) lumps together three quite different grounds for involuntary dismissal."  9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2369 (4th ed. 2022) ("Wright & Miller").  Relevant here, "[t]he third ground set out in the Rule providing for a dismissal for failure to 'comply' with 'these rules' or with a 'court order' is rather amorphous . . . ." *Id.*  Indeed, "[t]here is extensive and factually varied case law about what constitutes a failure to comply with a court order or instruction," and Rule 41(b) "does not exhaust the grounds on which an involuntary dismissal can be ordered."  *Id.*

In any event, federal courts have "inherent power to dismiss an action with prejudice as a sanction."  *In re Jemsek Clinic, P.A.*, 850 F.3d 150, 158 (4th Cir. 2017); *see also Link v. Wabash R. Co.*, 370 U.S. 626, 632 (1962) (recognizing that the federal courts retain inherent authority to impose a sanction of dismissal).  These inherent powers exist to "preserve the integrity of the judicial process and the resources needed to resolve disputes in an orderly and expeditious manner—two indispensable assets in any nation dedicated to the rule of law."  *In re Jemsek*, 850 F.3d at 157 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991).

A court is obligated to "protect the integrity of the judicial process because, '[a]s soon as the process falters . . . the people are then justified in abandoning support for the system.'"  *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *Shaffer*, 11 F.3d at 457).  And, "[t]his power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers." *United States v. Shaffer Equipment Co.,* 11 F.3d 450, 461 (4th Cir. 1993).

Dismissal is justified where "a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process[.]" *Shaffer,* 11 F.3d at 462; *see also Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013). Nevertheless, a dismissal under Rule 41(b) "is a harsh sanction which should not be invoked lightly in view of 'the sound public policy of deciding cases on their merits.'" *Herbert v. Saffell*, 877 F.2d 267, 269 (4th Cir. 1989) (citation omitted). And, "a district court's decision to exercise its inherent power to dismiss a case is reviewed for an abuse of discretion." *Gunter v. Alutiiq Advanced Security Solutions, LLC*, RDB-20-3410, 2022 WL 1139875, at *3 (D. Md. Apr. 18, 2022) (internal quotation marks omitted).

A court must exercise its dismissal power with considerable restraint and "may do so only after considering several factors[.]" *Shaffer*, 11 F.3d at 462. The factors include, *id.* at 462-63:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that [courts] seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

Of import here, a court may impose sanctions even when the misconduct occurred before another tribunal, rather than in its own case. For example, in *Chambers*, 501 U.S. 32, the Supreme Court observed, *id.* at 57:

> . . . Chambers challenges the District Court's imposition of sanctions for conduct before other tribunals, including the FCC, the Court of Appeals, and this Court, asserting that a court may sanction only conduct occurring in its presence. Our cases are to the contrary, however. As long as a party receives an appropriate hearing, as did Chambers, *see* 124 F.R.D., at 141, n.11, the party may be sanctioned for abuses of process occurring beyond the courtroom, such as disobeying the court's orders. *See Young [v. United States ex rel. Vuitton et Fils S.A.,]*, 481 U.S. [787 (1987)] at 798,; *Toledo Scale [v. Computing Scale Co.,* 261 U.S. 399 (1923)] at 426–428. Here, for example, Chambers' attempt to gain the FCC's permission to build a new transmission tower was in direct contravention of the District Court's

orders to maintain the status quo pending the outcome of the litigation and was therefore within the scope of the District Court's sanctioning power.

*See also Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01479-KOB, 2020 WL 2308319, at *6 (N.D. Ala. May 8, 2020) (discussing cases in which the sanctioning court considered behavior in other cases that shared an obvious linkage to its own case).

Further, as Judge Chasanow explained in *DeWitt v. Ritz*, DKC-18-3202, 2021 WL 915146, at *5 (D. Md. Mar. 10, 2021) (internal citations omitted):

> [I]n order to prove his § 1983 claim [for malicious prosecution], Plaintiff will have to establish that the criminal proceeding terminated in his favor.[ ] *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) . . . To do so, Plaintiff must rely on the grant of relief by the state post-conviction court and the ensuing decision of the State's Attorney for Baltimore City not to pursue a retrial. If, as Defendants claim, dismissal of the charges was procured by fraud and bribery, Plaintiff should not be allowed to rely on it to prove his civil rights claim.

Notably, "[t]here is no rule or required procedure for assessing a litigant's alleged misconduct, and a request for sanctions can arise in a variety of circumstances. The bedrock fundamental principle, however, is that a litigant must have notice and an opportunity to be heard before sanctions are imposed." *DeWitt*, 2021 WL 915146, at *3 (citing *Chambers*, 501 U.S. at 50).

To prove the misconduct, however, courts have employed the heightened standard of clear and convincing evidence, rather than a mere preponderance of the evidence. *See*, *e.g.*, *DeWitt*, 2021 WL 915146, at *4; *Glynn v. EDO Corp.*, JFM-07-01660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010). In *Glynn*, Judge J. Frederick Motz explained, *id.*:

> Whether it is sought under the Federal Rules of Civil Procedure or pursuant to this Court's inherent power, the precise burden of proof in a motion for sanctions is unclear in the Fourth Circuit. However, proving misconduct occurred by "clear and convincing" evidence, as opposed to by a mere preponderance, certainly suffices. *See Lahiri v. Univ. Music and Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) ("The burden of proof issue need not be resolved here because the district court's bad faith finding is supported by clear and convincing evidence."

-69-

(internal citations omitted)); *Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995) (citing several other circuits in holding that the "clear and convincing" standard is required to impose default judgment, whereas preponderance is the standard for imposing less dramatic sanctions); *Balcar v. Bell and Assoc., LLC*, 295 F.Supp.2d 635, [640] (N.D.W.Va. 2003) ("Because the court's inherent power to sanction should be exercised with caution and discretion, some circuits have held that clear and convincing evidence of bad faith and vexatious behavior is required for a court to exercise its inherent authority to sanction. Although the Fourth Circuit appears not to have addressed the issue, this Court believes it, too, would adopt the clear and convincing evidence standard with regard to the [c]ourt's inherent power to sanction." (internal citations omitted)).

### C.  Discussion

Defendants urge the Court to dismiss plaintiff's suit, claiming that plaintiff's exoneration in the Circuit Court for Baltimore City was secured by use of the fabricated affidavits of Hill and Burton as well as the attempt to influence the testimony of Dorsey, Carroll, and Lazenby.

The Court has a strong interest in sanctioning the deliberate use of false evidence. *See, e.g.*, *Green v. Mayor & City Council of Baltimore*, 198 F.R.D. 645, 647 (D.Md. 2001). In *Green*, 198 F.R.D. at 647, Judge Smalkin said:

> The prejudice to the integrity both of the process of adjudication in general and of this Court in particular, which relies on the trustworthiness of those who submit— not to mention notarize—affidavits, is manifest. The public interest in preserving the trustworthiness of sworn documents as part of the process of orderly adjudication demands that the strongest means available be taken to redress the situation in this particular case and to deter similar misconduct by others.

Plaintiff's intentional use of false affidavits cannot be condoned. Johnson testified that he was the person who first obtained the information from Burton. ECF 137-1 at 57. And, he sought to use the Burton Affidavit, even though he would have known that it was false, because it is inconsistent with what he personally knew about who was at the scene.

The Burton Affidavit (ECF 137-5) claims that Burton was in a car accident at Reisterstown Road and Woodlawn "[s]ometime after midnight . . . ." *Id.* ¶ 3. However, plaintiff states that he never knew of a car accident. ECF 137-1 at 70-71. And, in Johnson's Statement to police on

October 24, 1988, he said he saw "Poopie, Ornie, Tommy, Butt and Kenny" cross over Reisterstown Road to the basketball court. ECF 137-4 at 3. Yet, Johnson never mentioned Burton or an individual who fit Burton's description.

But, in Johnson's statement to the BPD on October 24, 1988, he revealed that he knew quite a bit of detailed information about the incident. And, he was in close proximity to the Night Owl when the crime occurred. By his own account, shortly before the shooting, he was walking to the Night Owl from Lucille Avenue. ECF 151-2 at 46. He claims that he encountered Alvin Morgan at the corner of Reisterstown Road and Lucille Avenue, who told him to stay put. *Id.* But, that location is a short distance from Reisterstown Road and Woodland Avenue, where the Night Owl was located and where the car accident supposedly occurred. ECF 138-2 at 72. If a car accident occurred at the alleged time of night, at the alleged place, Johnson would have known about it.

Plainly, Burton could not have been in Baltimore on July 14, 1988, because he was incarcerated. And, he could not have executed the Burton Affidavit because he was housed in restrictive confinement. *See* ECF 137-7 at 14. The affidavit is a forgery. And, plaintiff's claim that he did not know of the falsity of it rings hollow.

The Hill Affidavit's inclusion of Burton's averments necessarily makes that document false as well. And, the Hill Affidavit was featured in plaintiff's Joint Petition, which ultimately secured Johnson's release from prison. For example, the Joint Petition asserts, based on the Hill Affidavit: "On May 23, 2000, the Shooter [*i.e.*, Hill] provided an affidavit that Johnson was not present at the time of the murder. He admitted to pulling the gun out on Victim and that Johnson was not there." ECF 137-21 at 14. The Joint Petition again cited the Hill Affidavit under a list of the "most compelling" results of the CIU investigation. *Id.* at 17.

Unquestionably, the Hill Affidavit was not the sole basis for Johnson's exoneration. In addition to the Hill Affidavit, the CIU explained in its memo to the SAO that it based its decision on multiple independent witnesses including Morgan, Lazenby, Carroll, Dorsey, Owens, McFadden, and L.S. ECF 152-13. Still, the Hill Affidavit was used to corroborate that Johnson was not present at the scene of the crime. *Id.* at 3-4. And, regardless of whether plaintiff's post-conviction relief hinged on the Hill Affidavit, Johnson nevertheless intentionally submitted the false affidavit in his effort to persuade the SAO and the circuit court of his innocence.

Plaintiff contends that even though the Hill Affidavit was presented with his post-conviction relief petition, he has not attempted to use the Affidavit in the present litigation. ECF 152 at 32. However, "once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guise it may subsequently appear." *DeWitt*, 2021 WL915146, at *5.

Clearly, plaintiff's civil suit is grounded in his exoneration. Accordingly, plaintiff's misconduct falls within the scope of this Court's sanctioning power because the post-conviction proceedings and the present case are "immutably linked." *See id.* at *4.

As mentioned, defendants also claim that plaintiff attempted to influence Dorsey's testimony during a telephone call on June 25, 2020. ECF 137-1 at 75. And, they note that plaintiff promised Carroll that he would match whatever money Carroll raised to get an attorney (ECF 152-24), and sent Carroll $50 in the March 23 Letter. ECF 152-4 at 17. Further, plaintiff asked his friend to "show [Lazenby] love" for "stepping up to the plate" to testify on plaintiff's behalf. ECF 137-1 at 73.

I agree with plaintiff that these occurrences do not clearly amount to a quid pro quo arrangement to secure testimony in plaintiff's favor. According to CIU documents, Carroll was interviewed by the Innocence Project and the SAO on May 3, 2018, and professed plaintiff's

-72-

innocence several years *before* plaintiff's conversation with Carroll about helping Carroll to obtain counsel.  Additionally, Dorsey previously testified at plaintiff's sentencing hearing that plaintiff was not present when Taylor was killed.  ECF 152-22 at 3-5.  Dorsey also provided a sworn statement to police two weeks after the murder in which he named the group of men who confronted Taylor on the basketball court, but he did not name plaintiff.  ECF 152-12 at 8-9.  And, as to Lazenby, plaintiff claims he merely asked her to tell the truth.

However, it cannot seriously be disputed that plaintiff asked Dorsey to lie in support of his civil case during a telephone call on January 18, 2020.  It is clear that Johnson urged Dorsey to withhold information in support of plaintiff's current lawsuit.  ECF 155-25.  As noted, plaintiff said, *id.* at 00:14:28-00:15:22:

> What we got right now, Butt, is that what you told me about they told you about that statement. Yo, you can't never say that. I'm going to tell you why. Yo, listen to what I'm saying, because the way my case, the reason I'm out of prison, and the reason I got a 60 million dollar lawsuit against the police, is because we saying they withheld that statement. Now, if you saying they said something to you about it when they got – when you got lock up, right, but I'm telling you, don't say nothing about that, yo, in this case right now.

Plaintiff argues that the statement is "difficult to decipher," claiming it is unclear whether it referenced the statement of L.S. or Lazenby.  ECF 152 at 35.  Under either scenario, however, plaintiff plainly attempts to coach Dorsey to change his account about a witness statement because a truthful account would impact Johnson's civil suit.  This egregious conduct rises to the level of culpability and blameworthiness under *Shaffer*, sufficient to merit dismissal of the suit.

As I see it, there is clear and convincing evidence that plaintiff asked a potential witness to withhold testimony that he thought might damage plaintiff's civil case.  Witness tampering of any sort, at any juncture in litigation, prejudices the judicial process.  Furthermore, allowing this type of behavior would significantly damage public interest, as it would undermine the integrity of the

judicial process and perhaps encourage others to apply similarly improper measures in their own cases.

Defendants have also established by clear and convincing evidence that plaintiff engaged in litigation misconduct with respect to the Burton and Hill affidavits.  At the very least, he continued to use the Hill Affidavit after he knew of its falsity, even by his own account.  And, whether or not the SAO relied on it is beside the point.  Plaintiff purposely submitted it in his effort to secure his release.

In *DeWitt*, plaintiff also influenced witness testimony and included fraudulent evidence in post-conviction filings.  Judge Chasanow aptly stressed the importance of deterring individuals from such conduct, stating, 2021 WL 915146, at *13:

> There is a strong public interest in preserving the public confidence in the courts' ability to adjudicate disputes fairly on the basis of facts and legitimate evidence, not on perjured testimony and forged evidence. Our entire American judicial system is premised on such values.  Dismissal is also in the public interest because it deters others from engaging in similar misconduct by sending the clear message to potential offenders that attempts to game the system will not be tolerated.

Arguably, the conduct at issue in *DeWitt* was more egregious than the conduct here.  But, that does not alter the analysis or the result.  This Court takes a strong stance against misconduct in which, as here, plaintiff was caught submitting fraudulent evidence and tampering with witness testimony.  Collectively, the act of obtaining false affidavits from Burton and Hill, combined with attempting to influence the testimony of Dorsey, constitutes fraud on the Court.  For these reasons, dismissal of the Amended Complaint is the only appropriate sanction.

Defendants also seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988.  In 1976, Congress passed the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, which provides that a court, within its discretion, may award reasonable attorneys' fees to a prevailing party in certain types of actions, including those under 42 U.S.C. § 1983.  As noted by the Supreme Court,

most of the decisions addressing § 1988 concern awards to prevailing plaintiffs. *Fox v. Vice*, 563 U.S. 826, 833 (2011). A prevailing defendant, however, may also be awarded fees: "In enacting § 1988 . . . Congress sought 'to protect defendants from burdensome litigation having no legal or factual basis.'" *Fox*, 563 U.S. at 833 (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420 (1978)).

To be a prevailing party, a defendant must show that "'the plaintiff's action was frivolous, unreasonable, or without foundation.'" *Id.* And, of relevance here, "[t]he standard for awarding fees to defendants is higher than it is for plaintiffs because there are quite different equitable considerations present: awarding fees to defendants may discourage frivolous litigation, but doing it too often would undermine Congress' policy of encouraging meritorious civil rights litigation." *Wolfe v. Routzahn*, 953 F.Supp.2d 627, 635 (D.Md. 2013) (internal quotation marks omitted). And, a district court's determination in this regard is entitled to "great deference." *EEOC v. Great Steaks, Inc.*, 667 F.3d 510, 517 (4th Cir. 2012).

In my view, awarding attorneys' fees is not appropriate here. The sanction of dismissal of the suit is quite severe. A monetary sanction simply is not warranted.

I have determined that dismissal is warranted. Nevertheless, in an abundance of caution, I shall assume, *arguendo*, that the Sanction Motion lacks merit. Therefore, I turn to consider the summary judgment motions. Even so, plaintiff fares no better.

### III.    Summary Judgment Motions: Legal Standards

#### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322-24 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in *Bouchat*), *cert. denied*, 541

U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.   And, the court must view all of the facts,

including reasonable inferences to be drawn from them, in the light most favorable to the

nonmoving party.  *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; accord

*Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th

Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d

at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir.

2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).  But, the nonmovant "must rely on

more than conclusory allegations, mere speculation, the building of one inference upon another,

or the mere existence of a scintilla of evidence."   *Humphreys & Partners Architects, L.P. v.

Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).

Rather, "there must be evidence on which the jury could reasonably find for the

nonmovant."  *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal

quotation marks omitted).

Pursuant to Fed. R. Civ. P. 56(c)(1), if the moving party bears the burden of proof on the

issue at trial, it must support its factual assertions by "citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." But,

where the nonmovant bears the burden of proof at trial, the moving party may show that it is

entitled to summary judgment by citing to evidence in the record, or "by 'showing' that is, pointing

out to the district court-that there is an absence of evidence to support the nonmoving party's

case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

The district court's "function" is not "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Brown v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). But, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 F. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F. 4th 370, 383 n.8 (4th Cir. 2022) (quoting *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v.*

*Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).  "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment."  *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

### B.  Section 1983

Counts I through V of the Amended Complaint arise under § 1983 of Title 42 of the United States Code.  ECF 116, ¶¶ 119-226.  Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379 (2014).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48, (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area*

*Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982)). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (Citations and internal quotation marks omitted).

There is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Thus, § 1983 requires a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights).

Liability of a supervisory official under § 1983 attaches only upon personal participation of the official in the constitutional violation.  Such liability "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Under § 1983, supervisory liability must be predicated on facts that, if proven, establish evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

I discuss, *infra*, § 1983 in the context of a claim against the BPD pursuant to *Monell*, 436 U.S. 658.

## IV.   Officer Motion

### A.  Failure to Disclose Exculpatory and Impeachment Evidence

Count I, titled "Failure to Disclose Exculpatory and Impeachment Evidence," asserts a violation of due process under the Fifth and Fourteenth Amendments to the Constitution.  Plaintiff contends that, prior to trial, the Officer Defendants failed to produce exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[51]  Defendants dispute the contention.

---

[51] On one occasion in his Opposition to the Officer Motion (ECF 151 at 44), plaintiff cites *Giglio v. United States*, 405 U.S. 150 (1972).  But, his claims appear to be founded primarily on *Brady*.

### 1. Principles

In *Brady*, the Supreme Court expressly held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also United States v. Agurs*, 427 U.S. 97, 106-07 (1976); *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021); *Burr v. Jackson*, 19 F.4th 395, 409 (4th Cir. 2021); *Burgess v. Goldstein*, 997 F.3d 541, 550 (4th Cir. 2021); *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019), *cert. denied*, ___U.S.___, 140 S.Ct. 2641 (2020); *United States v. Young*, 916 F.3d 368, 382 n.9 (4th Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018), *cert. denied*, ___ U.S. ___, 139 S. Ct. 278 (2018); *United States v. Savage*, 885 F.3d 212, 220-22 (4th Cir. 2018), *cert. denied*, ___U.S. ___, 139 S. Ct. 238 (2018); *United States v. Horton*, 693 F.3d 463, 470 (4th Cir. 2012).

A *Brady* violation occurs when a defendant can show that the evidence at issue (1) was favorable to the defendant, (2) material to the defense, and (3) the prosecution had the evidence but failed to disclose it. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972); *Burr*, 19 F.4th at 409; *Young*, 916 F.3d at 383; *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998). The Supreme Court has said that the materiality of evidence must be evaluated cumulatively, rather than in isolation. *Wearry v. Cain*, 577 U.S. 385 (2016); *Kyles v. Whitley*, 514 U.S. 419 (1995).

Under *Giglio v. United States*, 405 U.S. 150, 154-55 (1972), it is improper for a prosecution to withhold evidence that tends to impeach a government witness. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). This is because evidence "favorable to the defendant includes not only exculpatory evidence but also evidence that the defendant can use to impeach government witnesses." *Blankenship*, 19 F.4th at 692 (italics omitted); *see United States v. Abdallah*, 911 F.3d

201, 217 (4th Cir. 2018) ("Evidence is favorable not only when it tends substantially to negate guilt but also when it tends to impeach the credibility of a key witness for the prosecution.") (internal quotations omitted); *Monroe v. Angelone*, 323 F.3d 286, 317 (4th Cir. 2003) (applying *Brady* principles and concluding that defendant did not receive a fair trial due to failure to disclose evidence that "would have significantly impaired the credibility of . . . a key prosecution witness . . . .").

Notably, "'the constitutional duty [to disclose under *Brady*] is triggered by the *potential impact of favorable* but undisclosed evidence.'" *Long v. Hooks*, 972 F.3d 442, 462 (4th Cir. 2020) (quoting *Kyles*, 514 U.S. at 434) (emphasis and alterations in *Long*). But, the "Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.'" *Blankenship*, 19 F.4th at 692 (quoting *Kyles*, 514 U.S. at 436-37).

Of relevance here, "the suppressed evidence must be *materially* favorable to the accused . . . ." *Blankenship*, 19 F.4th at 692 (emphasis added). Evidence is "material" when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. *See Kyles*, 514 U.S. at 433-34; *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Chavez*, 894 F.3d at 600-01; *Savage*, 885 F.3d at 220-22; *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015); *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013); *United States v. Kelly*, 35 F.3d 929, 936 (4th Cir. 1994).

But, the "'reasonable probability' standard does not require a showing that a defendant, "more likely than not," would have "received a different verdict." *Angelone*, 323 F.3d at 316. Rather, "the 'reasonable probability' standard is satisfied if 'the likelihood of a different result is great enough to undermine confidence in the outcome of the trial, or the suppression 'cast[s] serious doubt on the proceedings' integrity.'" *Gilliam*, 932 F.3d at 238 (quoting *Owens*, *supra*, 67

F.3d at 398) (internal citation omitted; alteration in *Gilliam*).   In *Kyles*, 514 U.S. at 434, the Supreme Court said:  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

The Fourth Circuit has observed that, ordinarily, a failure of the prosecution to disclose exculpatory evidence "turns out to be inadvertent[] . . . ."  *Angelone*, 323 F.3d at 316.  Thus, "the materiality requirement announced in *Brady* provides an important limitation . . . ."  *Id.*  Mere speculation as to the materiality of the evidence is insufficient.  *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).  Moreover, "exculpatory information is not 'suppressed' when a criminal defendant is already aware of it."  *Burgess*, 997 F.3d at 550.  And, there is no *Brady* violation when the alleged exculpatory material is available to the accused from "a source where a reasonable defendant would have looked."  *United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990); *see United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) (stating that there is also no Brady violation "if the evidence is available to the defense from other sources or the defense already possesses the evidence").

This case does not concern an alleged failure of *the prosecutor* to produce *Brady* material.  Rather, the claim concerns the conduct of the police.  Of import here, *Brady* is not limited to evidence known only to the prosecutor.  In addition, the "obligation applies to 'evidence known only to police investigators and not to the prosecutor.'"  *Blankenship*, 19 F.4th at 692 (quoting *Kyles*, 514 U.S. at 438). Indeed, law enforcement officers have a duty to turn over to the prosecutor any material evidence that is favorable to a defendant.  *See Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846-47 (4th Cir. 1964); *see also Owens*, 767 F.3d at 396.  Moreover, *Brady*'s obligations do not attach only to the officer who collected the evidence.  Rather, *Brady* applies to any officer who has knowledge of the exculpatory or impeachment evidence. *See Owens*, 767 F.3d at 397-

98 (holding that police officers possessing the same exculpatory statements could be held liable for failing to disclose them to prosecutors).

Nevertheless, and of significance here, the Fourth Circuit has made clear that, "[u]nlike prosecutors . . . police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Gilliam*, 932 F.3d at 238; *see Burgess*, 997 F.3d at 550; *Owens*, 767 F.3d at 396 n.6, 401.  Bad faith may be inferred from the fabrication of evidence and from the failure to disclose "the most relevant and exculpatory evidence in the case . . . ." *Gilliam*, 932 F.3d at 239-40 (finding that plaintiff adequately alleged bad faith in light of allegations that defendants "intentionally fabricated, obscured, and failed to disclose the most relevant and exculpatory evidence in the case").  Bad faith may also be inferred through gross deviations from routine police conduct. *See Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) (finding that because the officer defendant "had participated in hundreds of homicide investigations," a reasonable jury "could conclude that [the officer] knowingly suppressed the statements to secure a conviction"); *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013) (noting that errors in investigation "were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights").

In some circumstances, "the knowledge of some who are part of the investigative team is imputed to prosecutors regardless of the prosecutors' actual awareness." *United States v. Robinson*, 62 F.3d 941, 951 (4th Cir. 2010); *accord Kyles*, 514 U.S. at 437.  However, there are no "hard and fast lines about the scope of *Brady* imputation . . . ." *Robinson*, 627 F.3d at 952.

In addition, "to prove a due process violation, [plaintiff] must prove both but-for causation and proximate causation—in other words, that the alleged wrongful act(s) caused [his] loss of liberty and the loss of liberty was a reasonably foreseeable result of the act." *Gilliam*, 932 F.3d at

238; *see Massey v. Ojaniit*, 759 F.3d 343, 354-56 (4th Cir. 2014); *Evans v. Chalmers*, 703 F.3d 636, 647-48 (4th Cir. 2012).[52]

## 2. An Overview of Johnson's Contentions

Plaintiff contends that Johnson's conviction rested solely on the testimony of L.S.  ECF 151 at 10.  Moreover, he maintains that "[L.S.'s] trial testimony was false."  *Id.*  With these contentions as his framework, Johnson asserts numerous claims concerning "key evidence" that the police allegedly failed to disclose.  *Id.*

According to plaintiff, the detectives failed to disclose the following, *id.* at 10-11:  L.S.'s "initial statement," contained in the Jones Report of July 14, 1988 (ECF 138-4); an alleged "second interview" of L.S. by a detective at police headquarters on the night of July 14, 1988; the July 19 Report (ECF 151-2 at 13-14), which was allegedly "materially inconsistent" with L.S.'s trial testimony; Davis's July 19 Notes (ECF 138-10), which "revealed the presence of another witness who . . . would have testified that Mr. Johnson was not there"; a negative identification of Johnson in a photo array (ECF 151-2); notes showing that detectives conducted "a biased, sloppy investigation; and "other misconduct, including presenting a false and misleading application" for Johnson's arrest and "failure to investigate an obvious suspect" in order to "shield" their "malfeasance."  Defendants argue to the contrary.

As mentioned earlier, Officer Jones interviewed 15-year-old L.S. at the scene, shortly after she witnessed the brutal, cold-blooded murder of her cousin.  According to Jones, who was then a

---

[52] In ECF 151 at 36, plaintiff cites portions of the text from this Court's Memorandum Opinion of March 10, 2020 (ECF 45), denying three motions to dismiss (ECF 22, ECF 24, ECF 25).  Plaintiff seems to suggest that this Court has already determined that the disputed evidence was both exculpatory and material.  But, in the ruling, the Court expressly indicated that it was assuming the truth of plaintiff's allegations, and drawing all inferences in his favor.  ECF 45 at 3 n.2.  In that light, I found that plaintiff stated a plausible claim for withholding exculpatory evidence.  *Id.* at 42.  And, I observed that, "as alleged," the evidence was "material."  *Id.* at 43.

rookie cop, L.S. stated that she saw three males with the shooter, but she was unwilling to provide their names.  She explained that she was "in fear of her life."  ECF 138-5 at 2.  Moreover, she did not mention a gun hand-off by Johnson to Hill.  ECF 138-5 at 2.  To the extent that Jones may have asked questions of L.S., they are not reflected in the Jones Report.  In other words, there is no indication that L.S. was ever asked whether anyone other than the shooter also had a gun, or how the shooter came into possession of a gun.

Jones prepared his report, recounting his interview.  But, L.S. did not sign or adopt the Jones Report.

Johnson maintains that Jones conducted his interview of L.S. at the Homicide Unit. Therefore, he claims that afterwards, a homicide detective must have interviewed L.S.  And, plaintiff contends that the police failed to disclose that alleged second interview on July 14, 1988.

As to Davis's July 19 Report (ECF 151-2 at 13), which I previously summarized, it indicates that L.S. said that Johnson handed Hill a small gun.  *Id.*  Poopie pointed the gun at the victim, and it "clicked twice, but didn't fire." *Id.*   *See* ECF 152-2 at 13.  L.S. and Taylor ran into the Night Owl, and five suspects "ran to the front of the store." *Id.* The July 19 Report also states that L.S. "then saw Poopie holding a large black handgun." *Id.*  The July 19 Report does not mention that L.S. went to the Night Owl with two other people.

The July 19 Notes contain the information set forth above.  ECF 151-13 at 2-3.  However, the July 19 Notes also reflect that L.S. said she went to the Night Owl with her girlfriend and her mother's friend.  The July 19 Notes do *not* include the names of those people, however. *Id.*  Under the words, "In store at time of shooting," the July 19 Notes state, *id.*at 3: "[L.S.], her mothers [sic] friend, Poopie, Aaron & man he grabbed.  Her girlfriend was hiding outside."

In L.S.'s Grand Jury testimony, ECF 143, she testified that she saw the victim standing with five males. *Id.* at 3, 4. She recalled that as she was going into the Night Owl, "Lamont, he gave Poop a gun . . . ." *Id.* at 3. Then, she confirmed that Johnson "hand[ed] Poop the gun[.]" *Id.* at 4. When asked what Hill did after Johnson handed him the gun, L.S. testified: "Poop clicked it twice and it wouldn't shoot." *Id.* at 5. L.S.'s testimony indicated that the gun Johnson handed to Hill had misfired, and it was not the gun used to shoot Hooper.

At trial, L.S. testified that Johnson handed Hill a gun *after Hill's gun had misfired*. ECF 151-31 at 3-4; *see also* 137-23 at 7. Specifically, L.S. stated that Hill "shot it twice," but "nothing happen[ed]." ECF 151-31 at 4-5. According to L.S., Johnson then "handed [Hill] another gun." *Id.* at 5.

The trial testimony varied from L.S.'s Grand Jury testimony with regard to the sequence of when Johnson handed Hill a gun, and if it misfired. It is, however, consistent with the salient portion of the testimony: Johnson gave Hill a gun to shoot the victim.

In her trial testimony, L.S. claimed three males were on the playground and two males were with the victim. *Id.* at 18. In her Grand Jury testimony, she stated that five males were standing with the victim. ECF 151-14 at 6.

In her Grand Jury testimony, L.S. indicated that she had been at her home with her mother's friend and her girlfriend. The prosecutor did not ask their names or any other questions relating to them. But, the Grand Jury testimony was provided to the defense. Indeed, Tayback cross-examined L.S. vigorously regarding the discrepancies between her Grand Jury testimony and her trial testimony. ECF 151-31 at 9-59.

I turn to discuss the claims that various items were allegedly withheld by the Officer Defendants.

### a. Jones Report

The parties disagree as to whether the Officer Defendants failed to disclose the Jones Report to the prosecutor.

Det. Davis claimed that, as a matter of general practice, he turned over all information in a homicide file to the prosecutor.  ECF 138-6 at 6.  And, the Officer Defendants claim that the Jones Report was in the homicide file that the SAO reviewed.  ECF 138-1 at 23.

ASA Phillips testified at his deposition that it was his general practice to review the homicide detective's book and order the full Baltimore City complaint file and any documents filed under the complaint number in Central Records.  *See* ECF 138-14 at 8-10.  He also testified that he would have shared the Jones Report with defense counsel pursuant to his "open file policy."  ECF 151-36 at 3, 4.

Notably, there is no dispute that the defendants produced Davis's July 14 Report.  ECF 138-3 at 10-13.  And, in that report, Davis specifically states that Officer Jones interviewed L.S. on that date.  *Id.*  On that basis, it is difficult to grasp how defense counsel would not have known about the Jones interview, or at least have known to ask for it.

Nevertheless, plaintiff's defense attorney, Tayback, testified in 2012 that he did not remember receiving the Jones Report.  ECF 137-16 at 8.  Moreover, the Jones Report was not mentioned at the trial in 1989, and Jones was not called to testify.   Nor did Tayback use the Jones Report to cross-examine L.S. or Davis.  And, Tayback claimed that he would have used the Jones Report if he had it, because it is "contrary to the State's theory of the case."  ECF 151-36 at 6.[53]

---

[53] Defendants argue that even if the Jones Report was not disclosed to the prosecutor, defense counsel could have discovered it through the exercise of due diligence, by ordering the police reports from Central Records.  I reject this contention.  In *Strickler v. Greene*, 527 U.S. 263 (1999), the Court held that an attorney's knowledge that his client had been interviewed did not defeat a *Brady* claim that evidence from that interview had been suppressed.  *Id.* at 285.  Tayback

I shall assume, completely *arguendo*, that the Jones Report was not disclosed to defense counsel.

### b. July 19 Report and July 19 Notes

Plaintiff claims that defendants suppressed the July 19 Report because Tayback did not use it at trial, which indicates that he did not have it, and Thomas Carroll's lawyer learned for the first time at trial that L.S. identified a photo of Carroll, despite the reference to this identification in the July 19 Report. ECF 151-34 (Trial Transcript of March 9, 1989), at 4. Plaintiff also asserts that defendants suppressed the July 19 Notes because the SAO file that defendants produced did not include them.

The prosecutor claimed in his Affidavit that the July 19 Report was in his file, and that defense counsel had access to the file. ECF 138-21 at 4. Moreover, as the Officer Defendants point out, Det. Davis referenced the July 19 Report during a hearing on a motion to suppress concerning Carroll. ECF 138-2 at 26. Thus, Davis clearly did not seek to hide its existence. *Id.*

ASA Phillips acknowledged at trial that he learned of the two witnesses referenced in the July 19 Notes for the first time during L.S.'s trial testimony, when she spoke of them. ECF 151-29 (Trial Transcript of March 15, 1989), at 3. As noted, the July 19 Notes mention that two people went with L.S. to the Night Owl. But, their names are not mentioned. So, this may explain why Phillips did not know their names until trial. In other words, even if Phillips had those notes, the notes did not provide the names of the two individuals. And, as indicated, the July 19 Report does not mention that L.S. went to the Night Owl with twp other people.

---

served a discovery request for all exculpatory materials and police reports. ECF 151-26. It was reasonable for Tayback to rely on the representations in the files tendered to him.

I cannot determine whether the July 19 Notes or the July 19 Report were in the SAO file or Det. Davis's notebook.  Because I cannot resolve the factual dispute, I shall assume, *arguendo*, that the July 19 Report and the July 19 Notes were not produced prior to trial.

### c.  Photo Arrays

Plaintiff contends that the Officer Defendants failed to disclose a non-identification of Johnson in a photo array.  ECF 151 at 38-39.  There is no known non-identification, but plaintiff speculates that one must have occurred.

Plaintiff was included in at least two photo arrays contained in the Homicide File.  Plaintiff claims (ECF 151 at 12) that in L.S.'s Grand Jury testimony on July 28, 1988, L.S.  claimed to have selected plaintiff's photo.  ECF 151-14 at 14;[54] ECF 138-20.  Yet, according to plaintiff, the BPD's files lack any reference to L.S.'s alleged identification of Johnson, even though the defendants documented L.S.'s identification of Alvin Hill.  *See* ECF 151-2 at 67-68, 69-70.  Given the defendants' policy to document an inculpatory identification, as they did with L.S.'s identification of Hill, Johnson surmises that a jury could reasonably conclude that L.S. failed to identify Johnson, and thus the Officer Defendants suppressed a non-identification of Johnson.  ECF 151 at 40.

At the Grand Jury, L.S. specifically referenced her photographic identification of "Tommy," not Johnson, on July 12.  ECF 151-14 at 19-20.  As noted earlier, the photograph of Thomas Carroll was shown to L.S. on July 12, 1988.  ECF 151-2 at 14.  Plaintiff argues, without evidentiary support, that L.S. must have mixed up Johnson and Carroll.  ECF 151 at 49 n.22 (explaining that David Hightower died in the Carroll brothers' house).

Johnson complains out that various documents do not specify the identities of the witnesses who were shown photo arrays or single photographs, or the identities of the suspects depicted in

---

[54] Page 15 of the exhibit, in electronic form, is blank.

the photos. *See*, *e.g.*, ECF 151-2 at 24, 25, 68; ECF 151-12 at 3. He also notes that the Homicide File reflects many instances when photos were shown to witnesses, without adequate documentation. ECF 151 at 21. A check mark appears next to Mim's name, for example, when a photo array is referenced. ECF 151-2 at 75. However, according to plaintiff, there is no formal documentation pertaining to a photo identification made by Mims. ECF 151 at 14. From these facts, Johnson asks the Court to infer that Johnson must have been included in a photo array, or his photograph must have been shown, and the witness(es) must have failed to identify him.

I previously reviewed the facts concerning the use of photos. I highlight here that there is no evidence that anyone, let alone L.S., viewed a photo array that included Johnson's photo, or that a single photo of Johnson was displayed. To be sure, the Homicide File reflects several instances when witnesses identified Thomas Carroll and Alvin Hill. *See* ECF 151-12. For example, Donzella Carroll identified a photograph of Alvin Hill on August 1, 1988; L.S. identified Alvin as Poopie when shown a "spread" on August 2, 1988; and Kim identified Hill as the shooter on September 20, 1988. *Id.* at 2. L.S. also testified before the Grand Jury that she identified a photograph of Thomas Carroll.

Johnson has demonstrated that the documentation concerning the use of photos was sloppy. But, he has failed to produce evidence from which a jury could conclude that the Officer Defendants withheld or failed to disclose a non-identification of Johnson in a photo array or by way of use of a single photo.

The law is clear that, on summary judgment, a nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Although this Court is

-92-

mindful that it must draw all inferences in favor of Johnson as the nonmoving party, the inferences must be reasonable.  In my view, the claim of a non-identification of Johnson is little more than rank speculation.

### d.  Phantom L.S.  Interview

Johnson insists that Jones interviewed L.S. at the Homicide Unit on July 14, 1988, and that afterwards, she would have been interviewed by a Homicide Detective.  And, he then contends that the police failed to disclose the second interview of L.S., conducted on July 14, 1988.

The supposition of a second interview of L.S. on July 14, 1988, is entirely dependent on the contention that Jones interviewed L.S. at the Homicide Unit in downtown Baltimore.  And, that contention is completely belied by the record.

It is undisputed that the murder occurred at about 1:15 a.m. on July 14, 1988.  Jones obviously arrived at the scene after that time.  In the Jones Report, prepared on July 14, 1988, when Jones's memory would have been fresh, he wrote that his interview commenced at 1:50 a.m., *i.e.*, about 35 minutes after the murder.  *See* ECF 138-5 at 2.  Common sense suggests that Jones could not have identified L.S. at the scene as someone with whom to speak, and manage to transport her to the Homicide Unit in downtown Baltimore for an interview, and then begin the interview process, all by 1:50 a.m.

In addition, at trial Det. Davis stated that he encountered L.S. at the scene.  ECF 138-2 at 25.  However, he explained, *id.*:  "She was in a very emotional condition, and it was my decision to let her go home with her mother."  It was not until July 19, 1988 that he "spoke to her in depth . . . ."  *Id.*  His deposition testimony on July 20, 2021, is consistent with that statement.  *See* ECF 138-6 at 13.

Moreover, Det. Davis's handwritten notes reflect that the murder occurred at 1:16 a.m. on July 14, 1988, and the notes contain a reference to L.S.'s first name.  ECF 151-12 at 2.  Next to L.S.'s name, it states, *id*.:  "upset briefly interviewed at scene, released."  The notes do not specify who interviewed L.S., but it is significant that the notes confirm L.S.'s emotional state, and the interview was brief.

Significantly, in Det. Davis's Report to Capt. MacGillivary on July 14, 1988 (ECF 138-3 at 10-13), Davis identified L.S. as a witness, and said, *id*. at 12:  "This witness who was in a [sic] extremely excited condition stated she was in the store when her cousin . . . was shot."[55]  And, of import, Davis said, *id*.:  "This witness *will be interviewed* by Homicide Investigators as soon as possible."  (Emphasis added).  If a Homicide Detective had already interviewed L.S., that statement would make no sense.

In addition, and also of import, the plaintiff and the SAO expressly asserted in the Joint Petition that Jones interviewed L.S. *at the scene* on July 14.  ECF 137-21 at 4.  Thus, in Johnson's Joint Petition, he told the court a version of events that he now challenges.[56]

---

[55] In the Joint Petition, the SAO credits its interview of L.S. on May 16, 2018.  ECF 138-20.  In that interview, L.S. recalled that she was in "shock" at the scene.  Her recollection of her mental state is consistent with Davis's account.

[56] The doctrine of judicial estoppel has not been raised. But, its principles are noteworthy. "'Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation.'" *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 457 (4th Cir. 2017) (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28 (4th Cir. 1995)); *see Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019); *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007). In addition, the doctrine "'generally prevents a party from prevailing *in one phase of a case* on an argument and then relying on a contradictory argument to prevail *in another phase.*'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdich*, 530 U.S. 211, 227, n.8 (2000)) (emphasis added).

To be sure, judicial estoppel "'must be applied with caution'" and only "'in the narrowest of circumstances.'" *Gilliam*, 932 F.3d at 233 (quoting *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)); *see Faggert & Frieden*, 65 F.3d at 29 (instructing that "courts must apply the doctrine with caution"); *accord Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 639 (E.D. Va. 2016)

In short, there is no evidence that L.S. was interviewed by any officer other than Jones on July 14. And, there is no evidence that an interview took place at the Homicide Unit in downtown Baltimore.

Against the overwhelming evidence that L.S. was interviewed by Jones at the scene on July 14, 1988, Johnson attempts to create a dispute of fact by relying on the Declaration and the Affidavit of Jones, provided three decades later. *See* ECF 138-4; ECF 138-7.

In Jones's Declaration of June 25, 2021 (ECF 138-4), he claims that he was instructed by a homicide detective to take L.S. to the Homicide Unit in downtown Baltimore, which he did. *Id.* ¶¶ 6, 7. There, he took a statement from L.S., without making any notes. *Id.* ¶ 7. And, he recalled that he left L.S. in an interview room, because he "expected a homicide detective to interview" L.S., consistent with "procedure at the time . . . ." *Id.* ¶ 13.

In his Affidavit of August 26, 2021 (ECF 138-7), Jones reiterated that a member of the BPD told him to transport L.S. to Police Headquarters, where he interviewed her. *Id.* ¶¶ 4, 5. Jones recalls that, at the conclusion of his interview, he told a member of the BPD of L.S.'s presence. *Id.* ¶ 6.

---

(observing that judicial estoppel is an " 'extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice' ") (citation omitted). An equitable doctrine, judicial estoppel is "designed to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Martineau*, 934 F.3d at 393 (quoting *New Hampshire*, 532 U.S. at 749-50, 121 S.Ct. 1808); *see Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir. 1998) (observing that judicial estoppel "exists to prevent litigants from playing 'fast and loose' with the courts").

In the Fourth Circuit, judicial estoppel is appropriate only where: "(1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the position sought to be estopped must be one of fact rather than law or legal theory; (3) the prior inconsistent position must have been accepted by the court; and (4) the party sought to be estopped must have intentionally misled the court to gain unfair advantage." *Minnieland*, 867 F.3d at 458 (internal quotation marks and citation omitted); *see Martineau*, 934 F.3d at 393; *Gilliam*, 932 F.3d at 933. It is a fact-intensive inquiry. *See Martineau*, 934 F.3d at 394.

Plaintiff supposes that if L.S. were interviewed by Jones at the Homicide Unit, then she was necessarily interviewed afterwards by a homicide detective, but the report of that second interview was not disclosed.  Even if Jones interviewed L.S. at Headquarters, as he recalls three decades later, there is still no evidence that L.S. was then interviewed at that time by a Homicide Detective.

To be sure, in the posture of the case, the Court may not weigh the evidence or assess the credibility of witnesses, and I have not done so.  Rather, I rely on basic summary judgment principles.  The nonmovant cannot rely on the existence of a scintilla of evidence that is contradicted by overwhelming evidence.  Surmise and speculation are not sufficient to create a genuine dispute of material fact as to plaintiff's claim that the Officer Defendants failed to disclose a second interview of L.S. on July 14, 1988, conducted by a homicide detective.  *See*, *e.g.*, *Local Union 7107*, 124 F.3d at 640.

To review, I have assumed a genuine factual dispute as to whether the Officer Defendants failed to disclose the (1) Jones Report of July 14, 1988; (2) the July 19 Notes; and (3) the July 19 Report.  And, in Johnson's view, these pieces of evidence were exculpatory and material.  He contends that Tayback would have used the Jones Report, the July 19 Report, and the July 19 Notes to impeach L.S.'s trial testimony.  *See*, *e.g.*, ECF 151 at 45-48.  Therefore, I turn to the issue of materiality.

### 3.  Materiality

Plaintiff insists that L.S. was the only witness who implicated Johnson.  Therefore, her testimony was central to the State's case against Johnson.  Her testimony was certainly critical to the State.  But, she was not the only witness who implicated Johnson.  Plaintiff ignores the

testimony of K.A., who consistently maintained that Johnson was with Hill and Dorsey at the time of the murder.

As discussed repeatedly, Officer Jones interviewed L.S., the victim's cousin, shortly after the murder.  The Jones Report does not indicate that L.S. said Johnson gave a gun to Hill.  Nor did she provide the names of any assailants.  And, she did not mention that she went to the Night Owl with her friend and her mother's friend.

According to Davis's July 19 Notes, his July 19 Report, and L.S.'s Grand Jury testimony of July 28, L.S. identified Johnson and others as the assailants.  And, the July 19 Notes, the July 19 Report, and the Grand Jury testimony include statements that Johnson handed Hill a gun.  There is some inconsistency as to when Johnson provided the gun and whether that gun was the one that misfired.  But, there is no inconsistency with respect to L.S.'s contention that Johnson gave a gun to Hill.

In addition, the July 19 Notes reflect that two people went to the Night Owl with L.S., but their names are not identified.  Those people are not referenced at all in the July 19 Report.  And, in the July 19 Notes, L.S. claimed that her girlfriend fled the store.[57]

Johnson claims that because L.S. knew Johnson, she certainly would have provided his name, or a description of him, to Jones if she had actually seen him at the time.  Yet, when L.S. spoke to Jones soon after the murder, she did not mention Johnson. Thus, Johnson contends that the absence of any reference to him in the Jones Report exculpates him.  And, he claims that the Jones Report was material because his defense attorney, Tayback, would have used the Jones Report at trial to impeach L.S..  In addition, plaintiff argues that the Jones Report could have been

---

[57] In L.S.'s interview in 2018, she claimed her friend was hiding at the time of the shooting.

used to impeach Det. Davis, because Davis claimed that he did not speak to L.S. on the night of the murder.

These arguments are unconvincing.  It is plainly inaccurate to suggest, based on the Jones Report, that L.S. was unable to identify Johnson.  L.S., who was 15 years old at the time of the murder, was interviewed at the scene, within minutes of the brutal murder of her cousin.  She stated that there were three black males "with [the] suspect," one of whom she recognized but did not know the name.  ECF 138-5 at 2.  As to the other two black males with the suspect, Jones claimed that L.S. "know[s] the names . . . but she did not want to give the names because she's in fear of her life."  *Id.*  That statement is not inconsistent with L.S.'s later testimony, because it is not an inability to identify.  Rather, it was an unwillingness to identify.

To be sure, at the hearing on the 2012 Petition before Judge Murdock, Tayback claimed that he would have used the Jones Report because it is "contrary to the State's theory of the case."  ECF 151-36 at 6.  But, the State never claimed that Johnson was the shooter.  And, it is not entirely clear that a seasoned attorney like Tayback would have opted to use the Jones Report, given the risk that doing so may well have opened the door to an explanation by L.S. as to why she declined to identify the suspects, including Johnson:  She was in fear for her life.

Johnson also asserts that the Jones Report is material because L.S. did not mention a gun hand-off, which Tayback also would have used for impeachment.  ECF 151 at 45.  Notably, the Jones Report is Jones's account of what L.S. said; it is not actually L.S.'s statement.  And, there is no indication that L.S. was ever asked whether anyone else, apart from the shooter, had a gun.  Her later statements, asserting that Johnson gave a gun to Hill, is not actually inconsistent with the initial statement that "the suspect . . . came into the bar," and "pulled a . . . gun from his waistband . . . ."  ECF 138-5 at 2.

The reasoning of two Maryland courts that considered Johnson's claim concerning the Jones Report is noteworthy.

Baltimore City Circuit Court Judge Murdock considered the substance of the Jones Report in connection with Johnson's post-conviction challenge.  ECF 163-2.  She stated, *id.* at 5: "The [L.S.] statement, albeit vague, is materially consistent with the witness's trial testimony. . . . Notably, the statement fails to state that Petitioner was not present at the scene and fails to provide the name of any suspect, not just Petitioner. As a result, the statement could be used to point out her initial lack of detail, but not any inconsistency on the actual merits." Judge Murdock concluded that the "newly discovered evidence," *i.e.*, the Jones Report, was not exculpatory and would not have created a significant possibility of a different outcome at trial, even if it had been admitted.

On appeal, the Maryland Court of Special Appeals soundly agreed.  ECF 137-16.  It stated, *id*. at 11: "Although there were minor inconsistences between the police report and L.S.'s trial testimony, the circuit court was correct that the police report was not material."  The appellate court reasoned, *id.* at 11-12:

> At trial, as previously noted, L.S. testified that she saw the victim talking in front of the bar to the shooter and four other men (including Johnson).  In the report, she told the officer that there were three black males with "the suspect," one fewer than what she had said at trial.  But the court was correct that L.S. neither acknowledged  that Johnson  was not one of  those three other men present at the scene nor did she name other individuals in the report.  Significantly, she said in the report that she knew the name of two of the unnamed black males, but "she did  not want  to give  the  names because  she's in fear of her life."

> The incriminating portion of L.S.'s testimony was that Johnson, the shooter, and the other men were talking to the victim near the bar.  According to L.S., the shooter pulled out a gun, aimed it at the ground, shot twice, but the gun misfired.  She then testified that Johnson  handed  the shooter another gun, and the shooter ran after the victim  into the bar. In the bar, the victim was holding another man as a shield, but, after that man escaped, the shooter shot and killed the victim  with the gun that Johnson  had handed to him.

The police report recounts a similar set of circumstances. According to the report, L.S. told the officer that the shooter pulled a gun from his waistband and held it down toward the floor. The victim grabbed a man named Marvin Reid to use as a shield, but, explained L.S. in the report, Reid "somehow got away and hit the ground." She then ran out and heard five shots.

As the court concluded, there is nothing in the report that shows that L.S. "testified falsely on the core merits of the case under review." *Jackson,* 164 Md. App. at 698. Because the defense could have used the report only to further undermine L.S.'s testimonial credibility, the circuit court did not abuse its discretion when it found the report to be "merely impeaching" evidence and not "material."

At trial, Tayback made thorough use of L.S.'s Grand Jury testimony to cross-examine her, and to establish inconsistencies in L.S.'s trial testimony. Of relevance, the Maryland appellate court said, ECF 137-16 at 13:

Notably more damaging to L.S.'s credibility than her statement in the "newly discovered" [Jones] police report was her grand jury testimony, where she said that Johnson handed the shooter the gun that misfired, rather than the murder weapon-a statement that contradicted her version at trial. And Johnson's trial counsel thoroughly cross-examined her on that contradiction, among other things, without convincing the jury that Johnson was innocent. There is nothing in the police report that suggests it would have been more persuasive than defense counsel's cross-examination of L.S.. Accordingly, the circuit court did not abuse its discretion in denying Johnson's petition for writ of actual innocence.

As noted, in the Jones Report, there is no indication that L.S. mentioned the presence of her girlfriend or her mother's friend. On the other hand, there is no indication that she was asked a question that would have elicited that response. In any event, that a 15-year-old relative of a murder victim, interviewed within minutes of the crime, might not have thought to mention the two others who also went to the store, is neither exculpatory nor material.

Moreover, in her Grand Jury testimony, L.S. mentioned that she had been at her home with her girlfriend and her mother's friend. ECF 138-12 at 3. Yet, the prosecutor failed to inquire

further.  But, Tayback had the Grand Jury testimony.  So, he was certainly on notice of the fact that L.S. had been with two others shortly before the incident.

According to Johnson, if Tayback had access to the July 19 Notes, he would have learned of Lazenby's existence and then would have obtained her favorable testimony.  ECF 151 at 47-48. Johnson asserts that Lazenby would have told the police that she did not see him at the Night Owl on July 14, 1988.  ECF 151 at 47-48.  But, perhaps most significant, there is no basis whatsoever to conclude that the Officer Defendants were aware that the two individuals who went to the store with L.S. had exculpatory information.  Thus, they cannot be accused of hiding evidence favorable to Johnson.

Unidentified BPD officers attempted to interview Lazenby on the day of the murder.  ECF 138-15 at 13-14.  At Lazenby's deposition in May 2021, however, she testified that three officers came to her house on the day of the murder, and her mother unequivocally refused to allow the officers to speak with her.  *Id.* at 14-17.  And, in a pretrial statement, L.S. had said that Lazenby fled the Store.  ECF 151-13 at 3.  Thus, there is no basis to conclude that the officers were aware that Lazenby would have exculpated Johnson.  And, there is no indication that any police officer ever spoke to the man identified as Quinton, *i.e.,* the friend of L.S.'s mother.

Moreover, the July 19 Notes do not contain the names of the two people who went with L.S. to the Night Owl on July 14.  So, even if Tayback had the July 19 Notes, he would have had to track down the identities of the two individuals.  And, in effect, he had almost the same clues from L.S.'s Grand Jury testimony.  Yet, it appears that Tayback did nothing with that information.

Johnson also claims Tayback could have used the evidence of an unsuccessful attempt to interview Lazenby to cross-examine Det. Davis on his failure to properly investigate the homicide.

*Id.* at 48.  The unsuccessful attempt to interview Lazenby has no impeachment value.  The Officer

Defendants' failure to pursue every possible witness does not amount to a *Brady* violation.

As to Det. Davis, the Jones Report would not have impeached his testimony.  Davis never

claimed that L.S. was not interviewed at the scene.

Johnson also claims Tayback could have used the July 19 Report to impeach Det. Davis

because at trial Davis denied writing the July 19 Report.  However, Davis never denied authoring

the July 19 Report, as Johnson suggests.  Davis was asked whether he took "a written statement"

from L.S. at the time he interviewed her.  ECF 163-5 at 3.  Davis explained: "No, sir.  I made

notes, written notes.  It's her recollection of what happened."  *Id.*  In police parlance, that assertion

was correct; L.S. did not provide a signed statement.

At oral argument, and in follow-up correspondence (ECF 176), Johnson's counsel cited

*Burgess v. Goldstein*, 997 F.3d 541, 552 (4th Cir. 2021),[58] for the proposition that summary

judgment in favor of defendants would be inappropriate, because "thin evidence is not the same as

no evidence."  On this basis, plaintiff contends that, in the light most favorable to plaintiff, and

drawing the inferences in his favor, there is evidence from which a jury could infer that the Officer

Defendants suppressed exculpatory, material evidence, in violation of *Brady*.

In *Burgess*, the BPD was investigating the 1994 murder of Michelle Dyson, who had been

killed in the basement of her home while her four children were upstairs.  *Id.* at 546.  Sabein

Burgess, Dyson's boyfriend, had left the home before the murder to facilitate a drug deal, and

when he returned, he allegedly found the front door of the home cracked and the front room

ransacked.  He then found Dyson in the basement.  She had been shot to death.  *Id.*

---

[58] The Court notes that the defendant in *Burgess* (Det. Goldstein) is a defendant here.  And,
Gordon Tayback represented the plaintiff, Sabein Burgess, in his underlying criminal case, which
gave rise to the *Burgess* civil litigation.

The BPD received a call about a shooting at the home at around 10:27 p.m. on October 5, 1994. *Id.* Det. Goldstein, the lead detective, arrived at the scene at 10:45 p.m. *Id.* By then, three or four uniformed BPD officers were already on the scene. *Id.* It was undisputed that Goldstein was not in uniform. *Id.* at 551.

Burgess was convicted of Dyson's murder and sentenced to life imprisonment plus twenty years. *Id.* at 547. Three years after Burgess's conviction, a man named Charles Dorsey, then-serving a 45-year prison sentence, confessed to killing Dyson. *Id.* Burgess successfully filed a Petition for Writ of Actual Innocence in the Circuit Court for Baltimore City. *Id.* Burgess's convictions were vacated, and the State entered a *nolle prosequi*. *Id.* at 548. Burgess subsequently sued the BPD and others, claiming federal and state civil rights violations. *Id.*

By the time the civil case went to the jury, Det. Goldstein was the only remaining defendant. *Id.* Burgess claimed he violated *Brady* by concealing exculpatory evidence of FBI Notes referring to other suspects, and by suppressing information from a child of the victim, who allegedly saw a man other than Burgess enter the home. *Id.* Additionally, Burgess claimed that the defendant fabricated a police report stating that all the children were asleep at the time of the murder. *Id.*

The facts regarding Dyson's four children at the home were "heavily disputed." *Id.* at 546. Reports from the BPD and the Department of Social Services ("DSS") indicated that the children were asleep at the time of the murder. *Id.* The homicide report noted that the four children were asleep on the second floor and were "turned over" to the DSS. *Id.* at 547. Of the thirteen officers who responded to the scene, eight officers testified at trial, or their testimony was stipulated, and all denied speaking to the children. *Id.* at 546.

Some eighteen years after Dyson's murder, *id.* at 551, two of Dyson's children, Brian and Tawanda, claimed that "one or more uniformed BPD officers . . . questioned them" in their living room on the night of the murder.  *Id.* at 546.  Notably, Brian claimed that he woke up on the night of the murder and saw a man force his mother into the basement and that man was not Burgess. *Id.* at 547-48.  Officers testified that if the children had been interviewed, the defendant would have known or been involved.  *Id.* at 551.  Another officer's report from the night of the murder indicated that the defendant had been in the house with the children for forty-three minutes.  *Id.* On that basis, Burgess asserted that a jury could conclude that the defendant saw the children and spoke to one or more of them.  *Id.*  A handwritten note from another detective suggested that the victim's father had been trying to get in touch with Goldstein and referenced Brian as a witness. *Id.* at 547.

FBI Notes suggested that Dyson's murder was drug-related.  In addition, the FBI Notes suggested that there were other witnesses and potential suspects, and "that the information had been passed on to the case detective of the BPD Homicide Unit." *Id.* at 548.

In sum, Burgess claimed that Goldstein violated Burgess's constitutional rights by concealing exculpatory evidence, including that the police spoke to Brian at the home, who said he saw someone other than Burgess enter the home, and concealing information from the FBI about alternative suspects; fabrication of a police report stating that all four children were asleep at the time of the murder; malicious prosecution of Burgess, without probable cause; and intentional infliction of emotional distress.  *Id.*

In a pretrial ruling, Judge Bennett allowed the claims to proceed against several defendants, while granting summary judgment for other officer defendants.  *Burgess v. Baltimore Police Dep't*, RDB-15-0834, 2017 WL 4947004, at *1 (Dist. Md. Oct. 31, 2017).   In denying summary

judgment, the court found a genuine dispute of material fact as to whether the defendants withheld the eyewitness account of the victim's son, Brian. *Id.* at *11. Additionally, he found a genuine dispute of material fact regarding the exculpatory nature and suppression of the FBI Notes. *Id.* at *12.

Notably, Judge Bennett said, in part: "Defendants do not challenge that Brian Rainey's eyewitness account, which he allegedly shared with Defendants on the night of his mother's murder, is exculpatory evidence." *Id.* at 11. The factual dispute was solely based on whether the defendants suppressed Brian's eyewitness report, not whether the report was material or exculpatory. *Id.*

Additionally, regarding the materiality of the FBI Notes, Judge Bennett reasoned: "Plaintiff also argues that FBI-vetted information that the motive for Dyson's murder related to drugs is 'qualitatively different' different [sic] than Plaintiff's admitted awareness that Dyson used and/or sold drugs. For example, FBI information explicitly linking the drug trade to the murder may have enabled Tayback to present the drug angle at [Burgess's criminal] trial—where the trial judge had rejected evidence of Dyson's drug use as 'irrelevant.'" *Id. at* 12. Thus, Judge Bennett concluded that the information in the FBI Notes pointing to other potential suspects and a drug-related motive for Dyson's murder presented a factual dispute as to the materiality of the FBI Notes and whether the defendants withheld them. *Id.*

After a ten-day trial, the jury returned a $15 million verdict in favor of Burgess. *Burgess*, 997 F.3d at 549. The defendant then moved under Rule 50 for a judgment in his favor as to the four claims presented to the jury, but the district court denied those claims. *Id.* The Fourth Circuit characterized the evidence as "thin," and regarded Goldstein's arguments as "compelling." *Id.* at

552.  But, applying the applicable standard of review, the Fourth Circuit affirmed.[59]  It reasoned that "thin evidence is not the same as no evidence."  *Id.* at 552.  Moreover, the Court emphasized the importance of the jury in resolving credibility determinations.  *Id.* at 554.  And, in a comprehensive review of the evidence, it concluded that the jury could have found, *inter alia*, that Goldstein had, in fact, interviewed the children, despite his claim to the contrary.  *Id.* at 552.

*Burgess* is distinguishable.  *Burgess* involved a Rule 50 motion for judgment as a matter of law, *after* the case had surpassed the summary judgment phase and reached a jury.  Through his Rule 50 motion, the defendant asked the Court to disturb the jury's factual determinations, which included the jury's credibility determinations and decisions regarding which testimony to accept and which to reject.  The Fourth Circuit refused to upset the jury's findings.

Moreover, the newly discovered evidence in *Burgess* is altogether unlike the evidentiary issues in this case.  In *Burgess*, two of the victim's children came forward—albeit many years after the murder—and claimed to have spoken to officers on the night of the murder, contrary to the defendant's representations; the son, Brian, claimed to have informed the BPD that he saw an intruder who was not Burgess; and, there was a forty-three-minute period during which the defendant was in the home with the children.

Here, Johnson claims that Jones interviewed L.S. on the night of the murder, without disclosure.  But, in Davis's report to Capt. MacGillivary on July 14, 1988, Davis expressly stated that Officer Kenneth Jones of the Northwest District "interviewed . . . L.S., F/B/15 . . . . She is the cousin of the victim and witnessed the shooting . . . ."  ECF 138-3 at 10-13.  And, the plaintiff does

---

[59] The Fourth Circuit concluded that the district court admitted the FBI Notes in error. *Burgess*, 997 F.3d at 560.  However, the Court concluded that this error was harmless.  *Id.* at 561. Notably, the Fourth Circuit did not disturb Judge Bennett's conclusion that a factual dispute existed concerning the materiality of the FBI Notes and whether the defendant withheld the FBI Notes.

not contend that the Officer Defendants failed to disclose Davis's report of July 14, 1988. Moreover, the July 19 Notes and the July 19 Report do not exculpate Johnson. Nor is there a claim of fabrication of evidence.

In sum, the Jones Report, the July 19 Notes, and the July 19 Report were not material.

### 4. Bad Faith

Even assuming materiality, plaintiff's claims fail, because there is no evidence of bad faith on the part of the Officer Defendants.

As discussed earlier, "police officers and prosecutors have different obligations from one another with respect to the disclosure of exculpatory evidence . . . ." *Burgess*, 997 F.3d at 550; *see also Owens*, 767 F.3d at 396 n.6. To establish a *Brady* violation by a police officer, the plaintiff must prove, *inter alia*, suppression of evidence that was favorable to the plaintiff; the officer suppressed the evidence in bad faith; and prejudice ensued. *See*, *e.g.*, *Burgess*, 997 F.3d at 550.[60]

Johnson asserts that he has generated evidence from which a jury may infer bad faith, based on the combined failure to disclose the Jones Report; to name Officer Jones in the prosecution reports; the failure to document conversations with witnesses such as L.S., leading up to trial; the failure to investigate leads; and the falsehood in the application for charges, in which Davis stated that Johnson had entered the Night Owl. ECF 151 at 43-44. Johnson also cites *Gilliam*, 932 F.3d at 216, to argue that bad faith may be inferred from deviations from police policies.

I pause to review *Gilliam*. In that case, two teenaged brothers were wrongly convicted for the rape and murder of eleven-year-old Sabrina Buie in 1983. They were later exonerated based on DNA evidence linking the crime to another individual who was known to officers at the time of the investigation. *Id.* at 221-22.

---

[60] The Fourth Circuit did not address the issue of bad faith in *Burgess*.

The brothers, who were intellectually disabled, had signed coerced and fabricated confessions drafted by law enforcement officers.  A later investigation revealed that DNA evidence found on a cigarette butt at the scene of the crime matched Roscoe Artis, a man convicted in 1984 for the rape and murder of Joanna Brockman.  *Id.* at 225.[61]  That murder occurred just a month after Buie's murder, in a manner that was "strikingly similar" to Buie's murder.  *Id.*  The prosecutor and the defense attorney in the Brockman murder case were also involved in the plaintiffs' trial just two months later.  *Id.*

In addition, a potential eyewitness in the Buie case, Mary Richards, promptly told investigators that she saw Artis attacking Buie.  *Id.* at 228.  However, that information was never disclosed to the defendants.  *Id.*  DNA tested on items at the crime scene did not match the plaintiffs.  *Id.*  And, investigators cancelled a fingerprint comparison for Artis as to a beer can found at the Buie crime scene.  *Id.*

After the defendants in the Buie murder case were exonerated, they filed suit pursuant to § 1983 against the law enforcement officers who had investigated the crime for which they had been convicted.  *Id.* at 222.  The plaintiffs in the civil case (*i.e.*, the defendants in the criminal case) alleged that the police officers coerced and fabricated their confessions, and then, to cover up their wrongdoing, withheld evidence implicating Artis in Buie's murder.  *Id.* at 226, 228.  As mentioned, although investigators submitted Artis's fingerprints for comparison to prints found at the Buie crime scene, the investigators canceled the request, and the fingerprint comparison was never completed.  *Id.*  At Richards's deposition in the § 1983 case, she claimed that she told the police at the time that she saw Artis attacking Buie.  *Id.* at 228.  Yet, the defendants' investigation notes do not reflect this information.  *Id.*  Instead, the notes of one officer said Richards reported that

---

[61] The name also appears as "Brockhart."  *Id.* at 228.

she saw three "Indian males," one of whom was talking to the victim. *Id.* at 239. Another detective's notes indicated only that the interview generated "negative results." *Id.*

The officers moved for summary judgment on the basis of qualified immunity. The district court denied their motion, and the officers appealed. *Id.* at 222. The Fourth Circuit affirmed.

The defendants maintained that they did not violate *Brady*. They argued, *inter alia*, that Artis's criminal history and conviction were publicly available to the plaintiffs, the prosecutor in the plaintiffs' case knew about Artis's criminal history, and one of the plaintiffs' attorneys also represented Artis in the 1984 Brockman murder trial. *Id.* at 238-39. Thus, the defendants asserted that the plaintiffs were already aware of any *Brady* evidence. *Id.*

The Fourth Circuit soundly rejected the defendants' argument. *Id.* at 239. It reasoned, *id.*:

> It is the officers' job to investigate the crime and identify the suspects, not the prosecutor's. The same is true for [plaintiffs' attorney]: the connection between Artis and one of [the plaintiffs'] counsel is not enough to show that [the plaintiffs] possessed relevant information about Artis. Even if [plaintiffs' attorney] noticed the similarities between the crimes, he had no way to know that [the defendants] had considered Artis a suspect in Buie's murder, which is the key evidence [the defendants] failed to disclose.

The Court made clear that "police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Id.* at 238. It recognized that the *Brady*-based due process claims "hinge on the jury determining that [the officers] suppressed material *Brady* exculpatory evidence in bad faith." *Id.* And, plaintiffs must prove "both but-for causation and proximate causation – in other words, that the alleged wrongful act(s) caused [the] loss of liberty and the loss of liberty was a reasonably foreseeable result of the act." *Id.*; *see Massey v. Ojaniit*, 759 F.3d 343, 354-56 (4th Cir. 2014).

But, the Court permitted an inference of bad faith because of the "stark difference" between what one of the witnesses alleged she told the officers and what the officers recorded in their notes.

*Id.*  The Court concluded that if the plaintiffs' assertions are true, then defendants "intentionally fabricated, obscured, and failed to disclose the most relevant and exculpatory evidence in the case: the statement from an eye-witness affirmatively identifying a *different suspect* as Buie's attacker." *Id.* at 239-40 (emphasis in *Gilliam*).   Accordingly, the Court concluded that the plaintiffs adequately showed that the officers acted in bad faith.  *Id.* at 240.

A square peg does not fit in a round hole.   Plaintiff cannot show here the kind of "stark contrast" in conflicting evidence that was patently evident in *Gilliam*.  The egregious facts in *Gilliam*, including the withholding of critical exculpatory evidence from an eye-witness, and buried evidence implicating the true perpetrator, are completely unlike the facts in this case.

There is no serious contention here that any evidence was fabricated.  And, as stated, L.S.'s unwillingness to name the suspects when she was interviewed by Jones at the scene was not inconsistent with her later willingness to do so.  As to the initial omission of L.S.'s reference to a gun hand-off, that, too, is not inherently inconsistent with L.S.'s later, more fulsome account of the events.  And, of import, Davis expressly disclosed Jones's interview of L.S. in his report to Capt. MacGillivary on July 14, 1988.  *See* ECF 138-3 at 10-13.  He stated: "Officer Kenneth Jones, NWD interviewed . . . L.S.."  ECF 138-3 at 11.  Such conduct is a far cry from hiding evidence.

Moreover, Det. Davis referenced the July 19 Report during a suppression hearing.  That disclosure, too, is inconsistent with an intent to hide the evidence.  ECF 138-2 at 26.

With respect to the photo displays, the BPD Officers may have been sloppy.  But, there was certainly documentation of photo displays on numerous occasions.  The conduct simply does not equate to bad faith.  And, there is no evidence to suggest that a negative identification of Johnson ever occurred.  Thus, a non-identification was not hidden.  Indeed, the Joint Petition that Johnson submitted with the SAO, seeking his exoneration, stated: "At no point during [the July

19] interview or thereafter was a pre-trial identification procedure or confirmatory picture of Jerome Johnson shown to [L.S.]." ECF 151-30 at 6.

At the motions hearing, Johnson's counsel attacked the overall quality of the defendants' investigation and claimed that the defendants deviated from BPD policies concerning adequate documentation, and conducted a poor investigation. In his view, such conduct amounted to bad faith. But, "in general, there is no independent constitutional right to investigation of a third party." *Gilliam*, 932 F.3d at 240; *see also Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988). And, there is no basis to conclude that the failure to investigate Quinton or to pursue Lazenby was the product of bad faith. For one thing, the officers did, in fact, seek to talk to Lazenby. But, Lazenby's mother categorically refused to allow the officers to talk to her. ECF 138-15 at 14-17. Because the officers had no knowledge of what Lazenby would have said, they cannot be said to have buried what they did not know.

Moreover, before trial, L.S. claimed that Lazenby was hiding at the time of the shooting. ECF 151-13 at 3. So, from what the officers knew, Lazenby did not see anything, and therefore her testimony would not have helped Johnson. At trial, L.S. said Lazenby would have seen what she saw. ECF 151-31 at 12. If so, Lazenby's testimony would have bolstered L.S.'s testimony *inculpating* Johnson.

Plaintiff also fails on the final prong. He has not adduced evidence that defendants' conduct was a but-for cause or proximate cause of his conviction. He has not adduced evidence that the alleged wrongful acts caused his loss of liberty, or that his loss of liberty was a reasonably foreseeable result. *Gilliam*, 932 F.3d at 238.

I shall grant the Officer Defendants' Motion as to Count I.

## B.  Malicious Prosecution

Plaintiff has lodged claims for malicious prosecution under both federal (Count III) and state law (Count VI).  ECF 116, ¶¶ 210-14, 227-234.  Johnson asserts that Davis made an inaccurate statement in the Warrant Application concerning Johnson's entry into the Night Owl. Defendants concede in their motion that no witness told the police that plaintiff entered the bar. *See* ECF 138.  However, Dorsey suggested in his signed statement to Det. Davis that Johnson followed Hill into the bar.  ECF 137-2 at 5-6.

The Fourth Circuit has recognized that "there is no such thing as a '§ 1983 malicious prosecution' claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000), *cert. denied*, 531 U.S. 1130 (2001). Rather, a claim for malicious prosecution "'is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" *Hupp v. Cook*, 931 F.3d 307, 323-24 (4th Cir. 2019) (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)).  I shall consider Count III and Count IV together.[62]

To state such a claim under § 1983, a plaintiff must plausibly allege that the defendant "'(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor.'" *Humbert*, 866 F.3d at 555 (quoting *Evans*, 703 F.3d at 647); *see Shrewsbury v. Williams*, 844 F. App'x 647, 649 (4th Cir. 2021) (per curiam).  In a malicious prosecution claim under Maryland law, the plaintiff must satisfy those elements and show that the defendant acted intentionally.  *See Caldor, Inc. v. Bowden*, 330 Md. 632, 657, 625 A.2d 959, 971 (1993).

---

[62] There are, of course, notable differences between the claims.  For instance, qualified immunity is a cognizable defense to a § 1983 claim for malicious prosecution, but it presents no bar to an analogous state law claim.  *See Borzilleri v. Mosby*, 189 F. Supp. 3d 551, 560 n.4 (D. Md. 2016), *aff'd*, 874 F.3d 187 (4th Cir. 2017).

As indicated, the lack of probable cause is a central component of the claims. Probable cause for an arrest "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. at 243-44, n.13 (1983); *see also District of Columbia v. Wesby*, ___U.S.___, 138 S. Ct. 577, 586 (2018). An officer has probable cause when there are "'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (alterations in *Cahaly*) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations and quotations marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

Notably, probable cause is "'not a high bar.'" *United States v. Bosyk*, 933 F.3d 319, 315 (4th Cir. 2019) (quoting *Wesby*, 138 S. Ct. at 586); *see Kaley v. United States*, 571 U.S. 320, 338 (2014); *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020). It "is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The "standard" of "'reasonable ground for belief of guilt'

requires less of a showing than does the formal preponderance-of-the evidence standard." *Ortiz*, 669 F.3d at 444-45 (citing *Gates*, 462 U.S. at 235). Indeed, such "[f]inely-tuned standards . . . useful in formal trials, have no place in the magistrate's decision." *Gates*, 462 U.S. at 235; *see United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019); *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011).

Moreover, probable cause is an objective standard, viewed from the perspective of "an objectively reasonable police officer[.]'" *Wesby*, 138 S. Ct. at 586 (citation omitted). A court does "'not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause.'" *Gilliam*, 932 F.3d at 234 (quoting *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2019)). And, it is determined based on the totality of the circumstances. *Gilliam*, 932 F.3d at 234.

When reviewing an issuing judge's probable cause finding, consideration is ordinarily confined to the four corners of the application documents. *See, e.g., Gates*, 462 U.S. at 238. And, the court generally considers only the "information the officers had at the time of the arrest." *Gilliam*, 932 F.3d at 234. But, in Maryland, an officer who has probable cause to believe a suspect has committed a felony does not need a warrant to arrest the individual. Maryland law states: "A police officer without a warrant may arrest a person if the police officer has probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer." Md. Code, C.P. § 2-202(c).

In *Gilliam*, discussed earlier, the defendants argued that they did not violate the plaintiffs' constitutional rights because they had probable cause to arrest the plaintiffs based on the plaintiffs' confessions. *Id.* at 233-34. The district court "rejected" the argument, concluding that "whether

[defendants] had probable cause to arrest [plaintiffs] turns on whether [plaintiffs'] confessions were coerced or fabricated, which is a factual question." *Id.* at 234.  The Fourth Circuit agreed, reasoning that a coerced or fabricated confession that the police know to be coerced, based on their use of coercive interrogation tactics, the age, and the intellectual disabilities of the plaintiffs, and the inconsistencies between the confessions and the crime scene, "does not give police probable cause to arrest the suspect as a matter of law." *Id.*

Johnson contends that Det. Davis made a false statement in the Application For Statement of Charges when he wrote that "[t]he victim then ran into the Night Owl Bar followed by Jerome Johnson and Alvin Hill."  ECF 151-17.  Defendants concede in their motion that no witness told the police that plaintiff entered the bar.  *See* ECF 138 ("Plaintiff was never alleged to have gone inside the bar . . . .").  But, Dorsey suggested in his signed statement to Det. Davis that Johnson followed Hill into the bar.  ECF 137-2 at 5-6.  According to Dorsey, "Poopies [sic] buddy, the one with the automatic that didnt [sic] work, ran in the bar."  *Id*. at 5.  And, Det. Davis wrote a report to Capt. MacGillivary on July 15, 1988 (ECF 151-2 at 15), stating that the victim's family had identified "Lamont," who lives on "Lucille Avenue."  Davis also wrote, *id.* at 15: "According to the information the family has received, Lamont was in the bar and told 'Poopie' to shoot the victim in the haed [sic]."

Thus, Davis did not manufacture the claim that Johnson entered the Night Owl.  To the contrary, he had information supporting his assertion.  However, even if Davis's statement in the Application was ultimately inaccurate, there is no evidence that the misstatement was made recklessly or with malice.  The investigation certainly showed that Johnson was at the scene.  And, the Officer Defendants had ample probable cause to arrest Johnson, even if Johnson did not physically enter the Night Owl.

-115-

For example, both L.S. and K.A. told Det. Davis that plaintiff was at the scene.   The investigation indicated that Hill shot Taylor over a drug debt that Taylor owed to Johnson.   ECF 138-11 at 2-3; ECF 138-12 at 2-3; ECF 137-2 at 6-7.   L.S. also told Det. Davis that plaintiff handed a gun to Hill.   ECF 138-11 at 3.

To refute the existence of probable cause, Johnson points out that L.S. did not mention Johnson or any gun hand-off in her initial statement to Officer Jones on the night of the murder. *See* ECF 152-2 at 13.   Also, according to the K.A. Statement, Hill was the only person who had a gun and plaintiff was not at the scene of the crime.   ECF 138-13.

These facts do not defeat probable cause.   Johnson was never alleged to be the shooter. Nor does probable cause require proof beyond a reasonable doubt. *Gilliam*, 932 F.3d at 234.   And, in L.S.'s testimony, under oath, she implicated Johnson in the murder of Taylor.   Davis may have been mistaken as to whether Johnson entered the store, but this does not defeat probable cause.

In this case, the plaintiff takes nothing and tries to turn it into something.   But, zero plus zero is still zero.   Therefore, I shall grant the Officer Defendants' Motion as to Counts III and VI.

### C.  Failure to Intervene

Count IV asserts a claim against the Officer Defendants for "Failure to Intervene."

In the Fourth Circuit, a failure-to-intervene claim lies where there is "an omission to act . . .  coupled with a duty to act." *Randall v. Prince George's Cty.*, 302 F.3d 188, 202 (4th Cir. 2002).   With respect to a claim for failure to intervene that arises under § 1983, "bystander liability" is "'premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them.'" *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416-17 (4th Cir. 2014).   This duty "attaches when an officer observes or has reason to know that a 'constitutional  violation  [is  being]  committed'  by  other  officers  and  possesses  'a  realistic

opportunity to intervene to prevent the harm from occurring.'" *Randall*, 302 F.3d at 203-04.  Put simply, an officer who "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act" may be liable under this doctrine.  *Id.* at 203; *see Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir. 2019).

By choosing not to intervene, the bystanding officer "functionally participates in the unconstitutional act of his fellow officer." *Randall*,  302 F.3d at 203 n.24.  However, if "the bystander lacks such specific knowledge" of the constitutional violation, "he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible." *Id.*; *see Shipley v. Disney*, SAG-21-3173, 2022 WL 2789076, at *6-7 (D. Md. July 15, 2022); *see also McPherson v. Baltimore Police Dep't*, 494 F. Supp. 3d 269, 283 (D. Md. 2020) (finding that a plaintiff may plausibly state a claim for failure to intervene claim based on allegations that an officer was present at the time the plaintiff's constitutional rights were violated).

Given the requirement of an underlying constitutional violation, a § 1983 failure-to-intervene claim is, by nature, dependent on plaintiff's other § 1983 claims. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (observing that bystander liability claim is "derivative" of an excessive force claim and holding that the claim failed "[i]n the absence of any underlying use of excessive force"); *Dodson v. Prince George's Cty.*, No. JKS-13-2916, 2016 WL 67255, at *3 (D. Md. Jan. 6, 2016) ("Because the excessive force claim fails, the failure to intervene claim also fails.")

Det. Davis was the primary investigator of the case.  Plaintiff asserts, and defendants do not dispute, that Det. Boone was also involved in the investigation as the secondary detective.  Det. Davis wrote in 1988 that Det. Boone "assisted in all aspects of the [homicide] investigation."  ECF 151-2 at 9.  Boone was present for codefendant Reginald Dorsey's interview, and he interviewed

witnesses at the Homicide Unit after the murder.  ECF 151-2 at 31; ECF 151-28 at 2.  From these facts, plaintiff asserts: (1) one of the detectives must have interviewed L.S.  on July 14, (2) Detectives Boone and Davis must have known about the July 14 interview, (3) one or more detectives failed to disclose the July 14 interview to the prosecutor, and (4) one or more of the detectives knew about this failure to disclose and failed to intervene.

I have already explained, at length, that the claim that a homicide detective interviewed L.S. at Headquarters on July 14, 1988, is fanciful.  The contemporaneous record reflects that on July 14, 1988, shortly after the murder, Officer Jones interviewed L.S.  at the scene and then submitted the Jones Report.  ECF 138-4, ¶ 10; ECF 138-5 at 2.

In his report of July 14, 1988, Det. Davis mentioned that interview and also stated that L.S. "will be interviewed by Homicide Investigators as soon as possible."  ECF 138-3 at 12.  If L.S. had been interviewed that night by a homicide detective, there would have been no reason for Davis to make that statement.

The handwritten notes in the Homicide File corroborate that L.S. was not interviewed that night by a homicide detective.  ECF 151-12 at 2.  In notes with an entry date of July 14, 1988, Det. Davis wrote that L.S. was "upset"; was "briefly interviewed at scene"; and was "released."  ECF 151-12 at 2.

Det. Davis testified to the same information at Johnson's trial on March 9, 1989.  He said that he interacted with L.S. at the scene but chose to let her go home with her mother because she was in a distressed state from having witnessed the murder of her cousin.  ECF 138-2 at 25.  He confirmed the same in his deposition on July 20, 2021.  ECF 138-6 at 13.

Notably, in Jones's Affidavit of August 2021, he claimed to have taken L.S. back to the Homicide Unit on July 14, 1988. But, he did not remember seeing Detectives Davis or Boone at Police Headquarters. ECF 138-7 at 3, ¶ 6.

Even if the Court were to assume that an unidentified detective interviewed L.S. on July 14 and the evidence was material and exculpatory, Johnson still has not shown that Detectives Davis or Boone knew about the withheld evidence and failed to intervene. Johnson strings together a series of inferences to support a kitchen-sink claim.

As to Det. Goldstein, the record indicates that he was present for plaintiff's interrogation (ECF 151-2 at 42) in October 1988, and presented the evidence of plaintiff's involvement in the Taylor murder to the Grand Jury. ECF 151-23 (Goldstein Dep.), at 8. Goldstein testified that he likely would have reviewed police reports and spoken to the primary investigator about the case. *Id.* at 7. Plaintiff uses this evidence to argue that Goldstein must have been aware that *Brady* material was withheld.

Goldstein's participation in the interview and at the Grand Jury proceedings does not give rise to an inference that he must have known about Jones's interview of L.S. on July 14, 1988, much less that it was not disclosed. ECF 151 at 48. Afterall, if he reviewed the file, he would have seen that Davis disclosed Jones's July 14 interview of L.S. in Davis's report of July 14, 1988. ECF 138-3 at 10-13. Plaintiff's claim once again rests on speculation, not facts.

In sum, I shall grant the Officer Defendants' Motion.

### D. Intentional Infliction of Emotional Distress

Count VII asserts a state law claim against the Officer Defendants for "Intentional Infliction of Emotional Distress."

In Maryland, in order to prevail on a claim for IIED, a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's wrongful conduct and the emotional distress suffered; and (4) the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977); *accord, e.g.*, *Caldor, Inc. v. Bowden*, 330 Md. 632, 641-42, 625 A.2d 959, 963 (1993); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010).

A defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 850 (D. Md. 2015) (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59-60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)), *aff'd*, 166 F.3d 1208 (4th Cir. 1998).

Generally, claims for IIED are disfavored, difficult to establish and, as such, "rarely viable" under Maryland law. *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 4 751, 757 (D. Md. 2011); *see Arsham*, 85 F. Supp. 3d at 850; *Manikhi v. Mass. Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95, 113 (2000); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (stating that the tort of intentional infliction of emotional distress is "difficult to satisfy"), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see also* DAVID CRUMP, RETHINKING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, 25 GEO. MASON L. REV. 287, 297 (2018) (noting that an IIED claim is "a kind of vituperative epithet" that "adds little that can be the

subject of a separate or additional recovery" but "makes [the litigation] more expensive").  Since the Maryland Court of Appeals first recognized the tort of IIED in 1977, *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977), it has repeatedly advised that "recovery" for IIED "will be meted out sparingly[.]"  *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 75 (1991); *see Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191, 1216 (1992); *Caldor, Inc.*, 330 Md. at 642, 625 A.2d at 963.

Plaintiff claims that the Officer Defendants withheld exculpatory material and failed to adequately document their investigation, resulting in plaintiff's incarceration for thirty years. However, because I am rejecting the plaintiff's underlying claims, the IIED claim must fail.

### VII.  BPD Motion

In Count V, plaintiff lodges a "*Monell*" claim against the BPD, pursuant to 42 U.S.C. § 1983, the Fifth and Fourteenth Amendments, and *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978).  ECF 116, ¶¶ 219-26 (the "*Monell* Claim").  Plaintiff complains that BPD did not have a "policy addressing its officers' duty to disclose exculpatory and impeachment evidence," and did not "train [its] officers on these topics."  ECF 156 at 6.  He also complains of a "shocking deficiency" of the BPD, in that by 1988, the BPD "still did not have a policy addressing its officers' duty to disclose exculpatory and impeachment evidence.  Nor did it train officers on these topics."  *Id.*

To succeed on a *Monell* claim, plaintiff must establish that one or more of the Officer Defendants violated his constitutional rights in order to pursue his *Monell* claim against BPD.  *See City of Los Angeles v. Heller*, 465 U.S. 796, 799 (1986) ("[N]either *Monell* . . . , nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional

harm.").

I have rejected the claims of constitutional violations by the Officer Defendants. Thus, there is no viable *Monell* claim. Nevertheless, I shall assume, *arguendo*, that plaintiff has a basis to proceed as to a constitutional claim. Therefore, I will next consider the *Monell* claim. The *Monell* claim fails.

### A. Legal Standard

In the seminal case of *Monell*, 436 U.S. 658, the Supreme Court determined that a local governmental body may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government, resulting in a violation of the plaintiff's rights. *Id.* at 690-91. A viable *Monell* claim consists of two components: 1) an unconstitutional policy or custom of the municipality; 2) and the unconstitutional policy or custom caused a violation of the plaintiff's rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

The *Monell* Court explained, 436 U.S. at 694, that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-683). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691; *Canton*, 489 U.S. at 392; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases).

Notably, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Moreover, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___U.S.___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and

over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted).  In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Beyond "formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003).  A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 F. App'x at 799.  In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim, based on custom, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*).  Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that

proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230.   Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983.   *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

A claim of failure to train is a species of a *Monell* claim.   The manner in which a municipality trains its employees is "necessarily a matter of 'policy.'"   *Spell*, 824 F.2d at 1389.

In *Canton*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."   However, deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. at 410.   A municipality may be deemed deliberately indifferent "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61.

A plaintiff who seeks to establish *Monell* liability based on inadequate training must demonstrate "(1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the [official's] conduct resulted from said training*." Lewis v. Simms*, AW-11-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v.*

*Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014) (per curiam).

A municipal entity's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision . . . to violate the Constitution.'" *Connick,* 563 U.S. at 61-62 (quoting *Canton*, 489 U.S. at 395) (O'Connor, J., concurring in part and dissenting in part)). Indeed, "[i]naction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citation omitted).

"Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies'" of the relevant profession. *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (quoting *Spell*, 824 F.2d at 1390). But, "the training deficiency 'must be closely related to the ultimate injury,' meaning it must cause the incident." *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 951 F.3d 661, 672 (4th Cir. 2020) (quoting Canton, 489 U.S. at 391).

The policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Bryan Cty.*, 520 U.S. at 407. But, in the absence of notice "that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Of import here, even if "a particular [employee] may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted

from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91.  Indeed, "proving

an injury or accident could have been avoided if an [employee] had had better or more training,

sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Connick*,

563 U.S. at 68 (cleaned up).  The *Canton* Court explained, 489 U.S. at 391:

> Such a claim could be made about almost any encounter resulting in injury, yet not
> condemn the adequacy of the program to enable officers to respond properly to the
> usual and recurring situations with which they must deal. And plainly, adequately
> trained [employees] occasionally make mistakes; the fact that they do says little
> about the training program or the legal basis for holding the city liable.

Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily

necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563

U.S. at 62 (quoting *Bryan Cty.*, 520 U.S. at 409).  In this case, however, plaintiff has expressly

abandoned a *Monell* claim based on a pattern or practice.  In a footnote in his Opposition to the

BPD Motion, plaintiff states, ECF 156 at 10 n.1: "Mr. Johnson has communicated to BPD that he

is no longer pursuing the theory that a pattern of additional *Brady* violations show that BPD

condoned a widespread pattern or practice of constitutional violations."

The Supreme Court's decision in *Connick*, 563 U.S. 51, illustrates the challenge a plaintiff

faces when seeking to prevail on a failure to train claim.  In that case, Thompson was convicted of

murder. *Connick*, 563 U.S. at 54.  However, his conviction was overturned when it was discovered

that, in connection with an earlier armed robbery case, the prosecution had failed to disclose the

existence of an exculpatory crime lab report, in violation of *Brady v. Maryland*, 373 U.S. 83

(1963).  And, as a result of that robbery conviction, Thompson chose not to testify at his murder

trial. *Connick*, 563 U.S. at 55.

Thereafter, Thompson filed a § 1983 suit against Connick, in his official capacity as the

Orleans Parish District Attorney. He also sued the district attorney's office, the prosecutor, and

others. *Id.* at 56.  Thompson alleged, *inter alia*, a "deliberate indifference to an obvious need to train the prosecutors in [the] office to avoid such constitutional violations."  *Id.* at 57.

Connick conceded that the failure to produce the crime lab report constituted a *Brady* violation.  *Id.* at 57.  Thompson did not prove a pattern of similar *Brady* violations.  But, he showed that, in the decade preceding his trial, four convictions had been overturned because of other *Brady* violations committed by prosecutors in Connick's office.  *Id.* at 62.

The trial court determined that a pattern of violations was not necessary to prove deliberate indifference when the need for training is "'so obvious.'"  *Id.* at 58.  The district court instructed the jury that the sole issue "was whether the nondisclosure was caused by either a policy, practice, or custom of the district attorney's office or a deliberately indifferent failure to train the office's prosecutors." *Id.* at 57.  The jury found in favor of Thompson on the basis of a failure to train.  *Id.* at 57.  An evenly divided Fifth Circuit, sitting en banc, affirmed.  *Id.* at 54, 59 (citing 578 F.3d 293 (5th Cir. 2009) (per curiam)).  The Supreme Court reversed.

The Supreme Court considered whether a "district attorney's office may be held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation."  *Id.* at 54.  In a five to four decision, the Court held that it could not.  *Id*

The Court noted that *Canton* did not foreclose "the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Connick*, 563 U.S. at 64.  The *Connick* Court said, *id.* at 61 (emphasis added):

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous,

and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

The Court indicated that the plaintiff had the burden to prove 1) that Connick, the policymaker for the office, "was deliberately indifferent to the need to train the prosecutors about their *Brady* disclosure obligation with respect to evidence of this type and 2) that the lack of training actually caused the *Brady* violation in this case." *Id.* at 59. The Court was of the view that the plaintiff did not prove that Connick "was on actual or constructive notice of, and therefore deliberately indifferent to, a need for more or different *Brady* training." *Id.*

According to the Court, and of relevance here, the four prior reversals due to *Brady* violations, which occurred in the preceding ten years, could not have put Connick on notice that *Brady* training was inadequate "with respect to the sort of *Brady* violation at issue [in the case]. None of those [earlier] cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind." *Id.* at 62-63. In other words, just any *Brady* violation would not do. It had to be a *Brady* violation comparable to the one in Thompson's case.

However, the plaintiff relied on the "'single-incident'" theory, rather than a pattern of similar *Brady* violations. *Id.* at 63. He maintained that the *Brady* violation was the "'obvious' consequence of failing to provide" appropriate training, and asserted that the "'obviousness' can substitute for the pattern of violations ordinarily necessary to establish municipal culpability." *Connick*, 563 U.S. at 63.

The Supreme Court rejected the contention. It noted that lawyers "are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment," and must obtain a law license, and satisfy other "threshold requirements." *Id.* at 64. The Court reasoned, *id.* at 66: "In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious

consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." Therefore, Connick was "entitled to rely on [the] prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations. . . ." *Id.* at 67. And, the Court added that "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Id.* at 68.

### B. Factual Allegations

As noted, plaintiff initially maintained that the *Monell* Claim was based on a widespread pattern and practice of unconstitutional conduct, involving the suppression of exculpatory and impeachment evidence. *See* ECF 29 at 29-36. But, Johnson now states that "he is no longer pursuing the theory that a pattern of additional *Brady* violations show that BPD condoned a widespread pattern or practice of constitutional violations." ECF 156 at 10 n.1; *see also* ECF 136-3 (letter dated December 15, 2021, from plaintiff's counsel to defense counsel indicating the same). Rather, plaintiff asserts that his *Monell* Claim is predicated on the failure of the BPD to establish "a policy addressing its officers' duty to disclose exculpatory and impeachment evidence," in compliance with *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and to "train [its] officers on these topics." ECF 156 at 6.

A number of BPD policies are relevant. In particular, plaintiff refers the Court to "General Order 14-83," dated September 14, 1983. ECF 156-1 at 1. It was signed by then Police Commissioner Frank J. Battaglia and took effect "on the date of publication." *Id.* at 7. General Order 14-8 pertains to the subject of "Death and Serious Assault Investigations." *Id.* at 1. The "Purpose" of General Order 14-83 was to "recodify and promulgate existing departmental procedures pertaining to death investigations in Baltimore City." *Id.*

-130-

General Order 14-83 included a section titled "Duties of the Homicide Unit[.]"  *Id.* at 6. The duties included, among other things, "coordinat[ing] the entire investigation and handling the technical phases of the investigation . . . ."  *Id.* To that end, General Order 14-83 required that, "[u]nder the direction of the homicide supervisor[,] the detective(s) in charge of the investigation shall: . . . "Prepare complete and accurate case folders."  *Id.* at 6, 7.

Plaintiff also points to a document titled "Duties and Responsibilities Of Personnel Assigned To The Homicide Unit—Standing Operating Procedures," dated August 11, 1978.  *Id.* at 3.  ECF 156-2 (the "SOP") at 2.  It specifies, *id.* at 3: "The duties, responsibilities and procedures as contained herein are effective immediately and apply whenever members of the Homicide Unit are assigned or are required to perform investigatory tasks."  It also provides: "Detectives will be assigned to cases either singly or in pairs, depending on the case."  *Id.* at 5.  But, it states that a "primary case investigator will be designated in <u>all</u> cases."  *Id.*

Further, the SOP provides: "All case activity must be documented properly and the case folder is to be kept in neat chronological order in numerical hardback folders."  ECF 156-2 at 5. And, it instructs detectives to "Maintain Accurate and Complete Records of the entire case," which, in turn, required "Possession and marking of (chain of custody) evidence"; "Interrogate suspects (statements, etc.)"; and "Complete appropriate office reports and departmental forms." *Id.*; *see* ECF 162-3 (Worley Dep.) at 5-6 (specifying that the SOP instructs BPD officers to "maintain accurate and complete records of the entire case, and then it specifies a few reminders"). Further, the SOP states that detectives must "[r]eview [the] case with [a] representative of [the] States [sic] Attorneys Office prior to trial."  ECF 156-2 at 7.

"General Order 10-78," dated January 23, 1978, is also relevant.  *See* ECF 156-4.  It pertains to "Grand Jury Case Presentation" and specified: "It is the policy of the Baltimore Police

Department to cooperate with the Office of the State's Attorney in the review of all evidence in a criminal case before it is presented to a Grand Jury." *Id.* at 2.  Further, General Order 10-78 provided, *id.*: "It is the responsibility of members of the Homicide Unit to confer with an Assistant State's Attorney assigned to the Violent Crimes Liaison Unit *for complete case review*." (Emphasis added).

Col. Worley joined the BPD in August 1998 as a patrol trainee.  ECF 136-11 at 27.  In June 2021, he served as the "Chief of Detectives," overseeing all of the BPD's "Detective Divisions," including the "Homicide Unit, the Special Investigative Section, the Anti-Crime Section and [the] Warrant Apprehension Task Force." *Id.* at 17-18.  He testified that, "based on the affidavits [he] reviewed and the materials [he] reviewed regarding file turnover to the State's Attorney," BPD policy between 1983 and 1990 required "[e]verything [to be] turned over to the State's Attorney for review."  ECF 136-11 at 363.

Plaintiff has submitted two reports of an expert witness, Robert L. Stewart.  ECF 156-12 ("Stewart Report"); ECF 156-13 ("Stewart Rebuttal").  He has also submitted the report of another proposed expert, Brian Murphy, Esquire.  ECF 151-32.

Stewart is a "police practices expert with 50 years of experience in the field of law enforcement." ECF 156-12 at 3.  For the first thirty years of his career, Stewart served as a "sworn law enforcement officer in a variety of positions ranging from officer to police chief." *Id.* For the past twenty years, Stewart has served as an "instructor and consultant within the law enforcement community in a variety of capacities." *Id.*  In that role, Stewart has conducted reviews of several law enforcement agencies across the country, including the Chicago Police Department and the Detroit Police Department. *Id.*

According to Stewart, an "adequate written policy and training regarding exculpatory and impeachment evidence" must, at least, "outline the importance of exculpatory and impeachment evidence . . ." *Id.* at 41. It must also "detail how officers should identify, investigate, document, or retain exculpatory and impeachment evidence, and then provide step-by-step instructions for a specific procedure whereby officers would provide to prosecuting attorneys." *Id.*

Against this backdrop, Stewart opines that BPD policy in 1988 and 1989 regarding the disclosure of exculpatory and impeachment evidence, namely General Order 14-83, was "woefully inadequate and does not come close to establishing an appropriate *Brady* policy," as it did "not mention exculpatory evidence or impeachment evidence . . . ." *Id.* at 41. Stewart has asserted, *id.*: "It is unreasonable to think that an officer looking at that line would understand his obligations under *Brady* or *Giglio*." Stewart also criticizes the BPD for failing to promulgate a "formal, structured, systematic training provided to ensure detectives understood the ramifications of their failure to properly identify, investigate, document, retain and/or disclose exculpatory and impeachment evidence." ECF 156-12 at 41-42.

By way of comparison, Stewart points to a December 1987 bulletin from the New York City Police Department ("NYPD"), which provided notice to its officers of a recent decision of the New York Court of Appeals, *People v. Rosario*, 9 N.Y. 2d 286, 173 N.E. 2d 881 (1986). ECF 156-8 at 2-4 ("NYPD Bulletin"); *see* ECF 156-12 at 37 (discussing NYPD Bulletin). The NYPD Bulletin expressly advised that "all pre-trial statements of every prosecution witness must be made available [to the District Attorney]; *ANY* failure to turn over a witness statement- will result in the reversal of a conviction."   ECF 156-8 at 2 (italics in original). Further, the NYPD Bulletin specified that "police have the burden of interviewing witnesses to a crime, recording the statements that are made, and securing them for use at trial." *Id.* at 3. Relevant material included,

Case 1:19-cv-00698-ELH   Document 182   Filed 10/14/22   Page 134 of 152


among other things, "Memo books"; "Personal notes and preliminary worksheets prepared by an investigating officer"; "All notes made by a police officer who witnesses a crime"; and "Arrest reports, interview reports, complaint reports, and incident reports." *Id.* at 4. The NYPD Bulletin concluded, *id.*: "The importance of preserving **ALL** statements made by witnesses cannot be stressed enough. Any failure to produce *Rosario* material . . . will result in the reversal of a conviction."

Further, Stewart refers to a policy of the Metropolitan Police Department of the District of Columbia, dated May 26, 1972, titled "Preservation of Potentially Discoverable Material." ECF 156-9 (the "MPD Policy"). It instructed MPD officers to "preserve all material which may constitute evidence, or might otherwise be pertinent in a subsequent criminal judicial proceeding." *Id.* at 2. In particular, the MPD Policy specified that "members of the department shall preserve all potentially discoverable material, including any such material which might prove favorable to an accused." *Id.* Such evidence is defined to include: "Any written statement made by a witness, defendant, or codefendant, and signed or otherwise adopted by him"; "Any notes taken by a member of the department which are a substantially verbatim recital of an oral statement made by a prospective witness or defendant which are recorded contemporaneously with the making of the oral statement"; and "All other materials which may be expected to be relevant in a criminal judicial proceeding." *Id.* at 3.

The plaintiff's second expert, Brian Murphy, worked as an Assistant State's Attorney in the State's Attorney's Office for Baltimore City from 1980 to 1988. ECF 151-32 at 3. In 1989, he established a solo law practice. *Id.* at 4. He states: "I continue to handle all manner of criminal cases, including misdemeanors and felonies in Maryland State District Court and Circuit court as well as cases in federal court." *Id.*


-134-

Murphy claims that during his tenure as a prosecutor, the BPD lacked policies and procedures to ensure that exculpatory and impeachment evidence was turned over to the prosecutor. *Id.* at 6. Specifically, Murphy asserts that he was not aware that homicide detectives had any specific formal training concerning the concepts of exculpatory evidence and impeachment evidence. *Id.* at 18. Instead, he claims that knowledge of the principles was gained from "informal mentoring by other homicide detectives and various prosecutors. . . ." *Id.* In his view, "various homicide detectives did not understand the concept of exculpatory evidence and impeachment evidence at all." *Id.* Additionally, Murphy opines: "[D]uring that period, I saw no set or required method for homicide detectives to share the contents of the homicide file with prosecutors." *Id.*

Murphy also asserts that, as a criminal defense attorney, he has "been involved in at least two cases in which exculpatory information in the possession of the BPD was not turned over to prosecutors in the Baltimore City State's Attorney's Office, and consequently, was not disclosed by prosecutors to the defense." *Id.* at 19. Both were murder cases that were investigated by the Homicide Unit of the BPD. The first trial took place in 1989 and the second took place in 2000. *Id.*

Further, plaintiff claims that the BPD has since drafted a more comprehensive policy pertaining to the disclosure of exculpatory and impeachment evidence. *See* ECF 156-16 (the "Draft Policy"). He maintains that evidence of a new policy is relevant for *Monell* claims "as evidence of the absence of an earlier policy." *Conn v. City of Reno*, 591 F.3d 1081, 1104 n.7 (9th Cir. 2010), *vacated on other grounds*, 563 U.S. 915 (2011).

The Draft Policy is dated September 17, 2019, and is titled "Exculpatory Evidence Disclosure Requirements." *Id.* at 2. It states, *id.*: "The purpose of this policy is to ensure the

compliance of Baltimore Police Department (BPD) members with their solemn obligation to disclose Potential Exculpatory and Impeachment Evidence in criminal cases." And, it notes that this obligation was established by, among other things, *Brady*, 373 U.S. 83, and *Giglio*, 405 U.S. 150. The Draft Policy goes on to list examples of potential exculpatory and impeachment evidence. *Id.* at 3. And, it establishes a thorough, step-by-step process, pursuant to which BPD officers should adhere in order to satisfy their disclosure requirements. *Id.* at 4-8.

Plaintiff also invites the Court's attention to "General Order 10-86," which governs "Procedures for Viewing Criminal Suspect Photographs." ECF 156-7 at 2. It is dated March 19, 1986, and was effective as of that date. *Id.* at 2, 4. General Order 10-86 provided that it is "the responsibility of commanding officers, mid-level managers and supervisors to communicate this policy to their subordinates." ECF 156-7 at 4. Further, it required BPD officers to comply with a prescribed procedure when presenting a victim or a witness with "photographs in an attempt to identify a suspect," as set forth below, in relevant part, *id.* at 2-3:

1. Obtain a photograph of the suspect (s) which is not over three years old, if possible, and a minimum of five additional fill-in photographs.

\* \* \* \* \*

3. Ensure that fill-in photographs, when possible, are of persons of the same approximate age as the suspect and have similar characteristics; i.e., sex, race, complexion, facial hair, hair color and style, scars, visible tattoos, glasses, hat, etc.

4. Permanently affix the photographs to the Photograph Line-up Form (see Annex A) and enter in ink the Baltimore Police Identification (B.P.I.) or Identification (I.D.) number for each photograph in the appropriate block above it.

5. Show photographs to one victim/witness at a time. The victim/witness should view the entire group of photographs on the form even after a positive identification is made.

6. Record all photographs shown to the victim/witness on a supplement report listing the B.P.I./I.D. number and the date of each photograph (see Annex B).

7. Upon photographic identification of a suspect:

    a. Have the victim/witness sign with full signature, date and time. the Photograph Line-up Form above the photograph identified.

    b. Sign with full signature, date and time the Photograph Line-up Form.

    c. Submit the Photograph Line-up Form to Evidence Control Section (ECS).

    d. If photographs are to be shown to an additional victim/witness, prepare a new Photograph Line-up Form.

In the event of a negative showing, the Photograph Line-up Form need not be turned into the ECS, but should be retained in the member's investigative file.

Stewart criticizes General Order 10-86 because, in his view, it is "ambiguous" with respect to how "officers should document a negative photo array," as it states only that "Form 296 (Line-up Form) should be retained in the investigative file (but that it did not need to be sent to evidence control)." ECF 156-12 at 12. [63] Further, Stewart notes that General Order 10-86 "does not say what information, if any, on [the Photograph Line-up Form] is supposed to be filled out or whether any information other than the array itself on the back of the form must be retained." *Id.* Stewart asserts, *id.* at 13: "The photo array policy itself is not in accordance with generally accepted practices and procedures at the time, because it does not treat negative photo identifications as equally evidentially important as positive photo identifications." And, Stewart concludes: "The ambiguous photo array policy suggests that a blank array may mean that the array was shown to a witness with a negative result." *Id.*

---

[63] General Order 10-86 is accompanied by a sample "Photograph Line-up Form" (*id.* at 5-6) and a sample "Supplement Report." ECF 156-7 at 7. The "Photograph Line-Up" Form is also referred to as "Form 296." *See* ECF 156-7 at 5; *see also* ECF 156-12 (Stewart Report) at 12. And, the "Supplement Form" is also referred to as "Form 83/7." ECF 156-7 at 7.

In the Argument section of his opposition, plaintiff contends that "BPD's written materials instructing officers how to conduct photographic identification arrays are also inadequate to protect defendants' rights to favorable evidence." ECF 156 at 13.  According to Johnson, BPD's photo identification policy provides ample guidance on how to document a positive identification of a suspect, but it is nearly silent on how to document negative identifications.  ECF 156-7 at 2-3.

Defendants have submitted an expert report authored by Jeffrey Noble.  ECF 136-31 ("Noble Report").  He holds a law degree from Western State University College in Irvine, California.  *Id.* at 1.   In addition, Noble was a police officer in the City of Irvine, California for 28 years and became Deputy Chief of Police prior to his retirement.  *Id.*  And, he "served as an interim Chief of Police at the Westminster, California Police Department for nine months."  *Id.* In addition, he has worked as a police consultant and an expert witness.  *Id.*  Moreover, Noble has published numerous articles on police investigative procedures and other topics, has co-authored a textbook concerning police conduct, and has written two chapters for two other policing textbooks.  ECF 136-31 (Noble Report) at 3.

Noble maintains that, at the relevant time, the BPD policies were sufficient to satisfy BPD's constitutional obligations.  Regarding plaintiff's complaints about negative photo identifications, Noble noted that "the International Association of Chiefs of Police (IACP) Model policy does not have any mention of negative photo identifications."  ECF 136-31 at 9. Rather, IACP policy states only, *id.*: "'[P]reserve the photo array, together with full information about the identification process, for future reference[.]"  (Footnote omitted).   And, with regard to the BPD's disclosure policies, Noble opined: "Contrary to Mr. Stewart's claim that it was a generally accepted practice

in policing to have a written *Brady* policy, the IACP did not create a model policy on *Brady* until 2009." *Id.* at 15.

Plaintiff has also submitted declarations from three former BPD officers: Kenneth Jones, Robert Muhammad (formerly Mays), and Steve Owens.  On June 25, 2021, Jones averred, ECF 156-20, ⁋ 15: "BPD never trained me to turn over my notes in my note pad as a requirement under *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 105 (1970)."  Jones added: "BPD never trained me on turning over exculpatory information or impeachment information to the Office of the State's Attorney."  *Id.*  An identical statement was included in the declarations of Owens and Muhammad.  ECF 156-21 (Muhammad Decl., dated July 14, 2021), ⁋ 11; ECF 156-22 (Owens Decl., dated August 27, 2021), ⁋ 12.

But, the BPD points to a subsequent Declaration of Jones, dated August 26, 2021.  ECF 156-23.  In that Declaration, Jones advised, in relevant part, *id.* at 3, ⁋ 7: "It's been a long time since I worked as a police officer so I don't remember the names of specific legal cases that I may have been trained about by BPD."  Nonetheless, Jones acknowledged that the "BPD trained [him] in the academy and on the job that [he] should never falsify reports; that information that [he] learned in the field should be documented in [his] reports; and that relevant information should never be omitted from reports."  *Id.*

Johnson also submitted the Declaration of Stephen Tabeling.  ECF 136-29 (Tabeling Decl.).  Tabeling is a "25-year retired lieutenant of the [BPD]," whose career began in 1954.  *Id.* ⁋ 2; *see id.* ⁋ 3.  Tabeling claimed, *id.* at 3, ⁋ 9: "I learned on my own the critical importance of thoroughly documenting interviews with witnesses and suspects in order to prove that something did or did not happen."

Between 1978 and 1979, Tabeling was assigned "to teach at the Police Academy . . . including interviewing, interrogation, and note taking . . . ." *Id.* ¶ 10.  Although Tabeling initially retired from the BPD in 1979, *id.* ¶ 11, he "worked with BPD again as a consultant and as a trainer in the Education and Training Section from 2000 to 2009."  *Id.* ¶ 12.  To Tabeling's knowledge, "there were no standards that were communicated within the BPD training programs in the late 1970s regarding *Brady v. Maryland* and subsequent decisions that required the State to provide defendants with exculpatory statements."  *Id.*  And, he was "unaware of any orders or any other specific training communicating any of those requirements, or the need to make sure that all such information was included in the case file and communicated to the Assistant State's Attorney handling the case."  *Id.*

In January 2000, the former BPD Commissioner Ronald L. Daniel asked Tabeling to examine and report on the state of the Homicide Unit.  *Id.* ¶ 13.  Tabeling identified "numerous deficiencies in all aspects of the Homicide Unit's operation."  *Id.*  Specifically, Tabeling said, *id.*: "I reported that a preliminary assessment of the Homicide Unit attendees during the fall of 1999 Homicide School indicated great gaps among the student investigators in their knowledge/familiarity and/or mastery of many basic legal and investigative concepts."   He also noted that "the investigatory files were in a general state of disarray," as "[t]here was no apparent procedure for ensuring that all material about an investigation had been recorded and filed appropriately."  *Id.* ¶ 14.

The BPD has marshaled deposition testimony to establish that it provided training with respect to a police officer's obligations to disclose exculpatory and impeachment evidence under *Brady*, 373 U.S. 83, and *Giglio*, 405 U.S. 150.  For instance, Col. David Reitz, one of the BPD's Rule 30(b)(6) designees, testified that "Brady was taught when [he] went through the police

academy in 1982 . . . in legal." ECF 136-4 at 8 (Tr. at 25).  Col. Reitz clarified that his reference

to "legal" pertained to "[t]he class for legal law." ECF 138-4 at 9 (Tr. at 26).  Further, Col. Reitz

testified that "a detective who is working on a homicide case . . . getting prepared to turn over

documents to the state's attorney's office" would turn over "[t]he whole case file . . . ." *Id.* at 11

(Tr. at 34).

The parties point to different portions of the Officer Defendants' deposition testimony

pertaining to the issue of training as to *Brady*.  For instance, Det. Boone confirmed that he was

"tested on exculpatory evidence when [he] was in the academy," sometime between February 1973

and July 1973.  ECF 136-5 (Boone Dep.) at 100.  However, Boone could not remember whether

he was tested on impeachment evidence while at the police academy.  *Id.* at 101.  And, Det. Boone

could not recall whether he received training with respect to handling exculpatory evidence.  *Id.*

at 113.  Further, Det. Boone testified that he did not receive training at the police academy with

respect to interviewing witnesses or presenting photo arrays to witnesses.  *Id.* at 102.

Det. Goldstein did not recall whether he received any specific training as it pertained to the

disclosure of exculpatory evidence.  ECF 136-6 (Goldstein Dep.) at 138.  Further, he could not

remember whether the BPD maintained "any written policy in effect in 1988 on turning over

exculpatory evidence." *Id.*  at 150-51.  However, Goldstein also said that, as a matter of practice,

at the close of an investigation, he would send the "complete case folder . . . to the state's attorney's

office." *Id.*  And, Goldstein indicated that at the time he served as a BPD detective, he was familiar

with *Brady*'s command to disclose exculpatory evidence.  *Id.* at 144.

Det. Barlow stated that he was familiar with *Brady* and the concept of impeachment

evidence.  ECF 136-8 (Barlow Dep.) at 237-38.  He testified that he received training regarding

these concepts while he was at the police academy (*id.* at 240-41) and that he "learned early

on . . . to fully disclose everything to [defendants]," although it was the "attorney's job to turn over that evidence to the defendant's lawyer." *Id.* at 241. But, Barlow did not remember receiving training as it pertained to the mechanism by which he was required to turn over a case file to the SAO. *Id.* at 313.

Det. Davis could not recall whether the BPD had implemented at the relevant time a written policy pertaining to exculpatory and impeachment evidence. ECF 136-7 at 173. Nor could he remember receiving formal training with respect to disclosure obligations at the relevant time. ECF 136-7 at 101, 115. However, according to Det. Davis, "supervisors in the homicide unit would specifically train [BPD officers] about disclosing exculpatory evidence." *Id.* at 90. But, Det. Davis could not recall whether he ever learned what evidence qualifies as impeachment evidence. *Id.* at 174.

### C. Analysis

Johnson points, *inter alia*, to General Orders 14-83 and 10-78, and notes that these instructions do not mention "*Brady*, *Giglio*, exculpatory evidence, impeachment evidence, or anything about evidence favorable to the accused." ECF 156 at 6. Stewart, plaintiff's expert, stated that he had seen "no evidence that BPD communicated a coherent, consistent policy regarding the identification, documentation, disclosure, and retention of exculpatory and impeachment evidence to its offers in or before 1988" and concluded that "BPD lacked *any* policy whatsoever." ECF 156-13 at 14.

General Order 14-83 instructed officers to "[p]repare complete and accurate case folders." ECF 156-1 at 7. The Standard Operating Procedures for the Homicide Unit directed officers to "Maintain Accurate and Complete records of the entire case" and to properly document all case activity. ECF 156-2 at 5, 7. And, General Order 10-78 stated that the BPD must cooperate with

the SAO in the review of all evidence before presenting a criminal case to the Grand Jury, and directed homicide detectives to meet with ASAs for "complete case review[s]." ECF 156-4 at 2. As Col. Worley testified, BPD policy required "[e]verything [to be] turned over to the State's Attorney for review[.]" ECF 136-11 at 363.

Defendants also point to the testimony of their expert, Jeffrey Noble, who stated that there was no requirement for written policies to contain certain phrases or case names. ECF 136-31 at 16. In other words, the failure of the BPD to use specific case names, such as *Brady* or *Giglio*, or other magic words, is not evidence of a failure to train.

Moreover, BPD policy regarding negative photo identification was clear. Policy 10-86, Procedures for Viewing Criminal Suspect Photographs, stated: "In the event of a negative showing, the Photograph Line-Up Form need not be turned into the ECS but should be retained in the member's investigative file." *Id.* at 3. Furthermore, the document stated: "It is the policy of the Baltimore Police Department to adhere to proper guidelines in the use of criminal suspect photographs during the criminal investigative process in order that the rights of all suspects are maintained and subsequent judicial proceedings are not jeopardized." *Id.* at 2.

As mentioned, plaintiff highlights the Declaration of Lt. Tabeling, who stated that "a preliminary assessment of the Homicide Unit attendees during the fall of 1999 Homicide School indicated great gaps among the students investigators in their knowledge/familiarity and/or mastery of many basic legal and investigative concepts." ECF 136-29, ¶ 13. He also noted that "the investigatory files were in a general state of disarray," as "[t]here was no apparent procedure for ensuring that all material about an investigation had been recorded and filed appropriately." *Id.* ¶ 14.

-143-

However, Lt. Tabeling's averment does not cover the time period during which the Officer Defendants investigated the case.  And, for that reason, Judge Russell declined to consider Tabeling's averments in connection with a *Monell* claim concerning a homicide investigation during the period 1987-1988.  *See Owens v. Balt. City State's Attorneys Office*, No. GLR-11-2395, 2016 WL 5452944, *10 (D. Md. Sept. 29, 2016).  Specifically, Judge Russell stated, *id.* (internal citations and footnote omitted):

> Similarly, the Declaration of Stephen B. Tabeling describes his personal knowledge of BCPD training practices until 1979, when he retired from BCPD. Tabeling eventually returned to BCPD from 2000–2009.  But the investigation giving rise to Owens's Monell claims against BCPD took place in 1987 and 1988. Wase's affidavit and Tabeling's declaration, therefore, fail to offer evidence of BCPD practices during the relevant time period. The Court, therefore, concludes that Rule 56(c)(4) bars the Affidavit of Joseph Wase and the Declaration of Stephen B. Tabeling because they are not relevant.

Plaintiff contends that conflicting evidence regarding the training that the BPD officers received, if any, creates a genuine dispute of material fact.  ECF 156 at 12.  In particular, he highlights the declarations of three former BPD patrol officers who stated that they never received training concerning the production of exculpatory or impeachment evidence.  *Id.* at 19.  But, as defendants note, these officers were not homicide detectives and would not have been familiar with the Homicide Unit's training, practices, or policies on production of evidence to the prosecution during the operative time period.  Moreover, it is apparent from their declarations that these officers were trained to take complete and accurate reports, not to falsify reports, and not to withhold evidence.

Specifically, former Officer Jones averred that BPD trained him to "never falsify reports," to document information he learned in the field, and that "relevant information should never be omitted from reports."  ECF 156-23 at 3, ¶ 7.  Further, he stated that he "should put all of the information [he] obtained from any witness interview into a report" to be disclosed to the SAO.

*Id.* Former Officer Owens testified at his deposition that he was trained on gathering and documenting information from witnesses and crime scenes. ECF 136-27 (Owens Dep.), at 44. And, former Officer Mays testified that he was trained to "put down all pertinent information" in his report and that all notes in his notepad would end up in the police report. ECF 136-28 (Muhammad Dep.), at 93-94.

Col. Richard Worley acknowledged at his deposition that the 1978 Homicide Standard Operating Procedure did not mention *Brady* by name. But, he stated that it instructed officers "to put everything in the case folder to avoid any issues with *Brady*, to avoid anyone – information not getting in there." ECF 136-11 at 203-04.

In all but name, this *is* training on *Brady* and *Giglio*. Police officers are not lawyers. They are required to properly document and turn over exculpatory, material information, not to memorize the names of cases that pertain to constitutional jurisprudence. In other words, whether BPD had an adequate policy does not turn on nomenclature. It is the substance that controls. In *Connick,* 563 U.S. 51, the Court stated that "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Id.* at 68.

Additionally, testimony from the Officer Defendants (and others), when taken together, suggests that the BPD substantively trained its officers. For example, Det. Barlow testified that he was familiar with *Brady* and impeachment evidence (ECF 136-8 at 67), that he received "on the job" training from his sergeant and senior detectives about what evidence to turn over to the prosecution (*Id.* at 239), and that he received training on disclosing exculpatory and impeachment evidence. *Id.* at 313-14. Det. Davis testified that he received specific training from prosecutors and his supervisors on turning over exculpatory evidence (ECF 136-7 at 90), and that he knew to turn everything over to the prosecutor. *Id.* at 174. Although Det. Boone could not remember

whether he was tested on impeachment evidence (ECF 136-5 at 101), he confirmed that he was "tested on exculpatory evidence when [he] was in the academy[.]" *Id.* at 100. And, although Det. Goldstein did not recall whether he received any specific training as it pertained to the disclosure of exculpatory evidence. (ECF 136-6 at 138), he testified that he was familiar with *Brady*'s command to disclose exculpatory evidence and that the entire case folder would go to the prosecutor. *Id.* at 145, 150-53.

Even if three patrol officers were not adequately trained about disclosing exculpatory evidence, as plaintiff asserts, the evidence that a few patrol officers did not receive training is insufficient to support a *Monell* claim. In *Canton*, 489 U.S. at 390-91, the Court said: "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."

In addition, the BPD has produced substantial evidence concerning its custom and practice in 1988 and 1989 of submitting all evidence to the SAO, as well as the open file discovery practice of the SAO. If an errant officer failed to comply with a policy, that does not mean there was no policy. The evidence of such a custom and practice is essentially undisputed.

For example, Judge Doory was a Baltimore City prosecutor from 1974 to 1996. ECF 136-13 at 2. He stated in his Declaration that all prosecutors assigned to a case "had complete access to the entire BPD Homicide Division casefile – including all witness statements and detective notes." ECF 136-13 at 3. He claimed that it was "standard practice" to provide a complete copy of the BPD Homicide case file to the prosecutor assigned to the case. *Id.* Further, he stated: "The only material not included in this copy would be items not conducive to photocopying (e.g., matchboxes, business cards . . . .[]) These items were nonetheless available to the prosecutor, who

would be made aware of them." *Id.* Judge Doory also stated that detectives kept prosecutors "fully informed of all developments, witness interviews, and other evidence," and he was not aware of any instance where BPD detectives hid potentially exculpatory evidence from the prosecution. *Id.*

Det. Charles Gilbert also testified that he was trained to turn everything over to the prosecution. ECF 136-9 at 85. And, former Col. Robert Stanton testified that all information in the Homicide File would be turned over to the State's Attorney Office. ECF 136-10 at 256. Finally, even plaintiff's expert, Brian Murphy, who was a prosecutor in Baltimore City from 1980 to 1988, stated in his report: "Usually the homicide detective would bring his or her file to the State's Attorney's Office in the courthouse, but, occasionally, the trial prosecutor would travel to the homicide unit in police headquarters to view the file." ECF 136-15 at 14-15.

Defendants also point to deposition transcripts from *Owens*, 2016 WL 5452944, in which a plaintiff similarly alleged that the BPD withheld exculpatory evidence during a 1988 criminal trial.[64] Former Col. David Reitz testified at his deposition that *Brady* was taught in the police academy in 1982. ECF 136-4 at 8-10. He also testified that the "whole case" is turned over to the state's attorney. Former BPD Det. Gary Childs testified: "Our rules have always been, we give everything to the State's Attorneys' Office." ECF 136-14 at 52. And, former Det. Jay Landsman, who was a homicide detective during the relevant time period, testified that the "entire case folder was copied and given to the State's Attorney." ECF 136-12 at 3. He also claimed the State's Attorney would often "go down and we would have to watch him go through every piece of evidence." *Id.*

Richard James, who was a detective in BPD's Homicide Unit in 1989, stated in a Declaration that "the policy and practice of the BPD was to provide the State's Attorney's Office

---

[64] Plaintiff has not objected to the use of the evidence gleaned in *Owens*.

with a complete copy of the case file after the Defendant was arrested, well before trial and typically before indictment.  If any statements were taken or evidence was gathered after the file had been disclosed all additional information would be provided through supplemental disclosure." ECF 136-17 at 3.  Further, he stated that the "Assistant State's Attorney assigned to the Violent Crime Section or assigned to the Homicide Division always had total access to the homicide file and it was common practice for them to review the file." *Id.*

Former Det. Donald Kincaid, who worked in BPD's Homicide Unit in 1981, stated in his Declaration: "During the course of my career with the Baltimore Police Department, and specifically while a Homicide Detective, the policy and practice of BPD was to provide the State's Attorneys' Office with a complete copy of the case file after the Defendant was arrested, well before trial and typically before indictment.  If any statements were taken or evidence was gathered after the file had been disclosed all additional information would be provided through supplemental disclosure." ECF 136-18 at 3.  And, Gary Dunnigan, who was also a homicide detective during the relevant time period, testified that learning the constitutional obligations of police detectives was a part of the training, and one of the constitutional duties was the duty to turn over exculpatory evidence.  ECF 136-19 at 2-3.

At best, plaintiff has presented a scintilla of evidence as to a lack of BPD policies, custom, and training.  Stewart's criticisms of the adequacy of the policies do not undermine that there were, in fact, policies.  BPD's mountain of evidence establishing written and informal policies requiring officers to prepare and maintain accurate and complete records for the SAO's review as well as its practice to train officers, formally and informally, regarding their constitutional obligations.  In addition, the evidence shows that the policies were cemented by the SAO's practice of open file discovery.

Indeed, plaintiff acknowledges that "[t]he facts pertaining to Plaintiff's Monell claim are bare . . . ." ECF 156 at 8. He attributes that circumstance to "similarly skeletal" BPD policies and training materials. *Id.* Thus, he asserts that "the constitutional violation is straight forward." *Id.* This is tantamount to *ipse dixit*.

Even if plaintiff could surmount the evidentiary hurdle as to the claims of no policies and no practice, he has not shown "deliberate indifference." Even on summary judgment the plaintiff must present some evidence that BPD knew that, absent specified training, it was "highly predictable" that BPD employees would withhold evidence that its failure to train "amounted to conscious disregard for defendants' *Brady* rights." *Connick*, 563 U.S. at 71. "At its core, the strict *Monell* test asks for some level of notice." *Estate of Jones by Jones v. City of Martinsburg, West Virginia*, 961 F.3d 661, 672 (4th Cir. 2020). For this reason, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 62 (citing *Bryant Cty.*, 520 U.S. at 409).

Notably, "[w]ithout evidence of a pattern of constitutional violations, a plaintiff will struggle to establish municipal liability, as a decisionmaker can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights if the decisionmaker lacks notice that the training is deficient." *Howard v. City of Durham*, 487 F.Supp.3d 377, 439-40 (M.D.N.C. 2020) (citing *Connick*, 563 U.S. at 61) (cleaned up). Mere negligence by the policymakers is insufficient. *Spell*, 824 F.2d at 1390.

Plaintiff has failed to adduce any evidence to show that in 1988 and 1989, BPD policymakers were deliberately indifferent with respect to an express unconstitutional policy. *See Pembaur*, 475 U.S. at 483 ("We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various

alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."). He has not shown a pattern of similar constitutional violations, which is ordinarily necessary to prove deliberate indifference under a failure to train theory. Instead, he urges this Court to apply the single-incident theory to this case. ECF 156 at 25-26.

However, "a single incident is almost never enough to warrant municipal liability." *Jones*, 961 F.3d at 672; *see also Connick*, 563 U.S. at 64 (stating that only in the rarest of circumstances may "the unconstitutional consequences of failing to train be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."). And, to my knowledge, the Supreme Court has never ruled on whether a failure to train police officers in their *Brady* and *Giglio* obligations can give rise to a single-incident *Monell* claim. In fact, the Supreme Court has rejected application of the single-incident theory each time it has considered it. *See Connick*, 563 U.S. at 64; *Bryan Cty*., 520 U.S. at 397.

Plaintiff cites *Jackson v. City of Cleveland*, 925 F.3d 793, 836 (6th Cir. 2019), and *Gregory v. City of Louisville*, 444 F.3d 725, 755 (6th Cir. 2006), to support his position. *See* ECF 156 at 27-28. However, an analysis of case law in this Circuit militates against applying the exception. In *Jones*, 961 F.3d 661, the Fourth Circuit did not apply single-incident liability to an excessive force incident where five officers simultaneously shot a suspect 22 times while he lay motionless on the ground. *Id*. at 665. The Court said, *id*.:

> We take [Plaintiff's] point to be that five officers simultaneously violated this policy, and therefore the training must have been deficient. [] But *Monell*'s deliberate indifference standard ensures that a municipality either knew or should have known about the deficiency, so it could remedy that deficiency.

Furthermore, in *Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000), the Fourth Circuit declined to apply the single-incident theory to a failure to train claim regarding a search for confidential records, stating, *id*. at 456:

-150-

Moreover, because this was a single incident, the need for training with regard to the confidentiality of drug treatment records was not so "plainly obvious" to the policymakers that the failure to instruct on section 290dd–2 can be said to be deliberately indifferent. *See* [*Canton*, 489 U.S.] at 390 n. 10, 109 S.Ct. 1197. In sum, Doe advances his failure-to-train theory of municipal liability merely by reference to this single incident involving Detective Broderick; however, the Supreme Court has rejected the notion that "a § 1983 plaintiff [can] ... establish municipal liability without submitting proof of a single action taken by a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985).

Plaintiff has not provided evidence from which a jury could find that BPD lacked a policy concerning disclosure of exculpatory evidence or failed to train as a result of deliberate indifference. As mentioned, a number of BPD officers stated that they were trained not to falsify reports, to obtain accurate information, and to disclose all information to the prosecutor handling the case. And, critically, there is no evidence that BPD had reason to know that exculpatory evidence allegedly was being withheld. Accordingly, plaintiff has not shown that the need for different or additional training was "so obvious that the failure to provide it "may fairly be said to represent a policy for which the City is responsible[]." *Canton*, 489 U.S. at 390. Thus, I shall deny defendant's Motion with respect to Count V.[65]

### IX. Conclusion

The case reflects an enormous amount of work by all the lawyers. To the credit of plaintiffs' able counsel, plaintiff has adeptly crafted what appears to be a series of serious transgressions by the Officer Defendants who investigated the murder of Aaron Taylor. But, careful scrutiny indicates that, in actuality, there is a lot of smoke, but no fire.

---

[65] Defendants have moved to bifurcate the *Monell* claim for trial, pending the resolution of Johnson's claims against the Officer Defendants. ECF 140. In light of my disposition of Count V, I shall deny the Motion, as moot.

For the reasons stated above, I shall grant the Sanction Motion.  In the alternative, I shall grant the Officer Motion as well as the BPD Motion.  And, I shall deny the Bifurcation Motion, as moot.

An Order follows, consistent with this Memorandum Opinion.

Date: September 30, 2022                        _____/s/_____
                                                Ellen L. Hollander
                                                United States District Judge